# No. 25-1012

# United States Court of Appeals
## for the
## Fourth Circuit

RETAIL ENERGY ADVANCEMENT LEAGUE;
GREEN MOUNTAIN ENERGY COMPANY,

*Plaintiffs-Appellants,*

– v. –

ANTHONY G. BROWN, in his official capacity as Attorney General of Maryland;
FREDERICK H. HOOVER, in his official capacity as Chair of the Maryland
Public Service Commission; MICHAEL T. RICHARD, in his official capacity as
member of the Maryland Public Service Commission; KUMAR P. BARVE, in his
official capacity as member of the Maryland Public Service Commission;
BONNIE A. SUCHMAN, in her official capacity as member of the Maryland
Public Service Commission,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

# JOINT APPENDIX

Thomas M. Johnson, Jr.
Stephen J. Obermeier
Jeremy J. Broggi
Krystal B. Swendsboe
Boyd Garriott
Joel S. Nolette
WILEY REIN, LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for Appellants*
*Retail Energy Advancement League*
*and Green Mountain Energy Company*

Howard R. Feldman
James D. Handley
OFFICE OF THE ATTORNEY GENERAL
 OF MARYLAND
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6445

*Counsel for Appellee Anthony G. Brown*

Colin P. Glynn
MARYLAND PUBLIC SERVICE COMMISSION
6 St. Paul Street, 16th Floor
Baltimore, Maryland 21202
(443) 629-5930

*Counsel for Appellees Frederick H. Hoover,*
*Michael T. Richard, Kumar P. Barve, and*
*Bonnie A. Suchman*

# TABLE OF CONTENTS

District Court Docket Report ........................................................................... JA1

Complaint [ECF No. 1]
    filed October 1, 2024 ............................................................................ JA6

Plaintiffs' Motion for Preliminary Injunction [ECF No. 2]
    filed October 1, 2024 .......................................................................... JA43

    Exhibits:

    1.  Declaration of Christopher Ercoli (Ex. 1) [ECF No. 2-2] ................... JA46

        Draft Maryland Public Service Commission Regulations
        (Decl. Ex. 1) [ECF No. 2-2] ...................................................... JA53

    2.  Declaration of Michael Rombach (Ex. 2) [ECF No. 2-3] ................... JA58

    3.  Declaration of Christyna Nagle (Ex. 3) [ECF No. 2-4] ...................... JA71

Exhibits to Defendants' Response in Opposition to Plaintiffs' Motion for
Preliminary Injunction [ECF No. 14]
    filed October 29, 2024:

    1.  Senate Bill 1 (Ex. 1) [ECF No. 14-1] ............................................... JA82

    2.  Fiscal and Policy Note, Enrolled-Revised Senate Bill 1 (Ex. 2)
        [ECF No. 14-2] ........................................................................ JA133

    3.  December 2018 Abell Report, *Maryland's Dysfunctional
        Residential Third-Party Energy Supply Market: An Assessment
        of Costs And Policies* (Ex. 3) [ECF No. 14-3] ................................ JA153

    4.  Maryland Energy Advocates Coalition Testimony
        in Support of SB1 (Ex. 4) [ECF No. 14-4] ....................................... JA186

    5.  Testimony in Support of SB1 (Ex. 5) [ECF No. 14-5] ...................... JA195

    6.  Testimony in Support of SB1 (Ex. 6) [ECF No. 14-6] ...................... JA197

Transcript of Preliminary Injunction Hearing before
The Honorable Julie R. Rubin
      on November 18, 2024 ...................................................................... JA200

      Argument for Plaintiffs-Appellants (Thomas M. Johnson).................... JA202

      Argument for Defendants-Appellees (James D. Handley)...................... JA216

      Argument for Defendants-Appellees (Colin P. Glynn).......................... JA226

      Rebuttal for Plaintiffs-Appellants (Thomas M. Johnson) ...................... JA232

      Oral Ruling (Hon. Julie R. Rubin)....................................................... JA241

Paperless Order of The Honorable Julie R. Rubin
Re:  Denying Plaintiff's Motion for Preliminary Injunction [ECF No. 25]
      filed December 13, 2024 .................................................................... JA298

Plaintiffs' Notice of Appeal [ECF No. 26]
      filed December 13, 2024 .................................................................... JA300

# U.S. District Court
## District of Maryland (Baltimore)
## CIVIL DOCKET FOR CASE #: 1:24–cv–02820–JRR

Retail Energy Advancement League et al v. Brown et al
Assigned to: Judge Julie Rebecca Rubin
 Case in other court:  USCA, 25–01012
Cause: 42:1983 Civil Rights Act – Civil Action for Deprivation of Rights

Date Filed: 10/01/2024
Jury Demand: None
Nature of Suit: 950 Constitutional – State Statute
Jurisdiction: Federal Question

**Plaintiff**

**Retail Energy Advancement League**          represented by          **Jeremy Joseph Broggi**
Wiley Rein LLP
2050 M Street NW
Washington, DC 20036
202–719–3747
Email: jbroggi@wiley.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joel S. Nolette**
Wiley Rein LLP
2050 M St. NW
Washington, DC 20036
202–719–4741
Email: jnolette@wiley.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Krystal Brunner Swendsboe**
Wiley Rein LLP
2050 M Street NW
Washington, DC 20036
202–719–4197
Email: kswendsboe@wiley.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas M. Johnson , Jr.**
Wiley Rein LLP
2050 M Street, NW
Washington, DC 20036
202–719–4550
Email: tmjohnson@wiley.law
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Green Mountain Energy Company**          represented by          **Jeremy Joseph Broggi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joel S. Nolette**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Krystal Brunner Swendsboe**
(See above for address)
*LEAD ATTORNEY*

JA1

*ATTORNEY TO BE NOTICED*

**Thomas M. Johnson , Jr.**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Anthony G. Brown**
*in his official capacity as Attorney*
*General of Maryland*

represented by **James David Handley**
Maryland Office of the Attorney General
Civil Division
200 Saint Paul Place
Baltimore, MD 21202
410−576−6993
Email: jhandley@oag.state.md.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Howard Ross Feldman**
Office of the Attorney General of
Maryland
Civil Division
200 Saint Paul Place
Ste 20th Floor
Baltimore, MD 21202
410−576−6445
Fax: 410−576−6955
Email: hfeldman@oag.state.md.us
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Frederick H. Hoover**
*in his official capacity as Chair of the*
*Maryland Public Service Commission*

represented by **Colin Patrick Glynn**
Maryland Public Service Commission
Office of General Counsel
6 St. Paul St.
Baltimore, MD 21202
4436295930
Email: colin.glynn@maryland.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Miles H Mitchell**
Maryland Public Service Commission
Six St Paul St
Baltimore, MD 21202−6806
14107678000
Fax: 14103336495
Email: miles.mitchell@maryland.gov
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Michael T. Richard**
*in his official capacity as member of the*
*Maryland Public Service Commission*

represented by **Colin Patrick Glynn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Miles H Mitchell**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA2

**Defendant**

**Kumar P. Barve**
*in his official capacity as mem−ber of the*
*Maryland Public Service Commission*

represented by **Colin Patrick Glynn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Miles H Mitchell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bonnie A. Suchman**
*in her official capacity as member of the*
*Maryland Public Service Commission*

represented by **Colin Patrick Glynn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Miles H Mitchell**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/01/2024 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number AMDDC−11520426.), filed by Retail Energy Advancement League, Green Mountain Energy Company. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons)(Broggi, Jeremy) (Entered: 10/01/2024) |
| 10/01/2024 | 2 | MOTION for Preliminary Injunction *by December 1, 2024* by Green Mountain Energy Company, Retail Energy Advancement League (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1 Declaration of Christopher Ercoli, # 3 Exhibit 2 Declaration of Michael Rombach, # 4 Exhibit 3 Declaration of Christyna Nagle, # 5 Text of Proposed Order)(Broggi, Jeremy) (Entered: 10/01/2024) |
| 10/01/2024 | 3 | Local Rule 103.3 Disclosure Statement by Retail Energy Advancement League (Broggi, Jeremy) (Entered: 10/01/2024) |
| 10/01/2024 | 4 | Local Rule 103.3 Disclosure Statement by Green Mountain Energy Company identifying Corporate Parent NRG Energy, Inc. for Green Mountain Energy Company.(Broggi, Jeremy) (Entered: 10/01/2024) |
| 10/02/2024 | 5 | Summons Issued 60 days as to Kumar P. Barve, Anthony G. Brown, Frederick H. Hoover, Michael T. Richard, Bonnie A. Suchman, U.S. Attorney and U.S. Attorney General(bas, Deputy Clerk) (Entered: 10/02/2024) |
| 10/08/2024 | 6 | Consent MOTION to Set a Schedule Regarding Plaintiffs' Motion for Preliminary Injunction and to Extend Defendants' Response Deadline re 2 MOTION for Preliminary Injunction *by December 1, 2024*, 1 Complaint, by Green Mountain Energy Company, Retail Energy Advancement League (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Swendsboe, Krystal) (Entered: 10/08/2024) |
| 10/09/2024 | 7 | MOTION to Appear Pro Hac Vice for Thomas M. Johnson, Jr. (Filing fee $100, receipt number AMDDC−11540441.) by Green Mountain Energy Company, Retail Energy Advancement League(Nolette, Joel) (Entered: 10/09/2024) |
| 10/09/2024 | 8 | ORDER Granting 6 Motion to Set a Schedule Regarding Plaintiffs' Motion for Preliminary Injunction and to Extend Defendants' Response Deadline. Signed by Judge Julie Rebecca Rubin on 10/9/2024. (bas, Deputy Clerk) (Entered: 10/10/2024) |
| 10/09/2024 | 9 | ORDER Scheduling Parties to appear at 10:00AM, November 18, 2024, in Courtroom 3A, for a Hearing on Plaintiffs' 2 Motion for Preliminary Injunction. Signed by Judge Julie Rebecca Rubin on 10/9/2024. (bas, Deputy Clerk) (Entered: 10/10/2024) |
| 10/10/2024 | 10 | PAPERLESS ORDER granting 7 Motion to Appear Pro Hac Vice on behalf of Thomas M. Johnson, Jr. Directing attorney Thomas M. Johnson, Jr to register for pro hac vice filing in the District of Maryland through PACER at |

JA3

| | | |
|---|---|---|
| | | https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 10/10/2024. (mh4s, Deputy Clerk) (Entered: 10/10/2024) |
| 10/16/2024 | 11 | SUMMONS Returned Executed by Retail Energy Advancement League, Green Mountain Energy Company. All Defendants.(Nolette, Joel) (Entered: 10/16/2024) |
| 10/16/2024 | 12 | SUMMONS Returned Executed by Retail Energy Advancement League, Green Mountain Energy Company. (Nolette, Joel) (Entered: 10/16/2024) |
| 10/16/2024 | 13 | SUMMONS Returned Executed by Retail Energy Advancement League, Green Mountain Energy Company. (Nolette, Joel) (Entered: 10/16/2024) |
| 10/29/2024 | 14 | RESPONSE in Opposition re 2 MOTION for Preliminary Injunction *by December 1, 2024* filed by Anthony G. Brown. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Handley, James) (Entered: 10/29/2024) |
| 10/30/2024 | 15 | NOTICE of Appearance by Colin Patrick Glynn on behalf of Kumar P. Barve, Frederick H. Hoover, Michael T. Richard, Bonnie A. Suchman (Glynn, Colin) (Entered: 10/30/2024) |
| 10/30/2024 | 16 | NOTICE of Appearance by James David Handley on behalf of Anthony G. Brown (Handley, James) (Entered: 10/30/2024) |
| 10/30/2024 | 17 | NOTICE of Appearance by Miles H Mitchell on behalf of All Defendants (Mitchell, Miles) (Entered: 10/30/2024) |
| 11/01/2024 | 18 | STATUS REPORT , *Joint,* by Green Mountain Energy Company, Retail Energy Advancement League(Nolette, Joel) (Entered: 11/01/2024) |
| 11/06/2024 | 19 | PAPERLESS ORDER: An Off–Record Telephone Status Conference is scheduled for today, November 6, 2024, at 12:00 p.m. The parties are directed to dial into the chambers conference line at 1.888.278.0296, access code 7492675. Signed by Judge Julie Rebecca Rubin on 11/6/2024. (bas, Deputy Clerk) (Entered: 11/06/2024) |
| 11/06/2024 | 20 | PAPERLESS ORDER Pursuant to the off–record Teleconference this afternoon, by stipulation of the parties, all exhibits attached to the parties' papers regarding the Motion for Preliminary Injunction 2 are authentic and admissible for the limited purpose of the PI hearing. Signed by Judge Julie Rebecca Rubin on 11/6/2024. (bas, Deputy Clerk) (Entered: 11/06/2024) |
| 11/07/2024 | 21 | NOTICE of Appearance by Howard Ross Feldman on behalf of Anthony G. Brown (Feldman, Howard) (Entered: 11/07/2024) |
| 11/12/2024 | 22 | REPLY to Response to Motion re 2 MOTION for Preliminary Injunction *by December 1, 2024* filed by Retail Energy Advancement League, Green Mountain Energy Company.(Broggi, Jeremy) (Entered: 11/12/2024) |
| 11/18/2024 | 23 | Preliminary Injunction Hearing held on 11/18/2024 before Judge Julie Rebecca Rubin. (Court Reporter: Ronda Thomas) (td4s, Deputy Clerk) (Entered: 11/18/2024) |
| 12/09/2024 | 24 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 11/18/2024, before Judge Julie R. Rubin. Court Reporter Ronda Thomas, Telephone number 410–962–4504, ronda_thomas@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 12/30/2024. Redacted Transcript Deadline set for 1/9/2025. Release of Transcript Restriction set for 3/10/2025. (Entered: 12/09/2024) |
| 12/13/2024 | 25 | PAPERLESS ORDER: The court held a hearing on the Motion for Preliminary Injunction at ECF No. 2 on November 18, 2024. As set forth on the record, the court ordered that the Motion for Preliminary Injunction at ECF No. 2 was that day DENIED. Signed by Judge Julie Rebecca Rubin on 12/13/2024. (kk5s, Deputy Clerk) (Entered: 12/13/2024) |
| 12/13/2024 | 26 | NOTICE OF APPEAL by Retail Energy Advancement League, Green Mountain Energy Company. Filing fee $ 605, receipt number AMDDC–11662356.(Nolette, |

JA4

| | | |
|---|---|---|
| | | Joel) (Entered: 12/13/2024) |
| 12/13/2024 | 27 | Joint MOTION to Stay *Case Pending Appeal* by Retail Energy Advancement League, Green Mountain Energy Company (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Nolette, Joel) (Entered: 12/13/2024) |
| 12/17/2024 | 28 | ORDER Granting 27 Motion to Stay. Signed by Judge Julie Rebecca Rubin on 12/17/2024. (bas, Deputy Clerk) (Entered: 12/17/2024) |
| 12/17/2024 | | Case Stayed (bas, Deputy Clerk) (Entered: 12/17/2024) |
| 01/02/2025 | 29 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 26 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(jh6s, Deputy Clerk) (Entered: 01/02/2025) |
| 01/06/2025 | 30 | USCA Case Number 25–1012 for 26 Notice of Appeal filed by Green Mountain Energy Company, Retail Energy Advancement League. Case Manager – Ganna M. Aboutabl (jh6s, Deputy Clerk) (Entered: 01/07/2025) |

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

RETAIL ENERGY ADVANCEMENT LEAGUE,
   213 Market Street, Eighth Floor,
   Harrisburg, PA 17101; and

GREEN MOUNTAIN ENERGY COMPANY,
   910 Louisiana Street,
   Houston, TX 77002;
                    Plaintiffs,

     v.

ANTHONY G. BROWN, in his official capacity as
Attorney General of Maryland,
   200 St. Paul Place
   Baltimore, MD 21202;

FREDERICK H. HOOVER, in his official capacity as
Chair of the Maryland Public Service Commission,
   William Donald Schaefer Tower,
   6 St. Paul Street, 16th Floor,
   Baltimore, MD 21202;

MICHAEL T. RICHARD, in his official capacity as
member of the Maryland Public Service Commission,
   William Donald Schaefer Tower,
   6 St. Paul Street, 16th Floor,
   Baltimore, MD 21202;

KUMAR P. BARVE, in his official capacity as member of the Maryland Public Service Commission,
   William Donald Schaefer Tower,
   6 St. Paul Street, 16th Floor,
   Baltimore, MD 21202; and

BONNIE A. SUCHMAN, in her official capacity as
member of the Maryland Public Service Commission,
   William Donald Schaefer Tower,
   6 St. Paul Street, 16th Floor,
   Baltimore, MD 21202;
                    Defendants.

Civil Action No. 1:24-cv-2820

JA6

## <u>COMPLAINT</u>

Plaintiffs Retail Energy Advancement League ("REAL") and Green Mountain Energy Company ("Green Mountain," and, with REAL, collectively, "Plaintiffs"), by and through counsel, bring this suit against Defendants Anthony G. Brown, Frederick H. Hoover, Michael T. Richard, Kumar P. Barve, and Bonnie A. Suchman, in their official capacities (collectively, "Defendants"). In support thereof, Plaintiffs state as follows:

### INTRODUCTION

1. For decades, retail energy providers have been able to lawfully market clean energy solutions to residential consumers in Maryland, explaining how their products are better for the environment than the service offered by the local incumbent utility, with benefits like combatting climate change. But starting on January 1, 2025, a new Maryland law will prohibit these providers from truthfully and accurately describing these products, on pain of civil penalties, unless these providers agree with *the government's* views on green energy. If that law were to take effect, providers would either need to abandon green marketing altogether, while charging the same rate-capped price for service previously reserved for the utility, or else change their service offerings to conform to the government's views of renewable energy. And even if providers were willing to adopt Maryland's speech restrictions, they still could not describe and sell their green energy products before seeking government approval to charge a cost-based premium for those products. As a result, many retail providers will choose to stop marketing and selling products in Maryland altogether, at dramatic cost to consumer choice, the environment, and the marketplace of ideas.

2. The law at issue, introduced in the Maryland General Assembly as Senate Bill 1 and signed into law on May 9, 2024 (the "Act"), purports to be "[a]n Act concerning . . . regulation and consumer protection" in the retail energy supply sector. *See generally* 2024 Maryland Laws ch. 537 (S.B. 1). But in reality, the Act imposes an environmental speech code on suppliers of

JA7

renewable residential electricity who—accurately, truthfully, and consistently with federal standards and other states' laws—describe their products as "renewable," "green," "clean," "eco-friendly," and the like (collectively, "green power").

3.      The Act does so by prohibiting suppliers of renewable residential electricity from truthfully and accurately describing their existing products as "green power," on pain of civil penalties. *See* Md. Code, Pub. Util. §§ 7-507(k), 7-707(a)–(c).  And if suppliers wish to continue to engage in "green power" marketing, they must adopt Maryland's preferred understanding of those terms, change the products they offer accordingly, and obtain advance approval from the Maryland Public Service Commission ("PSC") pursuant to a process that does not exist.

4.      REAL members like CleanChoice Energy, Inc. ("CleanChoice"), supply renewable residential electricity to customers in Maryland and elsewhere.  So too do subsidiaries of REAL members, like Green Mountain, a subsidiary of REAL member NRG Energy, Inc.  These entities do so by purchasing renewable energy certificates (also called renewable energy credits)— "RECs," for short—from all over the country and pairing those RECs with the electricity they supply to their customers.  RECs are fungible commodities that embody the renewable attributes of renewable energy generation and are recognized federally and by states as the way to substantiate "green power" claims.

5.      Consistent with the "Green Guides" promulgated by the Federal Trade Commission, as well as the laws of other states in which they sell renewable energy, REAL members and their subsidiaries describe their current renewable energy products—electricity paired with RECs—as "green power" accurately, truthfully, and lawfully.  They also make disclosures about their products to the extent necessary to comply with federal standards.

3

JA8

6.      Maryland's conception of "green power," however, would require REAL members and their subsidiaries to change their current renewable products sold to Maryland customers in order to be able to continue describing those products as "green power."  Specifically, under Maryland's conception of "green power," REAL members and their subsidiaries cannot describe their renewable products as "green power" unless they obtain 51% of the RECs paired with their electricity supply to Maryland customers from renewable energy generation sources in and around Maryland.

7.      Further, to describe their products as "green power," suppliers of renewable residential electricity are forced by the Act to make controversial and inaccurate disclosures about the nature of their product offerings, including the claim that a REC can be sold separately from the "renewable" electricity on which it is based, a claim the Green Guides deem misleading.

8.      Absent relief from the Act's requirements, REAL members and their subsidiaries either will have to cancel their existing contracts with residential customers (and thus lose customers permanently to the default local utilities) or sell their more expensive products at a substantially lower price and without the ability to describe their product as "green power"—the reason they attract and retain customers in the first place.  Either way, then, the speech of REAL members and their subsidiaries will be silenced, and they will lose customers and market share to the default local utilities.

9.      By foisting a speech code on REAL members and their subsidiaries, the Act violates the First Amendment of the U.S. Constitution and Article 40 of the Maryland Declaration of Rights.  Maryland's speech code fails any relevant level of constitutional scrutiny, as any purported interests served by the Act's "green power" provisions are not sufficiently compelling or serious

JA9

to justify the speech burdens imposed and those provisions are not sufficiently tailored to serve any purported government interest.

10.     Further, by prohibiting REAL members and their subsidiaries from acquiring certain of their RECs from sources around the country rather than sources in and around Maryland, the Act violates the Commerce Clause of the U.S. Constitution.  This prohibition discriminates against interstate commerce by restricting renewable residential electricity suppliers from purchasing RECs they otherwise would from renewable generation sources outside the Maryland region (thereby disfavoring those renewable energy sources) and forcing those suppliers to purchase more RECs from renewable generation sources in the Maryland region (thereby favoring those renewable energy sources).  And this prohibition unduly burdens interstate commerce as well—from a renewability standpoint, local and national RECs are fungible and provide the same benefits towards ameliorating climate change and related issues.  The burdens imposed by the Act on renewable generation sources outside the Maryland region outweigh any putative local benefit from this prohibition.

11.     Plaintiffs seek declaratory and injunctive relief against the Act as a whole to prevent the imminent, irreparable injuries it is about to impose on suppliers of renewable residential electricity in Maryland.  The Act's "green power" provisions are central to the Act's overall scheme, which sought to create one regulatory scheme for the renewable electricity market and another regulatory scheme for the standard electricity market.  Without the "green power" provisions, suppliers in the renewable electricity market will be subject to the regulatory scheme the General Assembly intended to apply to suppliers in the standard electricity market, contrary to the legislature's intent.  In these circumstances, the Act is inseverable and must be enjoined entirely.

JA10

**PARTIES**

12.     Plaintiff REAL is a national advocacy organization dedicated to the expansion and modernization of American retail energy markets and is at the forefront of helping consumers obtain cost-efficient, renewable energy options.  REAL represents its members' interests by monitoring legal developments within the energy industry in the United States, advocating before federal and state legislatures and agencies about energy issues, and supporting or defending its' members interests in litigation related to energy regulation in the United States.[1]  REAL is a Pennsylvania corporation with its principal place of business at its headquarters in Harrisburg, PA.

13.     REAL's members include renewable residential electricity suppliers like CleanChoice.  CleanChoice is one of the nation's largest independent electricity supply retailers that exclusively offers its customers 100% renewable energy products; it is among the top five residential electricity suppliers in Maryland, by number of customers; it accurately, truthfully, and lawfully describes its product to Maryland customers as "green power"; and it will no longer be able to do so under the Act.

14.     Plaintiff Green Mountain is the nation's longest-serving renewable energy retailer and a mission-driven company focused on sustainability whose goal is to inspire hope and motivate action through the use of clean energy.  Green Mountain is a carbon-neutral company that supplies 100% clean energy to its customers, including renewable residential electricity to customers in Maryland.  Green Mountain accurately, truthfully, and lawfully describes its product to Maryland customers as "green power"; and it will no longer be able to do so under the Act.  Green Mountain

---

[1] Constellation Energy Generation, LLC and Constellation NewEnergy, Inc., (collectively Constellation), a REAL member headquartered in Baltimore, publicly opposed passage of the Act but did not authorize or participate in this lawsuit.

JA11

is a wholly owned subsidiary of NRG Energy, Inc., a member of REAL. Green Mountain is a Delaware corporation with its principal place of business at its headquarters in Houston, TX.

15. Defendant Anthony G. Brown is the Attorney General of Maryland. He is sued in his official capacity. The Maryland Attorney General has a role in enforcing the Act. *See, e.g.*, Md. Code, Pub. Util. § 7-507(k)(1). The Maryland Attorney General's headquarters are located at 200 St. Paul Place, Baltimore, MD 21202.

16. Defendant Frederick H. Hoover is the Chair of the PSC. He is sued in his official capacity. The PSC, through its Chair and members, exercises regulatory and enforcement authority in connection with the Act. *See, e.g.*, *id.*; *id.* § 7-707(c)–(d). The PSC office is located at the William Donald Schaefer Tower, 6 St. Paul Street, 16th Floor, Baltimore, MD 21202.

17. Defendant Michael T. Richard is a Commissioner of the PSC. He is sued in his official capacity. The PSC, through its Chair and members, exercises regulatory and enforcement authority in connection with the Act. *See, e.g.*, Md. Code, Pub. Util. § 7-507(k)(1); *id.* § 7-707(c)–(d). The PSC office is located at the William Donald Schaefer Tower, 6 St. Paul Street, 16th Floor, Baltimore, MD 21202.

18. Defendant Kumar P. Barve is a Commissioner of the PSC. He is sued in his official capacity. The PSC, through its Chair and members, exercises regulatory and enforcement authority in connection with the Act. *See, e.g.*, Md. Code, Pub. Util. § 7-507(k)(1); *id.* § 7-707(c)–(d). The PSC office is located at the William Donald Schaefer Tower, 6 St. Paul Street, 16th Floor, Baltimore, MD 21202.

19. Defendant Bonnie A. Suchman is a Commissioner of the PSC. She is sued in her official capacity. The PSC, through its Chair and members, exercises regulatory and enforcement authority in connection with the Act. *See, e.g.*, Md. Code, Pub. Util. § 7-507(k)(1); *id.* § 7-707(c)–

JA12

(d).  The PSC office is located at the William Donald Schaefer Tower, 6 St. Paul Street, 16th Floor, Baltimore, MD 21202.

## JURISDICTION & VENUE

20.     This case arises under the First Amendment and Fourteenth Amendment of the U.S. Constitution, the Commerce Clause of the U.S. Constitution, and 42 U.S.C. § 1983, as well as Article 40 of the Maryland Constitution, Declaration of Rights.  This Court has federal-question jurisdiction over the claims arising under the U.S. Constitution and federal law, *see* 28 U.S.C. § 1331, and supplemental jurisdiction over the claims arising under the Maryland Constitution, *see id.* § 1367(a).

21.     Venue is proper in this District because it is the judicial district in which all Defendants reside.  *See id.* § 1391(b)(1); *Honchok v. Hardin*, 326 F. Supp. 988, 990–91 (D. Md. 1971) (collecting authorities explaining that, for venue purposes, residency of a government official sued in their official capacity is the location of their office).

22.     Venue is proper in this Division because all Defendants are located in this Division, all Defendants are residents of Maryland, and at least one Defendant resides in this Division.  *See* 28 U.S.C. § 100(1) ("The Northern Division comprises . . . the City of Baltimore."); *Honchok*, 326 F. Supp. at 990–91.

## STATEMENT OF FACTS

### *Plaintiffs and the National Renewable Energy Market*

23.     REAL members and their subsidiaries sell renewable electricity supply to residential customers in Maryland.

24.     REAL members and their subsidiaries describe their renewable products as "green," "clean" (and "100% clean"), "renewable" (and "100% renewable") "pollution free" (and

JA13

"100% pollution free"), "100% renewable wind," "100% renewable wind and solar," "eco-friendly," "sustainable," and similar terms.

25.     REAL members and their subsidiaries do so because energy customers increasingly care about their impact on the environment.  More and more, energy customers are looking for supply options that will allow them to reduce carbon emissions and thereby combat climate change.

26.     REAL members and their subsidiaries provide renewable electricity supply to residential customers in Maryland by pairing their grid-sourced electricity supply with RECs obtained from renewable energy generation sources nationwide.

27.     The process of supplying the electricity relied on across the nation can generally be divided into three stages: generation, transmission, and distribution.  Electricity is generated from non-renewable sources like coal power plants or renewable sources like wind farms.  It is then transmitted into and through the electric grid in the United States.  And ultimately, it is distributed to end users—businesses, residences, and the like.

28.     Because electricity is transmitted on a shared grid, there is no practical way to tell which electrons in the grid were generated from renewable sources as opposed to non-renewable sources.  *See, e.g.*, Nat'l Renewable Energy Lab'y, *Renewable Electricity: How Do You Know You Are Using It?* 1 (2015), https://www.nrel.gov/docs/fy15osti/64558.pdf ("When electricity is generated—either from a renewable or non-renewable power plant—the electrons added to the grid are indistinguishable.").

29.     Enter RECs, which are commodities that "play an important role in accounting, tracking, and assigning ownership to renewable electricity generation and use." EPA, *Renewable*

JA14

*Energy Certificates (RECs)*, https://www.epa.gov/green-power-markets/renewable-energy-certif-icates-recs ("EPA, *RECs*") (last visited Sept. 26, 2024).

30.     A REC is a "market-based instrument" that embodies one megawatt-hour of electricity that is generated and delivered to the electricity grid from a renewable energy generation source such as a windmill or a solar panel. *See id.* In other words, a REC embodies the renewable attributes of electricity generated by renewable sources.

31.     As Green Mountain explains on its website, renewable energy is like Velcro, consisting of two parts: the electrons that make up the electricity itself, and the renewable attributes of the electricity embodied in a REC. *See* Green Mountain, *Part 1: What the Heck Is a REC?*, https://www.greenmountainenergy.com/en/blog/business-news/part-1-what-the-heck-is-a-rec ("*What the Heck Is a REC?*"). Like the two sides of Velcro, the two parts of renewable energy can be separated, and the renewable attributes can be paired with different electrons. *See id.* When that happens, the renewable attributes paired with the different electrons becomes renewable energy. *See id.* And because the original electrons no longer have the renewable attributes that were transferred via the REC, the original electrons by themselves are not renewable energy. *See* Green Guides, 16 C.F.R. § 260.15(a), (c)–(d), Example 5.

32.     For this reason, the EPA has recognized that "RECs are the instrument that electricity consumers must use to substantiate renewable electricity use claims." EPA, *RECs*, *supra*. Or, as the White House Council on Environmental Quality put it, "RECs are essential to claims concerning renewable energy." The White House Council on Env't Quality, *Federal Greenhouse Gas Accounting & Reporting Guidance* 27 (Rev. 1, June 2012), https://www.sustainabil-ity.gov/pdfs/federal_ghg%20accounting_reporting-guidance.pdf. And as the FTC's "Green Guides"—which set federal standards for making "green" claims—recognize, matching "non-

JA15

renewable energy use with renewable energy certificates" is an appropriate means for substantiating renewable energy claims.  *See* Green Guides, 16 C.F.R. § 260.15(a).

33.     Renewable generation sources from across the country produce RECs.  For instance, wind farms in Texas, solar farms in California, and hydroelectric plants in Oklahoma all generate RECs.  These RECs are then sold to a variety of market participants, including electricity suppliers looking to make their grid-sourced electricity "green."

34.     Thus, the national REC market is vital to the advancement of renewable energy.

35.     The price of RECs varies widely among renewable generation sources.  Factors that cause this price variation include details like type of renewable energy generated (e.g., wind versus solar), geographical location of the generation source (e.g., off-shore wind versus land-based wind), and the state in which the generation source is located (given different regulatory schemes imposing different costs that get reflected in the price of RECs).

36.     However, because RECs all embody the renewable attributes of one megawatt-hour of generated renewable energy, RECs are "a fungible commodity."  EPA Clean Energy—Env't Tech. Forum, *Renewable Energy Certificates: Background & Resources* 1 (2008), https://www.epa.gov/sites/default/files/2016-03/documents/background_paper_3.pdf.

37.     Because renewable electricity supply generally consists of grid electricity paired with RECs, renewable electricity generally is more expensive for retail customers than non-renewable electricity.

### *2024 Maryland Senate Bill 1*

38.     Since 1999, when Maryland enacted the Electric Customer Choice and Competition Act to give residential electricity customers the option of obtaining their electricity supply from someone other than their default local utility, *see* Md. Dep't of Legis. Servs., Off. of Policy Analysis, *The Road to Electric Restructuring in Maryland* 5–6 (2006),

11

JA16

https://dls.maryland.gov/pubs/prod/BusTech/Road_to_Electric_Restructuring_2006.pdf, the residential electricity supply market in Maryland has flourished.  REAL members and their subsidiaries have been supplying residential electricity to retail customers in Maryland for more than a decade.

39.     For renewable electricity they sell to Maryland customers—that is, grid-sourced electricity paired with RECs—REAL members and their subsidiaries describe their products accurately and truthfully as "green power."  Further, under existing regulations, they must disclose to their customers that RECs may be used to meet certain obligations under State law.  *See* Md. Code Regs. § 20.61.04.01(B)(2).  And in practice, REAL members and their subsidiaries disclose to their customers that they use RECs to provide renewable electricity.

40.     The Act, however, prevents REAL members and their subsidiaries from continuing to describe their products accurately and truthfully as "green power" unless they comply with an onerous speech code that burdens their speech and commerce rights.

41.     The Act was signed into law on May 9, 2024, *see generally* 2024 Maryland Laws ch. 537 (S.B. 1), and it applies to all electricity supply contracts entered into on or after January 1, 2025, *id.* § 9.

42.     As the Act's Senate sponsor explained, pursuant to an amendment to the original bill, the Act generally "create[s] two different markets" for residential electricity supply in Maryland.  *See Hearing Before the House Econ. Matters Comm.*, at 08:00–08:25 (Mar. 26, 2024) ("*March House Hearing*"), https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=ecm&clip=ECM_3_26_2024_meeting_1&ys=2024rs (Testimony of Sen. Augustine).

12

JA17

43.     One market created by the Act ("standard market") is for ordinary residential electricity supply; that is, electricity supply "other than green power." *See* Md. Code, Pub. Util. § 7-510(d)(2)(i), (iv); *id.* § 7-707(c).  In that market, rates that electricity suppliers may charge are capped at a price that may not exceed the default local utility's average price over the prior twelve months for its default service.

44.     The other market created by the Act is a "green power products market" for residential electricity supply sold as "green power." *See March House Hearing*, *supra*, at 08:00–08:25.  In this "green power" market, renewable residential electricity suppliers "may exceed th[e] price cap" in the standard market.  *See id.*; Md. Code, Pub. Util. § 7-510(d)(2)(i); *id.* § 7-707(d)(2)(ii)(1).

45.     But to be able to participate in the "green power" market, renewable residential electricity suppliers must comply with restrictions on speech for what qualifies as "green power," which the Act defines broadly to mean electricity described as "clean, green, eco-friendly, environmentally friendly or responsible, carbon-free, renewable, 100% renewable, 100% wind, 100% hydro, 100% solar, 100% emission-free, or similar claims." Md. Code, Pub. Util. § 7-707(a).  And they must comply with several compelled-speech obligations.

*The Act's Speech Restrictions*

46.     Effective January 1, 2025, the Act prohibits renewable residential electricity suppliers from describing their electricity as "green power" unless they meet three criteria.

47.     First, at least 51% of the RECs paired with the electricity being described as "green power" must be RECs that satisfy Maryland's renewable energy portfolio standard ("RPS"). *See id.* § 7-707(c)(1); *id.* § 7-703(b).

13

JA18

48.     To satisfy Maryland's RPS, RECs must come from certain renewable generation sources in a defined region in or around Maryland.  Specifically, RECs must come from certain renewable generation sources "located: (1) in the [Pennsylvania-New Jersey-Maryland ("PJM")] region; (2) outside the [PJM region] but in a control area that is adjacent to the PJM region, if the electricity is delivered into the PJM region; or (3) on the outer continental shelf of the Atlantic Ocean" in certain designated areas "between 10 and 80 miles off the coast" of Maryland.  *See id.* § 7-701(m).  The "PJM region" refers to all or parts of thirteen states[2] and the District of Columbia contained within the "PJM Interconnection," a federally regulated entity that manages the electric grid in that region of the country. *See* PJM, *Territory Served*, https://www.pjm.com/-/media/about-pjm/pjm-zones.ashx (last visited Sept. 26, 2024).

49.     In other words, under the Act, residential suppliers of renewable electricity—including REAL members and their subsidiaries—are not allowed to truthfully and accurately call their electricity "green power," even if paired 100% with RECs, unless 51% of those RECs are obtained from generation sources in or around Maryland.

50.     Because renewable energy generation sources from around the country generate RECs that renewable electricity suppliers can purchase, this requirement discriminates against and burdens renewable energy generation sources outside of the Maryland region by prohibiting their RECs from qualifying towards the Act's 51% requirement.  And this requirement privileges renewable energy generation sources in the Maryland region by making only their RECs sufficient to satisfy the Act's 51% requirement.  That is, by design, this requirement discourages renewable residential electricity suppliers in Maryland from obtaining RECs from renewable generation sources outside the Maryland region and requires them to obtain RECs from renewable generation

---

[2] Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia.

JA19

sources in or around Maryland, thereby discriminating against and burdening those out-of-region generation sources by reducing demand for their RECs compared to in-region generation sources. And this, in turn, harms REAL members and their subsidiaries by restricting their ability to purchase RECs they otherwise would in order to supply their residential customers with renewable electricity.

51.     Second, on an annual basis the PSC must "approve[] the price of the electricity being marketed as green power" in accordance with ratemaking proceedings that the Act requires the PSC to create and conduct.  *See id.* § 7-707(c)(2), (d)(1), (d)(2)(i), (d)(3)(i), (d)(5)(i); *id.* § 7-713.

52.     However, despite having filed on September 9, 2024, the draft regulations ostensibly meant to implement § 7-707 of the Act, the PSC has not proposed creating the ratemaking process called for under the law.

53.     And even when the process is created, renewable residential electricity suppliers will not be allowed to charge more than 150% of the default local utility's average price over the prior twelve months for its default service, except for if the supplier's cost exceeds that amount (in which case the supplier is capped to charging "only the actual price" of the renewable electricity). *See id.* § 7-707(d)(4)(i)–(ii).

54.     Further, if those ratemaking proceedings are ever created, the Act requires the PSC to take into account in them "[t]he state in which the electricity" that is being described as "green power" was generated.  *See id.* § 7-707(d)(2)(iii)(1)(C), (d)(3)(iii)(4).  This price factor underscores the Act's inherently discriminatory approach to out-of-region renewable energy—not only does it discourage renewable electricity suppliers from purchasing out-of-region RECs, but it also factors into the price they may charge the locale from which their electricity supply comes.

15

JA20

55.     Third, the electricity supplier must submit an application to the PSC that describes the "green power" electricity, including the "green power" source and the percentage of the electricity being supplied that actually is "green power"; describes how the "green power" complies with Maryland law; and "includes any other information the [PSC] considers necessary." *Id.* § 7-707(c)(3).

*The Act's Compelled-Speech Obligations*

56.     Further, even if renewable residential electricity suppliers can run this gauntlet just to surmount the Act's "green power" speech restrictions, they are then compelled by the Act to make controversial and inaccurate disclosures about the nature of their product offerings.

57.     For example, renewable residential electricity suppliers describing their products as "green power" must make the following disclosure to customers:

> We deliver energy through the purchase of Renewable Energy Credits (RECs).  A REC represents the ***social good*** that accompanies 1 megawatt-hour of renewable electricity generation.  ***RECs*** may be sold separately from ***renewable*** electricity itself.  Renewable electricity and RECs may be sold to different entities.  The purchase of a REC does not indicate that renewable electricity itself has been purchased by the entity that purchased the REC.

*Id.* § 7-707(f)(2) (emphases added).

58.     While RECs are part of the process by which renewable energy serves the social good, it is controversial whether RECs themselves "represent" a "social good."

59.     And while RECs may be sold separately from the underlying electricity that was generated in connection with the REC, when that occurs the underlying electricity is no longer "renewable," contrary to this mandatory disclosure.  *See* Green Guides, 16 C.F.R. § 260.15(d) & Example 5.

16

JA21

60. The Act also requires renewable residential electricity suppliers to include in their "marketing materials" an explanation of how the "green power"—as Maryland has defined it—"will benefit the environment." Md. Code, Pub. Util. § 7-707(g)(3).

61. These compelled disclosures would require REAL members and their subsidiaries to alter their current speech about their products and speak in ways with which they disagree.

\* \* \*

62. Compounding the Act's problems, the Act gives the PSC unqualified "discretion" to "determine whether an electricity supplier" is satisfying the foregoing speech code. *See* Md. Code, Pub. Util. § 7-707(h).

63. Further, the Act exempts, either explicitly or implicitly, several different types of sellers of energy products from this speech code.

64. For instance, in the Act, Maryland exempted itself from the "green power" speech code when its "Department of General Services sells energy" or RECs to purchasers. *See id.* § 7-707(b)(1) (referencing *id.* § 7-704.4(c)(3)). That is, by the Act's terms, one of the State's own agencies may market its electricity products as "green power" freely when selling it, without having to comply with the Act's speech restrictions or mandatory disclosures.

65. Similarly, the Act explicitly exempts the Montgomery County community choice aggregator from its "green power" speech code. *See id.* § 7-707(b)(2). Under Maryland law, the purpose of this government entity is to aggregate and purchase electricity supply on behalf of residents and small businesses and then turn around and manage the electricity supply for those customers. *See id.* § 7-510.3(b), (c)(2), (o), (q), (s)(1). This entity may supply REC-backed electricity. *See id.* § 7-510.3(f)(2)(vi), (j)(1)(ii), (k)(1). It also may "promot[e] the use of renewable energy." *Id.* § 7-510.3(j)(1)(ii). And it is required—either by doing so itself or by causing its

17

JA22

"selected electricity supplier" to do so on its behalf—to inform its customers of the "total renewable component of the electricity to be supplied." *Id.* § 7-510.3(f)(2)(vi).  But, whether speaking itself or through the "selected electricity supplier," this Montgomery County entity is exempt from the Act's speech code—that is, even if the REC mix paired with its electricity supply does not consist of the 51% "green power" requirement in the Act, this community choice aggregator is free to describe its supply as "green power."

66.     The Act also exempts electricity suppliers that sell products to commercial retail electric customers from its "green power" speech code.  *See id.* § 7-707(b)(3).  By one recent count, there are 245,859 businesses in Maryland, and 92.8% of them—or approximately 228,157 of these businesses—have less than twenty employees.  *See Maryland Overview*, https://www.business.maryland.gov/data/overview (last visited Sept. 26, 2024).  Under the Act, a renewable electricity supplier selling its product to someone seeking electricity as a "residential" customer is prohibited from describing its product as "green power" unless it complies with the Act's speech code.  But under this "commercial" exemption, a renewable electricity supplier selling its product to that same person seeking electricity as a mom-and-pop business operator is free to describe its product as "green power" to that person without having to comply with the Act's speech restrictions or mandatory disclosures.

67.     Further, some entities sell REC-only products directly to residential customers. *See, e.g.*, TerraPass, *Renewable Energy Certificates (One-Time Purchase)*, https://terrapass.com/product/productres-recs/.  Such entities do not qualify as "electricity supplier[s]," *see* Md. Code, Pub. Util. § 1-101(l)(1), and thus under § 7-707(c)—which applies to "electricity supplier[s]"—these entities remain free to describe their products as "green power" without having to comply with the Act's speech code.

JA23

**The Act Irreparably Injures Green Mountain**

68.     Green Mountain is a carbon-neutral energy retailer that supplies 100% renewable electricity to customers in seven states: Illinois, Massachusetts, New Jersey, New York, Pennsylvania, Texas, and Maryland.

69.     Green Mountain has been supplying renewable electricity to residential customers in Maryland since 2013.  Green Mountain currently serves nearly 2,000 residential electricity customers in Maryland.

70.     To provide renewable electricity to its residential customers in Maryland, Green Mountain obtains grid electricity and pairs 100% of that electricity with RECs.  Green Mountain then sells that combined product to its residential customers.

71.     Green Mountain's marketing of its electricity supply emphasizes the renewable attributes of that product.  Green Mountain describes its product as "green," "clean[]," "100% clean," "renewable," "pollution free," "100% Pollution Free," and "100% renewable wind."  Green Mountain does so because its residential customers in Maryland purchase its electricity supply because of its renewable attributes; and they are willing to pay a premium over the rates of the default local utility that does not offer 100% REC-backed electricity.  Green Mountain is able to attract and retain residential customers in Maryland because it is able to describe its product as "green power." Green Mountain's description of its product is truthful and accurate and complies with the Green Guides as well as with the laws of the other states in which it sells its product.

72.     Green Mountain already informs customers about the nature of its product.  For instance, on a page of its website, Green Mountain explains that the RECs it pairs with the grid electricity it supplies its customers "represent the environmental and other non-power attributes of renewable electricity generation."  Green Mountain, *What Is Clean Energy?*, https://www.green-mountainenergy.com/en/why-renewable-energy/benefits-of-clean-electricity  ("*What Is Clean*

19

JA24

*Energy?*").  Green Mountain also explains in each of its customer contracts that its product is electricity paired with RECs.  On its website, Green Mountain also explains that when RECs are sold separately from the underlying energy on which they are based, the underlying energy "is no longer considered renewable."  *See What the Heck Is a REC?*, *supra*.

73.     On its website, Green Mountain also explains the "[e]nvironmental benefits" of its 100% renewable product.  *See What Is Clean Energy?*, *supra*.  These include that its product "[h]elps preserve and protect the environment for future generations" and that it "[d]oesn't emit carbon dioxide (CO2), mercury, nitrogen oxides (NOx), sulfur dioxide (SO2) or particulate matter into the air, water or soil," key drivers of climate change and other environmental issues.  *Id.*; *see also Green Mountain Energy: Make a Positive Impact with Clean Energy*, https://www.youtube.com/watch?v=HJorVOuFu48 (explaining that its product helps customers "live a greener lifestyle," "leads to a cleaner grid," and "help[s] protect the environment").

74.     Green Mountain acquires its RECs from generation sources all over the country.  For electricity supply to Maryland customers, Maryland requires electricity companies to purchase sufficient RPS-eligible RECs, or pay a fee, to comply with the RPS.  To get to 100% renewable electricity, an electricity company may obtain additional RECs above and beyond what the RPS requires to pair 100% of its electricity supply to Maryland customers with RECs.  For example, in 2024, under the RPS, a renewable energy company must provide 36.2% renewable electricity to its customers—that is, 36.2% of its electricity has to be paired with RPS-eligible RECs—or it must pay a fee.  To provide 100% renewable electricity to its Maryland customers in 2024, a renewable electricity company must obtain enough RECs to cover the remaining 63.8% of its supply.  To support its claim of 100% renewable electricity, Green Mountain acquires RECs from generation sources all over the country that do not qualify under Maryland's RPS.

JA25

75. Green Mountain does not currently acquire 51% of the RECs it pairs with its renewable residential electricity supply to Maryland customers from sources that qualify under Maryland's RPS. Green Mountain would have to incur significant costs to do so; and it would no longer be able to acquire many RECs it currently does from sources outside the Maryland region.

76. Green Mountain does not need to source RECs differently than it currently does to be able to describe its product truthfully and accurately as "green power." And Green Mountain does not wish to alter its speech in any way to explain what RECs represent, what their relationship is to the generation source on which they are based, or how "green power" as Maryland has defined it (and which is different than Green Mountain's description) is environmentally beneficial.

### The Act Irreparably Injures CleanChoice

77. CleanChoice is a mission-driven, clean-tech company that empowers people and businesses to easily access solutions for climate change. Fundamentally, CleanChoice's mission is to make it easy for everyone, everywhere to choose clean electricity.

78. CleanChoice is a 100% renewable electricity supplier to approximately 235,000 retail customers in the District of Columbia and eight states: Delaware, Illinois, Massachusetts, New Jersey, New York, Ohio, Pennsylvania, and Maryland.

79. CleanChoice has been supplying renewable electricity to residential customers in Maryland since 2012. CleanChoice currently has about 20,000 residential electricity customers in Maryland.

80. To provide renewable electricity to its residential customers in Maryland, CleanChoice obtains grid electricity and pairs 100% of that electricity with RECs. CleanChoice then sells that combined product to its residential customers.

81. CleanChoice's marketing of its electricity supply emphasizes the renewable attributes of that product. CleanChoice describes its product as "green," "clean," "100% clean,"

21

JA26

"pollution-free," "100% pollution free," "100% renewable," "sustainable," and "eco-friendly." CleanChoice does so because its residential customers in Maryland purchase its electricity supply because of its renewable attributes; and they are willing to pay a premium over the rates of the default local utility that does not include 100% REC-backed electricity.  CleanChoice is able to attract and retain residential customers in Maryland because it is able to describe its product as "green power."  CleanChoice's description of its product is truthful and accurate and complies with the Green Guides as well as with the laws of the other states in which it sells its product.

82.     CleanChoice already informs customers about the nature of its product.  For instance, on a page of its website, CleanChoice explains that the RECs it pairs with the grid electricity it supplies its customers "represent the environmental attributes of the power produced from renewable energy projects."  *See* CleanChoice, *How We Bring You Clean Energy*, https://cleanchoiceenergy.com/news/how-we-bring-you-clean-energy. And in a report accessible on CleanChoice's website, it is explained that, when a REC is sold separately from the energy on which it is based, the "renewable attribute" of that energy travels with the REC and does not "remain attached to the generated electricity."  *See* Center for Resource Solutions, *The Legal Basis for Renewable Energy Certificates* 10 (2023), *available at* CleanChoice, *What Are Renewable Energy Certificates? How You Can Choose Clean Energy Through RECs*, https://cleanchoiceenergy.com/news/clean-renewable-energy-certificates-recs.

83.     On its website, CleanChoice also explains the environmental benefits from using its product.  *See* CleanChoice, *Clean Electricity for a Cleaner World*, https://cleanchoiceenergy.com/products/clean-electricity.  These include that its product "help[s] the environment" by "greatly reducing [one's] carbon footprint" and "increas[ing] demand for clean energy, paving the way to become less reliant on polluting fossil fuels."  *See id.*

22

JA27

84. CleanChoice acquires its RECs from generation sources all over the country, largely in the Upper Midwest and Mid-Atlantic Regions. To provide 100% renewable electricity to its Maryland customers in 2024, CleanChoice acquires RECs from generation sources all over the country that do not qualify under Maryland's RPS.

85. CleanChoice does not currently acquire 51% of the RECs it pairs with its renewable residential electricity supply to Maryland customers from generation sources that qualify under Maryland's RPS. CleanChoice would have to incur significant costs to do so; and it would no longer be able to acquire many RECS it currently does from sources outside the Maryland region.

86. CleanChoice does not need to source RECs differently than it currently does to be able to describe its product truthfully and accurately as "green power." And CleanChoice does not wish to alter its speech in any way to explain what RECs represent, what their relationship is to the generation source on which they are based, or how "green power" as Maryland has defined it (and which is different than CleanChoice's description) is environmentally beneficial.

### The Act's Unconstitutional Effects

87. The Act violates the speech and commerce rights of renewable residential electricity suppliers such as REAL members and their subsidiaries and threatens them with irreparable economic injuries.

88. First, although REAL members and their subsidiaries truthfully, accurately, and lawfully describe their products as "green power" under the Green Guides and the laws of the other states in which they sell renewable electricity, they can no longer do so in Maryland under the Act because of Maryland's views on the meaning of "green power." Further, if they want to describe the products they sell in Maryland as "green power," to conform with Maryland's views on what that means, the Act requires them to change the mix of RECs that they pair with their electricity supply and to go through a non-existent ratemaking process.

JA28

89.     Second, even if REAL members and their subsidiaries changed their views on the meaning of "green power" to conform to Maryland's, the Act compels them to speak in ways that would require them to alter their current speech—to describe RECs as representing a "social good," to describe the environmental benefits of the State's definition of "green power," and to explain misleadingly the relationship between RECs and the electricity from which they derive.

90.     Third, the Act prohibits renewable residential electricity suppliers such as REAL members and their subsidiaries from obtaining a certain percentage of their RECs from their preferred generation sources outside the Maryland region, instead requiring them to obtain that percentage of RECs from generation sources in the Maryland region.  That is, the Act explicitly disfavors renewable energy generation sources outside the Maryland region that create RECs and favors renewable energy generation sources in the Maryland region that create RECs.

91.     These burdens will force renewable residential electricity suppliers such as REAL members and their subsidiaries to forego participating in the "green power" market created by the Act and instead try to operate in the standard market.  But their products come with "additional costs," *see March House Hearing*, *supra*, at 16:40–16:50 (Testimony of Sen. Augustine) (acknowledging this), which is why the Act created the "green power" market to allow renewable residential electricity suppliers to charge more for their products.  Subject to the price caps in the standard market, renewable residential electricity suppliers such as REAL members and their subsidiaries will be forced to sell their products at a price that is not commercially viable.  Further, without the ability to describe their products as "green power" in the standard market, renewable residential electricity suppliers such as REAL members and their subsidiaries will be unable to attract and retain customers.  For these reasons, Green Mountain will soon face the prospect of a substantially lower revenue stream from the Maryland residential electricity supply market, and

24

JA29

CleanChoice is preparing to discontinue service for many of its existing customers and cease marketing to new customers in Maryland.

92.     Because both the U.S. Constitution and the Maryland Constitution prohibit Maryland from forcing renewable residential electricity suppliers such as REAL members and their subsidiaries into the horns of this dilemma, Plaintiffs hereby seek declaratory and injunctive relief to prevent the implementation and enforcement of the Act.

### COUNT I
### *U.S. Const. amends. I, XIV; 42 U.S.C. § 1983; 28 U.S.C. § 2201 (Speech Restrictions)*

93.     Plaintiffs incorporate by reference each of the foregoing paragraphs as if restated here in full.

94.     Under the First Amendment of the U.S. Constitution, "law[s] . . . abridging the freedom of speech" are prohibited.  U.S. Const. amend. I.  And the Fourteenth Amendment makes this prohibition applicable to the states. *See Gitlow v. New York*, 268 U.S. 652, 666 (1925).

95.     Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute . . . of any State . . . , subjects, or caused to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . , shall be liable to the party injured in a[] . . . suit in equity[] or other proper proceeding for redress."  Under § 1983, an injured party may obtain prospective relief against a "state official in his or her official capacity" to restrain the violation of constitutional rights.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) (citing *Ex parte Young*, 209 U.S. 123, 159–60 (1908)).

96.     Under 28 U.S.C. § 2201(a), this Court "may declare the rights and other legal relations of any interested party seeking such declaration" in a case before it.

JA30

97.     The Act violates the First Amendment right of freedom of speech of REAL members and their subsidiaries by prohibiting them from describing their products—accurately, truthfully, and consistently with the Green Guides and other states' laws—as "green power" unless they comply with the Act's speech code.

98.     The Act's speech code is a content-based restriction on speech because it restricts the speech of REAL members and their subsidiaries based on the idea or message expressed by that speech—namely, that their current renewable electricity supply is "green power" even though that supply does not conform to Maryland's definition of "green power."

99.     The Act's speech code is a viewpoint-based restriction on speech because it restricts the speech of REAL members and their subsidiaries based on their perspective that their current renewable electricity supply is "green power" even though it does not agree with Maryland's definition of the term, while permitting "green power" speech from those who agree with Maryland's views on what qualifies as "green power."

100.    Maryland has no compelling or substantial state interest in restricting the speech of REAL members and their subsidiaries in the manner the Act does.  Because RECs are fungible from a renewability standpoint, there is nothing deceptive or otherwise improper about describing electricity paired 100% with RECs as "green power," even if the RECs come primarily from generation sources that are not RPS-eligible in Maryland.  Indeed, REAL members and their subsidiaries describe their products accurately, truthfully, and consistently with the Green Guides and other states' laws.  Further, Maryland customers are already aware that RECs are used to supply their renewable electricity.  *See* Md. Code Regs. § 20.61.04.01(B)(2).  And REAL members and their subsidiaries disclose this information to their Maryland customers already.

JA31

101.    Even if Maryland had a compelling or substantial state interest in restricting the speech of REAL members and their subsidiaries in the manner the Act does, the Act's restrictions are not sufficiently tailored to advance those interests.  For one, the Act is overinclusive because it bans renewable residential electricity suppliers from using a long list of particular "green power" terms without regard for whether all such suppliers' use of those terms was causing consumer confusion.  Also, the Act is underinclusive because it explicitly or implicitly exempts from its scope purveyors of like products whose "green power" product marketing could just as well cause consumer confusion.  And Maryland has alternative means of serving whatever interest it ostensibly has in the speech restrictions, such as enforcing existing laws against misleading advertising or engaging in public education campaigns about "green power."

102.    Accordingly, the Act is unconstitutional under the First Amendment, and Plaintiffs request that this Court enter a declaration that the Act violates the First Amendment as well as preliminary and permanent injunctions prohibiting the implementation and enforcement of the Act.

### COUNT II
### *Md. Const., Decl. Rts., Art. 40, 28 U.S.C. § 2201 (Speech Restrictions)*

103.    Plaintiffs incorporate by reference each of the foregoing paragraphs as if restated here in full.

104.    Article 40 of the Maryland Constitution, Declaration of Rights protects the right "to speak, write and publish [one's] sentiments on all subjects."  Md. Const., Decl. Rts., art. 40.  Article 40 is "co-extensive" with the First Amendment.  *See Jakanna Woodworks, Inc. v. Montgomery Cnty.*, 689 A.2d 65, 70 (Md. 1997).

105.    Under Maryland law, "an officer of the State acting under color of his official authority may be enjoined from enforcing a State law claimed to be repugnant to the State or Federal Constitution."  *Davis v. State*, 37 A.2d 880, 885 (Md. 1944).

JA32

106.    Under 28 U.S.C. § 2201(a), this Court "may declare the rights and other legal relations of any interested party seeking such declaration" in a case before it.

107.    The Act violates the Article 40 right of freedom of speech of REAL members and their subsidiaries by prohibiting them from describing their products—accurately, truthfully, and consistently with the Green Guides and other states' laws—as "green power" unless they comply with the Act's speech code.

108.    The Act's speech code is a content-based restriction on speech because it restricts the speech of REAL members and their subsidiaries based on the idea or message expressed by that speech— namely, that their current renewable electricity supply is "green power" even though that supply does not conform to Maryland's definition of "green power."

109.    The Act's speech code is a viewpoint-based restriction on speech because it restricts the speech of REAL members and their subsidiaries based on their perspective that their current renewable electricity supply is "green power" even though it does not agree with Maryland's definition of the term, while permitting "green power" speech from those who agree with Maryland's views on what qualifies as "green power."

110.    Maryland has no compelling or substantial state interest in restricting the speech of REAL members and their subsidiaries in the manner the Act does.  Because RECs are fungible from a renewability standpoint, there is nothing deceptive or otherwise improper about describing electricity paired 100% with RECs as "green power," even if the RECs come primarily from generation sources that are not RPS-eligible in Maryland.  Indeed, REAL members and their subsidiaries describe their products accurately, truthfully, and consistently with the Green Guides and other states' laws.  Further, Maryland customers are already aware that RECs are used to supply

28

JA33

their renewable electricity.  *See* Md. Code Regs. §§ 20.61.04.01(B).  And REAL members and their subsidiaries disclose this information to their Maryland customers already.

111.  Even if Maryland had a compelling or substantial state interest in restricting the speech of REAL members and their subsidiaries in the manner the Act does, the Act's restrictions are not sufficiently tailored to advance those interests.  For one, the Act is overinclusive because it bans renewable residential electricity suppliers from using a long list of particular "green power" terms without regard for whether all such suppliers' use of those terms was causing consumer confusion.  Also, the Act is underinclusive because it explicitly or implicitly exempts from its scope purveyors of like products whose "green power" product marketing could just as well cause consumer confusion.  And Maryland has alternative means of serving whatever interest it ostensibly has in the speech restrictions, such as enforcing existing laws against misleading advertising or engaging in public education campaigns about "green power."

112.  Accordingly, the Act is unconstitutional under Article 40, and Plaintiffs request that this Court enter a declaration that the Act violates Article 40 as well as preliminary and permanent injunctions prohibiting the implementation and enforcement of the Act.

## COUNT III
### *U.S. Const. amends. I, XIV; 42 U.S.C. § 1983; 28 U.S.C. § 2201 (Compelled Speech)*

113.  Plaintiffs incorporate by reference each of the foregoing paragraphs as if restated here in full.

114.  Under the First Amendment of the U.S. Constitution, "law[s] . . . abridging the freedom of speech" are prohibited.  U.S. Const. amend. I.  And the Fourteenth Amendment makes this prohibition applicable to the states.  *See Gitlow*, 268 U.S. at 666.

115.  Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute . . . of any State . . . , subjects, or caused to be subjected, any citizen of the United States or other person

JA34

within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . , shall be liable to the party injured in a[] . . . suit in equity[] or other proper proceeding for redress."   Under § 1983, an injured party may obtain prospective relief against a "state official in his or her official capacity" to restrain the violation of constitutional rights.  *See Will*, 491 U.S. at 71 n.10 (citing *Ex parte Young*, 209 U.S. at 159–60).

116.    Under 28 U.S.C. § 2201(a), this Court "may declare the rights and other legal relations of any interested party seeking such declaration" in a case before it.

117.    The Act violates the First Amendment right of freedom of speech of REAL members and their subsidiaries by compelling them to speak in ways that would alter their current speech and that they do not wish to alter their current speech—requiring them to describe RECs as representing a "social good," to describe the environmental benefits of the State's definition of "green power," and to explain misleadingly the relationship between RECs and the electricity underlying them.

118.    Because the Act's compelled-speech mandate requires REAL members and their subsidiaries to alter their current speech to utter a particular message, it is a content-based speech mandate.

119.    Maryland has no compelling or substantial state interest in compelling the speech of REAL members and their subsidiaries in the manner the Act does.  REAL members and their subsidiaries already explain the nature of their product in their own accurate and truthful terms, they accurately and truthfully explain the environmental benefits of their existing product, and they explain the nature of their product accurately and truthfully.

120.    Even if Maryland had a compelling or substantial state interest in compelling the speech of REAL members and their subsidiaries in the manner the Act does, the Act's mandates

JA35

are not sufficiently tailored to advance those interests.  For one, the Act is overinclusive because it compels speech from all renewable residential electricity suppliers without regard for whether all such suppliers' current disclosures are inadequate.  Also, the Act is underinclusive because it explicitly or implicitly exempts from its scope purveyors of like products whose products could cause consumer confusion without mandatory disclosures.  And Maryland has alternative means of serving whatever interest it ostensibly has in the compelled-speech requirement, such as disclosure requirements that allow renewable residential electricity suppliers to explain in their own terms the nature of their product so long as the explanation is accurate and truthful, to accurately and truthfully explain the environmental benefits of their existing product rather than the State's definition of "green power," and to explain the nature of their product accurately and truthfully.

121.    Accordingly, the Act is unconstitutional under the First Amendment, and Plaintiffs request that this Court enter a declaration that the Act violates the First Amendment as well as preliminary and permanent injunctions prohibiting the implementation and enforcement of the Act.

**COUNT IV**
*Md. Const., Decl. Rts., Art. 40; 28 U.S.C. § 2201 (Compelled Speech)*

122.    Plaintiffs incorporate by reference each of the foregoing paragraphs as if restated here in full.

123.    Article 40 of the Maryland Constitution, Declaration of Rights protects the right "to speak, write and publish [one's] sentiments on all subjects."  Md. Const., Decl. Rts. art. 40.  Article 40 is "co-extensive" with the First Amendment.  *See Jakanna Woodworks*, 689 A.2d at 70.

124.    Under Maryland law, "an officer of the State acting under color of his official authority may be enjoined from enforcing a State law claimed to be repugnant to the State or Federal Constitution."  *Davis*, 37 A.2d at 885.

31

JA36

125.    Under 28 U.S.C. § 2201(a), this Court "may declare the rights and other legal relations of any interested party seeking such declaration" in a case before it.

126.    The Act violates the Article 40 right of freedom of speech of REAL members and their subsidiaries by compelling them to speak in ways that would alter their current speech and that they do not wish to alter their current speech—requiring them to describe RECs as representing a "social good," to describe the environmental benefits of the State's preferred definition of "green power," and to explain misleadingly the relationship between RECs and the electricity underlying them.

127.    Because the Act's compelled-speech mandate requires REAL members and their subsidiaries to alter their current speech to utter a particular message, it is a content-based speech mandate.

128.    Maryland has no compelling or substantial state interest in compelling the speech of REAL members and their subsidiaries in the manner the Act does.  REAL members and their subsidiaries already explain the nature of their product in their own accurate and truthful terms, they accurately and truthfully explain the environmental benefits of their existing product, and they explain the nature of their product accurately and truthfully.

129.    Even if Maryland had a compelling or substantial state interest in compelling the speech of REAL members and their subsidiaries in the manner the Act does, the Act's mandates are not sufficiently tailored to advance those interests.  For one, the Act is overinclusive because it compels speech from all renewable residential electricity suppliers without regard for whether all such suppliers' current disclosures are inadequate.  Also, the Act is underinclusive because it explicitly or implicitly exempts from its scope purveyors of like products whose products could cause consumer confusion without mandatory disclosures.  And Maryland has alternative means

JA37

of serving whatever interest it ostensibly has in the compelled-speech requirement, such as disclosure requirements that allow renewable residential electricity suppliers to explain in their own terms the nature of their product so long as the explanation is accurate and truthful, to accurately and truthfully explain the environmental benefits of their existing product rather than the State's definition of "green power," and to explain the nature of their product accurately and truthfully.

130. Accordingly, the Act is unconstitutional under Article 40, and Plaintiffs request that this Court enter a declaration that the Act violates Article 40 as well as preliminary and permanent injunctions prohibiting the implementation and enforcement of the Act.

**COUNT V**
***U.S. Const. art. I, § 8, cl. 3; 42 U.S.C. § 1983; 28 U.S.C. § 2201 (REC requirements)***

131. Plaintiffs incorporate by reference each of the foregoing paragraphs as if restated here in full.

132. Under Article I, Section 8, Clause 3 of the U.S. Constitution, Congress is vested with authority "[t]o regulate Commerce . . . among the several States."

133. "[T]his language . . . contain[s] a further, negative command, known as the dormant Commerce Clause," prohibiting certain state economic regulations "even when Congress has failed to legislate on the subject." *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995).

134. The Dormant Commerce Clause "confers 'rights, privileges, or immunities' within the meaning of [42 U.S.C.] § 1983." *Dennis v. Higgins*, 498 U.S. 439, 446 (1991).

135. Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute . . . of any State . . . , subjects, or caused to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . , shall be liable to the party injured in a[] . . . suit in equity[] or other proper

33

JA38

proceeding for redress."  Under § 1983, an injured party may obtain prospective relief against a "state official in his or her official capacity" to restrain the violation of constitutional rights.  *See Will*, 491 U.S. at 71 n.10 (citing *Ex parte Young*, 209 U.S. at 159–60).

136.    Under 28 U.S.C. § 2201(a), this Court "may declare the rights and other legal relations of any interested party seeking such declaration" in a case before it.

137.    The Act violates the Dormant Commerce Clause by prohibiting the RECs of renewable energy generation sources outside the Maryland region from counting towards the 51% "green power" REC requirement but permitting the RECS from renewable energy generation sources in the Maryland region to count towards the 51% "green power" REC requirement.

138.    This prohibition discriminates against interstate commerce.

139.    This prohibition also imposes burdens on interstate commerce that are clearly excessive in relation to any putative local benefit.  Renewable residential electricity suppliers such as REAL members and their subsidiaries comply with the Green Guides and the laws of other states in describing their products—grid electricity paired 100% with RECs, the majority of which are not RPS eligible in Maryland—as "green power."  And RECs that come from generation sources that are not RPS-eligible provide the same benefits with respect to climate-change mitigation that RECs from generation sources that are RPS-eligible do.  Nevertheless, the Act substantially burdens the ability of renewable residential electricity suppliers such as REAL members and their subsidiaries to obtain their RECs from the current generation sources outside the Maryland region from which they currently obtain their RECs.

140.    Accordingly, the Act is unconstitutional under Article I, Section 8, and Plaintiffs request that this Court enter a declaration that the Act violates Article I, Section 8, as well as preliminary and permanent injunctions prohibiting the implementation and enforcement of the Act.

## COUNT VI
### 28 U.S.C. § 2201 (Inseverability)

141.    Plaintiffs incorporate by reference each of the foregoing paragraphs as if restated here in full.

142.    Under 28 U.S.C. § 2201(a), this Court "may declare the rights and other legal relations of any interested party seeking such declaration" in a case before it.

143.    The Act "created two different markets" for residential electricity supply in Maryland. *March House Hearing*, *supra*, at 08:00–08:25 (Testimony of Sen. Augustine).  The standard market restricts residential electricity suppliers from charging customers more than the default local utility's average price over the prior twelve months for its default service.  But because of "additional costs" associated with supplying renewable energy, *see id.* at 16:40–16:50 (Testimony of Sen. Augustine), the "green power" market allows renewable residential electricity suppliers to exceed that price cap.

144.    In all the foregoing ways, the "green power" market created by the Act is unconstitutional and its implementation and enforcement must be enjoined.

145.    In Maryland, an "entire act must fall" when its provisions are "so connected that it cannot be presumed that the Legislature would have passed one without the other." *Park v. Bd. of Liquor License Comm'rs for Balt. City*, 658 A.2d 687, 695 (Md. 1995) (internal quotation marks omitted).

146.    That is true when an unconstitutional provision of a statute came in as an amendment to the original bill, as is true of the Act's "green power" provisions. *See Muller v. Curran*, 889 F.2d 54 (4th Cir. 1989) (applying Maryland law).

147.    That is also true when an unconstitutional provision of a statute is an exception to a prohibition, as is true of the Act's "green power" provisions that function as an exception to the

JA40

standard market's price caps.  *See, e.g.*, *Burning Tree Club, Inc. v. Bainum*, 501 A.2d 817, 831 (Md. 1985).

148.    Accordingly, the Act's unconstitutional "green power" provisions are inseverable from the remainder of the Act, and Plaintiffs request that this Court enter a declaration that the Act is inseverable as well as preliminary and permanent injunctions prohibiting the implementation and enforcement of the Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand a declaratory judgment against Defendants that the Act is unconstitutional and inseverable; preliminary and permanent injunctive relief preventing the implementation and enforcement of the Act; attorneys' fees, costs, and interest; along with all other appropriate relief that this Court may determine is warranted.

JA41

Date: October 1, 2024

Respectfully submitted,

*/s/ Jeremy J. Broggi*

Thomas M. Johnson, Jr.
   *Application for Admission Pending*
Stephen J. Obermeier
   *Application for Admission Pending*
Jeremy J. Broggi (MD Bar No. 14968)
William K. Lane III
   *Application for Admission Pending*
Krystal B. Swendsboe (MD Bar No. 30839)
Joel S. Nolette (MD Bar No. 30920)
WILEY REIN LLP
2050 M Street NW
Washington, D.C. 20036
T: (202) 719-7000
F: (202) 719-7049
tmjohnson@wiley.law
sobermeier@wiley.law
jbroggi@wiley.law
wlane@wiley.law
kswendsboe@wiley.law
jnolette@wiley.law

*Attorneys for Plaintiffs*

JA42

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

<table>
<tr>
<td>
RETAIL ENERGY ADVANCEMENT LEAGUE,<br>
<i>et al.</i>,<br>
<br>
      Plaintiffs,<br>
<br>
v.<br>
<br>
ANTHONY G. BROWN, in his official capacity as<br>
Attorney General of Maryland, <i>et al.</i>,<br>
<br>
      Defendants.
</td>
<td>Civil Action No. 1:24-cv-2820</td>
</tr>
</table>

### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Retail Energy Advancement League ("REAL") and Green Mountain Energy Company ("Green Mountain"), by undersigned counsel and pursuant to Federal Rule of Civil Procedure 65, hereby move to enjoin an Act introduced in the Maryland General Assembly as Senate Bill 1 and signed into law on May 9, 2024 (the "Act"), regarding the retail energy supply sector. *See generally* 2024 Maryland Laws ch. 537 (S.B. 1). The Act is an unconstitutional restriction of Plaintiffs' First Amendment rights and must be enjoined in full by **<u>December 1, 2024</u>**, to prevent Plaintiffs from having to undertake significant changes to their marketing and product offerings before the relevant portions of the Act go into effect. The reasoning and authorities supporting this Motion are contained in the accompanying Memorandum, which is incorporated herein by reference.

Plaintiffs, therefore, respectfully request that this Court grant their Motion.

JA43

Date: October 1, 2024

Respectfully submitted,

/s/ Jeremy J. Broggi
Thomas M. Johnson, Jr.
    *Application for Admission Pending*
Stephen J. Obermeier
    *Application for Admission Pending*
Jeremy J. Broggi (MD Bar No. 14968)
William K. Lane III
    *Application for Admission Pending*
Krystal B. Swendsboe (MD Bar No. 30839)
Joel S. Nolette (MD Bar No. 30920)
WILEY REIN LLP
2050 M Street NW
Washington, D.C. 20036
T: (202) 719-7000
F: (202) 719-7049
tmjohnson@wiley.law
sobermeier@wiley.law
jbroggi@wiley.law
wlane@wiley.law
kswendsboe@wiley.law
jnolette@wiley.law

*Attorneys for Plaintiffs*

2

JA44

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of October, 2024, the foregoing Motion for Preliminary Injunction, along with the proposed Order accompanying the Motion, was served on Defendants by mailing a copy thereof to:

<table>
<tr>
<td>Anthony G. Brown<br>200 St. Paul Place<br>Baltimore, MD 21202</td>
<td>Frederick H. Hoover<br>6 St. Paul Street, 16th Floor<br>Baltimore, MD 21202</td>
<td>Michael T. Richard<br>6 St. Paul Street, 16th Floor<br>Baltimore, MD 21202</td>
</tr>
<tr>
<td>Kumar P. Barve<br>6 St. Paul Street, 16th Floor<br>Baltimore, MD 21202</td>
<td>Bonnie A. Suchman<br>6 St. Paul Street, 16th Floor<br>Baltimore, MD 21202</td>
<td></td>
</tr>
</table>

Date: October 1, 2024

*/s/ Jeremy J. Broggi*
Jeremy J. Broggi

JA45

# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

|  |  |
|---|---|
| RETAIL ENERGY ADVANCEMENT LEAGUE *et al.*, | |
| Plaintiffs, | Civil Action No. 1:24-cv-2820 |
| v. | |
| ANTHONY G. BROWN, in his official capacity as Attorney General of Maryland, *et al.*, | |
| Defendants. | |

### DECLARATION OF CHRISTOPHER ERCOLI IN SUPPORT OF PLAINTIFFS' COMPLAINT AND MOTION FOR A PRELIMINARY INJUNCTION

I, Christopher Ercoli, pursuant to 28 U.S.C. § 1746, hereby declare as follows under the penalty of perjury:

1.     I am over eighteen years of age, of sound mind, and otherwise competent to make this Declaration.  The evidence set out in this Declaration is based on my personal knowledge, and if called to testify I could swear competently thereto.

2.     I submit this Declaration in support of Plaintiffs' Complaint and Motion for Preliminary Injunction.

3.     I am the President and CEO of the Retail Energy Advancement League ("REAL"). I have held this position since February 2022.

4.     REAL is a Pennsylvania corporation with its principal place of business at its headquarters at 213 Market Street, Eighth Floor, Harrisburg, PA 17101.

5.     REAL is a national advocacy organization founded in 2022.

JA47

6.     REAL is dedicated to the expansion and modernization of American retail energy markets.  REAL is at the forefront of helping consumers obtain cost-efficient, renewable energy options.  REAL's mission, in pertinent part, is to encourage states to allow for competition in their electricity markets so that consumers can choose from a variety of products available on the electric grid, such as 100% renewable energy.

7.     REAL was founded by a coalition of companies that believe that smart regulation and consumer protections are the foundation for a healthy market where states can capitalize on the innovations and customer demand driving a national transition to a clean energy economy.

8.     REAL represents its members' interests by monitoring legal developments within the energy industry in the United States, advocating before federal and state legislatures and agencies about energy issues, and supporting or defending its members' interests in litigation related to energy regulation in the United States.

9.     REAL has eight members who sell renewable electricity products, including in the Maryland residential electricity market.

10.     REAL members include CleanChoice Energy, Inc., a founding member since 2022, that sells 100% renewable electricity supply to Maryland residential customers.

11.     REAL members also include NRG Energy, Inc. ("NRG").  Green Mountain Energy Company ("Green Mountain") is a wholly owned subsidiary of NRG.

12.     REAL members have been operating in the Maryland residential electricity supply market for more than a decade.  CleanChoice has been operating in the Maryland residential electricity supply market since 2012.  Green Mountain has been operating in the Maryland residential electricity supply market since 2013.

JA48

13.     REAL members, including through their subsidiaries, currently supply renewable residential electricity to hundreds of thousands of customers in Maryland.  CleanChoice currently has about 20,000 renewable residential electricity supply customers in Maryland.

14.     REAL members and their subsidiaries supply renewable residential electricity to Maryland customers by obtaining renewable energy certificates (sometimes called renewable energy credits)—"RECs," for short—from renewable generation sources around the country and pairing those RECs with the electricity they supply their customers.

15.     REAL members and their subsidiaries describe their renewable electricity supply products by using terms like "clean," "green," "eco–friendly," "environmentally friendly or responsible," "carbon–free," "renewable," "100% renewable," "100% wind," "100% hydro," "100% solar," "100% emission–free," or similar terms.  In particular, CleanChoice describes its product as "green," "clean," "100% clean," "pollution-free," "100% pollution free," "100% renewable," "sustainable," and "eco-friendly."   Green Mountain describes its products as "green," "clean," "renewable," "100% clean," "pollution free," "100% pollution free," and "100% renewable wind."

16.     REAL members and their subsidiaries follow the "Green Guides" promulgated by the Federal Trade Commission, *see* 16 C.F.R. § 260.15, as well as the laws of other states, to ensure that their descriptions of their renewable electricity supply are not misleading.

17.     REAL members and their subsidiaries describe their renewable electricity products accurately and truthfully.  In particular, CleanChoice explains that its product is backed by RECs; it explains that RECs "represent the environmental attributes of the power produced from renewable energy projects"; it explains to its customers that when a REC is sold separately from the energy on which it is based, the "renewable attribute" of that energy travels with the REC and does not "remain attached to the generated electricity"; and it explains the environmental benefits of its

3

current product.  Green Mountain also explains that its product is backed by RECs, which "represent the environmental and other non-power attributes of renewable electricity generation and are part of most renewable electricity products"; Green Mountain also explains that "it's important to know" that when RECs are sold separately from the underlying energy on which they are based, the underlying energy "is no longer considered renewable"; and Green Mountain similarly explains the environmental benefits of its current product.

18.     REAL members and their subsidiaries already disclose to their customers that RECs are used to back their renewable electricity products.  *See* Md. Code Regs. § 20.61.04.01(B)(2). As applicable, REAL members and their subsidiaries also file an annual report with Maryland disclosing their total Maryland renewable electricity sales, including total number of Maryland-compliant RECs by renewable source.  *See id.* § 20.61.04.02(B)–(C).

19.     The customers of REAL members and their subsidiaries purchase their renewable electricity supply because of the renewable attributes of those products, and they are willing to pay a premium over the rates of the default local utility that does not offer 100% REC-backed electricity.

20.     Under the law at issue, introduced by the Maryland General Assembly as Senate Bill 1 and signed into law by the Governor on May 9, 2024 (the "Act"), effective January 1, 2025, REAL members and their subsidiaries and other retail energy companies will no longer be able to describe their renewable electricity supply products in all the ways that they currently do.  The Act's "green power" requirements—specifically, that residential electricity suppliers obtain 51% of their RECs from sources eligible under Maryland's renewable portfolio standard and get price

4

JA50

pre-approval through a currently non-existent process before they can market their products according to the State's new definition—prohibit REAL members and their subsidiaries and other retail energy companies from describing their renewable electricity products in those terms.

21.    Under the Act, effective January 1, 2025, REAL members and their subsidiaries, including CleanChoice and Green Mountain, will be forced to alter their current speech about their products in ways that they do not want to alter their current speech about their products.

22.    Under the Act, effective January 1, 2025, REAL members and their subsidiaries cannot operate in a commercially viable way in the standard, price-capped market created by the Act.  For example, CleanChoice is preparing to cancel many of its existing clean energy contracts with Maryland customers and to transfer them to the default local utilities as of January 1, 2025.  Similarly, Green Mountain will soon have to rewrite its marketing and advertising to remove the words that Maryland has banned in the Act.

23.    On September 9, 2024, the Maryland Public Service Commission ("PSC") filed draft regulations to implement the "green power" provisions of the Act.  Those regulations do not create any ratemaking process mandated by the Act before REAL members and their subsidiaries can describe their renewable electricity products as "green power."

24.    An injunction prohibiting the Act from being implemented and enforced will redress these injuries of REAL members, their subsidiaries, and other retail energy companies by allowing them to continue describing their renewable electricity products in all the ways that they currently do.

25.    Since the Act was enacted, REAL and its members have been engaged in discussions with Maryland legislators and the PSC to try to find ways to ameliorate the Act's harms to

5

JA51

REAL members.  In September, it has become apparent that these discussions will not yield meaningful results for REAL members in a way that will remedy the injuries that the Act will cause.

26.     I hereby certify that Exhibit 1 to this Declaration is a true and correct copy of the draft regulations filed September 9, 2024, referenced above in Paragraph 23.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 27, 2024.

Christopher Ercoli
President & CEO
REAL
213 Market Street, Eighth Floor
Harrisburg, PA 17101

6

JA52

# EXHIBIT 1

Green Product Offerings – Revisions to COMAR 20.53 and 20.61.04.01&2

20.53.07.07 Advertising and Solicitations
A. Advertising Permitted.
   (1) A supplier may advertise its services.
   (2) A supplier may not engage in a marketing or trade practice that is unfair, false, misleading, or deceptive.
   (3) A supplier may not make an offer to an energy assistance household unless the offer is for a Commission-approved contract for energy assistance households.
B. Disclosures.
   (1) All supplier marketing or solicitation information, including that used by its agents or employees, shall include the supplier's Maryland license number in a clear and conspicuous manner.
   (2) If a price is quoted, the following statements are required:
      (a) The price quoted is only for the specified commodity provided by the supplier;
      (b) The price quoted does not include any tax, utility distribution charge, or other utility fee or charge; and
      (c) The supplier's price is not regulated by the Commission.
   (3) A supplier may not make an offer to an energy assistance household unless the offer is for a Commission-approved contract for energy assistance households.
   **(4)** When offering green power for sale to residential customers, a Supplier, except for those described in Md. Code Ann., PU § 7-707(g), shall disclose:
      (a) what the customer will actually be paying for when the customer purchases green power from the electricity supplier;
      (b) how the electricity that the customer has purchased is generated;
      (c) how the green power will benefit the environment;
      (d) the percentage of electricity that would be provided by the electricity supplier that is eligible for inclusion in meeting the renewable energy portfolio standard; and
      (e) the state in which the electricity was generated.

C. Internet.
   (1) Internet Advertising. A supplier shall post on the Internet:
      (a) Readily understandable information about its services, prices, and emissions; and
      (b) A description of its supplier-consolidated billing offering, including a sample bill, if the supplier is licensed to provide supplier-consolidated billing services and is offering supplier-consolidated billing services.
   (2) Commission Website.
      (a) Suppliers shall submit open offers to the Commission's website according to instructions provided by the Commission.
      (b) In the event of a discrepancy between a supplier's open offer posted on the Commission's website and the supplier's corresponding open offer displayed on the supplier's website, the supplier shall honor the terms that are more favorable to the customer.
D. Telephone Solicitation.

JA54

(1) A supplier soliciting customers by telephone shall comply with all applicable State and federal law, including the Maryland Telephone Solicitations Act, Commercial Law Article, §§ 14-2201-14-2205, Annotated Code of Maryland.

(2) A supplier may not conduct a residential customer telephone solicitation before 8 a.m. or after 9 p.m.

20.53.07.15

.15 Green Power Offerings.

A. Beginning January 1, 2025, an electricity supplier that supplies electricity to residential retail electric customers may not market electricity as green power unless the Commission approves the price of the electricity being marketed as green power.

(1) the price approved by the Commission shall not exceed the trailing 12–month average of the electric company's standard offer service rate in the electric company's service territory as of the date of agreement with the customer, plus the average Tier 2 renewable energy credit price as determined by the most recent year's RPS Supplier Annual Reports; or

(2) the rate set by the Commission, on request by an electricity supplier, that the Commission set a price per megawatt–hour for electricity marketed as green power for that electricity supplier.

B. A REC used to comply with subsection (A) must comply with COMAR 20.61.03.01(A).

20.61.04.01 Consumer Protection

A.  (1) A supplier shall retire, in a PJM Environmental Information Services, Inc. Generation Attribute Tracking System reserve subaccount accessible by the Commission, one renewable energy credit for each megawatt-hour (MWh) of retail sales of electricity marketed as "Green Power" as defined in PUA 7-707(a) having characteristics of a Tier 1 renewable source or a Tier 2 renewable source.

(2) A supplier shall document, in a manner chosen by the Commission, the amount of renewable energy credits associated with electricity marketed as renewable or green, and that do not qualify as renewable energy credits as defined in Md. Code Ann., PU § 7–701.

B. A supplier contract for the sale of electricity that is marketed as renewable, green, or having the characteristics of a Tier 1 renewable source or Tier 2 renewable source shall include:

(1) The RPS for each year covered by the contract of sale;

(2) A statement that Tier 1 renewable source or Tier 2 renewable source RECs retired may be used to meet the supplier's RPS obligation for that particular sale; and

(3) Except as provided under Public Utilities Article, §7-705(b)(1), a A statement that a supplier may meet its RPS obligation by paying a compliance fee to the Fund under Public Utilities Article, §7-705, Annotated Code of Maryland.

C. The statement required by §B(3) of this regulation shall include, if appropriate, the dollar amount of the Tier 1, including solar and geothermal, and Tier 2 compliance fee.

D. Report Required.

(1) Except as provided in §D(3) of this regulation, on or before April 1 of each year, a supplier shall file with the Commission a report of any activity under §A of this regulation on a form provided by the Commission.

(2) The supplier report required under §D(1) of this regulation shall include:

JA55

(a) Total retail sales of electricity marketed as renewable energy in Maryland by the supplier for the preceding calendar year; and
(b) Total RECs associated with sales of renewable energy in Maryland retired by the supplier during the preceding calendar year.
(3) On or before April 30 of each year, a supplier shall file with the Commission a report of any activity under §A of this regulation that relates to retail sales of electricity marketed as having characteristics of offshore wind energy on a form provided by the Commission.

**20.61.04.02**
**.02 Annual Report Required.**
A. Except as provided under §B(3),(7) and (10~~5~~) of this regulation, on or before April 1 of each year, each supplier shall file with the Commission an RPS report covering all retail electricity sales in Maryland during the preceding calendar year.
B. The supplier RPS report required under §A of this regulation shall be on a form provided by the Commission and include the:
(1) Supplier's total Maryland retail electricity sales;
(2) Excluding exempted sales reported in §B(3) of this regulation, the total exempt electricity sales by category, and, if appropriate, the identity of the customer to which an exemption applies;
(3) On or before April 30 of each year, the total electricity sales ~~exempted from the offshore wind energy RPS~~ and the identity of the industrial process load and agricultural land owner customers to which the exemption applies;
~~(4) Total Maryland retail electricity sales, by renewable source, marketed as renewable or having characteristics of a Tier 1 renewable source or Tier 2 renewable source equal to or greater than the supplier's RPS obligation;~~
~~(5) Total Maryland retail electricity sales, by renewable source, marketed as renewable or having characteristics of a Tier 1 renewable source or Tier 2 renewable source less than the supplier's RPS obligation and the average percentage of the Tier 1 renewable source and Tier 2 renewable source claim for the sales;~~
(6~~4~~) Excluding Tier 1 solar RECs and ORECs, total number of Tier 1 renewable source RECs required to fulfill the supplier's RPS obligation;
(7~~5~~) Total number of Tier 1 solar RECs required to fulfill the supplier's RPS solar obligation, and if applicable, a statement specifying whether the total number is the result of an approved delay under COMAR 20.61.01.04;
(8~~6~~) Total number of Tier 2 renewable source RECs required to fulfill the supplier's RPS obligation;
~~(9) Excluding Tier 1 solar RECs and ORECs, the total number of Tier 1 renewable source RECs submitted by energy source as calculated under Public Utilities Article, §7-704, Annotated Code of Maryland;~~
(10~~7~~) On or before April 30 of each year, the total number of Tier 1 ORECs required to fulfill the supplier's offshore wind energy obligation and the number of Tier 1 ORECs purchased;
~~(11) Total number of Tier 1 solar renewable source RECs submitted as calculated under Public Utilities Article, §7-704, Annotated Code of Maryland;~~
~~(12) Total number of Tier 2 renewable source RECs submitted by energy source as calculated under Public Utilities Article, §7-704, Annotated Code of Maryland;~~

JA56

(~~13~~8) Excluding the Tier 1 solar and offshore wind energy renewable energy portfolio standard, the shortfall of RECs needed to meet the supplier's Tier 1 renewable source renewable energy portfolio standard;

(~~14~~9) Shortfall of RECs needed to meet the supplier's Tier 1 solar renewable source renewable energy portfolio standard;

(~~15~~10) By April 30 of each year, the shortfall of RECs needed to meet the supplier's Tier 1 offshore wind energy renewable energy portfolio standard;

(~~16~~11) The shortfall of RECs needed to meet the supplier's Tier 2 renewable source renewable energy portfolio standard;

(~~17~~12) If a shortfall in the number of RECs needed to meet the renewable energy portfolio standard is reported, the calculation of a compliance fee based on the total shortfall of Tier 1 renewable source and Tier 2 renewable source RECs, and less any fee waiver granted by the Commission under COMAR 20.61.01.06, including:

(a) The total shortfall of Tier 1 renewable source RECs excluding RECs derived from solar energy multiplied by the Tier 1 compliance fee;

(b) The Tier 1 renewable source RECs derived from solar energy multiplied by the Tier 1 solar compliance fee; and

(c) The Tier 2 renewable source RECs multiplied by the Tier 2 compliance fee.

(~~18~~13) If a shortfall in the number of Tier 1 renewable source ORECs needed to meet the renewable energy portfolio standard is associated with sales of industrial process load under COMAR 20.61.01.05E, the calculation of a compliance fee related to the shortfall attributable to sales of industrial process load; and

(~~19~~14) Certification of the accuracy and veracity of the report.

C. The reports due on or before April 1 and April 30 shall be accompanied by at least the following:

(1) All documentation to support the data in the annual RPS report;

(2) Any applicable financial hardship waiver with documentation of kilowatt-hours (kWhs) covered by the waiver for each customer and the total amount of compliance fees waived under COMAR 20.61.01.05;

(3) List of all RECs used to meet the RPS, including the REC identification number or documentation of a REC created under COMAR 20.61.03.03;

~~(4) Summary report of RECs that were retired during the reporting period;~~

(~~5~~4) ~~Excluding Tier 1 solar RECs and ORECs,~~ the ~~total~~ price of ~~all Tier 1 renewable source~~ each RECs retired during the reporting period;

~~(6) The total price of all Tier 1 solar renewable source RECs retired during the reporting period;~~

~~(7) The total price of all Tier 1 ORECs retired during the reporting period;~~

~~(8) The total price of all Tier 2 renewable source RECs retired during the reporting period;~~ and

(~~9~~5) Proof of payment of any compliance fee due.

JA57

# Exhibit 2

JA58

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

|  |  |
|---|---|
| RETAIL ENERGY ADVANCEMENT LEAGUE *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ANTHONY G. BROWN, in his official capacity as Attorney General of Maryland, *et al.*, <br><br> Defendants. | Civil Action No. 1:24-cv-2820 |

**DECLARATION OF MICHAEL ROMBACH IN SUPPORT OF
PLAINTIFFS' COMPLAINT AND MOTION FOR A PRELIMINARY INJUNCTION**

I, Michael Rombach, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am over eighteen years of age, of sound mind, and otherwise competent to make this Declaration. The evidence set out in this Declaration is based on my personal knowledge, and if called to testify I could swear competently thereto.

2. I submit this Declaration in support of Plaintiffs' Complaint and Motion for Preliminary Injunction.

3. I have been employed by NRG Energy, Inc. ("NRG"), the parent company of Green Mountain Energy Company ("Green Mountain"), since July 2023.

4. Green Mountain is a Delaware corporation headquartered in Houston, TX.

5. I currently serve as Vice President and General Manager at NRG, responsible for the overall management and financial results of all of our residential competitive energy businesses in the northeastern United States, including Green Mountain.

6. I also serve as Vice President for Green Mountain.

JA59

7. In my role as an executive officer at Green Mountain, I have ultimate responsibility for the execution of our marketing and sales strategy, which is focused on offering customers the option to enroll in electricity supply plans featuring renewable energy.

8. Green Mountain was founded in 1997 with a "mission[] to inspire hope and motivate action through the use of clean energy." *See* Green Mountain, *About Green Mountain Energy*, https://www.greenmountainenergy.com/en/our-story ("*About Green Mountain*"). It is "the nation's longest-serving renewable energy retailer." Green Mountain, *Renewable Energy Plans for Your Home*, https://www.greenmountainenergy.com/en/home-energy-solutions/shop-for-electricity ("*Renewable Energy Plans*").

9. Green Mountain seeks to "make the planet a cleaner, greener place to live" and is "proud to be a carbon-neutral company that continues to keep sustainability at the heart of everything" it does. *See About Green Mountain*, *supra*.

10. Green Mountain is a "carbon-neutral energy retailer" in seven states: Illinois, Massachusetts, New Jersey, New York, Pennsylvania, Texas, and Maryland. *See* Green Mountain, *Markets We Seve & Projects We Support*, https://www.greenmountainenergy.com/en/gme-renewable-energy-projects.

11. Across these markets, Green Mountain sells "100% clean electricity plans." *See Renewable Energy Plans*, *supra*.

12. Green Mountain serves hundreds of thousands of residential electricity supply customers, including nearly 2,000 in Maryland.

2

JA60

13.     Green Mountain has been supplying residential electricity to retail customers in Maryland since March 2013.  *See* Green Mountain, *Maryland FAQs*, https://www.greenmountainenergy.com/en/customer-service-center/energy-questions-faq/maryland-faqs     *("Maryland FAQs")*.

14.     Green Mountain sells electricity supply paired 100% with Renewable Energy Certificates ("RECs") to its residential customers in Maryland and elsewhere.  *See Green Mountain Energy:     Make     a     Positive     Impact     with     Clean     Energy*, https://www.youtube.com/watch?v=HJorVOuFu48 ("*Make a Positive Impact*"); Green Mountain, *What Is Clean Energy?*, https://www.greenmountainenergy.com/en/why-renewable-energy/benefits-of-clean-electricity ("*What Is Clean Energy?*"); Green Mountain, *Part 1: What the Heck Is a REC?*, https://www.greenmountainenergy.com/en/blog/business-news/part-1-what-the-heck-is-a-rec ("*What the Heck Is a REC?*").

15.     Green Mountain acquires its RECs from generation sources all over the country. *See What Is Clean Energy?*, *supra* ("Green Mountain Energy purchase[s] electricity to serve our customers' minute-by-minute power needs, and we ensure that an equal amount of clean energy gets produced through the purchase of renewable energy certificates from national wind or solar sources.").

16.     To market and sell its 100% REC-backed electricity products to customers, all of Green Mountain's marketing emphasizes the renewable attributes of Green Mountain's electricity supply.

JA61

17.     Green Mountain markets its residential electricity supply in Maryland through several means, including internet advertising and email newsletters.  Green Mountain's primary advertising channel is its own website on the internet and advertisements on social media that direct potential customers to its website.

18.     Under the law at issue, introduced by the Maryland General Assembly as Senate Bill 1 and signed into law by the Governor on May 9, 2024 (the "Act"), effective January 1, 2025, as explained below, Green Mountain will no longer be able to market its 100% clean and renewable residential electricity product in all the ways it does.

a.     For instance, on its main webpage, Green Mountain markets its electricity supply as "green[]."  *See* Green Mountain, *Cleaner Electricity for Greener Living*, https://www.greenmountainenergy.com/ ("*Home Page*") ("Cleaner electricity for greener living.").

b.     On its main webpage and on another of its webpages specifically for Maryland customers, Green Mountain markets its electricity supply as "clean[]."  *See id.* ("Cleaner electricity for greener living."); *accord Maryland FAQs*, *supra* ("In March 2013, Green Mountain Energy entered the BGE service territory in Maryland as an electricity supplier serving residential and business customers with cleaner energy. . . . We offer Maryland residents the choice of cleaner electricity products for their home, made from renewable sources like wind.").

c.     On its main webpage, Green Mountain refers to its electricity supply as "renewable."  *See Home Page*, *supra* ("Today, as the longest-serving renewable energy retailer, we remain committed to sustainability every step of the way.").

4

JA62

d.      On its webpage for customers to explore product options, Green Mountain markets its electricity supply as "100% clean."  See Green Mountain, *Renewable Energy Plans for Your Home*, https://www.greenmountainenergy.com/en/home-energy-solutions/shop-for-electricity (describing its products as "100% clean electricity plans").

e.      On its webpage listing product offerings for Maryland customers, Green Mountain markets its electricity supply as "pollution free."  *See* Green Mountain, *Find the Right Plan to Make an Impact*, https://shop.greenmountainenergy.com/northeast/home-energy-solutions/products/?zipCode=21201&txtLanguageCode=en ("[C]hoose the Pollution Free plan that works for your lifestyle.").

f.      On another webpage specifically for Maryland customers, Green Mountain describes its electricity supply as "100% Pollution Free."  *See Maryland FAQs*, *supra* ("We expanded our 100% Pollution Free electricity service to households in Potomac Edison in April 2015.").

g.      On that same webpage, Green Mountain describes its electricity supply as "100% renewable wind."  *See id.* ("We offer Maryland residents Pollution Free™ electricity, made from 100% renewable wind resources in the United States.").

19.     Green Mountain's representations regarding the "clean" and "renewable" qualities of its products are truthful and accurate.

20.     Green Mountain follows the "Green Guides" promulgated by the Federal Trade Commission to ensure that Green Mountain's marketing about its electricity supply is not misleading.  *See* 16 C.F.R. § 260.15.

21.     Green Mountain also complies with the law in the other states in which it operates in making claims about Green Mountain's clean electricity.  That is, Green Mountain's current

5

marketing practices are consistent with how the other states in which it operates regulate "green power" marketing.

22.     Green Mountain also has extensive marketing and informational materials that educate customers about RECs.

a.     For example, on one of its marketing webpages, Green Mountain explains that the RECs that it pairs with grid electricity to create its product "represent the environmental and other non-power attributes of renewable electricity generation and are part of most renewable electricity products." *What Is Clean Energy?*, *supra*.

b.     On that same webpage, Green Mountain explains that "RECs . . . can be traded separately from the actual electricity produced by renewable facilities." *Id.*

c.     In a customer-facing blog post on its website, Green Mountain further explains that "[i]t's important to know" that when RECs are sold separately from the underlying energy on which they are based, the underlying energy "is no longer considered renewable." *See What the Heck Is a REC?*, *supra*.

d.     On a marketing video accessible on its YouTube channel, Green Mountain explains that its product—electricity supply from the grid paired 100% with RECs—helps customers "live a greener lifestyle," "lead[] to a cleaner grid," and "help protect the environment." *See Make a Positive Impact*, *supra*.

23.     Consistent with pre-existing Maryland regulations, Green Mountain discloses in each of its renewable energy contracts that the renewable energy it offers is backed by RECs, including that Maryland-compliant RECs may be used to satisfy its obligations under State law. Green Mountain also is required to, and does, file a yearly Renewable Portfolio Standard Report

6

JA64

with the State disclosing its total Maryland renewable electricity sales, including total number of Maryland-compliant RECs by renewable source.

24.     On one of its marketing webpages, Green Mountain also explains that there are several "[e]nvironmental benefits" from using its 100% REC-backed products. *See What Is Clean Energy?*, *supra*. Those benefits include that Green Mountain's clean electricity is "[m]ade from unlimited renewable sources"; "[h]elps preserve and protect the environment for future generations"; "[u]ses little to no water in many forms"; "[d]oesn't damage the land"; and "[d]oesn't emit carbon dioxide (CO2), mercury, nitrogen oxides (NOx), sulfur dioxide (SO2) or particulate matter into the air, water or soil," the "commonly cited effects" of which "include climate change, mercury poisoning, smog, acid rain and respiratory disease." *Id.*; *see also id.* (explaining that Green Mountain's "clean electricity" helps "mitigate the effects of climate change").

25.     On that same marketing webpage, Green Mountain also explains that there are several "[e]conomic benefits" from using its product. *See id.* As it explains, those benefits include that clean electricity "[c]reates employment opportunities right here in the United States"; "[s]upports a homegrown energy source, helping secure America's energy future"; and "[b]rings development to rural areas, where renewable facilities can take advantage of ample space and resource potential." *Id.*

26.     100% REC-backed electricity is more expensive to supply than non-renewable energy supply.

27.     Green Mountain's residential customers in Maryland purchase Green Mountain's electricity supply because of its renewable attributes; and they are willing to pay a premium over the rates of the local public utility that does not offer 100% REC-backed electricity.

JA65

28.     As one customer testimonial available on one of Green Mountain's webpages at-tests, "It is amazing to have affordable energy while reducing our environmental footprint." *See* Green Mountain, *Residential Customer Reviews*, https://www.greenmountainenergy.com/en/why-renewable-energy/customer-testimonials/residential-testimonials.

29.     As another customer testimonial on that webpage puts it, "My energy is clean and reliable, and I have been a customer for years.  Using Green Mountain for power is something easy and within reach that everyone could and should do to do their part to keep our environment clean." *Id.*

30.     As another customer testimonial on that webpage puts it, "I am excited to know that each month I pay my bill I am contributing to a greener earth!  Thank you, Green Mountain, for supporting our environment and each day making it a little bit better." *Id.*

31.     In 2023, Green Mountain Maryland customers reported to Green Mountain that they purchase Green Mountain's renewable electricity products because of the "impact on climate change" and because Green Mountain products "help[] save the planet."  One Maryland customer stated that "it's great to be able to replace my dirty [] electrons with clean wind power electrons from Green Mountain."

32.     And, in 2024, Maryland customers reported to Green Mountain that they chose to purchase Green Mountain's renewable electricity products because "I feel I am making a differ-ence in lowering my carbon footprint" and "having clean wind is great for my grandkids."

33.     Because of the Act's requirement, effective January 1, 2025, Green Mountain can no longer market its products as "green," "clean," "renewable," "100% clean," "pollution free," "100% Pollution Free," or "100% renewable wind"—which are accurate and truthful statements—unless it agrees with Maryland's own definition of "green power."

8

JA66

34.     Green Mountain does not satisfy Maryland's definition of "green power" and would have to incur significant costs in order to satisfy that standard.

35.     Green Mountain also has marketing assets that target Maryland residents specifically, such as the product page customers see after entering a Maryland zip code at greenmountainenergy.com.  Due to Maryland's restrictions, this content would require significant overhaul or scrapping in its entirety, at the cost of time, money, and brand equity in the Maryland marketplace as a reliable green energy retailer whose website is ready when customers need it.

36.     In addition to not being able to market its products as it wants to, the Act also imposes a rate cap on electricity that does not meet Maryland's own definition of "green power," and Green Mountain would have to sell its 100% REC-backed product at a substantially reduced price in Maryland in order to participate in that market.  If Green Mountain were forced to offer its products at that reduced price, it could not differentiate itself from the local utility by marketing its products to consumers as green—thus preventing Green Mountain from educating the public about the key differentiator between its products and those of other retail electricity options.

37.     Even if Green Mountain could satisfy Maryland's definition of "green power" and it wanted to continue to market clean energy according to the State's new definition, it would be forced to satisfy a pre-approval process for renewable products—in which it proposes a price to the Maryland Public Service Commission for its review and approval—before it may market its products as "green," "clean," "renewable," "100% clean," "pollution free," "100% Pollution Free," or "100% renewable wind."  The uncertainty of the outcome of this application and review process, especially the uncertainty of whether Green Mountain could offer renewable products at a sustainable price and for how long, undermines Green Mountain's continued participation as a retailer in Maryland.

9

JA67

38.     Accordingly, Green Mountain soon will have to rewrite its marketing and advertising to remove the words that Maryland has banned in the Act.

39.     Even if Green Mountain could comply with Maryland's definition of "green power," it would be required to include a disclosure, stating

> We deliver energy through the purchase of Renewable Energy Credits (RECs). A REC represents the social good that accompanies 1 megawatt-hour of renewable electricity generation. RECs may be sold separately from renewable electricity itself. Renewable electricity and RECs may be sold to different entities. The purchase of a REC does not indicate that renewable electricity itself has been purchased by the entity that purchased the REC.

See Md. Code, Pub. Util. § 7-707(f).

40.     The Act also requires any electricity supplier that offers green power for sale to make a disclosure of

a.      "[W]hat the customer will actually be paying for when the customer purchases green power from the electricity supplier";

b.      "how the electricity that the customer has purchased is generated";

c.      "how the green power will benefit the environment";

d.      "the percentage of electricity that would be provided by the electricity supplier that is eligible for inclusion in meeting the renewable energy portfolio standard"; and

e.      "the state in which the electricity was generated."

See Md. Code, Pub. Util. § 7-707(g).

41.     In order to comply with these disclosures, Green Mountain would have to provide inaccurate information regarding RECs contrary to the information Green Mountain currently provides.  In particular, in the residential context, RECs must be paired with electricity in order for that electricity to be considered "renewable," but the Act's disclosures inaccurately state that renewable electricity and RECs may be sold separately.

10

JA68

42. The Act's disclosures regarding RECs and renewable energy also conflict with Green Mountain's statements regarding RECs, and Green Mountain could no longer say, as it does now, that "RECs . . . can be traded separately from the actual electricity produced by renewable facilities" or that when RECs are sold separately from the renewable energy on which they are based, the underlying energy "is no longer considered renewable."

43. The Act would also require Green Mountain to state that RECs are a "social good," which is in conflict with how Green Mountain describes RECs currently, and Green Mountain does not wish to make such a statement. That is, Green Mountain currently describes RECs as part of the process by which renewable energy serves the social good, but they are not, in and of themselves, a social good, and the Act would require Green Mountain to make a statement with which it does not agree.

44. The Act would also require Green Mountain to state how "green power" (as Maryland has defined it) will benefit the environment, but Green Mountain already explains how its products benefit the environment—including that Green Mountain's 100% REC-backed products help preserve and protect the environment and mitigate the effects of climate change—and would be required to alter its message to align with Maryland's preferred definition of "green power." Green Mountain does not want to change its messaging, much less to provide a bespoke Maryland-approved message of what green power is when that definition is different than Green Mountain's view.

I declare under penalty of perjury that the foregoing is true and correct.

11

JA69

Executed on September 26, 2024.

Michael Rombach
Vice President
Green Mountain Energy Company
910 Louisiana St.
Houston TX 77002

12

JA70

# Exhibit 3

JA71

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

RETAIL ENERGY ADVANCEMENT LEAGUE
*et al.*,

     Plaintiffs,

v.

ANTHONY G. BROWN, in his official capacity as
Attorney General of Maryland, *et al.*,

     Defendants.

Civil Action No. 1:24-cv-2820

## DECLARATION OF CHRISTYNA NAGLE IN SUPPORT OF
## PLAINTIFFS' COMPLAINT AND MOTION FOR PRELIMINARY INJUNCTION

I, Christyna Nagle, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am over eighteen years of age, of sound mind, and otherwise competent to make this Declaration. The evidence set out in this Declaration is based on my personal knowledge, and if called to testify I could swear competently thereto.

2. I submit this Declaration in support of Plaintiffs' Complaint and Motion for Preliminary Injunction.

3. I have been employed by CleanChoice Energy, Inc. ("CleanChoice") since 2013, and I currently serve as Chief Revenue Officer & Head of Retail. In that role, I oversee the Retail business, connecting hundreds of thousands of households to clean energy. As part of this, I oversee marketing and sales efforts, including CleanChoice's efforts to acquire and retain clean energy customers.

4. CleanChoice is a Maryland corporation headquartered in Washington, DC.

JA72

5. CleanChoice is a founding member of the Retail Energy Advancement League ("REAL"), a national advocacy organization dedicated to the expansion and modernization of American retail energy markets.

6. CleanChoice was founded in 2012 to "revolutionize clean energy" and to "create a world free of catastrophic climate change." CleanChoice, *About Us*, https://cleanchoiceen-ergy.com/about-us. It is a mission-driven, clean-tech company that empowers people and businesses to easily access solutions for climate change. Fundamentally, it is CleanChoice's "mission to make it easy for everyone, everywhere to choose clean electricity." *Id.*

7. CleanChoice is "proud to connect more customers than ever to clean energy" and is "striving toward a cleaner future powered by energy generated at [its] own solar farms." *Id.* CleanChoice cares deeply "about making a positive impact on both our planet and our world." *Id.*

8. CleanChoice is one of the largest independent retail energy providers in the country that exclusively offers its customers 100% renewable energy products.

9. CleanChoice currently has approximately 235,000 retail customers in the District of Columbia and eight states: Delaware, Illinois, Massachusetts, New Jersey, New York, Ohio, Pennsylvania, and Maryland.

10. CleanChoice currently has approximately 20,000 residential electricity supply customers in Maryland. CleanChoice is among the top five residential electricity suppliers in Maryland, by number of customers.

11. CleanChoice sells electricity supply paired 100% with Renewable Energy Certificates ("RECs") from wind- and solar-energy generation sources to its residential customers in Maryland and elsewhere. *See* CleanChoice, *What Are Renewable Energy Certificates? How You*

2

JA73

*Can Choose Clean Energy Through RECs*, https://cleanchoiceenergy.com/news/clean-renewable-energy-certificates-recs ("*What Are RECs*"); CleanChoice, *How We Bring You Clean Energy*, https://cleanchoiceenergy.com/news/how-we-bring-you-clean-energy ("*How We Bring You Clean Energy*").

12.     CleanChoice acquires its RECs from dozens of solar and wind farms, largely in the Upper Midwest and Mid-Atlantic Regions.  *See, e.g.*, *What Are RECs*, *supra*.

13.     To market and sell its 100% wind and solar REC-backed products, CleanChoice's marketing emphasizes the renewable attributes of CleanChoice's electricity supply.

14.     CleanChoice markets its residential electricity supply in Maryland through several means, including internet advertising, email marketing, direct-mail advertising, and occasional in-person advertising (such as kiosks at local farmer's markets).

15.     Under the law at issue, introduced by the Maryland General Assembly as Senate Bill 1 and signed into law by the Governor on May 9, 2024 (the "Act"), effective January 1, 2025, as explained below, CleanChoice will no longer be able to market its 100% clean and renewable residential electricity product in all the ways it does.

    a.     For instance, on its main webpage, CleanChoice markets its electricity supply as "clean."  *See* CleanChoice, *A Cleaner Future Starts with You*, https://cleanchoiceenergy.com/ ("*Home Page*") ("Explore what clean energy options are available to you."). CleanChoice does the same in its direct-mail advertisements.

    b.     On its main webpage, CleanChoice markets its electricity supply as "pollution-free."  *Id.* ("You can choose clean, pollution-free energy in minutes—and you won't have to change your daily routine.").  CleanChoice does the same in its direct-mail advertisements.

JA74

c.  On its main webpage, CleanChoice markets its electricity supply as "100% renewable." *Id.* ("We have high standards for our energy sources, so you'll know you're getting clean, 100% renewable energy."). CleanChoice also markets its electricity products as "100% renewable wind and solar energy." *See* CleanChoice, *Clean Electricity for a Cleaner World*, https://cleanchoiceenergy.com/products/clean-electricity ("*Clean Electricity*").

d.  In a video on its main webpage, CleanChoice markets its electricity supply as "green." *See Home Page*, *supra* ("Come learn about how we connect people with electricity from cleaner, greener sources like wind and solar, 100% pollution free, 100% regional power from farm to cable.").

e.  In that same video, CleanChoice markets its electricity supply as "100% pollution free." *See id.* CleanChoice does the same in its direct-mail advertisements.

f.  In that same video, CleanChoice markets its electricity supply as "sustainable." *See id.* (referring to its supply as a "sustainable way to provide power to communities").

g.  On its Instagram social-media page, CleanChoice markets its electricity supply as "eco-friendly." *See* Instagram, *CleanChoice Energy* (Jan. 23, 2024) https://www.instagram.com/cleanchoiceenergy/p/C2c8YCXNkYf/ ("Are you looking for a simple way to make your life more eco-friendly this year? When you sign up with CleanChoice Energy, you can significantly reduce your carbon footprint—without a change in your daily routine—by powering your home with 100% clean energy.").

h.  On that social-media page, as well as on its website, CleanChoice markets its electricity as "100% clean." *See id.*

4

JA75

16.     CleanChoice's representations regarding the "clean" and "renewable" qualities of its products are truthful and accurate.

17.     CleanChoice follows the "Green Guides" promulgated by the Federal Trade Commission to ensure that its marketing about its electricity supply is not misleading.  *See* 16 C.F.R. § 260.15.

18.     CleanChoice also complies with the law in the other states in which it operates in making claims about its "100% clean" electricity.  That is, CleanChoice's current marketing practices are consistent with how the other states in which it operates regulate "green power" marketing.

19.     CleanChoice also has extensive marketing and information materials that educate customers about RECs.

    a.     For example, in a customer-facing news item on one of its webpages, CleanChoice explains that RECs are "the 'clean' in 'clean energy'" and are "the credible way to track renewable energy content in electricity products, and for a consumer to legally claim they are using clean energy."  *What Are RECs*, *supra*.

    b.     In a customer-facing news item on another of its webpages, CleanChoice explains that "RECs represent the environmental attributes of the power produced from renewable energy projects."  *How We Bring You Clean Energy*, *supra*.

    c.     In a report accessible on CleanChoice's website, it is explained that, when a REC is sold separately from the energy on which it is based, the "renewable attribute" of that energy travels with the REC and does not "remain attached to the generated electricity."  Center for Resource Solutions, *The Legal Basis for Renewable Energy Certificates* 10 (2023), *available at What Are RECs, supra* (internal quotation marks omitted).

JA76

20. CleanChoice also discloses that its renewable energy products are backed by RECs on its website, and that 100% of its renewable energy sold in Maryland is backed by wind and solar RECs. *See Clean Electricity, supra.*

21. Consistent with pre-existing Maryland regulations, CleanChoice also discloses in each of its renewable energy contracts that the renewable energy it offers is backed by RECs, including that Maryland-compliant RECs are used to satisfy its obligations under State law. CleanChoice similarly files a yearly Renewable Portfolio Standard Report with the State disclosing its total Maryland renewable electricity sales, including total number of Maryland-compliant RECs by renewable source.

22. On one of its webpages, CleanChoice also explains the environmental benefits from using its product. *See id.* As CleanChoice explains, "becoming a CleanChoice Energy customer help[s] the environment" by "greatly reducing [one's] carbon footprint" and "increas[ing] demand for clean energy, paving the way to become less reliant on polluting fossil fuels." *Id.* And in the Terms and Conditions accompanying its direct-mail marketing materials and its contracts, CleanChoice explains that "[i]ncreased demand for, and generation of, renewable electricity can help reduce conventional electricity generation from fossil fuels in the region where the renewable electricity generator is located" and "may also have other environmental benefits such as little or no regional air pollution or carbon dioxide."

23. 100% solar and wind REC-backed electricity is more expensive to supply than non-renewable energy supply.

24. CleanChoice's residential customers in Maryland purchase CleanChoice's electricity supply because of its renewable attributes, and they are willing to pay a premium over the rates of the local public utility that does not include 100% REC-backed electricity.

JA77

25. As one customer testimonial on CleanChoice's main webpage attests, "Thank you for providing this environmentally friendly power option and with minimal effort on the part of the consumer!" *See Home Page*, *supra*.

26. As another customer testimonial on that webpage puts it, "We like getting reports that show how much of a difference our household has made by using CleanChoice Energy." *Id.*

27. As another customer testimonial on that webpage puts it, "[CleanChoice is] a seamless and easy way to contribute to a clean energy future. Love it." *Id.*

28. Because of the Act's requirement, effective January 1, 2025, CleanChoice can no longer market its products as "clean," "pollution-free," "100% renewable," "green," "100% pollution free," "sustainable," "eco-friendly," or "100% clean"—which are accurate and truthful statements—unless it agrees with Maryland's own definition of "green power."

29. Even though CleanChoice's electricity products are backed by regional solar and wind RECs, they do not satisfy Maryland's definition of "green power," and CleanChoice would have to incur significant costs in order to satisfy that standard.

30. CleanChoice also has marketing materials for Maryland residents specifically, such as the product page customers see after entering a Maryland zip code at cleanchoiceenergy.com. Due to Maryland's restrictions, this content could not be updated to comply with the Act's restrictions and would need to be removed entirely, at the cost of time and money spent on its development.

31. In addition to not being able to market its products as it wants to, the Act imposes a rate cap on electricity that does not meet Maryland's own definition of "green power," and CleanChoice would have to sell its 100% wind and solar REC-backed product at a substantially lower, financially unsustainable price in Maryland in order to participate in that market.

7

32.     CleanChoice cannot sustain its clean energy products at the capped rate, and, to avoid incurring substantial loss of revenue, it would have to discontinue service for many of its existing customers and cease marketing to new customers in Maryland.

33.     Even if CleanChoice could satisfy Maryland's definition of "green power" and it wanted to continue to market clean energy according to the State's new definition, it would be forced to satisfy a pre-approval process for renewable products—in which it proposes a price to the Maryland Public Service Commission for its review and approval—before it may market its products as "clean," "pollution-free," "100% renewable," "green," "100% pollution free," "sustainable," "eco-friendly," or "100% clean."  The uncertainty of the outcome of this application and review process, including the uncertainty of whether CleanChoice could offer renewable products at a financially sustainable price, further limits CleanChoice's ability to participate as a retailer in Maryland.

34.     Accordingly, CleanChoice has already suspended any in-person marketing in Maryland, and CleanChoice will soon have to discontinue its marketing and advertising to any Maryland customer, because it cannot rewrite its marketing materials to fully remove all of the words that Maryland has banned in the Act.

35.     Additionally, in light of CleanChoice's inability to advertise its clean energy product and charge a reasonable rate under the Act, it is preparing to cancel many of its existing clean energy contracts with Maryland consumers and to transfer them to Maryland utility companies as of January 1, 2025.

36.     Even if CleanChoice could comply with Maryland's definition of "green power," it would be required to include a disclosure, stating

> We deliver energy through the purchase of Renewable Energy Credits (RECs). A REC represents the social good that accompanies 1

JA79

> megawatt-hour of renewable electricity generation. RECs may be sold separately from renewable electricity itself. Renewable electricity and RECs may be sold to different entities. The purchase of a REC does not indicate that renewable electricity itself has been purchased by the entity that purchased the REC.

*See* Md. Code, Pub. Util. § 7-707(f).

37. The Act also requires any electricity supplier that offers green power for sale to make a disclosure of

> a. "[W]hat the customer will actually be paying for when the customer purchases green power from the electricity supplier";

> b. "how the electricity that the customer has purchased is generated";

> c. "how the green power will benefit the environment";

> d. "the percentage of electricity that would be provided by the electricity supplier that is eligible for inclusion in meeting the renewable energy portfolio standard"; and

> e. "the state in which the electricity was generated."

*See* Md. Code, Pub. Util. § 7-707(g).

38. In order to comply with these disclosures, CleanChoice would have to provide inaccurate information regarding RECs contrary to the information CleanChoice currently provides. In particular, while electricity and RECs generally may be sold separately, electricity cannot be accurately described as renewable ***unless*** it is paired with RECs. The Act's disclosures inaccurately state that "renewable energy" and RECs may be sold separately.

39. The Act's disclosures regarding RECs and renewable energy also conflict with CleanChoice's statements regarding RECs, and CleanChoice could no longer say, as it does now, that RECs are "the credible way to track renewable energy content in electricity products."

JA80

40.     If it were required to make the disclosures required by the Act, CleanChoice would have to change its marketing and public statements regarding RECs because the conflicting messages required by the Act would cause substantial confusion for CleanChoice's existing customers and prospective customers.

41.     The Act would also require CleanChoice to state that RECs are a "social good," which is in conflict with how CleanChoice describes RECs currently—that is, that "RECs represent the environmental attributes of power produced from renewable energy projects"—and CleanChoice does not wish to make such a statement.  That is, CleanChoice currently describes RECs as part of the process by which renewable energy serves the social good, but they are not, in and of themselves, a social good, and the Act would require CleanChoice to make a statement with which it does not agree.

42.     The Act would also require CleanChoice to state how "green power" (as Maryland has defined it) will benefit the environment, but CleanChoice already explains how its products benefit the environment—including that CleanChoice's 100% solar and wind REC-backed products "greatly reduc[e] carbon footprint" and "pav[e] the way to become less reliant on polluting fossil fuels"—and would be required to alter its message to align with Maryland's preferred definition of "green power."  CleanChoice does not want to change its messaging, much less to do so to support Maryland's definition of green power, which is different than CleanChoice's products.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 26 , 2024.

*Christy Nagle*
Christyna Nagle
Chief Revenue Officer & Head of Retail
CleanChoice Energy, Inc.
2445 M Street NW, Suite 200
Washington, DC 20037-1674

10

JA81

# EXHIBIT 1

JA82

Chapter 537

**(Senate Bill 1)**

AN ACT concerning

**Electricity and Gas – Retail Supply – Regulation and Consumer Protection**

FOR the purpose of altering a certain charge that may be assessed to a public service company; changing the name of the Retail Choice Customer Education and Protection Fund to the Education and Protection Fund; modifying the purpose and uses of the Fund; altering the scope of a certain training and educational program that the Public Service Commission is required to develop; requiring the Commission to require a residential energy retailer to post certain information on the energy retailer's website; providing for the recovery of certain costs through rates; establishing an energy salesperson license for certain persons that offer or sell electricity supply agreements or gas supply agreements to customers in the State; establishing an energy vendor license for certain persons that provide energy sales services in the State; providing for the terms of electricity supplier, energy salesperson, energy vendor, and gas supplier licenses issued by the ~~Public Service~~ Commission; establishing certain licensing and renewal requirements for certain persons; providing for certain disciplinary actions by the Commission against electricity suppliers, gas suppliers, ~~and~~ energy vendors, and energy salespersons for certain acts; altering and establishing the amounts of certain civil penalties that may be assessed with respect to electricity suppliers, gas suppliers, and energy ~~salespersons~~ vendors for certain violations; prohibiting the Commission from imposing a civil penalty on an energy salesperson; establishing certain authorizations and restrictions on the offer and sale of certain electricity supply and gas supply; requiring an electric company ~~and an~~, a certain electricity supplier, a gas company, and a certain gas supplier to establish a mechanism for a customer to request and receive a certain replacement number under certain circumstances and to allow a customer to be placed on a certain list regarding electricity service or gas service; requiring ~~electric companies~~ billing entities to submit to the Commission a certain monthly report on customer choice; altering the contents of a certain annual report that each electricity supplier is required to submit to the Commission; prohibiting a certain electricity supplier from marketing electricity as green power unless certain conditions are met; requiring an electricity supplier that offers green power for sale to residential customers to purchase certain renewable energy credits in excess of the renewable energy portfolio standard ~~in a certain year in an amount equal to the amount of electricity sold to residential customers as green power in that year~~; *requiring the Commission to hold certain proceedings to set the price of electricity marketed as green power under certain circumstances;* requiring certain electricity suppliers marketing and selling green power to residential customers to include ~~a certain disclosure~~ certain disclosures in certain marketing materials; stating the intent of the General Assembly regarding the establishment of a certain division within the Commission; allowing the Commission to impose on certain persons up to a certain amount as a special assessment in a certain manner; allowing

– 1 –

JA83

certain funds to be expended for certain purposes in accordance with an approved budget amendment; <u>requiring, on or before a certain date, the Commission to develop a certain training and education program;</u> *requiring the Commission to study and report to certain committees of the General Assembly, on or before a certain date, on certain customer load configurations;* and generally relating to retail energy supply and consumer protection.

BY repealing and reenacting, without amendments,
    Article – Public Utilities
    Section 1–101(a), (l), (p), (ee), and (ff), ~~7–310(b)~~ 2–110(a) and (b), *7–701(a) and (m),*
        13–101, and 13–201(a) and (b)
    Annotated Code of Maryland
    (2020 Replacement Volume and 2023 Supplement)

BY adding to
    Article – Public Utilities
    Section 1–101(l–1) <u>and (l–2)</u>, ~~7–507.1~~ <u>7–315 through 7–318</u>, 7–603.1, <u>7–604.2,</u> and
        7–707
    Annotated Code of Maryland
    (2020 Replacement Volume and 2023 Supplement)

BY repealing and reenacting, with amendments,
    Article – Public Utilities
    Section <u>2–110(c)(12),</u> ~~7–310(c)~~ <u>7–310, 7–311</u>, 7–507, 7–510, 7–602, 7–603, 7–604,
        7–605, 7–705(a), and 13–201(e)(3)
    Annotated Code of Maryland
    (2020 Replacement Volume and 2023 Supplement)

SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND, That the Laws of Maryland read as follows:

**Article – Public Utilities**

1–101.

(a)     In this division the following words have the meanings indicated.

(l)     (1)     "Electricity supplier" means a person:

            (i)     who sells:

                1.     electricity;

                2.     electricity supply services;

                3.     competitive billing services; or

JA84

4.      competitive metering services; or

(ii)     who purchases, brokers, arranges, or markets electricity or electricity supply services for sale to a retail electric customer.

(2)     "Electricity supplier" includes an electric company, an aggregator, a broker, and a marketer of electricity.

(3)     "Electricity supplier" does not include:

(i)     the following persons who supply electricity and electricity supply services solely to occupants of a building for use by the occupants:

1.      an owner/operator who holds ownership in and manages the internal distribution system serving the building; or

2.      a lessee/operator who holds a leasehold interest in and manages the internal distribution system serving the building;

(ii)     a person who generates on–site generated electricity; or

(iii)     a person that owns or operates equipment used for charging electric vehicles, including a person that owns or operates:

1.      an electric vehicle charging station;

2.      electric vehicle supply equipment; or

3.      an electric vehicle charging station service company or provider.

**(L–1) (1)   "ENERGY SALESPERSON" MEANS AN INDIVIDUAL WHO IS LICENSED BY THE COMMISSION TO SELL:**

**(1) (I)   ELECTRICITY OR ELECTRICITY SUPPLY SERVICES TO RESIDENTIAL RETAIL ELECTRIC CUSTOMERS ON BEHALF OF AN ELECTRICITY SUPPLIER AS AN EMPLOYEE OR AGENT OF THE ELECTRICITY SUPPLIER; OR**

**(2) (II)   GAS OR GAS SUPPLY SERVICES TO RESIDENTIAL RETAIL GAS CUSTOMERS ON BEHALF OF A GAS SUPPLIER AS AN EMPLOYEE OR AGENT OF THE GAS SUPPLIER.**

**(2)   "ENERGY SALESPERSON" DOES NOT INCLUDE:**

– 3 –

JA85

(I)     THE DEPARTMENT OF GENERAL SERVICES WHEN THE DEPARTMENT OF GENERAL SERVICES SELLS ENERGY UNDER § 7–704.4 OF THIS ARTICLE;

(II)    THE WASHINGTON SUBURBAN SANITARY COMMISSION WHEN THE WASHINGTON SUBURBAN SANITARY COMMISSION SELLS ENERGY UNDER DIVISION II OF THIS ARTICLE;

(III)   A COMMUNITY CHOICE AGGREGATOR UNDER § 7–510.3 OF THIS ARTICLE; OR

(IV)    AN EMPLOYEE OR CONTRACTOR OF AN ELECTRIC COMPANY WHEN THE EMPLOYEE OR CONTRACTOR IS PERFORMING DUTIES SPECIFIC TO STANDARD OFFER SERVICE.

(L–2) "ENERGY VENDOR" MEANS A PERSON THAT HAS A CONTRACT OR SUBCONTRACT TO PROVIDE ENERGY SALES SERVICES TO AN ELECTRICITY SUPPLIER OR A GAS SUPPLIER THAT PROVIDES ELECTRICITY SUPPLY SERVICES OR GAS SUPPLY SERVICES, RESPECTIVELY, TO A RESIDENTIAL CUSTOMER.

(p)     (1)     "Gas supplier" means a person who:

(i)     sells:

1.      gas;

2.      gas supply services; or

3.      competitive billing services for gas supply services; or

(ii)    purchases, brokers, arranges, or markets gas or gas supply services for sale to a retail gas customer.

(2)     "Gas supplier" includes an aggregator, a broker, and a marketer of gas.

(3)     "Gas supplier" does not include:

(i)     a gas company to the extent that the gas company provides gas sales or delivery service at rates regulated by the Commission;

(ii)    the following persons who supply gas solely to occupants of a building for use by the occupants:

1.      an owner/operator who holds ownership in and manages the internal distribution system serving the building; and

– 4 –

JA86

2.      a lessee/operator who holds a leasehold interest in and manages the internal distribution system serving the building; or

(iii)    a person who transmits or distributes gas within a site owned by the person or the person's affiliate that is incidental to a primarily landlord–tenant relationship.

(ee)    (1)    "Retail electric customer" means a purchaser of electricity for end use in the State.

(2)    "Retail electric customer" includes:

(i)    a person that owns or operates equipment used for charging electric vehicles, including:

1.      an electric vehicle charging station;

2.      electric vehicle supply equipment; or

3.      an electric vehicle charging station service company or provider; and

(ii)    a person that charges an electric vehicle at an electric vehicle charging station that the person owns or operates.

(3)    "Retail electric customer" does not include:

(i)    an occupant of a building in which the owner/operator or lessee/operator manages the internal distribution system serving the building and supplies electricity and electricity supply services solely to occupants of the building for use by the occupants;

(ii)    a person who generates on–site generated electricity, to the extent the on–site generated electricity is consumed by that person or its tenants; or

(iii)    except as provided in paragraph (2)(ii) of this subsection, a person that charges an electric vehicle at an electric vehicle charging station.

(ff)    (1)    "Retail gas customer" means a purchaser of gas for end use in the State.

(2)    "Retail gas customer" excludes an occupant of a building in which the owner/operator or lessee/operator manages the internal distribution system serving the building and supplies gas and gas supply services solely to occupants of the building for use by the occupants.

JA87

2–110.

(a)     In this section, "public service company" includes an electricity supplier and a gas supplier as those terms are defined in § 1–101 of this article.

(b)     (1)     The costs and expenses of the Commission and the Office of People's Counsel shall be borne by the public service companies that are subject to the Commission's jurisdiction.

(2)     The costs and expenses shall be assessed as provided in this section.

(3)     The Commission shall pay the money that it collects for the assessment under this section into the Public Utility Regulation Fund in the State Treasury established under § 2–110.1 of this subtitle to reimburse the State for the expenses of the Commission and the Office of People's Counsel.

(c)     (12)     The total amount that may be charged to a public service company under this section for a State fiscal year may not exceed:

(i)     [0.25%] **0.50%** of the public service company's gross operating revenues derived from intrastate utility and electricity supplier operations in the preceding calendar year, or other 12–month period that the Chairman determines, for the costs and expenses of the Commission other than that of the Office of People's Counsel; plus

(ii)     0.074% of those revenues for the costs and expenses of the Office of People's Counsel.

7–310.

~~(b)     There is a Retail Choice Customer Education and Protection Fund.~~

~~(c)     (1)     The Fund is a special, [nonlasping] NONLAPSING fund that is not subject to § 7–302 of the State Finance and Procurement Article.~~

~~(2)     The State Treasurer shall hold the Fund separately, and the Comptroller shall account for the Fund.~~

(a)     In this section, "Fund" means the [Retail Choice Customer] Education and Protection Fund.

(b)     There is [a Retail Choice Customer] **AN** Education and Protection Fund.

(c)     The purpose of the Fund is to provide resources to improve the Commission's ability to:

(1)     educate customers on**:**

– 6 –

JA88

**(I)** retail electric and gas choice; and

**(II)** ENERGY CHOICES THAT HELP MEET THE STATE'S CLIMATE COMMITMENTS UNDER §§ 7–211 AND 7–211.2 OF THIS TITLE AND §§ 2–1204.1 AND 2–1204.2 OF THE ENVIRONMENT ARTICLE;

(2) protect customers from unfair, false, misleading, or deceptive practices by electricity SUPPLIERS, ENERGY SALESPERSONS, ENERGY VENDORS, or gas suppliers; AND

**(3)** DEVELOP A TRAINING AND EDUCATIONAL PROGRAM FOR ELECTRICITY SUPPLIERS, GAS SUPPLIERS, ENERGY SALESPERSONS, AND ENERGY VENDORS AS PROVIDED UNDER § 7–311 OF THIS SUBTITLE.

(d) The Commission shall administer the Fund.

(e) (1) The Fund is a special, **[**nonlasping**]** NONLAPSING fund that is not subject to § 7–302 of the State Finance and Procurement Article.

(2) The State Treasurer shall hold the Fund separately, and the Comptroller shall account for the Fund.

(f) The Fund consists of:

(1) revenue distributed to the Fund under § 13–201(e)(3) of this article;

(2) money appropriated in the State budget to the Fund; and

(3) any other money from any other source accepted for the benefit of the Fund.

(g) The Fund may be used only to:

(1) educate retail electric or gas customers on retail choice AND ENERGY CHOICES THAT HELP TO MEET THE STATE'S CLIMATE COMMITMENTS UNDER §§ 7–211 AND 7–211.2 OF THIS TITLE AND §§ 2–1204.1 AND 2–1204.2 OF THE ENVIRONMENT ARTICLE; **[**and**]**

(2) improve customer protections for retail electric or gas customers; AND

**(3)** DEVELOP A TRAINING AND EDUCATIONAL PROGRAM FOR ELECTRICITY SUPPLIERS, GAS SUPPLIERS, ENERGY SALESPERSONS, AND ENERGY VENDORS AS PROVIDED UNDER § 7–311 OF THIS SUBTITLE.

JA89

(h) (1) The State Treasurer shall invest the money of the Fund in the same manner as other State money may be invested.

(2) Any investment earnings of the Fund shall be credited to the General Fund of the State.

(i) Expenditures from the Fund may be made only in accordance with the State budget.

7–311.

(a) The Commission shall develop a training and educational program for any entity or individual that is licensed by the Commission as an electricity supplier **[**or**]**, a gas supplier**, AN ENERGY SALESPERSON, OR AN ENERGY VENDOR**.

(b) The Commission shall develop the program in consultation with interested stakeholders, including electricity suppliers **[**and**]**, gas suppliers, **ENERGY SALESPERSONS, AND ENERGY VENDORS**.

(c) The program shall require that a designated representative of each licensed electricity supplier **[**or**]**, licensed gas supplier**, LICENSED ENERGY VENDOR, OR LICENSED ENERGY SALESPERSON** demonstrate a thorough understanding of the Commission's regulations regarding:

(1) sales;

(2) consumer protection; and

(3) any other matter the Commission deems appropriate.

(d) At the conclusion of the training, the Commission shall:

(1) conduct an examination; and

(2) on a satisfactory score, certify that the designated representative of the licensed electricity supplier **[**or**]**, licensed gas supplier**, LICENSED ENERGY SALESPERSON, OR LICENSED ENERGY VENDOR** has successfully completed the training.

(e) (1) The Commission shall determine the schedule and frequency by which a designated representative of a licensed electricity supplier **[**or**]**, licensed gas supplier**, LICENSED ENERGY SALESPERSON, OR LICENSED ENERGY VENDOR** must complete the training and certification.

JA90

(2)    A designated representative of a new electricity supplier **[**or**],** gas supplier**, ENERGY SALESPERSON, OR ENERGY VENDOR** shall complete the training and certification prior to the issuance of a license.

(f)    The Commission may adopt regulations that include appropriate penalties or sanctions for failure to comply with this section.

(g)    (1)    The Commission shall use **[**the assessments collected in accordance with § 2–110 of this article**] THE FOLLOWING FUNDING SOURCES** for the initial development of the training and educational program**:**

(I)    **THE ASSESSMENTS COLLECTED IN ACCORDANCE WITH § 2–110 OF THIS ARTICLE; OR**

(II)    **FUNDS DEPOSITED INTO THE EDUCATION AND PROTECTION FUND IN ACCORDANCE WITH § 7–310 OF THIS SUBTITLE.**

(2)    The Commission may establish reasonable fees to pay for the costs of the program.

**7–315.**

(A)    (1)    **IN THIS SECTION, "RESIDENTIAL ENERGY RETAILER" INCLUDES:**

(I)    **AN ELECTRICITY SUPPLIER THAT SUPPLIES ELECTRICITY TO RESIDENTIAL RETAIL ELECTRIC CUSTOMERS;**

(II)    **A GAS SUPPLIER THAT SUPPLIES GAS TO RESIDENTIAL RETAIL GAS CUSTOMERS;**

(III)    **AN ENERGY SALESPERSON; AND**

(IV)    **AN ENERGY VENDOR.**

(2)    **"RESIDENTIAL ENERGY RETAILER" DOES NOT INCLUDE:**

(I)    **THE DEPARTMENT OF GENERAL SERVICES WHEN THE DEPARTMENT OF GENERAL SERVICES SELLS ENERGY UNDER § 7–704.4 OF THIS TITLE;** ~~OR~~

(II)    **A COMMUNITY CHOICE AGGREGATOR UNDER § 7–510.3 OF THIS TITLE;**

JA91

(III) AN ELECTRICITY SUPPLIER ~~THAT SUPPLIES~~ *WHEN SUPPLYING* ELECTRICITY TO COMMERCIAL RETAIL ELECTRIC CUSTOMERS; OR

(IV) A GAS SUPPLIER THAT SUPPLIES GAS TO COMMERCIAL RETAIL GAS CUSTOMERS.

(B) THE COMMISSION MAY ADOPT REGULATIONS TO:

(1) REQUIRE A RESIDENTIAL ENERGY RETAILER TO POST NOTICES AND DISCLOSURES REQUIRED UNDER THIS TITLE ON THE RETAILER'S WEBSITE:

(I) IN A PROMINENT LOCATION;

(II) USING AT LEAST A CERTAIN MINIMUM FONT SIZE; AND

(III) IN A FORMAT APPROVED BY THE COMMISSION; AND

(2) REQUIRE OR PROHIBIT THE USE OF SPECIFIC LANGUAGE IN A RESIDENTIAL ENERGY RETAILER'S MARKETING MATERIALS, DISCLAIMERS, DISCLOSURES, AND LEGAL DOCUMENTS, INCLUDING REQUIRING OR PROHIBITING THE USE OF SPECIFIC LANGUAGE BASED ON SERVICE OR PRODUCT TYPE.

(C) THE COMMISSION SHALL REQUIRE A RESIDENTIAL ENERGY RETAILER TO POST ON THE RETAILER'S WEBSITE, IN CLEAR AND UNAMBIGUOUS LANGUAGE:

(1) THE TERMS AND CONDITIONS OF THE RESIDENTIAL SERVICES AND PRODUCTS SOLD BY THE RETAILER; AND

(2) AN ENVIRONMENTAL DISCLOSURE, IN A FORMAT REQUIRED BY THE COMMISSION, FOR THE RESIDENTIAL SERVICES AND PRODUCTS SOLD BY THE RETAILER.

**7–316.**

(A) IN THIS SECTION, "MARKETING" DOES NOT INCLUDE MATERIALS TO EDUCATE OR INFORM A RETAIL CUSTOMER ABOUT STANDARD OFFER SERVICE, DEFAULT GAS COMMODITY SERVICE, OR CUSTOMER CHOICE.

(B) ~~AN~~ *EXCEPT AS PROVIDED IN SUBSECTION (D) OF THIS SECTION, AN* ELECTRIC COMPANY ~~AND~~ *OR* A GAS COMPANY MAY NOT RECOVER THROUGH ITS RATES ANY COSTS ASSOCIATED WITH MARKETING ITS SERVICES.

(C) AN ELECTRIC COOPERATIVE MAY RECOVER THROUGH ITS RATES ANY COSTS ASSOCIATED WITH MARKETING ITS SERVICES, INCLUDING THE COSTS

JA92

ASSOCIATED WITH MATERIALS THAT EDUCATE OR INFORM A RETAIL CUSTOMER ABOUT STANDARD OFFER SERVICE OR CUSTOMER CHOICE.

*(D)   THE COMMISSION MAY, BY REGULATION, ADOPT CRITERIA FOR REVIEWING MARKETING AND OTHER COMMUNICATION MATERIALS OF AN ELECTRIC COMPANY OR A GAS COMPANY TO DETERMINE WHETHER THE COST OF THE MATERIALS MAY BE RECOVERED THROUGH THE COMPANY'S RATES.*

7–317.

(A)   (1)   BEGINNING JULY 1, 2025, A PERSON MAY NOT ENGAGE IN THE BUSINESS OF AN ENERGY SALESPERSON IN THE STATE UNLESS THE PERSON HOLDS A LICENSE ISSUED BY THE COMMISSION.

(2)   A LICENSED ENERGY SALESPERSON MAY OFFER OR SELL ELECTRICITY SUPPLY AGREEMENTS OR GAS SUPPLY AGREEMENTS TO CUSTOMERS IN THE STATE ONLY IF THE ENERGY SALESPERSON IS ASSOCIATED WITH A LICENSED ELECTRICITY SUPPLIER OR LICENSED GAS SUPPLIER, RESPECTIVELY.

(B)   (1)   AN APPLICATION FOR AN ENERGY SALESPERSON LICENSE SHALL:

(I)   BE MADE TO THE COMMISSION IN WRITING ON A FORM ADOPTED BY THE COMMISSION;

(II)   BE VERIFIED BY OATH OR AFFIRMATION; AND

(III)   CONTAIN INFORMATION THAT THE COMMISSION REQUIRES, INCLUDING:

1.   PROOF OF ASSOCIATION WITH A LICENSED ELECTRICITY SUPPLIER OR LICENSED GAS SUPPLIER, AS APPROPRIATE;

2.   PROOF OF COMPLIANCE WITH ALL APPLICABLE TRAINING REQUIREMENTS FOR CUSTOMER PROTECTION UNDER THIS SUBTITLE AND SUBTITLES 5 AND 6 OF THIS TITLE AS REQUIRED BY THE COMMISSION; AND

3.   PAYMENT OF THE APPLICABLE LICENSING FEE.

(2)   (I)   THE TERM OF AN ENERGY SALESPERSON LICENSE IS 3 YEARS.

(II)   THE TERMS OF LICENSES MAY BE STAGGERED AS DETERMINED BY THE COMMISSION.

– 11 –

JA93

(III)   SUBJECT TO SUBPARAGRAPH (V) OF THIS PARAGRAPH, UNLESS A LICENSE IS RENEWED FOR A 3–YEAR TERM IN ACCORDANCE WITH THIS SUBSECTION, THE LICENSE EXPIRES ON THE DATE THAT THE COMMISSION SETS.

(IV)   A LICENSEE MAY RENEW A LICENSE FOR A 3–YEAR TERM BEFORE THE LICENSE EXPIRES IF THE LICENSEE:

1.   OTHERWISE IS ENTITLED TO BE LICENSED;

2.   SUBMITS TO THE COMMISSION A RENEWAL APPLICATION ON THE FORM THAT THE COMMISSION PROVIDES; AND

3.   PAYS TO THE COMMISSION THE APPLICABLE RENEWAL FEE SET BY THE COMMISSION.

(V)   A LICENSEE MAY CONTINUE TO PROVIDE SERVICES AS AN ENERGY SALESPERSON AFTER THE LICENSEE'S LICENSE EXPIRES IF THE LICENSEE'S RENEWAL APPLICATION IS SUBMITTED TO THE COMMISSION BEFORE THE LICENSE EXPIRES.

(C)   THE COMMISSION SHALL, BY REGULATION OR ORDER:

(1)   REQUIRE PROOF OF FINANCIAL INTEGRITY;

(2)   REQUIRE A LICENSEE TO POST A BOND OR OTHER SIMILAR INSTRUMENT IF, IN THE COMMISSION'S JUDGMENT, THE BOND OR SIMILAR INSTRUMENT IS NECESSARY TO ENSURE AN ENERGY SALESPERSON'S FINANCIAL INTEGRITY; AND

(3)   ADOPT ANY OTHER REQUIREMENTS THE COMMISSION FINDS TO BE IN THE PUBLIC INTEREST.

(D)   A LICENSE ISSUED UNDER THIS SECTION MAY NOT BE TRANSFERRED WITHOUT PRIOR COMMISSION APPROVAL.

7–318.

(A)   BEGINNING JULY 1, 2025, A PERSON MAY NOT ENGAGE IN THE BUSINESS OF AN ENERGY VENDOR IN THE STATE UNLESS THE PERSON HOLDS A LICENSE ISSUED BY THE COMMISSION.

(B)   (1)   AN APPLICATION FOR AN ENERGY VENDOR LICENSE SHALL:

JA94

**(I)**     BE MADE TO THE COMMISSION IN WRITING ON A FORM ADOPTED BY THE COMMISSION;

**(II)**     BE VERIFIED BY OATH OR AFFIRMATION; AND

**(III)**     CONTAIN INFORMATION THAT THE COMMISSION REQUIRES, INCLUDING PAYMENT OF THE APPLICABLE LICENSING FEE.

**(2)     (I)**     THE TERM OF AN ENERGY VENDOR LICENSE IS 3 YEARS.

**(II)**     THE TERMS OF LICENSES MAY BE STAGGERED AS DETERMINED BY THE COMMISSION.

**(III)**     UNLESS A LICENSE IS RENEWED FOR A 3–YEAR TERM IN ACCORDANCE WITH THIS SUBSECTION, THE LICENSE EXPIRES ON THE DATE THAT THE COMMISSION SETS.

**(IV)**     A LICENSEE MAY RENEW A LICENSE FOR A 3–YEAR TERM BEFORE THE LICENSE EXPIRES IF THE LICENSEE:

**1.**     OTHERWISE IS ENTITLED TO BE LICENSED;

**2.**     SUBMITS TO THE COMMISSION A RENEWAL APPLICATION ON THE FORM THAT THE COMMISSION PROVIDES; AND

**3.**     PAYS TO THE COMMISSION THE APPLICABLE RENEWAL FEE SET BY THE COMMISSION.

**(C)**     THE COMMISSION SHALL, BY REGULATION OR ORDER:

**(1)**     REQUIRE PROOF OF FINANCIAL INTEGRITY;

**(2)**     REQUIRE A LICENSEE TO POST A BOND OR OTHER SIMILAR INSTRUMENT IF, IN THE COMMISSION'S JUDGMENT, THE BOND OR SIMILAR INSTRUMENT IS NECESSARY TO ENSURE AN ENERGY VENDOR'S FINANCIAL INTEGRITY; AND

**(3)**     ADOPT ANY OTHER REQUIREMENTS THE COMMISSION FINDS TO BE IN THE PUBLIC INTEREST.

**(D)**     A LICENSE ISSUED UNDER THIS SECTION MAY NOT BE TRANSFERRED WITHOUT PRIOR COMMISSION APPROVAL.

7–507.

– 13 –

JA95

(a)    A person, other than an electric company providing standard offer service under § 7–510(c) of this subtitle, a municipal electric utility serving customers solely in its distribution territory, **THE DEPARTMENT OF GENERAL SERVICES SELLING ENERGY UNDER § 7–704.4 OF THIS TITLE,** or a community choice aggregator under § 7–510.3 of this subtitle, may not engage in the business of an electricity supplier in the State unless the person holds a license issued by the Commission.

(b)    **(1)**    An application for an electricity supplier license shall:

[(1)] **(I)**    be made to the Commission in writing on a form adopted by the Commission;

[(2)] **(II)**    be verified by oath or affirmation; and

[(3)] **(III)**    contain information that the Commission requires, including:

[(i)] **1.**    proof of technical and managerial competence;

[(ii)] **2.**    proof of compliance with all applicable requirements of the Federal Energy Regulatory Commission, and any independent system operator or regional or system transmission operator to be used by the licensee;

[(iii)] **3.**    a certification of compliance with applicable federal and State environmental laws and regulations that relate to the generation of electricity; and

[(iv)] **4.**    payment of the applicable licensing fee.

**(2)    (I)    THE TERM OF ~~AN~~ A RESIDENTIAL ELECTRICITY SUPPLIER LICENSE IS 3 YEARS.**

**(II)    THE TERMS OF LICENSES MAY BE STAGGERED AS DETERMINED BY THE COMMISSION.**

**(III)    UNLESS A LICENSE FOR A RESIDENTIAL ELECTRICITY SUPPLIER IS RENEWED FOR A 3–YEAR TERM IN ACCORDANCE WITH THIS SUBSECTION, THE LICENSE EXPIRES ON THE DATE THAT THE COMMISSION SETS.**

**(IV)    A LICENSEE MAY RENEW A LICENSE FOR ~~AN ADDITIONAL~~ A 3–YEAR TERM BEFORE THE LICENSE EXPIRES IF THE LICENSEE:**

**1.    OTHERWISE IS ENTITLED TO BE LICENSED;**

JA96

**2.** **SUBMITS TO THE COMMISSION A RENEWAL APPLICATION ON THE FORM THAT THE COMMISSION PROVIDES; AND**

**3.** **PAYS TO THE COMMISSION THE APPLICABLE RENEWAL FEE SET BY THE COMMISSION.**

(c)     The Commission shall, by regulation or order:

(1)     require proof of financial integrity;

(2)     require a licensee to post a bond or other similar instrument**[,]** if, in the Commission's judgment, the bond or similar instrument is necessary to insure an electricity supplier's financial integrity;

(3)     require a licensee to:

(i)     provide proof that **[**it**] THE LICENSEE** is qualified to do business in the State with the Department of Assessments and Taxation; and

(ii)     agree to be subject to all applicable taxes; and

(4)     adopt any other requirements **[**it**] THE COMMISSION** finds to be in the public interest, which may include different requirements for:

(i)     electricity suppliers that serve only large customers; and

(ii)     the different categories of electricity suppliers.

(d)     A license issued under this section may not be transferred without prior Commission approval.

(e)     The Commission shall adopt regulations or issue orders to:

(1)     protect consumers, electric companies, **[**and**]** electricity suppliers**, ~~AND~~ ENERGY SALESPERSONS, AND ENERGY VENDORS** from anticompetitive and abusive practices;

(2)     require each electricity supplier **~~AND,~~ EACH ENERGY SALESPERSON, AND EACH ENERGY VENDOR** to provide, in addition to the requirements under § 7–505(b)(5) of this subtitle, adequate and accurate customer information to enable customers to make informed choices regarding the purchase of any electricity services offered by the electricity supplier;

(3)     establish reasonable restrictions on telemarketing;

(4)     establish procedures for contracting with customers;

– 15 –

JA97

(5)     establish requirements and limitations relating to deposits, billing, collections, and contract cancellations;

(6)     establish provisions providing for the referral of a delinquent account by an electricity supplier to the standard offer service under § 7–510(c) of this subtitle; and

(7)     establish procedures for dispute resolution.

(f)     In accordance with regulations or orders of the Commission, electricity bills, for competitive and regulated electric services, provided to consumers may provide, in addition to the requirements of § 7–505(b)(5) of this subtitle and subsection (e)(2) of this section, the following information:

(1)     the identity and phone number of the electricity supplier of the service;

(2)     sufficient information to evaluate prices and services; and

(3)     information identifying whether the price is regulated or competitive.

(g)     (1)     An electricity supplier**, AN ENERGY SALESPERSON, AN ENERGY VENDOR,** or any person or governmental unit may not, without first obtaining the customer's permission:

(i)     make any change in the electricity supplier for a customer; or

(ii)     add a new charge for a new or existing service or option.

(2)     The Commission shall adopt regulations or issue orders establishing procedures to prevent the practices prohibited under paragraph (1) of this subsection.

(h)     (1)     An electricity supplier**, AN ENERGY SALESPERSON, OR AN ENERGY VENDOR** may not discriminate against any customer based wholly or partly on race, color, creed, national origin, or sex of an applicant for service or for any arbitrary, capricious, or unfairly discriminatory reason.

(2)     An electricity supplier**, AN ENERGY SALESPERSON, OR AN ENERGY VENDOR** may not refuse to provide service to a customer except by the application of standards that are reasonably related to the electricity supplier's economic and business purposes.

(i)     An electricity supplier**, AN ENERGY SALESPERSON, AND AN ENERGY VENDOR** shall be subject to all applicable federal and State environmental laws and regulations.

JA98

(j)      An electricity supplier shall post on the Internet information that is readily understandable about its services and rates for small commercial and residential electric customers.

(k)      (1)      **[**The**] ~~FOR~~ SUBJECT TO SUBSECTION (R) OF THIS SECTION, FOR JUST CAUSE ON THE COMMISSION'S OWN INVESTIGATION OR ON COMPLAINT OF THE OFFICE OF PEOPLE'S COUNSEL, THE ATTORNEY GENERAL, OR AN AFFECTED PARTY, THE** Commission may**:**

      **(I)      DENY A LICENSE TO, OR** revoke **[**or**], suspend, OR REFUSE TO RENEW** the license of**,** an electricity supplier**[,] ~~OR,~~ AN ENERGY SALESPERSON, OR AN ENERGY VENDOR;**

      **(II)      impose a civil penalty or other remedy[,];**

      **(III)      order a refund or credit to a customer[,]; or**

      **(IV)** impose a moratorium on adding or soliciting additional customers by the electricity supplier**[**, for just cause on the Commission's own investigation or on complaint of the Office of People's Counsel, the Attorney General, or an affected party**] ~~OR,~~ ENERGY SALESPERSON, OR ENERGY VENDOR**.

(2)      A civil penalty may be imposed in addition to the Commission's decision to **DENY,** revoke, suspend, **OR REFUSE TO RENEW A LICENSE** or impose a moratorium.

(3)      Just cause includes:

(i)      intentionally providing false information to the Commission;

(ii)      switching, or causing to be switched, the electricity supply for a customer without first obtaining the customer's permission;

(iii)      failing to provide electricity for its customers;

(iv)      committing fraud or engaging in deceptive practices;

(v)      failing to maintain financial integrity;

(vi)      violating a Commission regulation or order;

(vii)      failing to pay, collect, remit, or calculate accurately applicable State or local taxes;

(viii)      violating a provision of this article or any other applicable consumer protection law of the State;

JA99

(ix)    conviction of a felony by the licensee or principal of the licensee or any crime involving fraud, theft, or deceit; **[**and**]**

(x)    **DENIAL,** suspension**,** or revocation of **OR REFUSAL TO RENEW** a license by any State or federal authority**; AND**

**(XI)    COMMISSION OF ANY OF THE ACTS DESCRIBED IN ITEMS (I) THROUGH (X) OF THIS PARAGRAPH BY A PERSON THAT IS AN AFFILIATE OF THE LICENSEE OR THAT IS UNDER COMMON CONTROL WITH THE LICENSEE.**

(l)    (1)    An electricity supplier**, AN ENERGY** ~~SALESPERSON~~ **VENDOR,** or **ANY OTHER** person**, EXCEPT FOR AN ENERGY SALESPERSON,** selling or offering to sell electricity in the State in violation of this section **OR** ~~§ 7–507.1 OF THIS SUBTITLE~~ **§ 7–318 OF THIS TITLE**, after notice and an opportunity for a hearing, is subject to:

(i)    a civil penalty of not more than **[**$10,000**] $25,000** for the violation; **[**or**]**

(ii)    license **DENIAL,** revocation**,** or suspension **OR REFUSAL TO RENEW THE LICENSE; OR**

**(III)    BOTH.**

(2)    **AN ENERGY SALESPERSON SELLING OR OFFERING TO SELL ELECTRICITY IN THE STATE IN VIOLATION OF THIS SECTION OR § 7–317 OF THIS TITLE, AFTER NOTICE AND AN OPPORTUNITY FOR A HEARING, IS SUBJECT TO LICENSE DENIAL, REVOCATION, OR SUSPENSION OR REFUSAL TO RENEW THE LICENSE.**

**(3)**    Each day **OR PART OF A DAY** a violation continues is a separate violation.

~~(3)~~ **(4)**    **EACH CUSTOMER TO WHOM ELECTRICITY IS SOLD OR OFFERED IN VIOLATION OF THIS SECTION IS A SEPARATE VIOLATION.**

~~(4)~~ **(5)**    The Commission shall determine the amount of any civil penalty after considering:

(i)    the number of previous violations of any provision of this division **BY THE ELECTRICITY SUPPLIER, ENERGY** ~~SALESPERSON~~ **VENDOR, OR OTHER PERSON**;

(ii)    the gravity of the current violation; **[**and**]**

– 18 –

JA100

(iii) the good faith of the electricity supplier**, ENERGY** ~~SALESPERSON~~ **VENDOR,** or **OTHER** person charged in attempting to achieve compliance after notification of the violation**; AND**

**(IV) ANY OTHER MATTER THAT THE COMMISSION CONSIDERS APPROPRIATE AND RELEVANT**.

(m) In connection with a consumer complaint or Commission investigation under this section **OR** ~~§ 7–507.1 OF THIS SUBTITLE~~ **§ 7–317 OR § 7–318 OF THIS TITLE**, an electricity supplier**, AN ENERGY SALESPERSON, ENERGY VENDOR, AND ANY OTHER PERSON SELLING OR OFFERING TO SELL ELECTRICITY IN THE STATE** shall provide to the Commission access to any accounts, books, papers, and documents **[**which**] THAT** the Commission considers necessary to resolve the matter at issue.

(n) The Commission may order the electricity supplier**, ENERGY SALESPERSON, AN ENERGY VENDOR, OR OTHER PERSON** to cease adding or soliciting additional customers or to cease serving customers in the State.

(o) The Commission shall consult with the Consumer Protection Division of the Office of the Attorney General before issuing regulations designed to protect consumers.

(p) The People's Counsel shall have the same authority in licensing, complaint, and dispute resolution proceedings as it has in Title 2 of this article.

(q) Nothing in this subtitle may be construed to affect the authority of the Division of Consumer Protection in the Office of the Attorney General to enforce violations of Titles 13 and 14 of the Commercial Law Article or any other applicable State law or regulation in connection with the activities of electricity suppliers ~~AND~~**,** **ENERGY SALESPERSONS, AND ENERGY VENDORS**.

**(R) THE COMMISSION MAY NOT IMPOSE A CIVIL PENALTY ON AN ENERGY SALESPERSON UNDER SUBSECTION (K) OR (L) OF THIS SECTION.**

~~7–507.1.~~

~~(A) (1) A PERSON MAY NOT ENGAGE IN THE BUSINESS OF AN ENERGY SALESPERSON IN THE STATE UNLESS THE PERSON HOLDS A LICENSE ISSUED BY THE COMMISSION.~~

~~(2) A LICENSED ENERGY SALESPERSON MAY OFFER OR SELL ELECTRICITY SUPPLY AGREEMENTS OR GAS SUPPLY AGREEMENTS TO CUSTOMERS IN THE STATE ONLY IF THE ENERGY SALESPERSON IS ASSOCIATED WITH A LICENSED ELECTRICITY SUPPLIER OR LICENSED GAS SUPPLIER, RESPECTIVELY.~~

– 19 –

JA101

Ch. 537                     2024 LAWS OF MARYLAND

(B)     (1)     AN APPLICATION FOR AN ENERGY SALESPERSON LICENSE SHALL:

                (I)     BE MADE TO THE COMMISSION IN WRITING ON A FORM ADOPTED BY THE COMMISSION;

                (II)    BE VERIFIED BY OATH OR AFFIRMATION; AND

                (III)   CONTAIN INFORMATION THAT THE COMMISSION REQUIRES, INCLUDING:

                        1.      PROOF OF ASSOCIATION WITH A LICENSED ELECTRICITY SUPPLIER OR LICENSED GAS SUPPLIER, AS APPROPRIATE;

                        2.      PROOF OF COMPLIANCE WITH ALL APPLICABLE TRAINING REQUIREMENTS FOR CUSTOMER PROTECTION UNDER THIS SUBTITLE AND SUBTITLE 6 OF THIS TITLE AS REQUIRED BY THE COMMISSION; AND

                        3.      PAYMENT OF THE APPLICABLE LICENSING FEE.

        (2)     (I)     THE TERM OF AN ENERGY SALESPERSON LICENSE IS 3 YEARS.

                (II)    THE TERMS OF LICENSES MAY BE STAGGERED AS DETERMINED BY THE COMMISSION.

                (III)   UNLESS A LICENSE IS RENEWED FOR A 3–YEAR TERM IN ACCORDANCE WITH THIS SUBSECTION, THE LICENSE EXPIRES ON THE DATE THAT THE COMMISSION SETS.

                (IV)    A LICENSEE MAY RENEW A LICENSE FOR AN ADDITIONAL 3–YEAR TERM BEFORE THE LICENSE EXPIRES IF THE LICENSEE:

                        1.      OTHERWISE IS ENTITLED TO BE LICENSED;

                        2.      SUBMITS TO THE COMMISSION A RENEWAL APPLICATION ON THE FORM THAT THE COMMISSION PROVIDES; AND

                        3.      PAYS TO THE COMMISSION THE APPLICABLE RENEWAL FEE SET BY THE COMMISSION.

(C)     THE COMMISSION SHALL, BY REGULATION OR ORDER:

        (1)     REQUIRE PROOF OF FINANCIAL INTEGRITY;

– 20 –

JA102

WES MOORE, Governor                                          Ch. 537

~~(2)      REQUIRE A LICENSEE TO POST A BOND OR OTHER SIMILAR INSTRUMENT IF, IN THE COMMISSION'S JUDGMENT, THE BOND OR SIMILAR INSTRUMENT IS NECESSARY TO INSURE AN ENERGY SALESPERSON'S FINANCIAL INTEGRITY; AND~~

~~(3)      ADOPT ANY OTHER REQUIREMENTS THE COMMISSION FINDS TO BE IN THE PUBLIC INTEREST.~~

~~(D)      A LICENSE ISSUED UNDER THIS SECTION MAY NOT BE TRANSFERRED WITHOUT PRIOR COMMISSION APPROVAL.~~

7–510.

(a)      (1)      Subject to subsection (b) of this section, the phased implementation of customer choice shall be implemented as follows:

(i)      on July 1, 2000, one–third of the residential class in the State of each electric company shall have the opportunity for customer choice;

(ii)      on January 1, 2001, the entire industrial class and the entire commercial class in the State of each electric company shall have the opportunity for customer choice;

(iii)      on July 1, 2001, two–thirds of the residential class in the State of each electric company shall have the opportunity for customer choice;

(iv)      on July 1, 2002, all customers of each electric company shall have the opportunity for customer choice; and

(v)      by July 1, 2003, under a separate schedule adopted by the Commission, all customers of each electric cooperative shall have the opportunity for customer choice.

(2)      (i)      In accordance with this paragraph, the Commission may adopt a separate schedule for municipal electric utilities for the implementation of customer choice.

(ii)      A municipal electric utility may not be required to make its service territory available for customer choice unless it elects to do so.

(iii)      If a municipal electric utility elects to allow customer choice, the municipal electric utility shall file a proposed plan and schedule with the Commission.

(iv)      The Commission may approve each municipal electric utility plan and schedule after considering the features that distinguish the municipal electric utility from other electric companies.

– 21 –

JA103

(v)     Nothing in this subtitle may be construed to require the functional, operational, structural, or legal separation of the regulated and nonregulated operations of the municipal electric utility.

(3)     If a municipal electric utility serves customers outside its distribution territory, electricity suppliers licensed under § 7–507 of this subtitle may serve the customers in the distribution territory of the municipal electric utility.

(b)     For good cause shown and if the Commission finds the action to be in the public interest, the Commission may:

(1)     accelerate or delay the initial implementation date of July 1, 2000, by up to 3 months; or

(2)     accelerate any of the other implementation dates and phase–in percentages in subsection (a) of this section.

(c)     (1)     Beginning on the initial implementation date, an electric company's obligation to provide electricity supply and electricity supply service is stated by this subsection.

(2)     **(I)**     Electricity supply purchased from a customer's electric company is known as standard offer service.

**(II)**     A customer is considered to have chosen the standard offer service if the customer:

[(i)]   **1.**     is not allowed to choose an electricity supplier under the phase in of customer choice in subsection (a) of this section;

[(ii)]   **2.**     contracts for electricity with an electricity supplier and it is not delivered;

[(iii)]   **3.**     cannot arrange for electricity from an electricity supplier;

[(iv)]   **4.**     does not choose an electricity supplier;

[(v)]   **5.**     chooses the standard offer service; or

[(vi)]   **6.**     has been denied service or referred to the standard offer service by an electricity supplier in accordance with § 7–507(e)(6) of this subtitle.

(3)     [(i)     Except as provided under subparagraph (ii) of this paragraph, any obligation of an electric company to provide standard offer service shall cease on July 1, 2003.

– 22 –

JA104

(ii)    1.    Electric cooperatives and municipal electric utilities may choose to continue providing standard offer service in their respective distribution territories and may cease offering that service after notifying the Commission at least 12 months in advance.

2.    On and after July 1, 2003,**]** ~~an~~ **(I)         AN**         electric company ~~continues to have~~ **HAS** the obligation to provide standard offer service to residential and small commercial customers at a market price that permits recovery of the verifiable, prudently incurred costs to procure or produce the electricity plus a reasonable return.

~~(iii)    1.]~~ **(II)**    On or before December 31, 2008, and every 5 years thereafter, the Commission shall report to the Governor and, in accordance with § 2–1257 of the State Government Article, to the General Assembly on the status of the standard offer service**[,] AND** the development of competition**[**, and the transition of standard offer service to a default service**]**.

**[**2.    The Commission shall establish, by order or regulation, the definition of "default service".**]**

(4)    (i)    **1.**    On or before July 1, 2001, the Commission shall adopt regulations or issue orders to establish procedures for the competitive selection of wholesale electricity suppliers, including an affiliate of an electric company, to provide electricity for standard offer service to customers of electric companies under paragraph (2) of this subsection, except for customers of electric cooperatives and municipal electric utilities.

**2.**    Unless delayed by the Commission, the competitive selection shall take effect no later than July 1, 2003.

(ii)    1.    Under the obligation to provide standard offer service in accordance with **[**paragraph (3)(ii) of**]** this subsection, the Commission, by regulation or order, and in a manner that is designed to obtain the best price for residential and small commercial customers in light of market conditions at the time of procurement and the need to protect these customers from excessive price increases:

A.    shall require each investor–owned electric company to obtain its electricity supply for residential and small commercial customers participating in standard offer service through a competitive process in accordance with this paragraph; and

B.    may require or allow an investor–owned electric company to procure electricity for these customers directly from an electricity supplier through one or more bilateral contracts outside the competitive process.

– 23 –

2.      A.      As the Commission directs, the competitive process shall include a series of competitive wholesale bids in which the investor–owned electric company solicits bids to supply anticipated standard offer service load for residential and small commercial customers as part of a portfolio of blended wholesale supply contracts of short, medium, or long terms, and other appropriate electricity products and strategies, as needed to meet demand in a cost–effective manner.

B.      The competitive process may include different bidding structures and mechanisms for base load, peak load, and very short–term procurement.

C.      By regulation or order, as a part of the competitive process, the Commission shall require or allow the procurement of cost–effective energy efficiency and conservation measures and services with projected and verifiable energy savings to offset anticipated demand to be served by standard offer service, and the imposition of other cost–effective demand–side management programs.

3.      A.      In order to prevent an excessive amount of load being exposed to upward price risks and volatility, the Commission may stagger the dates for the competitive wholesale auctions.

B.      By regulation or order, the Commission may allow a date on which a competitive wholesale auction takes place to be altered based on current market conditions.

4.      By regulation or order, the Commission may allow an investor–owned electric company to refuse to accept some or all of the bids made in a competitive wholesale auction in accordance with standards adopted by the Commission.

5.      The investor–owned electric company shall publicly disclose the names of all bidders and the names and load allocation of all successful bidders 90 days after all contracts for supply are executed.

~~6.      AN INVESTOR–OWNED ELECTRIC COMPANY MAY MARKET STANDARD OFFER SERVICE TO CUSTOMERS IN ITS SERVICE TERRITORY IN COMPLIANCE WITH APPROPRIATE CONSUMER PROTECTIONS CONSISTENT WITH THOSE THAT APPLY TO ELECTRICITY SUPPLIERS UNDER § 7–507 OF THIS SUBTITLE.~~

(5)      An electric company may procure the electricity needed to meet its standard offer service electricity supply obligation from any electricity supplier, including an affiliate of the electric company.

(6)      In order to meet long–term, anticipated demand in the State for standard offer service and other electricity supply, the Commission may require or allow an investor–owned electric company to construct, acquire, or lease, and operate, its own generating facilities, and transmission facilities necessary to interconnect the generating facilities with the electric grid, subject to appropriate cost recovery.

JA106

(7) (i) To determine whether an appropriate phased implementation of electricity rates that is necessary to protect residential customers from the impact of sudden and significant increases in electricity rates, the Commission in the case of an increase of 20% or more over the previous year's total electricity rates, shall conduct evidentiary proceedings, including public hearings.

(ii) 1. A deferral of costs as part of a phased implementation of electricity rates by an investor–owned electric company shall be treated as a regulatory asset to be recovered in accordance with a rate stabilization plan under Part III of this subtitle or any other plan for phased implementation approved by the Commission.

2. A deferral of costs under this paragraph must be just, reasonable, and in the public interest.

(iii) The Commission shall approve the recovery of deferred costs under subparagraph (ii) of this paragraph as:

1. long–term recovery in accordance with a rate stabilization plan under Part III of this subtitle; or

2. short–term recovery through a rate proceeding mechanism approved by the Commission.

(iv) The Commission may approve a phasing in of increased costs by:

1. placing a cap on rates and allowing recovery over time; or

2. allowing rates to increase and providing for a rebate to customers of any excess costs paid.

(8) (i) An electric cooperative that as of July 1, 2006, supplied its standard offer service load through a portfolio of blended wholesale supply contracts of short, medium, and long terms, and other appropriate electricity products and strategies, as needed to meet demand in a cost–effective manner, may choose to continue to use a blended portfolio:

1. as approved and modified by the electric cooperative's board of directors; and

2. with appropriate review for prudent cost recovery as determined by the Commission.

(ii) The Commission may not set or enforce a termination date for the procurement of supply through a managed portfolio previously approved by the Commission.

– 25 –

(9)    (i)    The Commission, on request by an electric cooperative or on its own initiative, shall initiate a proceeding to investigate options for a rate stabilization plan to assist residential electric customers to gradually adjust to market rates over an extended period of time.

(ii)    If an electric cooperative determines that total electric rates for residential customers are anticipated to increase by more than 20% in a 12–month period resulting from an increase in the cost of generation, the electric cooperative shall survey its membership to determine whether to make a request to the Commission to initiate a proceeding under subsection (a) of this section.

(iii)    Notwithstanding subparagraphs (i) and (ii) of this paragraph, as approved by the Commission, an electric cooperative may receive a modification in distribution and transmission rates.

**(10)** *(I)    THIS PARAGRAPH DOES NOT APPLY TO A MEMBER–REGULATED COOPERATIVE AS DEFINED IN § 5–601 OF THE CORPORATIONS AND ASSOCIATIONS ARTICLE.*

*(II)    AN ELECTRIC COOPERATIVE MAY ADVERTISE, MARKET, AND PROMOTE STANDARD OFFER SERVICE AND RELATED PRODUCTS IN ITS SERVICE TERRITORY, INCLUDING AVAILABILITY, PRICE, AND OTHER TERMS, IN COMPLIANCE WITH APPROPRIATE CONSUMER PROTECTIONS CONSISTENT WITH THOSE THAT APPLY TO ELECTRICITY SUPPLIERS UNDER § 7–507 OF THIS SUBTITLE.*

**[**(d)    Notwithstanding the dates set forth in this section or any other law, customer choice may not commence until legislation is enacted by the General Assembly to restructure Maryland taxes to address the State and local tax implications of restructuring the electric utility industry.**]**

**(D)    (1)    THIS SUBSECTION APPLIES TO RESIDENTIAL ELECTRICITY SUPPLY OTHER THAN SUPPLY OFFERED THROUGH:**

**(I)    STANDARD OFFER SERVICE;**

**(II)    THE DEPARTMENT OF GENERAL SERVICES' SALE OF ENERGY UNDER § 7–704.4 OF THIS TITLE; OR**

**(III)    A COMMUNITY CHOICE AGGREGATOR UNDER § 7–510.3 OF THIS SUBTITLE.**

**(2)    ~~AN~~ A RESIDENTIAL ELECTRICITY SUPPLIER:**

JA108

(I)      MAY OFFER ELECTRICITY, OTHER THAN GREEN POWER, ONLY AT A PRICE THAT DOES NOT EXCEED THE TRAILING 12–MONTH AVERAGE OF THE ELECTRIC COMPANY'S STANDARD OFFER SERVICE RATE IN THE ELECTRIC COMPANY'S SERVICE TERRITORY AS OF THE DATE OF AGREEMENT WITH THE CUSTOMER;

(II)     MAY OFFER RESIDENTIAL ELECTRICITY SUPPLY ONLY:

1.     FOR A TERM NOT TO EXCEED 12 MONTHS AT A TIME;

(III)    MAY, FOR ELECTRICITY SUPPLY OTHER THAN GREEN POWER, AUTOMATICALLY RENEW THE TERM ONLY IF THE ELECTRICITY SUPPLIER PROVIDES NOTICE TO THE CUSTOMER 90 DAYS BEFORE AND 30 DAYS BEFORE RENEWAL;

(IV)    MAY OFFER GREEN POWER THAT MEETS THE REQUIREMENTS OF § 7–707 OF THIS TITLE, BUT MAY NOT AUTOMATICALLY RENEW THE TERM WITH THE CUSTOMER; ~~AND~~

~~2.     WITHOUT AUTOMATIC RENEWAL;~~

~~(III)~~ (V)     SUBJECT TO PARAGRAPH (3) OF THIS SUBSECTION, MAY NOT OFFER A VARIABLE RATE OTHER THAN A RATE THAT ADJUSTS FOR SEASONAL VARIATION NOT MORE THAN TWICE IN A SINGLE YEAR; AND

~~(IV)~~ (VI)     MAY NOT PAY A COMMISSION OR OTHER INCENTIVE–BASED COMPENSATION TO AN ENERGY SALESPERSON FOR ENROLLING CUSTOMERS~~; AND~~

~~(V)     MAY NOT IMPOSE ON A CUSTOMER A FEE FOR CANCELLATION OR EARLY TERMINATION OF AN ELECTRICITY SUPPLY AGREEMENT~~.

(3)     PARAGRAPH ~~(2)(III)~~ (2)(V) OF THIS SUBSECTION DOES NOT PROHIBIT THE OFFER AND USE OF TIME–OF–USE RATES THAT ESTABLISH DIFFERENT RATES FOR PERIODS WITHIN A SINGLE DAY.

~~(4)     AN ELECTRICITY SUPPLIER MAY NOT OFFER OR PROVIDE ELECTRICITY SUPPLY TO A CUSTOMER WHO RECEIVES ENERGY ASSISTANCE THROUGH THE ELECTRIC UNIVERSAL SERVICE PROGRAM UNDER § 7–512.1 OF THIS SUBTITLE OR THE ENERGY ASSISTANCE PROGRAM OF THE DEPARTMENT OF HUMAN SERVICES UNDER TITLE 5, SUBTITLE 5A OF THE HUMAN SERVICES ARTICLE.~~

– 27 –

JA109

~~(5)~~ **(4)** ~~AN~~ **A RESIDENTIAL** ELECTRICITY SUPPLIER MAY NOT SELL TO AN ELECTRIC COMPANY, AND AN ELECTRIC COMPANY MAY NOT PURCHASE FROM ~~AN~~ **THE** ELECTRICITY SUPPLIER, ACCOUNTS RECEIVABLE.

**(E)** **(1)** THIS SUBSECTION DOES NOT APPLY TO:

**(I)** THE DEPARTMENT OF GENERAL SERVICES' SALE OF ENERGY UNDER § 7–704.4 OF THIS TITLE; OR

**(II)** A COMMUNITY CHOICE AGGREGATOR UNDER § 7–510.3 OF THIS SUBTITLE.

**(2)** AN ELECTRIC COMPANY AND ~~AN~~ **A RESIDENTIAL** ELECTRICITY SUPPLIER SHALL ESTABLISH A MECHANISM FOR A CUSTOMER WHOSE ACCOUNT NUMBER OR CUSTOMER CHOICE IDENTIFICATION NUMBER HAS BEEN COMPROMISED TO RECEIVE A REPLACEMENT ACCOUNT NUMBER OR CUSTOMER CHOICE IDENTIFICATION NUMBER ON REQUEST, SUBJECT TO VERIFICATION IN A MANNER APPROVED BY THE COMMISSION.

**(F)** **(1)** THIS SUBSECTION DOES NOT APPLY TO:

**(I)** THE DEPARTMENT OF GENERAL SERVICES' SALE OF ENERGY UNDER § 7–704.4 OF THIS TITLE; OR

**(II)** A COMMUNITY CHOICE AGGREGATOR UNDER § 7–510.3 OF THIS SUBTITLE.

**(2)** EXCEPT AS PROVIDED IN PARAGRAPH (3) OF THIS SUBSECTION, ~~AS~~ **AS** APPROVED BY THE COMMISSION BY REGULATION OR ORDER, EACH ELECTRIC COMPANY AND EACH **RESIDENTIAL** ELECTRICITY SUPPLIER SHALL ALLOW A CUSTOMER TO INDICATE THE CUSTOMER'S INTENTION TO REMAIN ON STANDARD OFFER SERVICE INDEFINITELY AND NOT TO RECEIVE DIRECTED MARKETING CONTACTS FROM ELECTRICITY SUPPLIERS THROUGH THE IMPLEMENTATION OF A "DO NOT TRANSFER" LIST ONTO WHICH THE CUSTOMER MAY REQUEST TO BE PLACED.

**(3)** A RESIDENTIAL ELECTRICITY SUPPLIER MAY CONTACT A CUSTOMER ON A "DO NOT TRANSFER" LIST UNTIL THE ELECTRICITY SUPPLY AGREEMENT ENTERED INTO BETWEEN THE ELECTRICITY SUPPLIER AND THE CUSTOMER EXPIRES.

JA110

**(G)** **(1)** IN THIS SUBSECTION, "BILLING ENTITY" MEANS AN ELECTRIC COMPANY, A LICENSED ELECTRICITY SUPPLIER, OR ANY OTHER ENTITY THAT IS RESPONSIBLE FOR ISSUING AN ELECTRIC BILL TO A RESIDENTIAL CUSTOMER.

**(2)** ON OR BEFORE THE 15TH DAY OF EACH MONTH, EACH ~~ELECTRIC COMPANY~~ BILLING ENTITY SHALL SUBMIT A REPORT TO THE COMMISSION ON CUSTOMER CHOICE IN ITS SERVICE TERRITORY FOR THE PRECEDING MONTH, INCLUDING:

~~(1)~~ **(I)** THE TOTAL KILOWATT–HOURS DISTRIBUTED TO CUSTOMERS PURCHASING ELECTRICITY FROM A THIRD–PARTY ELECTRICITY SUPPLIER;

~~(2)~~ **(II)** THE TOTAL SUPPLY COST CHARGED TO CUSTOMERS PURCHASING ELECTRICITY FROM A THIRD–PARTY ELECTRICITY SUPPLIER;

~~(3)~~ **(III)** THE TOTAL COST THAT CUSTOMERS SPECIFIED IN ITEM ~~(2)~~ **(II)** OF THIS ~~SUBSECTION~~ PARAGRAPH WOULD HAVE PAID UNDER STANDARD OFFER SERVICE;

~~(4)~~ **(IV)** THE NET THIRD–PARTY TOTAL COST COMPARED TO THE NET STANDARD OFFER SERVICE COST;

~~(5)~~ **(V)** THE TOTAL THIRD–PARTY AVERAGE RATE;

~~(6)~~ **(VI)** THE STANDARD OFFER SERVICE AVERAGE RATE;

~~(7)~~ **(VII)** THE DIFFERENCE BETWEEN THE TOTAL THIRD–PARTY AVERAGE RATE AND THE STANDARD OFFER SERVICE AVERAGE RATE;

~~(8)~~ **(VIII)** THE THIRD–PARTY AVERAGE RESIDENTIAL RATES BROKEN OUT BY SUPPLIER AND THE VARIANCE BETWEEN EACH OF THESE RATES AND THE STANDARD OFFER SERVICE AVERAGE RATE;

~~(9)~~ **(IX)** THE THIRD–PARTY AVERAGE GENERAL SERVICE NONDEMAND RATES BROKEN OUT BY SUPPLIER AND THE VARIANCE BETWEEN EACH OF THESE THIRD–PARTY RATES AND THE STANDARD OFFER SERVICE AVERAGE RATE;

~~(10)~~ **(X)** THE THIRD–PARTY AVERAGE GENERAL SERVICE DEMAND RATES BROKEN OUT BY SUPPLIER AND THE VARIANCE BETWEEN EACH OF THESE THIRD–PARTY RATES AND THE STANDARD OFFER SERVICE AVERAGE RATE;

– 29 –

JA111

**(11)** **(XI)**    THE THIRD–PARTY AVERAGE LARGE POWER DEMAND RATES BROKEN OUT BY SUPPLIER AND THE VARIANCE BETWEEN EACH OF THESE THIRD–PARTY RATES AND THE STANDARD OFFER SERVICE AVERAGE RATE; AND

**(12)** **(XII)** OTHER PERTINENT INFORMATION THE COMMISSION CONSIDERS APPROPRIATE.

[(e)] **(H)**      The Commission shall, by regulation or order, adopt procedures to implement this section[, including the allocation of any unused opportunity for customer choice among customer classes].

[(f)] **(I)**      Except as provided in § 7–510.3 of this subtitle, a county or municipal corporation may not act as an aggregator unless the Commission determines there is not sufficient competition within the boundaries of the county or municipal corporation.

7–602.

The General Assembly finds and declares that the purpose of this subtitle is to:

(1)    clarify existing law regarding the provision of competitive retail gas supply and gas supply services in the State;

(2)    require the Commission to license gas suppliers ~~AND,~~ ENERGY SALESPERSONS, AND ENERGY VENDORS;

(3)    authorize the Commission to adopt complaint procedures;

(4)    establish certain requirements relating to the competitiveness of retail gas supply and gas supply services markets; and

(5)    establish standards for the protection of consumers.

7–603.

(a)    The Commission shall license gas suppliers ~~AND,~~ ENERGY SALESPERSONS, AND ENERGY VENDORS and shall have the same authority as the Commission has under [§ 7–507] ~~§§ 7–507 AND 7–507.1~~ §§ 7–317, 7–318, AND 7–507 of this title for electricity suppliers ~~AND,~~ ENERGY SALESPERSONS, AND ENERGY VENDORS, including the authority to:

(1)    DENY, revoke [or], suspend, OR REFUSE TO RENEW a license;

(2)    impose a moratorium, civil penalty, or other remedy; or

(3)    order a refund for or credit to a customer.

(b)    The Commission shall adopt licensing requirements and procedures for gas suppliers ~~AND~~, ENERGY SALESPERSONS, AND ENERGY VENDORS that protect consumers, the public interest, and the collection of all State and local taxes, CONSISTENT WITH THE REQUIREMENTS FOR ELECTRICITY SUPPLIERS ~~AND ENERGY SALESPERSONS~~ UNDER SUBTITLE 5 OF THIS TITLE AND ENERGY SALESPERSONS AND ENERGY VENDORS UNDER SUBTITLE 3 OF THIS TITLE.

**7–603.1.**

(A)    (1)    ~~FOR~~ SUBJECT TO SUBSECTION (B)(5) OF THIS SECTION, FOR JUST CAUSE ON THE COMMISSION'S OWN INVESTIGATION OR ON COMPLAINT OF THE OFFICE OF PEOPLE'S COUNSEL, THE ATTORNEY GENERAL, OR AN AFFECTED PARTY, THE COMMISSION MAY:

(I)    DENY A LICENSE TO, OR REVOKE, SUSPEND, OR REFUSE TO RENEW THE LICENSE OF, A GAS SUPPLIER ~~OR~~, AN ENERGY SALESPERSON, OR AN ENERGY VENDOR;

(II)    IMPOSE A CIVIL PENALTY OR OTHER REMEDY;

(III)    ORDER A REFUND OR CREDIT TO A CUSTOMER; OR

(IV)    IMPOSE A MORATORIUM ON ADDING OR SOLICITING ADDITIONAL CUSTOMERS BY THE GAS SUPPLIER ~~OR~~, ENERGY SALESPERSON, OR AN ENERGY VENDOR.

(2)    A CIVIL PENALTY MAY BE IMPOSED IN ADDITION TO THE COMMISSION'S DECISION TO DENY, REVOKE, SUSPEND, OR REFUSE TO RENEW A LICENSE OR IMPOSE A MORATORIUM.

(3)    JUST CAUSE INCLUDES:

(I)    INTENTIONALLY PROVIDING FALSE INFORMATION TO THE COMMISSION;

(II)    SWITCHING, OR CAUSING TO BE SWITCHED, THE GAS SUPPLY FOR A CUSTOMER WITHOUT FIRST OBTAINING THE CUSTOMER'S PERMISSION;

(III)    FAILING TO PROVIDE GAS FOR ITS CUSTOMERS;

(IV)    COMMITTING FRAUD OR ENGAGING IN DECEPTIVE PRACTICES;

– 31 –

JA113

(V)     FAILING TO MAINTAIN FINANCIAL INTEGRITY;

(VI)    VIOLATING A COMMISSION REGULATION OR ORDER;

(VII)   FAILING TO PAY, COLLECT, REMIT, OR CALCULATE ACCURATELY APPLICABLE STATE OR LOCAL TAXES;

(VIII)  VIOLATING A PROVISION OF THIS ARTICLE OR ANY OTHER APPLICABLE CONSUMER PROTECTION LAW OF THE STATE;

(IX)    CONVICTION OF A FELONY BY THE LICENSEE OR PRINCIPAL OF THE LICENSEE OR ANY CRIME INVOLVING FRAUD, THEFT, OR DECEIT;

(X)     DENIAL, SUSPENSION, OR REVOCATION OF OR REFUSAL TO RENEW A LICENSE BY ANY STATE OR FEDERAL AUTHORITY; AND

(XI)    COMMISSION OF ANY OF THE ACTS DESCRIBED IN ITEMS (I) THROUGH (X) OF THIS PARAGRAPH BY A PERSON THAT IS AN AFFILIATE OF THE LICENSEE OR THAT IS UNDER COMMON CONTROL WITH THE LICENSEE.

(B)   (1)   (I)   A GAS SUPPLIER, AN ENERGY ~~SALESPERSON~~ VENDOR, OR ANY OTHER PERSON, EXCEPT FOR AN ENERGY SALESPERSON, SELLING OR OFFERING TO SELL GAS IN THE STATE IN VIOLATION OF THIS SECTION OR § 7–603 OF THIS SUBTITLE, AFTER NOTICE AND AN OPPORTUNITY FOR A HEARING, IS SUBJECT TO:

~~(I)~~   1.   A CIVIL PENALTY OF NOT MORE THAN $25,000 FOR THE VIOLATION;

~~(II)~~   2.   LICENSE DENIAL, REVOCATION, OR SUSPENSION OR REFUSAL TO RENEW THE LICENSE; OR

~~(III)~~   3.   BOTH.

(II)    AN ENERGY SALESPERSON SELLING OR OFFERING TO SELL GAS IN THE STATE IN VIOLATION OF THIS SECTION OR § 7–603 OF THIS SUBTITLE, AFTER NOTICE AND AN OPPORTUNITY FOR A HEARING, IS SUBJECT TO LICENSE DENIAL, REVOCATION, OR SUSPENSION OR REFUSAL TO RENEW THE LICENSE.

(2)    EACH DAY OR PART OF A DAY A VIOLATION CONTINUES IS A SEPARATE VIOLATION.

JA114

**(3)** EACH CUSTOMER TO WHOM GAS IS SOLD OR OFFERED IN VIOLATION OF THIS SECTION IS A SEPARATE VIOLATION.

**(4)** THE COMMISSION SHALL DETERMINE THE AMOUNT OF ANY CIVIL PENALTY AFTER CONSIDERING:

**(I)** THE NUMBER OF PREVIOUS VIOLATIONS OF ANY PROVISION OF THIS DIVISION BY THE GAS SUPPLIER, ENERGY ~~SALESPERSON~~ <u>VENDOR</u>, OR OTHER PERSON;

**(II)** THE GRAVITY OF THE CURRENT VIOLATION;

**(III)** THE GOOD FAITH OF THE GAS SUPPLIER, ENERGY ~~SALESPERSON~~ <u>VENDOR</u>, OR OTHER PERSON CHARGED IN ATTEMPTING TO ACHIEVE COMPLIANCE AFTER NOTIFICATION OF THE VIOLATION; AND

**(IV)** ANY OTHER MATTER THAT THE COMMISSION CONSIDERS APPROPRIATE AND RELEVANT.

**(5)** <u>THE COMMISSION MAY NOT IMPOSE A CIVIL PENALTY ON AN INDIVIDUAL ENERGY SALESPERSON IN ACCORDANCE WITH THIS SUBSECTION.</u>

**(C)** IN CONNECTION WITH A CONSUMER COMPLAINT OR COMMISSION INVESTIGATION UNDER THIS SECTION OR § 7–603 OF THIS SUBTITLE, A GAS SUPPLIER, AN ENERGY SALESPERSON, <u>AN ENERGY VENDOR,</u> AND ANY OTHER PERSON SELLING OR OFFERING TO SELL GAS IN THE STATE SHALL PROVIDE TO THE COMMISSION ACCESS TO ANY ACCOUNTS, BOOKS, PAPERS, AND DOCUMENTS THAT THE COMMISSION CONSIDERS NECESSARY TO RESOLVE THE MATTER AT ISSUE.

**(D)** THE COMMISSION MAY ORDER THE GAS SUPPLIER, ENERGY SALESPERSON, <u>AN ENERGY VENDOR,</u> OR OTHER PERSON TO CEASE ADDING OR SOLICITING ADDITIONAL CUSTOMERS OR TO CEASE SERVING CUSTOMERS IN THE STATE.

7–604.

(a)     On or before July 1, 2001, the Commission shall adopt consumer protection orders or regulations for gas suppliers ~~AND~~<u>,</u> ENERGY SALESPERSONS<u>, AND ENERGY VENDORS</u> that:

(1)     protect consumers from discriminatory, unfair, deceptive, and anticompetitive acts and practices in the marketing, selling, or distributing of natural gas;

– 33 –

JA115

Ch. 537 2024 LAWS OF MARYLAND

(2) provide for contracting, enrollment, and billing practices and procedures; and

(3) the Commission considers necessary to protect the consumer.

(b) In adopting orders and regulations under this section, unless the Commission determines that the circumstances do not require consistency, the Commission shall:

(1) provide customers with protections consistent with applicable protections provided to retail electric customers; and

(2) impose appropriate requirements on gas suppliers ~~AND~~, ENERGY SALESPERSONS, AND ENERGY VENDORS that are consistent with applicable requirements imposed on electricity suppliers ~~AND~~, ENERGY SALESPERSONS, AND ENERGY VENDORS.

**7–604.2.**

**(A)** IN THIS SECTION, "DEFAULT GAS COMMODITY SERVICE" MEANS THE SUPPLY OF RETAIL GAS COMMODITY SERVICE BY A CUSTOMER'S GAS COMPANY.

**(B)** **(1)** THIS SUBSECTION APPLIES TO RESIDENTIAL GAS SUPPLY OTHER THAN DEFAULT GAS COMMODITY SERVICE PROVIDED BY A GAS COMPANY.

**(2)** A GAS SUPPLIER THAT SUPPLIES GAS TO RESIDENTIAL RETAIL GAS CUSTOMERS:

**(I)** MAY OFFER GAS SERVICE ONLY AT A PRICE THAT DOES NOT EXCEED THE TRAILING 12–MONTH AVERAGE OF THE GAS COMPANY'S DEFAULT GAS COMMODITY SERVICE IN THE GAS COMPANY'S SERVICE TERRITORY AS OF THE DATE OF THE AGREEMENT WITH THE CUSTOMER;

**(II)** MAY OFFER RESIDENTIAL GAS SUPPLY ONLY FOR A TERM NOT TO EXCEED 12 MONTHS AT A TIME AND MAY AUTOMATICALLY RENEW THE TERM ONLY IF THE GAS SUPPLIER PROVIDES NOTICE TO THE CUSTOMER 90 DAYS BEFORE AND 30 DAYS BEFORE RENEWAL;

**(III)** SUBJECT TO PARAGRAPH (3) OF THIS SUBSECTION, MAY NOT OFFER A VARIABLE RATE OTHER THAN A RATE THAT ADJUSTS FOR SEASONAL VARIATION NOT MORE THAN TWICE IN A SINGLE YEAR; AND

**(IV)** MAY NOT PAY A COMMISSION OR OTHER INCENTIVE–BASED COMPENSATION TO AN ENERGY SALESPERSON FOR ENROLLING CUSTOMERS.

– 34 –

(3)     PARAGRAPH (2)(III) OF THIS SUBSECTION DOES NOT PROHIBIT THE OFFER AND USE OF RATES THAT DIFFER BASED ON THE TOTAL NUMBER OF THERMS USED BY A CUSTOMER IN ANY BILLING PERIOD.

(4)     A GAS SUPPLIER THAT SUPPLIES GAS TO RESIDENTIAL RETAIL GAS CUSTOMERS MAY NOT SELL TO A GAS COMPANY, AND A GAS COMPANY MAY NOT PURCHASE FROM THE GAS SUPPLIER, ACCOUNTS RECEIVABLE.

(C)     A GAS COMPANY AND A GAS SUPPLIER THAT SUPPLIES GAS TO RESIDENTIAL RETAIL GAS CUSTOMERS SHALL ESTABLISH A MECHANISM FOR A CUSTOMER WHOSE ACCOUNT NUMBER OR CUSTOMER CHOICE IDENTIFICATION NUMBER HAS BEEN COMPROMISED TO RECEIVE A REPLACEMENT ACCOUNT NUMBER OR CUSTOMER CHOICE IDENTIFICATION NUMBER ON REQUEST, SUBJECT TO VERIFICATION IN A MANNER APPROVED BY THE COMMISSION.

(D)     (1)     EXCEPT AS PROVIDED IN PARAGRAPH (2) OF THIS SUBSECTION, AS APPROVED BY THE COMMISSION BY REGULATION OR ORDER, EACH GAS COMPANY AND EACH GAS SUPPLIER THAT SUPPLIES GAS TO RESIDENTIAL RETAIL GAS CUSTOMERS SHALL ALLOW A CUSTOMER TO INDICATE THE CUSTOMER'S INTENTION TO REMAIN ON DEFAULT GAS COMMODITY SERVICE INDEFINITELY AND NOT TO RECEIVE DIRECTED MARKETING CONTACTS FROM GAS SUPPLIERS THROUGH THE IMPLEMENTATION OF A "DO NOT TRANSFER" LIST ONTO WHICH THE CUSTOMER MAY REQUEST TO BE PLACED.

(2)     A GAS SUPPLIER THAT SUPPLIES GAS TO RESIDENTIAL RETAIL GAS CUSTOMERS MAY CONTACT A CUSTOMER ON A "DO NOT TRANSFER" LIST UNTIL THE GAS SUPPLY AGREEMENT ENTERED INTO BETWEEN THE GAS SUPPLIER AND THE CUSTOMER EXPIRES.

(E)     (1)     IN THIS SUBSECTION, "BILLING ENTITY" MEANS A GAS COMPANY, A LICENSED GAS SUPPLIER, OR ANY OTHER ENTITY THAT IS RESPONSIBLE FOR ISSUING A GAS BILL TO A RESIDENTIAL CUSTOMER.

(2)     ON OR BEFORE THE 15TH DAY OF EACH MONTH, EACH BILLING ENTITY SHALL SUBMIT A REPORT TO THE COMMISSION ON CUSTOMER CHOICE IN ITS SERVICE TERRITORY FOR THE PRECEDING MONTH, INCLUDING:

(I)     THE TOTAL THERMS DISTRIBUTED TO CUSTOMERS PURCHASING GAS FROM A THIRD–PARTY GAS SUPPLIER;

(II)     THE TOTAL SUPPLY COST CHARGED TO CUSTOMERS PURCHASING GAS FROM A THIRD–PARTY GAS SUPPLIER;

– 35 –

JA117

(III)   THE TOTAL COST THAT CUSTOMERS SPECIFIED IN ITEM (II) OF THIS PARAGRAPH WOULD HAVE PAID UNDER DEFAULT GAS COMMODITY SERVICE;

(IV)   THE NET THIRD–PARTY TOTAL COST COMPARED TO THE NET DEFAULT GAS COMMODITY SERVICE COST;

(V)   THE TOTAL THIRD–PARTY AVERAGE RATE;

(VI)   THE DEFAULT GAS COMMODITY SERVICE AVERAGE RATE;

(VII)   THE DIFFERENCE BETWEEN THE TOTAL THIRD–PARTY AVERAGE RATE AND THE DEFAULT GAS COMMODITY SERVICE AVERAGE RATE;

(VIII)   THE THIRD–PARTY AVERAGE RESIDENTIAL RATES BROKEN OUT BY SUPPLIER AND THE VARIANCE BETWEEN EACH OF THESE RATES AND THE DEFAULT GAS COMMODITY SERVICE AVERAGE RATE;

(IX)   THE THIRD–PARTY AVERAGE GENERAL SERVICE NONDEMAND RATES BROKEN OUT BY SUPPLIER AND THE VARIANCE BETWEEN EACH OF THESE THIRD–PARTY RATES AND THE DEFAULT GAS COMMODITY SERVICE AVERAGE RATE;

(X)   THE THIRD–PARTY AVERAGE GENERAL SERVICE DEMAND RATES BROKEN OUT BY SUPPLIER AND THE VARIANCE BETWEEN EACH OF THESE THIRD–PARTY RATES AND THE DEFAULT GAS COMMODITY SERVICE AVERAGE RATE;

(XI)   THE THIRD–PARTY AVERAGE LARGE POWER DEMAND RATES BROKEN OUT BY SUPPLIER AND THE VARIANCE BETWEEN EACH OF THESE THIRD–PARTY RATES AND THE DEFAULT GAS COMMODITY SERVICE AVERAGE RATE; AND

(XII)   OTHER PERTINENT INFORMATION THE COMMISSION CONSIDERS APPROPRIATE.

(F)   THE COMMISSION SHALL, BY REGULATION OR ORDER, ADOPT PROCEDURES TO CARRY OUT THIS SECTION.

7–605.

(a)   This subtitle may not be construed to:

(1)   affect the authority of the Division of Consumer Protection of the Office of the Attorney General to enforce violations of Titles 13 and 14 of the Commercial Law

– 36 –

JA118

Article or any other applicable State law or regulation in connection with the activities of gas suppliers ~~OR,~~ **ENERGY SALESPERSONS, OR ENERGY VENDORS**; or

(2)     exempt gas companies **[**and**],** gas suppliers**,** ~~AND~~ **ENERGY SALESPERSONS, AND ENERGY VENDORS** from otherwise applicable State or federal consumer protection and antitrust laws.

(b)     The Commission shall consult with the Consumer Protection Division of the Office of the Attorney General before adopting regulations designed to protect consumers of gas supply and gas supply services.

(c)     The People's Counsel has the same authority in licensing, complaint, and dispute resolution proceedings as the People's Counsel has under Subtitle 5 of this title and Title 2 of this article.

(d)     In connection with a consumer complaint or Commission investigation under this subtitle, a gas supplier ~~OR,~~ **AN ENERGY SALESPERSON, OR AN ENERGY VENDOR** shall provide to the Commission access to any accounts, books, papers, and documents that the Commission considers necessary to resolve a matter in dispute.

*7–701.*

*(a)     In this subtitle the following words have the meanings indicated.*

*(m)     "Renewable energy credit" or "credit" means a credit equal to the generation attributes of 1 megawatt–hour of electricity that is derived from a Tier 1 renewable source or a Tier 2 renewable source that is located:*

*(1)     in the PJM region;*

*(2)     outside the area described in item (1) of this subsection but in a control area that is adjacent to the PJM region, if the electricity is delivered into the PJM region; or*

*(3)     on the outer continental shelf of the Atlantic Ocean in an area that:*

*(i)     the United States Department of the Interior designates for leasing after coordination and consultation with the State in accordance with § 388(a) of the Energy Policy Act of 2005; and*

*(ii)     is between 10 and 80 miles off the coast of the State.*

7–705.

(a)     **(1)**     ~~Each~~ **EXCEPT AS PROVIDED IN PARAGRAPH (2) OF THIS SUBSECTION, EACH** electricity supplier shall submit a report to the Commission each year in a form and by a date specified by the Commission that:

(1)     (i) **(I) 1.**     demonstrates that the electricity supplier has complied with the applicable renewable energy portfolio standard under § 7–703 of this subtitle and includes the submission of the required amount of renewable energy credits; or

(ii)     **2.**     demonstrates the amount of electricity sales by which the electricity supplier failed to meet the applicable renewable energy portfolio standard; **[**and**]**

(2)     **(II)**     documents the level of participation of minority business enterprises and minorities in the activities that support the creation of renewable energy credits used to satisfy the standard under § 7–703 of this subtitle, including development, installation, and operation of generating facilities that create credits**; AND**

(3)     **(III)** DOCUMENTS THE AMOUNTS AND TYPES OF GENERATION ASSOCIATED WITH RENEWABLE ENERGY CREDITS PURCHASED IN COMPLIANCE WITH § 7–707(B) OF THIS SUBTITLE DURING THE REPORTING PERIOD; AND

**(IV)** DOCUMENTS THE AMOUNT OF RENEWABLE ENERGY CERTIFICATES THAT DO NOT QUALIFY AS RENEWABLE ENERGY CREDITS AS DEFINED IN § 7–701 OF THIS SUBTITLE, INCLUDING, FOR EACH CERTIFICATE:

**1.**     THE ENERGY SOURCE ASSOCIATED WITH THE CERTIFICATE, INCLUDING ITS LOCATION, WHEN IT WAS CONSTRUCTED, AND WHICH ELECTRIC DISTRIBUTION SYSTEM RECEIVED THE ENERGY;

**2.**     WHETHER THE PURCHASE OF THE CERTIFICATE WAS BUNDLED WITH A POWER PURCHASE AGREEMENT FROM THE ENERGY SOURCE ASSOCIATED WITH THE CERTIFICATE;

**3.**     WHETHER THE CERTIFICATE WAS PURCHASED DIRECTLY FROM THE OPERATOR OF THE ENERGY SOURCE OR THROUGH A THIRD PARTY; AND

**4.**     ANY OTHER INFORMATION REQUIRED BY THE COMMISSION.

**(2)     PARAGRAPH (1)(III) AND (IV) OF THIS SUBSECTION DOES NOT APPLY TO:**

**(I)     THE DEPARTMENT OF GENERAL SERVICES' SALE OF ENERGY UNDER § 7–704.4 OF THIS SUBTITLE; OR**

**(II)     A COMMUNITY CHOICE AGGREGATOR UNDER § 7–510.3 OF THIS TITLE.**

– 38 –

JA120

**7–707.**

~~(A)      IN THIS SECTION, "GREEN POWER" MEANS ENERGY SOURCES OR RENEWABLE ENERGY CREDITS THAT ARE MARKETED AS GREEN, ECO–FRIENDLY, ENVIRONMENTALLY FRIENDLY OR RESPONSIBLE, CARBON–FREE, RENEWABLE, 100% RENEWABLE, 100% WIND, 100% HYDRO, 100% SOLAR, 100% EMISSION–FREE, OR SIMILAR CLAIMS.~~

**(A)      IN THIS SECTION**~~, "ELECTRICITY SUPPLIER" DOES NOT INCLUDE:~~**,** *"GREEN POWER" MEANS ENERGY SOURCES OR RENEWABLE ENERGY CREDITS THAT ARE MARKETED AS CLEAN, GREEN, ECO–FRIENDLY, ENVIRONMENTALLY FRIENDLY OR RESPONSIBLE, CARBON–FREE, RENEWABLE, 100% RENEWABLE, 100% WIND, 100% HYDRO, 100% SOLAR, 100% EMISSION–FREE, OR SIMILAR CLAIMS.*

*(B)      THIS SECTION DOES NOT APPLY TO:*

**(1)      THE DEPARTMENT OF GENERAL SERVICES WHEN THE DEPARTMENT OF GENERAL SERVICES SELLS ENERGY UNDER § 7–704.4 OF THIS SUBTITLE;** ~~OR~~

**(2)      A COMMUNITY CHOICE AGGREGATOR UNDER § 7–510.3 OF THIS TITLE; OR**

**(3)      AN ELECTRICITY SUPPLIER** ~~THAT SUPPLIES~~ *WHEN SUPPLYING* **ELECTRICITY TO COMMERCIAL RETAIL ELECTRIC CUSTOMERS.**

~~(B)~~ *(C)*      ~~(1)~~      **AN ELECTRICITY SUPPLIER THAT SUPPLIES ELECTRICITY TO RESIDENTIAL RETAIL ELECTRIC CUSTOMERS MAY NOT MARKET ELECTRICITY AS GREEN POWER UNLESS:**

~~(1)~~ *(1)*      **THE PERCENTAGE OF THE ELECTRICITY BEING OFFERED, OR THE EQUIVALENT NUMBER OF RENEWABLE ENERGY CREDITS ASSOCIATED WITH THE ELECTRICITY** *BEING* **MARKETED AS GREEN POWER, THAT IS ELIGIBLE FOR INCLUSION IN MEETING THE RENEWABLE ENERGY PORTFOLIO STANDARD EQUALS OR EXCEEDS THE GREATER OF:**

~~1.~~ *(I)* **51%; OR**

~~2.~~ *(II)* **1% HIGHER THAN THE RENEWABLE ENERGY PORTFOLIO STANDARD FOR THE YEAR THE ELECTRICITY IS PROVIDED TO THE CUSTOMER;** ~~AND~~

JA121

~~(II)~~ *(2)*      THE COMMISSION APPROVES THE PRICE OF THE ELECTRICITY BEING MARKETED AS GREEN POWER *IN ACCORDANCE WITH SUBSECTION (D) OF THIS SECTION; AND*

*(3)      THE ELECTRICITY SUPPLIER SUBMITS AN APPLICATION TO THE COMMISSION THAT:*

*(I)      DESCRIBES THE ELECTRICITY BEING MARKETED AS GREEN POWER, INCLUDING THE GREEN POWER SOURCE AND PERCENTAGE OF THE ELECTRICITY THAT IS GREEN POWER;*

*(II)      DESCRIBES HOW THE GREEN POWER COMPLIES WITH STATE LAW AND REGULATIONS; AND*

*(III)      INCLUDES ANY OTHER INFORMATION THE COMMISSION CONSIDERS NECESSARY.*

~~(2)      IN APPROVING THE PRICE OF ELECTRICITY UNDER PARAGRAPH (1)(II) OF THIS SUBSECTION, THE COMMISSION SHALL CONSIDER:~~

~~(I)      WHETHER THE PURCHASE OF RENEWABLE ENERGY CREDITS WAS BUNDLED WITH A POWER PURCHASE AGREEMENT FROM THE ENERGY SOURCES ASSOCIATED WITH THE CREDIT;~~

~~(II)      THE PRICE OF THE ENERGY PURCHASED, INCLUDING THE TOTAL COST OF THE RENEWABLE ENERGY CREDITS OR POWER PURCHASE AGREEMENTS;~~

~~(III)      THE AMOUNT OF ELECTRICITY THAT IS ELIGIBLE FOR INCLUSION IN MEETING THE RENEWABLE ENERGY PORTFOLIO STANDARD; AND~~

~~(IV)      THE STATE IN WHICH THE ELECTRICITY WAS GENERATED.~~

*(D)      (1)      THE PRICE APPROVED BY THE COMMISSION UNDER SUBSECTION (B)(2) OF THIS SECTION SHALL BE DETERMINED THROUGH:*

*(I)      A PROCEEDING HELD IN ACCORDANCE WITH PARAGRAPH (2) OF THIS SUBSECTION; OR*

*(II)      A PROCEEDING HELD IN ACCORDANCE WITH PARAGRAPH (3) OF THIS SUBSECTION.*

*(2)    (I)    EACH YEAR THE COMMISSION SHALL HOLD A PROCEEDING TO SET A PRICE PER MEGAWATT–HOUR FOR ELECTRICITY MARKETED AS GREEN POWER UNDER THIS SECTION THAT MAY NOT BE EXCEEDED BY AN ELECTRICITY SUPPLIER EXCEPT AS PROVIDED IN PARAGRAPH (3) OF THIS SUBSECTION.*

*(II)    SUBJECT TO PARAGRAPH (4) OF THIS SUBSECTION, THE PRICE SET BY THE COMMISSION UNDER SUBPARAGRAPH (I) OF THIS PARAGRAPH MAY:*

*1.    EXCEED THE MAXIMUM PRICE PER MEGAWATT–HOUR THAT IS AUTHORIZED UNDER § 7–510(D)(2)(I) OF THIS TITLE; AND*

*2.    DIFFER BASED ON THE AMOUNT AND SOURCE OF THE ELECTRICITY GENERATION.*

*(III)    DURING A PROCEEDING HELD UNDER SUBPARAGRAPH (I) OF THIS PARAGRAPH, THE COMMISSION:*

*1.    SHALL CONSIDER:*

*A.    THE PRICE OF THE ENERGY PURCHASED, INCLUDING THE TOTAL COST OF THE RENEWABLE ENERGY CREDITS;*

*B.    THE AMOUNT OF ELECTRICITY THAT IS ELIGIBLE FOR INCLUSION IN MEETING THE RENEWABLE ENERGY PORTFOLIO STANDARD;*

*C.    THE STATE IN WHICH THE ELECTRICITY WAS GENERATED; AND*

*D.    APPLICABLE MARKET DATA; AND*

*2.    MAY CONSIDER WHETHER THE PURCHASE OF RENEWABLE ENERGY CREDITS WAS BUNDLED WITH A POWER PURCHASE AGREEMENT FROM THE ENERGY SOURCES ASSOCIATED WITH THE CREDIT.*

*(3)    (I)    ON REQUEST BY AN ELECTRICITY SUPPLIER, THE COMMISSION SHALL HOLD A PROCEEDING TO SET A PRICE PER MEGAWATT–HOUR FOR ELECTRICITY MARKETED AS GREEN POWER FOR THAT ELECTRICITY SUPPLIER.*

*(II)    SUBJECT TO PARAGRAPH (4) OF THIS SUBSECTION, AT A PROCEEDING HELD UNDER THIS PARAGRAPH THE COMMISSION MAY SET A PRICE PER MEGAWATT–HOUR THAT IS HIGHER THAN THE PRICE DETERMINED IN THE PROCEEDING HELD UNDER PARAGRAPH (2) OF THIS SUBSECTION FOR AN ELECTRICITY SUPPLIER IF:*

– 41 –

JA123

*1.      THE ELECTRICITY SUPPLIER DEMONSTRATES TO THE COMMISSION'S SATISFACTION, BASED ON AN INDEPENDENT THIRD–PARTY AUDIT, THAT THE ACTUAL COST TO THE ELECTRICITY SUPPLIER FOR THE GENERATION OR SUPPLY OF ELECTRICITY EXCEEDS THAT OF THE PRICE DETERMINED THROUGH THE PROCEEDING HELD IN ACCORDANCE WITH PARAGRAPH (2) OF THIS SUBSECTION;*

*2.      THE INCREASED PRICE REFLECTS ONLY THE COST OF THE ELECTRICITY MARKETED AS GREEN POWER AND IS NOT ASSOCIATED WITH ANY OF THE ELECTRICITY SUPPLIER'S OTHER COSTS; AND*

*3.      THE ELECTRICITY SUPPLIER DEMONSTRATES TO THE COMMISSION'S SATISFACTION THAT THE ELECTRICITY SUPPLIER HAS A SIGNIFICANT LONG–TERM INVESTMENT IN RENEWABLE ENERGY THAT MEETS THE RENEWABLE ENERGY PORTFOLIO STANDARD UNDER § 7–703 OF THIS SUBTITLE.*

*(III)   DURING A PROCEEDING HELD UNDER THIS PARAGRAPH, THE COMMISSION SHALL CONSIDER:*

*1.      WHETHER THE PURCHASE OF RENEWABLE ENERGY CREDITS WAS BUNDLED WITH A POWER PURCHASE AGREEMENT FROM THE ENERGY SOURCES ASSOCIATED WITH THE CREDIT;*

*2.      THE PRICE OF THE ENERGY PURCHASED, INCLUDING THE TOTAL COST OF THE RENEWABLE ENERGY CREDITS OR POWER PURCHASE AGREEMENTS;*

*3.      THE AMOUNT OF ELECTRICITY THAT IS ELIGIBLE FOR INCLUSION IN MEETING THE RENEWABLE ENERGY PORTFOLIO STANDARD;*

*4.      THE STATE IN WHICH THE ELECTRICITY WAS GENERATED; AND*

*5.      APPLICABLE MARKET DATA.*

*(4)   (I)   A PRICE APPROVED BY THE COMMISSION UNDER THIS SUBSECTION MAY NOT EXCEED 150% OF THE MAXIMUM PRICE PER MEGAWATT–HOUR THAT IS AUTHORIZED UNDER § 7–510(D)(2)(I) OF THIS TITLE UNLESS THE COMMISSION DETERMINES THAT THE ACTUAL COST OF THE GREEN POWER EXCEEDS THAT AMOUNT.*

*(II)   WITHIN 120 DAYS AFTER APPROVING A PRICE FOR GREEN POWER THAT EXCEEDS 150% OF THE MAXIMUM PRICE PER MEGAWATT–HOUR THAT*

JA124

*IS AUTHORIZED UNDER § 7–510(D)(2)(I) OF THIS TITLE, AND ANNUALLY FOR AS LONG AS THE PRICE EXCEEDS THAT AMOUNT, THE COMMISSION SHALL SUBMIT A REPORT TO THE GENERAL ASSEMBLY, IN ACCORDANCE WITH § 2–1257 OF THE STATE GOVERNMENT ARTICLE, THAT:*

*1.        DEMONSTRATES THAT THE APPROVED PRICE REPRESENTS ONLY THE ACTUAL PRICE OF THE GREEN POWER; AND*

*2.        INCLUDES THE COMMISSION'S ORDER AUTHORIZING THE PRICE OF THE GREEN POWER.*

*(III)   IF THE COMMISSION HAS APPROVED FOR 3 CONSECUTIVE YEARS A PRICE FOR GREEN POWER THAT EXCEEDS 150% OF THE MAXIMUM PRICE PER MEGAWATT–HOUR THAT IS AUTHORIZED UNDER § 7–510(D)(2)(I) OF THIS TITLE, THE COMMISSION SHALL INCLUDE IN THE ANNUAL REPORT REQUIRED UNDER SUBPARAGRAPH (II) OF THIS PARAGRAPH:*

*1.        INFORMATION ON MARKET CONDITIONS THAT NECESSITATE THE APPROVED PRICE OF THE GREEN POWER THAT EXCEEDS 150% OF THE MAXIMUM PRICE PER MEGAWATT–HOUR THAT IS AUTHORIZED UNDER § 7–510(D)(2)(I) OF THIS TITLE; AND*

*2.        A RECOMMENDATION OF WHETHER TO INCREASE THE LIMITATION ON THE MAXIMUM PRICE OF GREEN POWER ABOVE WHICH THE COMMISSION IS REQUIRED TO MAKE A DETERMINATION UNDER THIS PARAGRAPH.*

*(5)    THE COMMISSION:*

*(I)    SHALL ANNUALLY REVIEW A PRICE APPROVED UNDER PARAGRAPH (3) OF THIS SUBSECTION; AND*

*(II)   MAY, ON ITS OWN INITIATIVE, OR ON PETITION BY THE OFFICE OF PEOPLE'S COUNSEL, REQUIRE AN ELECTRICITY SUPPLIER OFFERING GREEN POWER UNDER A PRICE ESTABLISHED UNDER PARAGRAPH (3) OF THIS SUBSECTION TO DEMONSTRATE THAT THE PRICE CONTINUES TO MEET THE REQUIREMENTS OF PARAGRAPH (3) OF THIS SUBSECTION.*

~~(B) (C)~~ *(E)* **(1)   ON AND AFTER JANUARY 1, 2025, AN ELECTRICITY SUPPLIER SHALL PURCHASE RENEWABLE ENERGY CREDITS FOR EACH YEAR THE ELECTRICITY SUPPLIER OFFERS GREEN POWER FOR SALE TO RESIDENTIAL RETAIL ELECTRIC CUSTOMERS** ~~AS FOLLOWS:~~

~~(I)   BEGINNING JULY 1, 2025, 0% OF THE CREDITS MAY BE GENERATED IN THE PJM REGION;~~

– 43 –

JA125

(II) BEGINNING JULY 1, 2027, AT LEAST 10% OF THE CREDITS SHALL BE GENERATED IN THE PJM REGION;

(III) BEGINNING JULY 1, 2029, AT LEAST 20% OF THE CREDITS SHALL BE GENERATED IN THE PJM REGION;

(IV) BEGINNING JULY 1, 2031, AT LEAST 30% OF THE CREDITS SHALL BE GENERATED IN THE PJM REGION;

(V) BEGINNING JULY 1, 2033, AT LEAST 40% OF THE CREDITS SHALL BE GENERATED IN THE PJM REGION; AND

(VI) BEGINNING JULY 1, 2035, AT LEAST 50% OF THE CREDITS SHALL BE GENERATED IN THE PJM REGION.

(2) THE CREDITS THAT AN ELECTRICITY SUPPLIER PURCHASES UNDER PARAGRAPH (1) OF THIS SUBSECTION SHALL BE:

(I) GENERATED:

1. IN THE PJM REGION; OR

2. OUTSIDE THE PJM REGION ONLY IF THE ELECTRICITY IS DELIVERED INTO THE PJM REGION; AND

(II) (2) A RENEWABLE ENERGY CREDIT *AN ELECTRICITY SUPPLIER PURCHASES UNDER PARAGRAPH (1) OF THIS SUBSECTION* SHALL BE RETIRED IN A PJM ENVIRONMENTAL INFORMATION SERVICES, INC., GENERATION ATTRIBUTE TRACKING SYSTEM RESERVE SUBACCOUNT ACCESSIBLE BY THE COMMISSION.

(C) (D) *(F)* (1) THIS SUBSECTION DOES NOT APPLY TO:

(I) THE DEPARTMENT OF GENERAL SERVICES WHEN THE DEPARTMENT OF GENERAL SERVICES SELLS ENERGY UNDER § 7–704.4 OF THIS SUBTITLE; OR

(II) A COMMUNITY CHOICE AGGREGATOR UNDER § 7–510.3 OF THIS TITLE.

(2) AN ELECTRICITY SUPPLIER THAT CLAIMS IN THE ELECTRICITY SUPPLIER'S MARKETING OF ELECTRICITY TO RESIDENTIAL RETAIL ELECTRIC CUSTOMERS THAT THE CUSTOMER WILL BE PURCHASING GREEN POWER SHALL

JA126

INCLUDE THE FOLLOWING DISCLOSURE OR A SIMILAR DISCLOSURE APPROVED BY THE COMMISSION:

~~"IF YOU PURCHASE THIS ENERGY PLAN, YOU ARE AGREEING TO PURCHASE LOCAL UTILITY DISTRIBUTION GRID ELECTRICITY THAT IS PAIRED WITH RENEWABLE ENERGY CREDITS ("RECS") IN AN AMOUNT SUFFICIENT TO MATCH THE PERCENT OF "GREEN POWER" ELECTRICITY IN YOUR CONTRACT.".~~

"WE DELIVER ENERGY THROUGH THE PURCHASE OF RENEWABLE ENERGY CREDITS (RECS). A REC REPRESENTS THE SOCIAL GOOD THAT ACCOMPANIES 1 MEGAWATT–HOUR OF RENEWABLE ELECTRICITY GENERATION. RECS MAY BE SOLD SEPARATELY FROM RENEWABLE ELECTRICITY ITSELF. RENEWABLE ELECTRICITY AND RECS MAY BE SOLD TO DIFFERENT ENTITIES. THE PURCHASE OF A REC DOES NOT INDICATE THAT RENEWABLE ELECTRICITY ITSELF HAS BEEN PURCHASED BY THE ENTITY THAT PURCHASED THE REC.".

~~(E)~~ *(G)*     IN ADDITION TO THE DISCLOSURE REQUIRED UNDER SUBSECTION ~~(D)~~ *(F)* OF THIS SECTION, THE COMMISSION SHALL ADOPT REGULATIONS THAT REQUIRE AN ELECTRICITY SUPPLIER, OTHER THAN THE DEPARTMENT OF GENERAL SERVICES WHEN THE DEPARTMENT OF GENERAL SERVICES SELLS ENERGY UNDER § 7–704.4 OF THIS SUBTITLE OR A COMMUNITY CHOICE AGGREGATOR UNDER § 7–510.3 OF THIS TITLE, THAT OFFERS GREEN POWER FOR SALE TO RESIDENTIAL RETAIL CUSTOMERS TO INCLUDE IN THE ELECTRICITY SUPPLIER'S MARKETING MATERIALS A DISCLOSURE, WRITTEN IN PLAIN LANGUAGE, THAT EXPLAINS:

(1)     WHAT THE CUSTOMER WILL ACTUALLY BE PAYING FOR WHEN THE CUSTOMER PURCHASES GREEN POWER FROM THE ELECTRICITY SUPPLIER;

(2)     HOW THE ELECTRICITY THAT THE CUSTOMER HAS PURCHASED IS GENERATED;

(3)     HOW THE GREEN POWER WILL BENEFIT THE ENVIRONMENT;

(4)     THE PERCENTAGE OF ELECTRICITY THAT WOULD BE PROVIDED BY THE ELECTRICITY SUPPLIER THAT IS ELIGIBLE FOR INCLUSION IN MEETING THE RENEWABLE ENERGY PORTFOLIO STANDARD; AND

(5)     THE STATE IN WHICH THE ELECTRICITY WAS GENERATED.

*(H)     THE COMMISSION, IN ITS DISCRETION, MAY DETERMINE WHETHER AN ELECTRICITY SUPPLIER IS MARKETING ELECTRICITY IN ACCORDANCE WITH THIS SECTION.*

13–101.

JA127

Ch. 537                    2024 LAWS OF MARYLAND

(a)     This section does not apply to a violation of the following provisions of this article:

     (1)     Title 5, Subtitle 4;

     (2)     Title 7, Subtitle 1;

     (3)     Title 8, Subtitles 1 and 3; and

     (4)     Title 9, Subtitle 3.

(b)     A person may not fail, neglect, or refuse to comply with any provision of this division or any effective and outstanding direction, ruling, order, rule, regulation, or decision of the Commission.

(c)     An individual who knowingly violates or knowingly aids or abets a public service company in the violation of subsection (b) of this section or any provision of this division:

     (1)     is guilty of a misdemeanor; and

     (2)     unless a different punishment is specifically provided by law, on conviction is subject to a fine not exceeding $1,000 for a first offense and not exceeding $5,000 for each additional or subsequent offense.

13–201.

(a)     This section does not apply to a violation of the following provisions of this article:

     (1)     Title 5, Subtitle 4;

     (2)     Title 7, Subtitle 1;

     (3)     § 7–213 as it applies to electric cooperatives;

     (4)     Title 8, Subtitles 1 and 3;

     (5)     Title 9, Subtitle 3; and

     (6)     Title 8, Subtitle 4.

(b)     (1)     Except as provided in paragraph (2) of this subsection, the Commission may impose a civil penalty not exceeding $25,000 against a person who violates a provision

– 46 –

JA128

of this division, or an effective and outstanding direction, ruling, order, rule, or regulation of the Commission.

(2)     The civil penalty that the Commission may impose on a common carrier for each violation may not exceed $2,500.

(e)     (3)     A civil penalty assessed for a violation of **[**§ 7–505(b)(7), § 7–507, § 7–603, § 7–604, or § 7–606**] § 7–317, § 7–318, § 7–505(B)(7), § 7–507, § 7–507.1, § 7–603, § 7–603.1, § 7–604, § 7–606, OR § 7–707** of this article, or a rule, an order, or a regulation adopted under any of those sections, shall be paid into the ~~Retail Choice Customer~~ Education and Protection Fund under § 7–310 of this article.

SECTION 2. AND BE IT FURTHER ENACTED, That it is the intent of the General Assembly that:

(1)     the Public Service Commission shall establish a division within the Commission with the specific responsibility to receive, investigate, and resolve, including by disciplinary actions and prosecution, complaints against electricity suppliers, gas suppliers, and energy salespersons for violations of this Act with respect to retail customers;

(2)     _(i)_     at least two additional Position Identification Numbers (PINs) shall be created and assigned to the new division, in addition to existing Commission personnel in the Commission's Consumer Affairs Division, who may be assigned to assist the new division in its responsibilities under this Act; _and_

_(ii)     the Department of Budget and Management shall include the two PINs created under item (i) of this item in the Commission's budget for fiscal year 2025;_

(3)     the functions of the new division shall be funded by licensing and renewal fees imposed on electricity suppliers, gas suppliers, and energy salespersons under this Act; and

(4)     a special assessment on public service companies under Section 3 of this Act shall be used for initial funding of the new division.

SECTION 3. AND BE IT FURTHER ENACTED, That:

(a)     Notwithstanding any other provision of law, for fiscal year 2025 only, in addition to the amounts appropriated in the budget bill for fiscal year 2025, the Public Service Commission may impose up to $275,000 as a special assessment using the assessment process authorized under § 2–110 of the Public Utilities Article, provided that:

(1)     the assessment shall be imposed only on those electric companies, electricity suppliers, gas companies, and gas suppliers otherwise subject to the assessment under § 2–110 of the Public Utilities Article; and

**JA129**

(2)    the limit under § 2–110(c)(12) of the Public Utilities Article does not apply to any assessment made under this section.

(b)    (1)    The amounts collected under subsection (a) of this section may be expended for fiscal year 2025 for the support of the Commission in accordance with an approved budget amendment.

(2)    Notwithstanding § 2–110(c)(10) of the Public Utilities Article, any unexpended funds at the end of fiscal year 2025 that were collected under this section:

(i)    shall be considered encumbered by the Public Service Commission by June 30, 2025; and

(ii)    may not be deducted from the appropriation for fiscal year 2026.

(c)    The bill sent to each electric company, electricity supplier, gas company, and gas supplier subject to the assessment under subsection (a) of this section shall equal the product of multiplying:

(1)    the amount authorized to be collected under this section; and

(2)    the ratio of the gross operating revenues of the entity subject to the special assessment to the total gross operating revenues for all entities subject to the assessment.

SECTION 4. AND BE IT FURTHER ENACTED, That:

(1)    the licenses of electricity suppliers and gas suppliers that are licensed by the Public Service Commission as of July 1, 2024, shall expire on a staggered basis as determined by the Commission, such that equal numbers of licenses shall expire throughout each of the following 3 years but not later than June 30, 2027;

(2)    the licenses of energy salespersons who are licensed by the Commission on or before June 30, 2027, shall expire on a staggered basis as determined by the Commission, such that equal numbers of licenses shall expire each year; and

(3)    all new and renewed licenses for electricity suppliers, gas suppliers, and energy salespersons shall be for a term not exceeding 3 years.

SECTION 5. AND BE IT FURTHER ENACTED, That, on or before December 31, 2024, the Public Service Commission shall:

(1)    in accordance with § 7–311 of the Public Utilities Article, as enacted by Section 1 of this Act, develop a training and education program for any entity or individual

– 48 –

JA130

that is licensed by the Commission as an electricity supplier, a gas supplier, an energy salesperson, or an energy vendor; and

(2)      in accordance with § 2–1257 of the State Government Article, report to the General Assembly on the status of the development of the training and education program required under § 7–311 of the Public Utilities Article, as enacted by Section 1 of this Act.

*SECTION 6. AND BE IT FURTHER ENACTED, That:*

*(a)      The Public Service Commission shall study and make recommendations on issues related to the utilization of end–use electricity customer load that is physically connected to the facilities of an existing or planned electric generation facility, also known as co–located load configuration, including:*

*(1)      any potential cost impacts to Maryland ratepayers related to co–located load configurations;*

*(2)      any potential impacts to the wholesale capacity, energy and ancillary markets, or the planning function overseen by PJM Interconnection, LLC related to co–located load configurations;*

*(3)      any potential impacts to the reliability of the electric distribution or transmission systems serving Maryland related to co–located load configurations; and*

*(4)      means to manage or mitigate the impacts specified in items (1) through (3) of this subsection.*

*(b)      On or before December 15, 2024, the Public Service Commission shall report its findings and recommendations to the Senate Committee on Education, Energy, and the Environment and the House Economic Matters Committee, in accordance with § 2–1257 of the State Government Article.*

SECTION ~~5.~~ ~~6.~~ *7.* AND BE IT FURTHER ENACTED, That a presently existing obligation or contract right may not be impaired in any way by this Act.

SECTION ~~6.~~ ~~7.~~ *8.* AND BE IT FURTHER ENACTED, That ~~§ 7–510(d)~~ §§ 7–510(d) and 7–604.2(c) of the Public Utilities Article, as enacted by Section 1 of this Act, shall be construed to apply to all electricity supply agreements and gas supply agreements entered into or renewed on or after January 1, 2025.

SECTION ~~7.~~ ~~8.~~ *9.* AND BE IT FURTHER ENACTED, That this Act shall be construed to apply only prospectively and may not be applied or interpreted to have any effect on or application to any electricity supply agreement or gas supply agreement that is in effect on or before December 31, 2024.

– 49 –

JA131

Ch. 537                                2024 LAWS OF MARYLAND

SECTION ~~8.~~ ~~9.~~ _10._ AND BE IT FURTHER ENACTED, That this Act shall take effect July 1, 2024.

**Approved by the Governor, May 9, 2024.**

– 50 –

JA132

# EXHIBIT 2

JA133

SB 1

# Department of Legislative Services
Maryland General Assembly
2024 Session

## FISCAL AND POLICY NOTE
### Enrolled - Revised

Senate Bill 1                          (Senator Augustine)

Education, Energy, and the Environment                     Economic Matters

## Electricity and Gas - Retail Supply - Regulation and Consumer Protection

This bill alters regulatory requirements for the marketing and sale of electricity and gas by retail suppliers, utilities, and related entities. Most of the requirements are related to residential service. The bill must be construed to apply only prospectively and may not be applied or interpreted to have any effect on or application to any electricity supply agreement or gas supply agreement that is in effect on or before December 31, 2024. The bill also (1) increases the maximum amount that the Public Service Commission (PSC) may assess public service companies each year to reimburse its expenses; (2) alters the name, purposes, and permissible uses of the Retail Choice Customer Education and Protection Fund; and (3) requires PSC to conduct a study on co-located load configuration. **The bill takes effect July 1, 2024.**

## Fiscal Summary

**State Effect:** Net special fund expenditures for PSC and the Office of People's Counsel (OPC) increase by $1.7 million FY 2025. Future years generally reflect annualization and the elimination of one-time costs. The FY 2025 budget as passed by the General Assembly includes 12 positions and $1.2 million in associated net funding for PSC and OPC, contingent on enactment of this bill or its cross file, as discussed below. Special fund revenues increase correspondingly from fees and from assessments imposed on public service companies to fund PSC and OPC operations. Other effects are discussed below.

| ($ in millions) | FY 2025 | FY 2026 | FY 2027 | FY 2028 | FY 2029 |
|---|---|---|---|---|---|
| SF Revenue | $1.7 | $1.8 | $1.9 | $2.0 | $2.1 |
| SF Expenditure | $1.7 | $1.8 | $1.9 | $2.0 | $2.1 |
| Net Effect | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |

Note:() = decrease; GF = general funds; FF = federal funds; SF = special funds; - = indeterminate increase; (-) = indeterminate decrease

**Local Effect:** The bill does not materially affect local government finances or operations.

**Small Business Effect:** Meaningful.

JA134

## Analysis

**Bill Summary:**  Broadly, in addition to other minor and conforming changings, the bill:

- establishes an energy salesperson license and an energy vendor license, subject to specified requirements;
- updates and aligns licensing requirements for electricity and gas suppliers and enhances related penalties;
- establishes new requirements for residential electricity supplier contracts;
- establishes new reporting requirements for billing entities;
- establishes new requirements related to electric and gas company marketing and cost recovery;
- establishes additional requirements on green power marketing;
- establishes additional requirements for residential energy retailers, as defined;
- states the intent of the General Assembly that PSC establish, staff, and fund a new division focused on retail supply;
- authorizes PSC to impose a one-time $275,000 special assessment;
- increases the amount that PSC may annually assess each public service company to fund its operations;
- modifies the purposes and permissible uses of the Retail Choice Customer Education and Protection Fund, renames it the Education and Protection Fund, and allows for it to be used as a funding source for a required training and educational program; and
- requires PSC to study and make recommendations on issues related to co-located load configuration and to report its findings and recommendations to specified committees of the General Assembly by December 15, 2024.

*New Licenses*

The bill establishes energy salesperson and energy vendor licenses, subject to specified requirements described below. Energy salespersons and energy vendors are also generally integrated into other provisions relating to electricity and natural gas supply, such as those requiring PSC to adopt consumer protection orders or regulations and establishing civil penalties.

SB 1/ Page 2

JA135

*Energy Salesperson License*

"Energy salesperson" means an individual who is licensed by PSC to sell:

- electricity or electricity supply services to residential retail electric customers on behalf of an electricity supplier as an employee or agent of the electricity supplier; or
- gas or gas supply services to residential retail gas customers on behalf of a gas supplier as an employee or agent of the gas supplier.

It does not include specified governmental entities or an employee or contractor of an electric company when the individual is performing duties specific to standard offer service (SOS).

Beginning July 1, 2025, a person may not engage in the business of an energy salesperson in the State unless the person holds a license issued by PSC. Additionally, a licensed energy salesperson may offer or sell electricity supply agreements or gas supply agreements to customers in the State only if the energy salesperson is associated with a licensed electricity supplier or licensed gas supplier, respectively.

The bill specifies application requirements for an energy salesperson license, including providing proof of association with a licensed electricity or gas supplier, as appropriate, payment of an applicable licensing fee, and proof of compliance with applicable training requirements for customer protection. PSC must also, by regulation or order, require proof of financial integrity and require the licensee to post a bond or similar instrument if, in PSC's judgement, it is necessary to insure the licensee's financial integrity. The term of the license is three years and may be renewed. Terms may be staggered by PSC. The license cannot be transferred without prior PSC approval.

*Energy Vendor License*

"Energy vendor" means a person that has a contract or subcontract to provide energy sales services to an electricity supplier or a gas supplier that provides electricity supply services or gas supply services, respectively, to a residential customer.

Beginning July 1, 2025, a person may not engage in the business of an energy vendor in the State unless the person holds a license issued by PSC. The bill specifies application requirements for an energy vendor license, including payment of an applicable licensing fee, and additional actions that PSC must take by regulation or order that mirror those for energy salespersons. The term of the license is three years and may be renewed. Terms may be staggered by PSC. The license cannot be transferred without prior PSC approval.

SB 1/ Page 3

JA136

*Public Service Commission Licensing and Related Enforcement Activities*

Existing provisions related to PSC's authority to license electricity and gas suppliers are updated to incorporate energy salespersons and energy vendors and to authorize PSC to deny an initial license or refuse to renew a license. Additionally, PSC's authority to impose a moratorium on adding or soliciting customers by an electricity supplier for just cause on its own investigation, or on complaint of OPC, the Attorney General, or an affected party is expanded to include other specified regulatory actions:  licensing, civil penalties, and ordering refunds. The expanded authority for electricity suppliers is mirrored in updated provisions regulating gas suppliers.

The maximum civil penalty for related electricity supplier violations is increased from $10,000 to $25,000 and applicability is expanded to include energy vendors. Civil penalty and other PSC enforcement provisions for electricity suppliers are mirrored in updated provisions regulating gas suppliers, including the maximum civil penalty of $25,000. Energy salespersons are not subject to a civil penalty, but are subject, after a hearing, to specified administrative actions, such as license revocation.

*Residential Electricity or Gas Supply Other Than Standard Offer Service*

For residential electricity supply other than supply offered through SOS or specified governmental entities, a residential electricity supplier:

- may offer electricity, other than green power, only at a price that does not exceed the trailing 12-month average of the electric company's SOS rate in the electric company's service territory as of the date of agreement with the customer;
- may offer residential electricity supply only for a term up to 12 months at a time and without automatic renewal;
- may, for electricity supply other than green power, automatically renew the term only if the electricity supplier provides notice to the customer 90 days before and 30 days before renewal;
- may offer green power that meets specified requirements, discussed below, but may not automatically renew the term with the customer;
- may not offer a variable rate other than a rate that adjusts for seasonal variation up to two times in a single year (this does not prohibit the offer and use of time-of-use rates that establish different rates for periods within a single day); and
- may not pay a commission or other incentive-based compensation to an energy salesperson for enrolling customers.

Additionally, a residential electricity supplier may not sell to an electric company, and an electric company may not purchase from an electricity supplier, accounts receivable. The

SB 1/ Page 4

above requirements must be construed to apply to all electricity agreements and supply agreements entered into or renewed on or after January 1, 2025.

An electric company and a residential electricity supplier must establish a mechanism for a customer whose account number or customer choice identification number has been compromised to receive a replacement number on request, subject to verification in a manner approved by PSC.

Generally, as approved by PSC by regulation or order, each electric company and each residential electricity supplier must allow a customer to indicate the customer's intention to remain on SOS indefinitely and not to receive directed marketing contacts from electricity suppliers through the implementation of a "do not transfer" list onto which the customer may request to be placed.

The bill establishes parallel requirements for gas suppliers that supply gas to residential gas customers – although there are no requirements related to green power.

The requirement that PSC establish the definition of "default service" and include information on the transition of SOS to a default service in a recurring report are repealed.

### Monthly Data Reporting

By the 15th day of each month, each billing entity, as defined, must submit a report to PSC on customer choice in its service territory for the preceding month, including:

- the total kilowatt-hours distributed, and supply cost charged, to customers purchasing electricity from a third-party electricity supplier, along with the total cost that would have been paid by those customers under SOS;
- the net third-party total cost compared to the net SOS cost;
- the total third-party average rate, the SOS average rate, and the difference between the two;
- various specified third-party average rates for specified customers and types of rates, and the variance between such rates and the SOS average rate; and
- other pertinent information PSC considers appropriate.

The bill establishes parallel requirements billing entities for gas customers.

### Marketing and Cost Recovery

Generally, except for materials to educate or inform a retail customer about SOS, default gas commodity service, or customer choice, an electric company or gas company may not

SB 1/ Page 5

JA138

recover through its rates costs associated with marketing its services. However, PSC may adopt criteria for reviewing marketing and other communications materials to determine whether their costs may be recovered through rates.

An electric cooperative may advertise, market, and promote SOS and related products in its service territory in compliance with appropriate consumer protections consistent with those that apply to electricity suppliers under § 7-507 of the Public Utilities Article (this does not apply to Choptank Electric Cooperative). An electric cooperative may recover through its rates any costs associated with marketing its services, including the costs associated with materials that educate or inform a retail customer about SOS or customer choice.

*Green Power Marketing*

Generally, an electricity supplier that supplies electricity to residential electric customers may not market electricity as "green power" unless:

- the percentage of electricity being offered, or the equivalent number of renewable energy credits (RECs) associated with the electricity being marketed as green power, equals or exceeds the greater of 51% or 1% higher than the Renewable Energy Portfolio Standard (RPS) for the year the electricity is provided to the customer; and
- PSC approves the price of the electricity being marketed as green power, subject to specified requirements.

PSC must hold a proceeding each year to set the price per megawatt-hour for electricity marketed as green power that, generally, an electricity supplier may not exceed. However, the bill establishes a process that authorizes PSC to set a higher price for a particular electricity supplier under specified circumstances. Among other requirements, the electricity supplier must demonstrate to PSC that the actual cost for the generation or supply of electricity exceeds the general green power price set by PSC. A separate price approved by PSC may not be more than 150% of the general price unless PSC determines that the actual cost of the green power exceeds the general price; any such approval requires PSC to report to the General Assembly, as specified. PSC must annually review any specific supplier prices.

Beginning January 1, 2025, an electricity supplier must purchase RECs for each year the electricity supplier offers green power for sale to residential retail electric customers. The RECs must be retired in a PJM Generation Attribute Tracking System reserve subaccount accessible by PSC.

SB 1/ Page 6

An electricity supplier that claims in its marketing materials for residential customers that the customer will be purchasing green power must include in those marketing materials related disclosures about the source of the green power. The bill specifies one disclosure and requires PSC to adopt regulations that explain related concepts. An annual reporting requirement for electricity suppliers is updated to include (1) the amount and types of generation associated with RECs purchased in accordance with the bill during the reporting period and (2) the amount of renewable energy certificates that do not qualify as RECs and related information.

PSC, in its discretion, may determine whether an electricity supplier is marketing electricity in accordance with these requirements.

The above requirements do not apply to specified governmental entities or a supplier when supplying electricity to commercial retail electric customers.

*Residential Energy Retailer Disclosures*

PSC may adopt regulations to (1) require a "residential energy retailer" to post notices and disclosures required under Title 7 of the Public Utilities Article on the retailer's website, subject to specified requirements and (2) require or prohibit the use of specific language in a residential energy retailer's marketing materials, disclaimers, disclosures, and legal documents, as specified. However, PSC must require a residential energy retailer to post on its website the terms and conditions of its residential services and products and an environmental disclosure in clear, unambiguous language. For purposes of these requirements, a "residential energy retailer" means an electricity supplier that supplies electricity to residential retail electric customers, a gas supplier that supplies gas to residential retail customers, an energy salesperson, and an energy vendor. It does not include specified governmental entities or a gas or electric supplier when supplying gas or electricity to commercial retail customers.

*General Assembly Intent That the Public Service Commission Establish, Staff, and Fund a New Division*

The bill establishes the intent of the General Assembly that:

- PSC establish a division with the specific responsibility to receive, investigate, and resolve complaints against electricity suppliers, gas suppliers, and energy salespersons for violations with respect to retail customers;
- (1) at least two additional Position Identification Numbers (PINs) be created and assigned to the new division, in addition to existing PSC personnel in its Consumer Affairs Division, who may be assigned to assist the new division in its

JA140

responsibilities and (2) the Department of Budget and Management (DBM) must include the two PINs in PSC's fiscal 2025 budget;

- the functions of the new division be funded by licensing and renewal fees imposed on electricity suppliers, gas suppliers, and energy salespersons; and
- the special assessment on public service companies authorized under the bill be used for initial funding of the new division.

*Special Assessment*

Notwithstanding any other provision of law, for fiscal 2025 only, in addition to the amounts appropriated in the budget bill for fiscal 2025, PSC may impose up to $275,000 as a special assessment using the assessment process authorized under § 2-110 of the Public Utilities Article. The assessment must be imposed proportionally, as specified, on the electric companies, electricity suppliers, gas companies, and gas suppliers otherwise subject to PSC's annual assessment. The statutory limit of public service company revenues that applies to PSC's annual assessment does not apply to the bill's special assessment.

The amounts collected under the special assessment may be expended for fiscal 2025 for the support of PSC with an approved budget amendment. Unexpended funds at the end of fiscal 2025 are considered encumbered by PSC and may not be deducted from the fiscal 2026 appropriation.

*Annual Assessment on Public Service Company Gross Operating Revenues*

The amount that PSC may assess each public service company to fund its operations each year is increased, from 0.25% to 0.5%, of each company's gross operating revenues derived from intrastate utility and electricity supplier operations in the preceding calendar year. The amount that PSC may assess to fund OPC is unchanged.

*Retail Choice and Customer Education Fund*

The Retail Choice Customer Education and Protection Fund is renamed the Education and Protection Fund. The purposes and permissible uses of the fund are expanded to include (1) educating customers on energy choices that help meet the State's climate commitments, as specified; (2) protecting customers from unfair, false, misleading, or deceptive practices by energy salespersons and energy vendors (currently, this is only for electricity and gas suppliers); and (3) developing a training and educational program for electricity and gas suppliers, energy salespersons, and energy vendors.

Conforming changes are made to allow funding for the currently required supplier training and educational program to include the Education and Protection Fund as a funding source and to include energy salespersons and energy vendors.

SB 1/ Page 8

By December 31, 2024, PSC must develop the training and education program and report to the General Assembly on the status of program development.

*Staggered Licenses with Maximum Three-year Duration*

All new and renewed licenses for electricity suppliers, gas suppliers, and energy salespersons must be for a term of no more than three years.

The licenses of electricity suppliers and gas suppliers that are licensed by PSC as of July 1, 2024, must expire on a staggered basis as determined by PSC such that equal numbers of licenses expire throughout each of the following three years, but not later than June 30, 2027.

The licenses of energy salespersons who are licensed by PSC on or before June 30, 2027, must expire on a staggered basis as determined by PSC such that equal numbers of licenses expire each year.

*Co-located Load Configuration Study*

PSC must study and make recommendations on issues related to the utilization of end-use electricity customer load that is physically connected to the facilities of an existing or planned electric generation facility, also known as co-located load configuration, including:

- any potential cost impacts to Maryland ratepayers related to co-located load configurations;
- any potential impacts to the wholesale capacity, energy, and ancillary markets, or the planning function overseen by PJM Interconnection, LLC related to co-located load configurations;
- any potential impacts to the reliability of the electric distribution or transmission systems serving Maryland related to co-located load configurations; and
- means to manage or mitigate the impacts specified above.

By December 15, 2024, PSC must report its findings and recommendations to the Senate Committee on Education, Energy, and the Environment and the House Economic Matters Committee.

SB 1/ Page 9

JA142

**Current Law:**

*Retail Customer Choice*

 *Generally*

The Electric Customer Choice and Competition Act of 1999 facilitated the restructuring of the electric utility industry in Maryland. The resulting system of customer choice allows the customer to purchase electricity from a competitive supplier or to continue receiving electricity under SOS. Default SOS electric service is provided by a customer's electric company (*e.g.*, Baltimore Gas and Electric Company or Pepco). Competitive electric supply is provided by competitive electricity suppliers. In either case, the electric company delivers the electricity and recovers the costs for delivery through distribution rates. Gas supply and delivery are similarly restructured, with gas suppliers and gas companies.

In practice, to provide SOS, electric companies solicit bids for electricity through a series of rolling auctions every six months. At any one time, the SOS rate reflects the average of four separate auctions held over two years, which has a moderating effect on rate changes.

 *Supplier Licensing and Related Enforcement Activities*

An electricity supplier must be licensed by PSC before doing business in the State. PSC must adopt regulations or issue orders to protect consumers, electric companies, and electricity suppliers from anticompetitive and abusive trade practices and to establish related consumer safeguards, such as procedures for contracting with customers.

An electricity supplier or person selling or offering to sell electricity in the State in violation of supplier licensing requirements, after notice and an opportunity for a hearing, is subject to a civil penalty of up to $10,000 or license revocation or suspension.

PSC is required to license gas suppliers and has the same regulatory authority as it does for electricity suppliers. PSC must adopt licensing requirements and procedures for gas suppliers that protect consumers, the public interest, and the collection of all State and local taxes. Penalties for gas suppliers or persons selling or offering to sell natural gas are not separately specified.

Electricity and gas supplier licenses do not expire under current law.

 *Limitation on Supply Offers to Households Receiving Energy Assistance*

Effective July 1, 2023, unless PSC has approved the supply offer, a retail supplier may not offer to provide electricity or gas to households in the State that have received energy

SB 1/ Page 10

JA143

assistance from Office of Home Energy Programs within the Department of Human Services during the previous fiscal year or take other similar actions. An approved supply offer must include a commitment to charging at or below SOS for the duration of the offer.

### *Energy Supplier Contracts*

PSC regulations specify minimum contract requirements for electricity and gas supply, which are similar but not identical. Broadly, a supply contract may only be executed by the appropriate electricity or gas supplier licensee. A supply contract must contain all material terms and conditions, a statement of contract duration and any rollover provision, a statement that the supplier and the customer may terminate the contract early, renewal procedures (if any), and the amount of any cancellation fee. Evergreen contracts are permitted, subject to certain disclosure requirements.

### *Renewable Energy Credits*

Generally, a REC is a tradable commodity equal to one megawatt-hour of electricity generated or obtained from a renewable energy generation resource. REC generators and electricity suppliers are allowed to trade RECs using a PSC-approved system known as the Generation Attributes Tracking System, a trading platform designed and operated by PJM, that tracks the ownership and trading of RECs. Generally, to be eligible for compliance with the State RPS, RECs must be created at a facility either in the PJM region or adjacent to the PJM region if the electricity is delivered into the PJM region, and certain sources, like solar, have further geographic restrictions. For additional related information, see the **Appendix – Renewable Energy Portfolio Standard**.

### *Annual Assessment on Public Service Company Gross Operating Revenues*

The costs and expenses of PSC and OPC must be borne by the public service companies that are subject to PSC's jurisdiction. The total amount that may be charged to a public service company for a State fiscal year, as a percentage of the company's gross operating revenues derived from intrastate utility and electricity supplier operations in the preceding calendar year may not exceed 0.25% for PSC. PSC is also authorized to assess up to 0.074% for the expenses of OPC. Assessed amounts accrue to the Public Utility Regulation Fund.

### *Retail Choice Customer Education and Protection Fund*

Chapter 134 of 2016 established the Retail Choice Customer Education and Protection Fund in PSC. The purpose of the fund is to provide resources to improve PSC's ability to (1) educate customers on retail electric and gas choice and (2) protect customers from unfair, false, misleading, or deceptive practices by electricity or gas suppliers. The fund

SB 1/ Page 11

may be used only for these purposes. Revenues from specified civil penalties assessed on energy suppliers accrue to the fund, rather than the general fund. The fund consists of (1) the revenues from the related civil penalties; (2) money appropriated in the State budget to the fund; and (3) any other money from any other source accepted for the benefit of the fund.

*Supplier Training Program*

Chapters 373 and 374 of 2020 required PSC to develop a training and educational program, in consultation with interested stakeholders, for any entity or individual that is licensed by PSC as an electricity supplier or a gas supplier, subject to specified requirements. The program must require that a designated representative of each licensed electricity supplier or licensed gas supplier demonstrate a thorough understanding of relevant PSC regulations. PSC must conduct an examination at the end of the training and certify that the designated representative has successfully completed the training. PSC may recover the initial costs of the program through its standard assessment and may establish reasonable fees for the program. In practice, the program has yet to be funded.

**State Fiscal Effect:**   The fiscal effects associated with implementing the bill and the contingent provisions in the fiscal 2025 budget as passed by the General Assembly are discussed separately below.

*Implementation of the Bill*

   *Retail Energy Supply – Regulation and Enforcement*

PSC advises that the incremental workload required by the bill cannot be absorbed within existing resources. PSC requires additional staff to review potentially thousands of individual licenses and to develop and enforce ongoing licensure and related requirements. Additional funds are also required for contractual services to develop automated licensing and citation platforms. There will also be extensive rulemaking as part of implementation. This estimate reflects the intent of the General Assembly that PSC establish a division with the specific responsibility to receive, investigate, and resolve complaints against electricity suppliers, gas suppliers, and energy salespersons for violations with respect to retail customers; costs may be marginally less if PSC instead hires positions directly into its existing divisions. The fiscal 2025 budget as passed by the General Assembly does not include positions specific to implementation of this bill.

Accordingly, special fund expenditures for PSC increase by $523,296 in fiscal 2025, which accounts for a 90-day startup delay. This estimate reflects the cost of hiring one program manager, one regulatory economist, one administrative specialist, and one staff attorney to administer and enforce the new licensing and related provisions in the bill. It includes

SB 1/ Page 12

JA145

salaries, fringe benefits, one-time start-up costs, ongoing operating expenses, and a one-time programming expense.

| | |
|---|---|
| Positions | 4.0 |
| Salaries and Fringe Benefits | $282,272 |
| Programming Costs | 200,000 |
| Other Operating Expenses | 41,024 |
| **Total FY 2025 PSC Implementation Expenditures** | **$523,296** |

Future year expenditures reflect full salaries with annual increases and employee turnover as well as annual increases in ongoing operating expenses.

Generally, PSC is funded through an assessment each fiscal year on the public service companies that it regulates. Under the bill, PSC also (1) collects initial and renewal licensure revenue from energy salespersons and energy vendors beginning in fiscal 2026; (2) collects renewal licensure revenue from energy suppliers beginning in fiscal 2025; and (3) is authorized to impose a one-time special assessment of $275,000 in fiscal 2025. Licensure revenues, though unknown, and special assessment revenues are assumed to offset revenues generated from the standard assessment. Accordingly, special fund revenues for PSC increase correspondingly from licensure revenue and assessments imposed on public service companies.

Enhanced penalties are not anticipated to materially affect special fund revenues.

*Education and Protection Fund and Education Programs*

PSC can handle the bill's requirements related to the (renamed) Education and Protection Fund with existing budgeted resources. PSC advises that special funds (from retail supplier penalties under current law, plus additional penalties under the bill) in the fund will be used as they become available to fund (1) a new climate policy customer education program and (2) the currently required, but unfunded, supplier education program, with modifications for energy salespersons and energy vendors. Funding for retail customer education is expected to remain unchanged. In any particular year, special fund expenditures for PSC may be more or less than they otherwise would have been, as limited funds from retail supplier penalties are used for different purposes under the bill. Annual differences are likely modest, based on recent annual expenditures from the fund of about $450,000.

*Assessment Cap Increase*

Increasing the percentage of public service company revenues that PSC may assess each year does not directly affect special fund revenues or expenditures. However, it does

SB 1/ Page 13

JA146

increase the likelihood that the assessment can collect a sufficient amount of revenues to fund PSC's budget.

### *Co-located Load Configuration Study*

PSC can conduct the study on co-located load configuration and report on its findings and recommendations with existing budgeted resources.

### *Contingent Funding Effectuated by Enactment of the Bill*

The fiscal 2025 budget as passed by the General Assembly includes the following funding for both PSC and OPC, contingent on enactment of this bill or its cross file:  $634,837 in special funds for eight positions in PSC; and $528,368 in special funds for five positions in OPC (net of a $200,000 reduction in consultant funding, described below). The budget language specifies that the amounts are to provide operating funds and positions to address capacity and workload challenges. Both PSC and OPC advise that the contingent funding provisions are to support implementation of prior-year legislation, and not this bill. Therefore, this analysis assumes that the contingent funding is in addition to, and distinct from, the administrative requirements and associated fiscal effects described above.

### *Public Service Commission*

Special fund expenditures for PSC increase by $634,837 in fiscal 2025, which accounts for the employee turnover included in the fiscal 2025 budget associated with the new positions and generally reflects an October 1, 2024 start date. This estimate reflects the cost of hiring eight staff due to the contingency in the fiscal 2025 budget that this bill effectuates: one human resources administrator, one staff attorney, two regulatory economists, two engineers, and two senior auditors. It includes salaries, fringe benefits, one-time start-up costs, and ongoing operating expenses. According to DBM, the $72,208 budgeted for contractual services is meant to fund operating expenses associated with the positions.

| | |
|---|---|
| Positions | 8.0 |
| Salaries and Fringe Benefits | $562,629 |
| Other Operating Expenses | 72,208 |
| **Total FY 2025 PSC Contingent Expenditures** | **$634,837** |

Future year expenditures, which range from $772,330 in fiscal 2026 to $875,601 in fiscal 2029, reflect full salaries with annual increases and employee turnover as well as annual increases in ongoing operating expenses and the elimination of one-time costs.

Generally, PSC is funded through an assessment on the public service companies that it regulates. As a result, special fund revenues for PSC increase correspondingly from assessments imposed on public service companies.

*Office of People's Counsel*

Special fund expenditures for OPC increase by $528,368 in fiscal 2025, which accounts for the lack of employee turnover included in the fiscal 2025 budget associated with the new positions and reflects a July 1, 2024 start date. This estimate reflects the cost hiring five staff due to the contingency in the fiscal 2025 budget that this bill effectuates: three assistant People's Counsel, one legislative/communications director, and one administrative specialist. It includes salaries, fringe benefits, one-time start-up costs, and ongoing operating expenses. It also includes a $200,000 reduction in OPC's consultant budget, which this analysis assumes is ongoing, based on information provided by OPC.

| | |
|---|---|
| Positions | 5.0 |
| Salaries and Fringe Benefits | $687,321 |
| Consultant Costs | -200,000 |
| Other Operating Expenses | 41,047 |
| **Net FY 2025 OPC Contingent Expenditures** | **$528,368** |

Net future year expenditures, which range from $672,653 in fiscal 2026 to $762,396 in fiscal 2029, reflect salaries with annual increases and employee turnover as well as annual increases in ongoing operating expenses, the elimination of one-time costs, and continued annual reductions in OPC's consultant budget.

Generally, OPC is also funded through an assessment on the public service companies that PSC regulates. As a result, special fund revenues for OPC increase correspondingly from assessments imposed on public service companies.

**Small Business Effect:** Small electricity suppliers must comply with the bill's residential contract and price limitations, in addition to salesperson licensing, REC purchasing, green power marketing, reporting, and disclosure requirements. In particular, the contract limitations and the prohibition against the sale of residential accounts receivable to utilities likely limit the ability of many small suppliers to meaningfully participate in the retail markets in the State. For example, under current practice, many contract offerings are for longer than one year and may include rates higher than SOS. Electric companies also purchase accounts receivable from electricity suppliers and then recoup the funds directly from customers through their utility bills. Generally, prohibiting this practice shifts business risk from electric companies to electricity suppliers. Small residential gas suppliers have similar ongoing requirements related to contract and price limitations, licensing, and the sale of accounts receivable.

Finally, additional restrictions on residential electricity and gas supplier contract terms and prices may result in upward pressure on residential energy prices, which may increase costs for some small businesses that pay residential rates.

## Additional Information

**Recent Prior Introductions:**  Similar legislation has not been introduced within the last three years.

**Designated Cross File:**  HB 267 (Delegate Crosby) - Economic Matters.

**Information Source(s):**   Public Service Commission; Office of People's Counsel; Department of Human Services; Office of the Attorney General (Consumer Protection Division); Department of General Services; Department of Budget and Management; Maryland Municipal League; Department of Legislative Services

**Fiscal Note History:**    First Reader - January 23, 2024
rh/lgc                                  Third Reader - March 25, 2024
                                                Revised - Amendment(s) - March 25, 2024
                                        Enrolled - May 6, 2024
                                                Revised - Amendment(s) - May 6, 2024
                                                Revised - Clarification - May 6, 2024
                                                Revised - Budget Information - May 6, 2024

Analysis by:   Stephen M. Ross                  Direct Inquiries to:
                                                (410) 946-5510
                                                (301) 970-5510

JA149

# Appendix – Renewable Energy Portfolio Standard

*General Overview*

Maryland's Renewable Energy Portfolio Standard (RPS) was enacted in 2004 to facilitate a gradual transition to renewable sources of energy. There are specified eligible ("Tier 1" or "Tier 2") sources as well as carve-outs for solar, offshore wind, and geothermal. Electric companies (utilities) and other electricity suppliers must submit renewable energy credits (RECs) equal to a percentage of their retail electricity sales specified in statute each year or else pay an alternative compliance payment (ACP) equivalent to their shortfall. Historically, RPS requirements have been met almost entirely through RECs, with negligible reliance on ACPs; however, as discussed further below, that has not been the case recently. The Maryland Energy Administration must use ACPs for purposes related to renewable energy, as specified.

In 2024, the requirements are 33.7% from Tier 1 sources, including at least 6.5% from solar and 0.15% from post-2022 geothermal systems, plus 2.5% from Tier 2 sources.

*Recent Significant Changes to Overall Percentage Requirements*

- Chapter 757 of 2019 significantly increased the percentage requirements, which now escalate over time to a minimum of 50% from Tier 1 sources, including 14.5% from solar, by 2030.

- Chapter 673 of 2021 reduced the amount of solar energy required under the RPS each year from 2022 through 2029, while leaving the nonsolar requirement generally unchanged, before realigning with the previous requirements beginning in 2030. The Act also extended Tier 2 in perpetuity at 2.5%.

- Chapter 164 of 2021 created a carve-out for post-2022 geothermal systems in Tier 1 beginning in 2023.

*Limited Applicability to Municipal Electric Utilities and Electric Cooperatives*

As RPS percentage requirements have grown over time, legislation has been enacted to limit the effect on municipal electric utilities and electric cooperatives. Tier 1 percentage requirements for municipal electric utilities are limited to 20.4% in total beginning in 2021, including at least 1.95% from solar energy and up to 2.5% from offshore wind. Municipal electric utilities are also exempt from Tier 2 after 2021. Electric cooperatives are exempt

SB 1/ Page 17

JA150

from future increases to the solar carve-out beyond 2.5%, and the RPS does not apply to Choptank Electric Cooperative.

*Renewable Energy Credits*

Generally, a REC is a tradable commodity equal to one megawatt-hour of electricity generated or obtained from a renewable energy generation resource. In other words, a REC represents the "generation attributes" of renewable energy – the lack of carbon emissions, its renewable nature, etc. A REC has a three-year life during which it may be transferred, sold, or redeemed. REC generators and electricity suppliers are allowed to trade RECs using a Public Service Commission (PSC) approved system known as the Generation Attributes Tracking System, a trading platform designed and operated by PJM Environmental Information Services, Inc., that tracks the ownership and trading of RECs.

*Eligible Sources*

Tier 1 sources include wind (onshore and offshore); solar (photovoltaic and certain water-heating systems); qualifying biomass; methane from anaerobic decomposition of organic materials in a landfill or wastewater treatment plant; geothermal; ocean, including energy from waves, tides, currents, and thermal differences; a fuel cell that produces electricity from specified sources; a small hydroelectric plant of less than 30 megawatts; poultry litter-to-energy; waste-to-energy; refuse-derived fuel; thermal energy from a thermal biomass system; and raw or treated wastewater used as a heat source or sink for heating or cooling. Tier 2 includes only large hydroelectric power plants.

Chapter 673 of 2021 excluded black liquor, or any product derived from black liquor, from Tier 1 beginning in 2022.

*Trends in Compliance Costs, Renewable Energy Credit Prices, and Resources Used*

Compliance costs for electricity suppliers totaled $438.8 million in 2022:  $332.7 million for 15.2 million RECs; and $77.1 million in ACPs. Costs and RECs are shown in **Exhibit 1**. This continues a multi-year trend of increasing compliance costs and, generally, average REC prices.

In 2021, wind (50.8%), solar (13.2%), black liquor (12.5%), small hydroelectric (8.0%), and municipal solid waste (6.4%) were the primary energy sources used for Tier 1 RPS compliance. This continues a multi-year trend of increasing reliance on wind and solar energy. Maryland facilities generated 5.0 million RECs in 2021:  approximately 2.9 million Tier 1 RECs; and 2.1 million Tier 2 RECs. Many RECs can be used for compliance in both Maryland and other surrounding states, although there are geographic and energy source restrictions.

SB 1/ Page 18

**Exhibit 1**
**RPS Compliance Costs and REC Prices**
**2017-2022**

| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| **Compliance Costs ($ Millions)** | | | | | | |
| Tier 1 Nonsolar RECs | $50.0 | $56.4 | $79.3 | $99.8 | $187.3 | $246.5 |
| Tier 1 Solar RECs | 21.3 | 27.4 | 55.2 | 122.9 | 144.4 | 101.4 |
| Tier 2 RECs | 0.7 | 1.0 | 0.06 | 0.4 | 1.0 | 4.4 |
| ACPs | 0.1 | 0.1 | 7.7 | 0.1 | 77.1 | 86.6 |
| **Total** | **$72.1** | **$84.9** | **$142.3** | **$223.2** | **$409.8** | **$438.8** |
| | | | | | | |
| **Average REC Price ($)** | | | | | | |
| Tier 1 Nonsolar | $7.14 | $6.54 | $7.77 | $8.24 | $14.36 | $17.80 |
| Tier 1 Solar | 38.18 | 31.91 | 47.26 | 66.10 | 72.59 | 57.80 |
| Tier 2 | 0.48 | 0.66 | 1.05 | 1.06 | 6.45 | 7.42 |

ACP:  alternative compliance payment
REC:  renewable energy credit
RPS:  Renewable Energy Portfolio Standard

Note:  Numbers may not sum to total due to rounding. The vast majority of ACPs in 2021 and 2022 ($76.9 million and $85.9 million, respectively) were due to a shortfall of solar RECs.

Source:  Public Service Commission

*Related Studies and Reports*

PSC must submit an RPS compliance report to the General Assembly each year. The most recent report, which contains historical data through 2022, can be found here.

The Power Plant Research Program (PPRP) in the Department of Natural Resources has frequently been required to conduct RPS studies. PPRP submitted a final report on a comprehensive RPS study in December 2019, which can be found here. PPRP also submitted a related required study on nuclear energy at that time, which can be found here. A supplemental study on the overall costs and benefits of increasing the RPS to a goal of 100% by 2040 was due by January 1, 2024, but has been delayed.

The Department of Legislative Services also issued a report on the RPS in 2023, which can be found here. The report contains additional detail on the program, significant statutory changes, and visualizations of planned and actual RPS percentage requirements over time.

SB 1/ Page 19

JA152

# EXHIBIT 3

JA153

# Maryland's Dysfunctional Residential Third-Party Energy Supply Market: An Assessment of Costs and Policies

By Laurel Peltier and Arjun Makhijani, Ph.D.

December 2018



ABELL
FOUNDATION

JA154



The Abell Foundation
Suite 2300
111 S. Calvert Street
Baltimore, MD 21202-6174

www.abell.org
Phone: 410-547-1300
@abellfoundation

Cover photo: Shutterstock

JA155

# TABLE OF CONTENTS

Executive Summary ................................................................................................ 1

Introduction.......................................................................................................... 3

Third-Party Supply Data ....................................................................................... 5

Third-Party Supplier View ..................................................................................... 8

Growth of Maryland's Third-Party Energy Supplier Market........................................ 8

Maryland's Electricity Choice Pricing Outcomes........................................................ 9

The Burdens and Harms Due to Unaffordable Utility Bills ......................................... 16

Data From Other States ......................................................................................... 19

Current Status at the Maryland PSC........................................................................ 20

Recommendations................................................................................................. 21

Conclusions .......................................................................................................... 23

Acknowledgements ............................................................................................... 25

References ............................................................................................................ 26

JA156

# Maryland's Dysfunctional Residential Third-Party Energy Supply Market: An Assessment Of Costs And Policies

by Laurel Peltier and Arjun Makhijani, Ph.D.

## Executive Summary[1]

Maryland's Electric Customer Choice and Competition Act of 1999 opened the door to electric retail competition and allowed a variety of third-party supply companies to sell electricity supply and other services to Maryland's consumers. The regulated utilities continue to provide distribution service to all customers, and they supply service to those customers who do not want to purchase it from competitive suppliers. The idea was that a deregulated energy market would provide consumers with choices, spark competition, and "provide economic benefits to all customer classes."[2] This report examines whether retail competition has benefited residential consumers, especially low-income households. Gas retail competition also is available, subject to the same licensing and consumer protection rules that apply to electric retail competition.

For a variety of reasons, the marketplace for nonregulated suppliers was slow to grow until 2010. The impact, however, during that year was positive: Residential consumers who purchased from non-utility ("third-party") suppliers saved in total about $20 million, as compared to regulated utility supply prices. Between 2011 and 2013, consumers who switched to third-party suppliers came out about even on the whole.

**But from 2014 to 2017, Maryland households have been paying tens of millions of dollars more per year in aggregate to third-party electricity suppliers—about $255 million more in all than if they had stayed with their utility's supply offer.** This adverse outcome for consumers, despite a large number of suppliers, indicates that Maryland's third-party supply residential market has become dysfunctional[3]; in its current state, it is no longer fulfilling the purpose of the law—to benefit all consumer classes.

---

1 References for statements in this summary can be found in the body of the report.

2 Maryland Electric Restructuring Act 1999, 20.

3 We use the word "dysfunctional" in the sense that price-based competition, with transparency in the market, should in theory produce lower prices on average, but that is not the case for Maryland's residential customers.

### Table ES-1: Maryland residential electricity third-party supply summary 2014-2017

| Year | # On third-party supply | % Supplier rate over SOS | Total overpayment compared to SOS |
|------|------|------|------|
| 2014 | 477,000 | 15% | $77 million |
| 2015 | 441,000 | 14% | $69 million |
| 2016 | 418,000 | 11% | $50 million |
| 2017 | 400,400 | 16% | $59 million |
| **Total** | | | **$255 million** |

JA157

In this report, we examine the impact of higher rates on low-income households, with a focus on Baltimore City. There are 383,000 low-income households in Maryland that are eligible for government assistance to help reduce energy bills; 20 percent live in Baltimore City alone. Statewide, in 2016, assisted households had an average income of about $14,700 and average energy bills of about $2,180—15 percent of income. Many more families live under serious financial stress.

For better insight, we collected data and interviewed clients at a Baltimore City agency that provides a variety of services to low-income Baltimoreans, including energy assistance. Most of the people we interviewed were elderly African-American women. We found the following:

- When compared to Baltimore Gas and Electric Company's (BGE) Standard Offer Service (SOS) rates, the 40 low-income account holders we interviewed paid a 51 percent premium for electricity and a 78 percent premium for natural gas.

- The 40 low-income account holders we interviewed have all applied for, and most have received, financial aid through Maryland's Office of Home Energy Programs (OHEP) to help pay their energy bills. We estimated that over half of the low-income clients who visited the Baltimore City agency for energy assistance in May and June were on third-party supply, more than double the statewide average.

- For a sample of nine energy-assistance clients, we analyzed monthly bill-level data, which revealed that 34 percent of energy-assistance money was negated by higher prices of third-party suppliers.

Since 2009, Public Service Commission (PSC) regulations have allowed regulated utilities to purchase the suppliers' receivables at a very small discount, effectively shifting the risk of nonpayment of bills to the utilities—and the ratepayers—rather than the companies that charge the high prices. Yet no state agency actually collects and analyzes the impact of third-party supply rates for Maryland consumers, even though federal electricity supplier reporting is available. More remarkably, no government agency assesses the impact of higher rates on energy burdens, though the harms to low-income families caused by unaffordable utility bills are known to be severe.

The outcomes of these policies for low-income consumers are clear:

- Certain consumers face higher utility bills than the regulated utilities' SOS for electricity and gas supply.

- They are at greater risk of nonpayment of utility bills and utility service termination notices.

- There is a decreased effectiveness of limited energy assistance dollars in reducing high energy costs.

- Third-party suppliers are incentivized to charge high rates because they no longer bear the risk of nonpayment—a phenomenon known in economics as "moral hazard."

- The already-severe economic stresses faced by low-income families are intensified by high energy bills, thereby magnifying the damage to low-income families (e.g., ill health, homelessness, loss of productivity). Maryland also incurs substantial costs in the form of added emergency room visits, shelter for the homeless, and other economic and social losses.

JA158

The report offers the following recommendations:

1. The PSC should be required to annually collect and report actual bill-level data for consumers by zip code. These data would reveal the scope of overpayments if they continue to exist, or estimate customer savings, if any, and would verify whether they disproportionately affect low-income households as our data and analyses from other states suggest.

2. Residential customers who want third-party supply should only be served by some form of aggregated supply that would ensure lower costs. We are not recommending the end of third-party supply for the residential sector but are advocating for the end of marketing to and contracting with households for third-party supply on an individual basis with a very restricted exception of 100 percent renewable energy procurement. There are tested approaches to such aggregated contracts. For example, Ohio and Delaware have such programs that guarantee savings to low-income households.

3. A comprehensive program that uses the competitive supply market to ensure lower costs for all low-income households getting assistance should be put into place. All other households, including non-low-income households, should be allowed to opt-in to such programs, if they choose.

4. Variable rate contracts should not be permitted for residential customers.

5. Consumers should be allowed to terminate third-party energy supply contracts without early termination fees.

6. For consumers who choose third-party supply, utility bills should prominently display that the customer saved Y dollars or paid X dollars extra for that month by being on third-party supply.

7. Some marketing practices to low-income households in Baltimore appear to be similar to those condemned by the PSC in 2014. We strongly recommend that the PSC initiate a broad and thorough investigation into marketing practices affecting low-income households and also more actively enforce current regulations.

Unlike many issues facing the state, improving consumer outcomes quickly and effectively seems a realistic goal. Maryland has many good models to study and consider, and we offer a list of common-sense reforms to dramatically improve a marketplace that is currently not functioning to the benefit of Maryland households, especially low-income residents.

## Introduction

The utility bill is an essential part of everyday life. When these monthly statements arrive, most people look at the amount due and pay it, rarely glancing at the details. All too often, however, low-income households cannot afford all the bills that are due. Those who fall behind on payment of utility bills can build up a large balance due and thus risk termination of electricity or natural gas supply. They may also be unable to pay for other essentials, like food, medicine, and rent. High residential utility costs can cause a large variety of serious harms to people and also damage the state's economy in the form of lower productivity, loss of time at school and work, and higher medical costs.

JA159

In this report, we examine the impact that Maryland's Electric Customer Choice and Competition Act of 1999 (Energy Choice Act) has had on residential electricity and natural gas costs, with a special focus on low-income households. Like other states, Maryland's legislature assumed that increased energy supply competition would lower costs and benefit the economy and people of the state. To examine the results for Maryland's households, we begin with a few basics about the electricity deregulation law.

Electric and gas utilities are subject to extensive regulation of their rates and services by federal and state agencies due to their monopolistic nature. Prior to deregulation, the generation, transmission, and distribution of electricity by Maryland utilities were regulated to ensure safety and reliability, and to prevent excessive profits. Deregulation required Maryland utilities to transfer or sell their generating facilities, and allowed many non-utility supply companies, including those that own generating facilities, to use the utilities' transmission and distribution wires to deliver electricity. The utilities remained under regulation. Electricity supply can be purchased by both competitive suppliers and utilities in the interstate wholesale market administered by a regional transmission operator (RTO) (known as "PJM" in the mid-Atlantic region)[4] to ensure reliability and a level playing field for all wholesale suppliers.

In Maryland, the Public Service Commission (PSC) is the state agency that regulates all electric and gas utilities; the regulation extends to transmission and distribution services, as well as the provision of electricity or gas supply to customers who do not use energy suppliers. The regulated utilities include the larger investor-owned utilities, as well as electric cooperatives and municipal utilities. The Office of People's Counsel (OPC) is an independent state agency that represents Maryland's residential consumers in electricity, natural gas, telecommunications, private water, and certain transportation matters before the PSC, federal regulatory agencies, and the courts.[5]

The regulated utilities acquire electricity and natural gas supply under the purview of the PSC to ensure reasonable prices and reliable supply. Electric utility supply is called "Standard Offer Service." Natural gas utility supply is referred to as "gas commodity service." But Maryland consumers can also choose a different energy supplier—referred to as "third-party suppliers" in this report. The electricity and gas are still brought to consumers' homes and businesses via the same distribution wires and pipes owned by the utilities.

In contrast to Standard Offer Service rates, third-party suppliers' prices are not regulated by the PSC; however, third-party suppliers must be licensed by the PSC before they can sell energy in the state and must agree to comply with extensive consumer protection requirements. It is these unregulated, different prices that can raise or lower consumers' bills compared to the option of just sticking with the prices overseen by the PSC.

This report focuses on two questions:

1. Have residential consumers, in general, benefited from the opening up of the market to third-party suppliers?

2. Within that assessment, have low-income households, specifically, benefited?

We excluded commercial consumers from this analysis because the available data indicate that competition has, on the whole, benefited this sector in the form of lower prices.[6]

---

4  PJM initially stood for Pennsylvania, Jersey, and Maryland. The PJM grid now covers parts or all of many eastern states, with the westernmost point being Chicago, Illinois.

5  http://opc.maryland.gov/

6  We examined commercial third-party electricity supply briefly to determine whether this sector also experienced higher Standard Offer Service rates. The data show that, in the aggregate, commercial customers on third-party supply save money. However, it also appears that small commercial customers pay more, on average. While we have not examined this issue in detail, there may be a need to protect small commercial customers as well as residential customers from higher prices.

JA160

## Third-Party Supply Data

Three of Maryland's four privately owned distribution utilities are owned by the Exelon Corporation: Baltimore Gas & Electric (BGE), Potomac Electric Power Company (PEPCO), and Delmarva Power & Light. These three utilities serve about 83 percent of the state's electricity customers. Exelon is engaged in power generation and competitive energy sales, in addition to its ownership of utilities in several jurisdictions. A fourth utility, Potomac Edison, is owned by First Energy and serves Western Maryland. A fifth, SMECO, is a customer-owned electric cooperative in Southern Maryland, along the western shore of the Chesapeake Bay. Maryland also has seven other small cooperatives and municipal utilities.

Washington Gas provides natural gas for the territories of PEPCO and SMECO. There are also several other companies, like Columbia Gas, that provide natural gas to Maryland customers.

Both regulated utilities and third-party suppliers acquire electricity and natural gas through interstate wholesale electricity and gas markets. It is the same energy; only the regulatory circumstances are different. About 20 percent of Maryland homes have switched their electricity to one of the 60 or so third-party suppliers that sell to Maryland households (see Table 1).[7] Similarly, about 20 percent of households with natural gas have switched to a third-party gas supplier.

---

7  OPC list 2018.

### Table 1: Electricity third-party supplier participation

| | Number of households on electricity supply by Utility | Percent of households on electricity supply by Utility | Number of households on third-party electricity supply | Percent of households on third-party electricity supply |
|---|---|---|---|---|
| BGE | 1,163,650 | 52% | 281,697 | 24% |
| PEPCO | 524,495 | 23% | 105,694 | 20% |
| Potomac Edison | 235,169 | 10% | 25,580 | 11% |
| Delmarva | 178,278 | 8% | 24,737 | 14% |
| SMECO | 148,685 | 7% | 4,906 | 3% |
| Total for five utilities | 2,250,277 | 100% | 442,614 | 20% |

Source: May 2018 PSC Monthly Reports.

Note 1: All customers on third-party supply include those who subscribe to suppliers that only sell renewable energy plans. In the rest of this report, we do not include these "green" energy suppliers in estimating higher costs because their customers pay more for the specific type of energy they want.

## Table 2: Natural gas third-party supplier participation

| | Number of natural gas households by Utility | Percent of households served by Utility | Number of households on third-party natural gas supply | Percent of Utility's households on third-party supply |
|---|---|---|---|---|
| BGE | 630,714 | 58% | 136,021 | 22% |
| Washington Gas | 449,021 | 42% | 90,686 | 20% |
| Total | 1,079,735 | 100% | 226,707 | 21% |

Source: May 2018 PSC Monthly Reports.

Note 1: Data for third-party supply for several smaller natural gas utilities are not available. The total households and percentages here are only for the two utilities shown.

For the 80 percent of households that choose not to buy their home's energy from a third-party supplier, their local utility is automatically assigned as their residence's default electricity and/or gas supplier; this is known as Standard Offer Service.

Electricity usage is measured in units called kilowatt-hours (kWh). Standard Offer Service prices are based on a PSC-approved bid solicitation process that requires the utilities to secure two-year contracts on a staggered basis; each spring and fall, they bid to acquire a portion (25 percent) of their full needs. The bid results are reviewed and approved by the PSC, and are reflected in tariff rates. Natural gas usage is measured in units called therms; natural gas prices change monthly or quarterly, subject to prudency reviews.

Most Maryland households, including those that have switched from utility Standard Offer Service to third-party energy supply, receive one monthly utility bill. But their electricity (and when applicable, natural gas) supply portion of the bill represents the charges by the third-party supplier based on that supplier's price rather than the Standard Offer Service rate.

Figure 1 (next page) is an actual bill from a low-income BGE account holder who switched to a third-party supplier. The section labeled "distribution" is common to all BGE bills and represents getting energy to homes (poles, power lines, service, and billing). The "supply" section is the amount owed to the third-party supplier for the amount of electricity the home used during that invoice cycle.

During January 2018, this customer's electricity supply rate of $0.1559 per kWh was *90 percent more than BGE's Standard Offer Service rate* of $0.08218 per kWh. The higher third-party supply rate added an extra $16.88 to this customer's bill, even though monthly electricity usage was relatively low—229 kWh compared to an average monthly 800 kWh typical of a BGE residence that heats with natural gas.

JA162

Figure 1: Low-income household's BGE invoice for third-party electricity supply



BGE home used 229 kilowatt hours (kWh) electricity in January 2018.

**SUPPLY**

From 'Electric Supplier Charges' box on Page 3. 229 kWh used multiplied by $0.1559 supply rate.

**DISTRIBUTION**

Costs by BGE of getting electricity to home, billing, fees and taxes.

**BGE SUPPLY RATE TO COMPARE**

Standard Offer Service (SOS) electricity was $0.08218 / kWh through May 2018.

Found on Page 3 of BGE bill is Electric Supplier Charges box. Supplier sends this information to BGE to be printed on customer's bill.

## Third-Party Supplier View

The third-party suppliers' association, known as RESA, claims that suppliers offer a variety of benefits to consumers. Based on these benefits outlined below, RESA argues that third-party supply rates are not comparable to Standard Offer Service prices:

- Fixed rates over a year or more can insulate the customer from price changes in the Standard Offer Service, which are adjusted twice a year under PSC supervision.

- Customers may choose a "smart thermostat" as an incentive for signing up, allowing them to conserve energy, reduce usage, and lower bills despite a higher rate.

- Retail suppliers provide other benefits like grocery discounts or cash gift cards.

- Some retail suppliers offer renewable energy as part or all of their supply.[8]

We agree that in the case of renewable energy, the principal product, electricity, has attributes that are different. We have, therefore, excluded renewable energy third-party suppliers from our estimates of excess costs.

However, RESA's remaining arguments are not valid on the whole. For instance, Standard Offer Service rates can go down as well as up; in fact, in recent years, they have been declining. Further, many consumers on third-party supply are on variable—not fixed—rates. And finally, the cost of all incentives, such as thermostats or cash incentives, must be recovered by charges that consumers pay. These generally fall into three categories—the supply charge, a monthly fee (in some cases), and in many cases, a termination fee if the customer wants to exit a contract before its expiry. These can be as high as $100 or more. This is a stiff deterrent to choosing another supplier or reverting to Standard Offer Service, especially for low-income consumers when they realize they are paying more for third-party supply.

## Growth of Maryland's Third-Party Energy Supplier Market

By 2008, eight years after the Electric Choice Act, only 3 percent of Maryland households had waded into the energy choice pool.[9] That changed in late 2008, however, when the PSC finalized the Purchase of Receivables (POR) rule, which made the market more attractive for third-party suppliers.[10] Before that time, third-party charges were part of utility bills. So if all or part of the bill was unpaid, utilities could transfer past-due amounts back to the supplier, who then bore the cost of collecting the arrears (or not).

Two significant changes came about when POR went into full effect in 2010. Under the rule, Maryland's utilities are allowed to buy the amount owed by customers from the suppliers, unless the utilities want to prorate the revenues received.[11] Third-party suppliers are paid whether or not their customers pay their utility bills. For customers who do not pay, Maryland utility ratepayers have to make up for the arrears because regulated utilities are guaranteed a rate of return on investment.

The impact of the regulation can be clearly seen in Figure 2 (next page) with the rise of third-party residential contracts since the POR rule went into effect.

Third-party suppliers are required to pay something for this POR service. Specifically, under the rule, utilities pay a slightly lower

---

8  We note that in most cases, "green energy" options do not involve purchases of renewable energy but electric certificates (RECs) representing that energy; the energy itself is sold to other parties. In some cases, RECs are purchased from renewable energy generators in states like Texas and Iowa, where renewable generation greatly exceeds any mandates. Such RECs are typically very cheap relative to premiums paid for renewable energy. In some cases, suppliers do actually purchase the renewable energy.

9  PSC Monthly Reports. Reports for each year, including 2008, can be found in these monthly reports.

10  PSC Rule Making # 17. COMAR 20.53.05.06. See COMAR various articles in the reference list.

11  RESA Glossary.

JA164



Figure 2: Maryland households on third-party electricity supply

Source: Public Service Commission Electric Choice: Monthly Enrollment Reports

amount (a "discounted" rate) than the amount due because some bills will be uncollectible. But this "discount" does not take into account the higher risk of default when third-party rates are higher, which they are on average for residential customers. This discounting based on Standard Offer Service insulates third-party suppliers from the effects of uncollected bills that are due to higher prices, as they have been since 2014. In other words, third-party suppliers can charge much higher rates and increase the risk of default without any penalty for the risky practice.

The economic term for such a policy is "moral hazard"—a situation in which one party is freed up to take risks, while another party bears the consequences. **Purchase of Receivables freed third-party suppliers to increase prices to levels that created a greater likelihood of nonpayment of a bill, while reaping guaranteed payment of invoices and transferring the risk of nonpayment to ratepayers** (via the regulated utilities). POR also expanded the marketplace because credit

history and inability to pay high bills are no longer relevant risks for third-party suppliers. It is noteworthy that, during the rulemaking process, BGE stressed that the Purchase of Receivables approach would be costly for ratepayers because it would shift cost and risk to them from third-party suppliers.[12]

## Maryland's Electricity Choice Pricing Outcomes

Has third-party supply brought benefits to Maryland's residential electricity and gas customers?

Until November 2018, there was no official answer to this rather straightforward and important question. In that month, however, a report commissioned by the Office of People's Counsel concluded that Maryland's residential electricity customers on third-party supply were losing about $34.1 million per year on electricity costs and $20.7 million per year on natural gas costs relative to the costs of Standard Offer Service. To make

---

12 BGE 2009

these estimates, the study relied on published and fixed rates, rather than actual prices from state databases, assuming they were constant.[13] The published prices reflect the initial rate that the consumer would pay at the time of signing up for third-party supply. Yet we know that many third-party suppliers charge variable rates — and that those rates go up after an initial period, such as three months. Fixed rates can be and are adjusted upward after the period of the initial contract expires. Thus, the average actual rate paid over time tends to be higher than published rates.

We found only one reference to Maryland residential results based on actual prices billed. SMECO ran aggregated 2017 billing data and found that its 5,301 electric third-party customers paid $1.9 million over SMECO's Standard Offer Service prices. This amounted to an extra $358 per household that chose a third-party supplier for electricity.[14]

We estimated overpayments based on data that all electricity providers must report to the federal government. These data allow us to estimate the actual annual average prices that consumers paid for both regulated utility and third-party suppliers.

We found that Maryland homeowners on third-party electricity supply:

- Saved about $20 million in 2010 as compared to their utility's offer;

- Came out about even in 2011, 2012, and 2013; and

- **Overpaid about $255 million from 2014 to 2017, ranging from a high of $77 million in 2014 to a low of $50 million in 2016. The overpayment amount was about $59 million in 2017.**[15]

Table 3 (next page) takes a closer look at how many customers, sorted by average supplier overpayment to Standard Offer Service, paid higher and lower rates than SOS. Only about 3 percent of the 387,000 households, on average, came out ahead in 2017. The other 97 percent of households on third-party supply—17 percent of all Maryland households—paid an average of about $154 more for third-party supply as compared to their utility's Standard Offer Service rates. In the worst case, a third-party supplier charged about 5,000 households an average rate that was 76 percent more than the Standard Offer Service rate.

### Electric choice outcomes for low-income households in Baltimore City

In this section, we focus on the impact of third-party supply on low-income households. We interviewed 40 people and, with their permission, collected current BGE utility bills at a Baltimore City assistance center known as GEDCO CARES,[16] which also serves as a Fuel Fund of Maryland satellite energy assistance center.[17]

---

13 Office of People's Counsel 2018, vi.

14 SMECO 2018, 1.

15 These are approximate estimates. We used the Energy Information Administration Form 861's "Sales_Ult_Cust-XXXX" spreadsheet to compute the actual annual average rate for each third-party supplier; XXXX stands for the year for which data are provided. The EIA 861 spreadsheet is segmented by residential, commercial, industrial, and transportation sectors. To calculate the statewide

Standard Offer Service rate and compare the third-party actual rates, we combined data from two publicly available sources. State data for the number of customers on third-party supply by utility are available at PSC Monthly Reports on the Public Service Commission's website. To calculate the statewide weighted average Standard Offer Service rates for each utility, we pulled monthly utility Standard Offer Service rates as reported by the Office of People's Counsel at OPC Price Comparison. Using these data, we were able to derive a weighted average Standard Offer Service rate by month and by utility served. We used a monthly kilowatt-hour usage figure reported by BGE to calculate a yearly weighted average by utility price. We excluded third-party suppliers that sell only 100 percent renewable products (i.e., CleanChoice, Clearview, Inspire, and Green Mountain Energy).

16 GEDCO CARES provides emergency financial assistance, including energy assistance. It is a program of the parent organization, GEDCO, which provides affordable housing for seniors and formerly homeless men and women. https://gedco.org/what-we-do/community-services/cares/. CARES services Baltimore City zip codes: 21210, 21212, 21218, and 21239 from the city line to 33rd Street.

17 The Fuel Fund provides resources to vulnerable Maryland families for heat and home utility needs. https://www.fuelfund-maryland.org/about

JA166

Table 3: 2017 Residential third-party supply customers sorted
by average supplier overpayment premium to SOS

| Rate differences from Standard Offer Service (SOS) (Note 1) | Number of homes on third-party supply (rounded) | Percent of third-party customers in category | Average overpayment or savings per customer |
|---|---|---|---|
| 30%+ to 76% above SOS | 96,000 | 24% | $365 |
| 20%+ to 30% above SOS | 50,000 | 13% | $235 |
| 0 to 20% above SOS | 241,000 | 60% | $53 |
| **Total accounts on average above SOS** | **387,000** | **97%** | **$154** |
| Accounts on average less than SOS | 13,000 | 3% | -$58 |
| **Total on third-party supply** | **400,000** | **100%** | **$147** |

Note 1: The rate differences are averages, with one percentage representing the average for all customers served by a supplier. Individual customers for each supplier could have rates different than that reflected by the average.

While our CARES interviews do not constitute a statistically random sample, the findings match the negative outcomes reported in other states (notably Massachusetts[18]) and mirror the aggregate federal data cited above. All CARES clients have applied to Maryland's Office of Home Energy Program (OHEP) for energy assistance.

Most of the CARES clients we interviewed were elderly, African-American, and very low-income. Very few had access to a computer, email, or the internet. We were able to determine answers to the following key questions:

18 Massachusetts Attorney General 2018, pp. 13-18

- What portion of CARES clients appeared to be enrolled with third-party suppliers?

- What were pricing outcomes compared to BGE's Standard Offer Service rates?

- Were any government energy assistance funds going to suppliers as a result of higher third-party supplier prices?

To determine what portion of CARES clients were enrolled with a third-party supplier, we compiled the yearly energy usage for 127 CARES client who visited the energy assistance

JA167

## By the Numbers

Cares clients interviewed: 40
- Average percent electricity rate premium to BGE: 51
- Average percent natural gas rate premium to BGE: 78

May & June clients assisted at CARES: 127
- Estimated percent on third-party electricity: 55
- Percent MD homes on third-party electricity: 20

BGE "deep dive" supplier analyses: 9
- Average overpayment to supplier: $479
- Average energy assistance payments*: $1,421
- Percent assistance to third-party overpayment: 34

*MD energy assistance can be: Taxpayer/ratepayer-funded OHEP bill assistance & MEAP arrearages, donor-funded Fuel Fund Payments, and ratepayer BGE/Fuel Fund matching credits

center in May and June 2018. We were able to determine, through BGE data, whether the account was enrolled with a third-party electricity supplier. The majority—55 percent—of these CARES clients were enrolled with third-party suppliers at the time they visited CARES to seek utility bill assistance. Maryland's statewide average is 20 percent.

**Aggregating BGE billing data for the 40 low-income clients revealed that these households' rates were on average 51 percent higher for electricity and 78 percent higher for natural gas as compared to BGE's Standard Offer Service rates.**[19]

To determine what portion of taxpayer and ratepayer-funded energy assistance is captured by third-party suppliers due to higher prices, we were able to take a "deep dive" into nine CARES clients' BGE monthly bills. With their permission, we analyzed their BGE accounts for the duration of their enrollment with a third-party supplier.[20] We also collected the actual energy assistance funds received by these clients.

---

19 These data, including the average overpayment per households in the box below, are only for the months we looked at and are not annual numbers.

20 Source: bge.com. This website posts account invoice history for a maximum of 24 months. It appears a few CARES clients were enrolled with suppliers longer than 24 months, but we did not have access to those prior invoices. The range of recorded duration of third-party enrollment for the 24-month period for the nine CARES clients was between five and 24 months.

JA168

Table 4: "Deep dive" into nine low-income residential accounts on third-party supply

| Client | Months on third-party supply | Supply cost if customer paid SOS | Actual supplier bill | % Supplier Rate Over SOS | Added third-party payment | Total Energy Assistance* | % Energy Assistance paid to Supplier Overpayment |
|--------|------|---------|---------|-----|---------|---------|-----|
| 1 | 24 | $2,603 | $3,433 | 32% | $830 | $2,902 | 29% |
| 2 | 5 | $295 | $528 | 79% | $233 | $340 | 69% |
| 3 | 24 | $1,118 | $1,677 | 50% | $559 | $1,126 | 50% |
| 4 | 24 | $1,959 | $2,527 | 29% | $568 | $1,853 | 31% |
| 5 | 17 | $1,103 | $1,445 | 31% | $342 | $1,300 | 26% |
| 6 | 10 | $968 | $1,597 | 65% | $629 | $2,147 | 29% |
| 7 | 8 | $663 | $842 | 27% | $179 | $659 | 27% |
| 8 | 22 | $1,877 | $2,534 | 35% | $657 | $1,064 | 62% |
| 9 | 20 | $1,361 | $1,674 | 23% | $313 | $1,403 | 22% |
| **17 mo. avg.** | | **$11,947** | **$16,257** | **36%** | **$4,310** | **$12,794** | **34%** |
| | | | | per person > | **$479** | **$1,422** | |

*Note: Bill assistance requires annual applications. Assistance for clearing arrearages can be obtained once every seven years, though exceptions can be made. Often families do not apply every year or come in to CARES when they are in arrears and threatened with a cutoff notice. We have calculated the percent of assistance that goes to third-party supply as a fraction of third-party excess payment to assistance. The results in this column are approximate and indicative rather than definitive.

Table 4 (above) illustrates that low-income households in energy crisis can tap into multiple energy assistance sources.[21] **On average, about one-third of the total energy assistance went into the coffers of third-party suppliers, instead of lowering bills.** In each case, the account holder had no idea that choosing a third-party supplier had a negative impact on their utility bill. Several had turn-off notices.

The CARES data also show that the third-party natural gas rate was $0.79 per therm—78 percent above the average BGE gas rate. As a result, the average CARES client that we interviewed on third-party natural gas supply would pay $329 more per year due to the higher third-party natural gas price based on average usage of 997 therms.

The average assistance provided by OHEP in FY 2017 to households using electricity heat was $959; it was $1,081 for households using natural gas heat.[22] Both values are statewide averages; we do not have Baltimore-specific numbers. We note that both OHEP figures are below the average assistance of $1,178 received by the nine "deep dive" customers from all sources. These indicative data raise the urgent question: **What is the fraction of assistance intended to lower bills of low-income households going to third-party suppliers in the form of higher rates?**

21 The assistance sources include the Electric Universal Supply Program, Maryland Energy Assistance Program, the assistance provided by the private non-profits like the Fuel Fund of Maryland, and the matching assistance provided by BGE.

22 OHEP 2018, Table 9.

## Information issues

According to OHEP, the average Maryland family that received energy assistance in 2016 earned just $14,707. Its average utility bill was $2,178, about 15 percent of income. For Maryland, the average utility bill percent of income is between 3 and 4 percent. With finances tight, low-income families looking to shave their budgets may be vulnerable to sales pitches and incentives that appear attractive in the short term but may turn out to be costly over time. Marketing tactics may explain why low-income households appear to enroll with third-party suppliers at higher rates.

We identified four problem areas:

i. **Lack of accurate information and effective price-comparison tools**: Third-party suppliers do not use mass media advertising as a principal tool for marketing to low-income consumers. No one who we interviewed knew what BGE's energy rates were or where to find them. Every CARES client we interviewed assumed they were saving money by switching to a third-party supplier.

ii. **Lack of internet access**: There is some rate information on official websites (PSC, OPC), but very few of the low-income people we interviewed had access to the internet. This is an example of how the digital divide exacerbates poverty. For consumers with internet access, the PSC's official electricity supplier shopping web site is difficult to read and sometimes lists inaccurate pricing. Published information is also incomplete in that it does not inform the consumer of the maximum possible rate or even of the fact there is no actual upper limit to the rate in case of variable rate contracts.

iii. **Complex utility bills**: On the whole, interviewees had little understanding about how to read their BGE bills. This problem is not confined to low-income households. We have also found cases where households with relatively high incomes are paying more—sometimes much more—for electricity but are unaware of this fact. Many weren't even sure if they had switched to a third-party supplier and needed to be shown where to find that information on their BGE invoice.[23]

iv. **Complex pricing plans**: When consumers enroll with third-party suppliers, they enter into formal business contracts. The pricing plan is a big component of the contract terms and conditions along with early cancellation fees, monthly fees, contract length, and contract renewal terms. Termination fees can be as high as $150. Our interviews indicate that most CARES clients did not understand their supplier contract. There are variable rate plans, in which rates can increase from month to month after an initial promotional period. In principle, the new rate must be made available 12 days before the change, but this requires the consumer to know how to access the information and to check it each month. Rates can increase up to 30 percent per month without explicit notice to the consumer. There are fixed rate plans that automatically become variable rate after the initial contract term ends, unless the consumer takes action to prevent that.

---

23  Southwell et al. 2012. Researchers looked at energy literacy in the United States with participants in all income and educational groups (~10 percent had less than a high school education, and one-third had a bachelor's degree or higher). An online survey was used, so unlike the low-income sample in this report, all participants had internet access. In regard to energy bills, the study found that only 27 percent of respondents could correctly answer all three questions; 19 percent could not answer any question. See Table 4 and pages 8-10.

JA170

Unfortunately, even after energy assistance is factored in, energy burdens still remain high for most households. On average, energy burdens were almost 15 percent in FY 2018 before assistance and over 10 percent after assistance provided by the Office of Home Energy Programs.

### Direct sales agents in low-income neighborhoods

In Baltimore City, especially in urban neighborhoods with dense housing, third-party suppliers often use door-to-door sales tactics. Direct sales agents canvas neighborhoods repeatedly, and sometimes offer gift cards, rebate checks, bill credits, and other incentives to encourage enrollments. Supplier direct sales agents are usually employed by separate marketing companies, and do not work directly for energy suppliers. Agents are usually paid on a sales-per-head, commission-only basis.

Every CARES client who we interviewed self-reported they had enrolled with a third-party supplier through a direct sales agent at their door or in their neighborhood. A pervasive complaint was that too many aggressive energy direct sales agents knocked on their doors at night.

The majority of clients we interviewed self-reported that the direct sales agent offered a gift card that was promised to come in the mail after enrollment, yet the incentive never came. One CARES client did report receiving rebates in the mail that totaled $12 for the year.

In Baltimore, third-party suppliers also market in places frequented by low-income citizens accessing government assistance. Direct sales agents sell energy at the steps to Baltimore City's Social Services office on North Avenue, the Housing office on Pratt Street, and the OHEP office on York Road. Suppliers can often be found marketing at the city's larger MTA bus transfer stations and even next to soup kitchens.

For two days in November 2017, a third-party supplier set up shop across the alley from Paul's Place Outreach Center, which offers services and programs to low-income individuals and families in South Baltimore's Washington Village and Pigtown communities. [24] Ironically, the supplier was offering significant BGE bill credits the same day that the Fuel Fund was hosting its Watt Watcher energy efficiency classes.[25] Offering rebates at locations where there are large numbers of low-income people seeking assistance is problematic because it creates a situation where short-term interests may dominate, even if there are negative long-term consequences. This is precisely the result we observed in the energy data we reviewed. We also received some complaints that, again, the promised incentives never materialized.

---

24  https://paulsplaceoutreach.org/about-us/

25  Laurel Peltier personal communication and email with Paul's Place Day Programs Coordinator in November 2017 and on-site visit.

## The Burdens and Harms Due to Unaffordable Utility Bills[26]

Low-income households in Baltimore live under considerably greater economic stress than the state as a whole. The problem in Baltimore is especially acute because the median income there was just $42,665 in 2014, which is only 56 percent of the median income of $76,067 for the state as a whole.[27]

The term "energy burden" is defined as the fraction of a household's gross income (i.e., before taxes) that is spent on household energy bills, which include utility electricity and natural gas bills, heating fuel oil, and propane bills. They do not include expenditures on transportation fuels.

Energy burdens in Maryland average between 3 and 4 percent. They are much higher for low-income households and can be 10 to 20 percent of income. For the lowest-income households with incomes at 50 percent or less of the federal poverty level, energy burdens are higher than 30 percent of gross income.[28]

Maryland, like other states, has an energy assistance program to help low-income households reduce their energy burdens. Households with incomes of up to 175 percent of the federal poverty level are eligible to get government assistance to pay their electricity and heating bills. About 383,000 Maryland households qualify, with about 20 percent living in Baltimore City. In FY 2018, however, only about 27 percent of those who qualified actually received utility bill assistance. The vast majority do not apply, and an increasing number of those who do are being rejected. Further, the number of households assisted has been declining since 2011.[29]

Unfortunately, even after energy assistance is factored in, energy burdens still remain high for most households. On average, energy burdens were almost 15 percent in FY 2018 before assistance and over 10 percent after assistance provided by the Office of Home Energy Programs. This provides the context for considering the added harm inflicted when third-party supply results in higher bills than would be the case with Standard Offer Service.

### Description of harm

Low-income Maryland households often face impossible choices that go under the rubric of "heat or eat." The range of intractable problems is much greater than the phrase implies.[30]

A 2011 national survey of households receiving heating bill assistance at least once in the previous five years found that:

- More than one-third of the households had to forgo medical/dental care and medications because of high energy bills;

- Nearly one in five had someone become ill because their homes were too cold; and

- Six percent were evicted from rental units while another 4 percent faced foreclosure, exacerbating homelessness.

### Overall financial stress

Low-income families typically experience economic stresses that can increase quickly due to an unexpected illness or breakdown of a vehicle. "The Report on the Well-Being of U.S. Households in 2017" by the Board of Governors of the Federal Reserve System found that "22 percent of adults expected to forgo payment on some of their bills in the month of the survey," mainly credit card bills. For one-third of them—about 7 percent of all households—the payment conflicts were explicitly between rent or mortgage payment and utility bills. They expected that these bills would be left at least partially unpaid in the month of the survey.[31]

---

26  Unless otherwise stated, this section is based on or taken from Makhijani, Mills, and Makhijani 2015.

27  Baltimore Facts 2017 and Maryland Facts 2018.

28  Fisher, Sheehan & Colton 2017.

29  OHEP Budget 2018, Exhibit 1, 6. There was a slight uptick in 2014 relative to 2013. The downward trend resumed the year after.

30  Portions of this chapter are taken from Makhijani, Mills, and Makhijani 2015.

31  Federal Reserve Report 2018, 22.

JA172

African-American households face such bill payment conflicts at roughly double the average rate for all households.[32] From this we may infer that about 14 percent of African-American households—about one in seven households—would have faced rent/mortgage and utility bill conflicts during the month of the survey. The greater financial stresses reported by African-Americans in the Federal Reserve survey were likely due to lower incomes and higher unemployment on average because race and income are closely correlated.

These bill payment conflicts occur even without unexpected expenses. An expected bill of $400 increases the fraction of households unable to pay all their bills from 22 percent to almost 35 percent.[33] Coincidentally, $400 is roughly the average overpayment of electricity bills faced by almost 100,000 Maryland households with the most expensive third-party supply contracts in 2017 (see Table 3 on page 11).

For Baltimore, which has a majority African-American population and a high poverty rate, we may infer that on the order of 10 percent of all households—about 24,000—face routine rent/mortgage and utility bill conflicts.[34]

Most people who lose their homes move in with friends or family. A fraction—roughly one-fourth—become homeless. Besides the costs and trauma experienced by the homeless families themselves, there are also costs to society as a whole.

Costs of shelter for homeless families vary a great deal. Data in a 2010 study by the U.S. Department of Housing and Urban Development indicate costs of housing a

homeless family for one year range from about $5,000 to well over $40,000.[35]

Homelessness also increases other costs as well, notably health care costs. There is clear evidence that such costs are huge. A study of 6,494 patients in the Boston Health Care for the Homeless Program estimated added costs of $1,468 per month for one person compared to low-income people who live in their homes.[36] Combining the costs of providing shelter and added emergency care for a family of two for seven months, a typical period of homelessness, gives an estimate of $28,000.

There are many other categories of cost once people become homeless. The American Roundtable to Abolish Homelessness estimates that when all costs are taken into account, the range of costs to society of one homeless person is between $35,000 and $150,000 per year;[37] this gives an estimate of $40,000 to $170,000 for total costs per family rendered homeless for a typical period of seven months.

The data we have cited above indicate that a few thousand families in Maryland become homeless each year due to rent/mortgage and utility bill conflicts. This suggests costs on the order of $100 million to $200 million per year. A significant fraction of these costs would be in Baltimore City.

In addition, those families who move in with friends or family also cause the latter to bear added costs, the extent of which is unknown. There are two to four times as many families in this category as there are families who become homeless and need public shelter.

Even when families are able to remain stably housed, there are many health problems attributable to high energy burdens. The 2011 survey by the National Energy Assistance Directors' Association (NEADA) found that about one in eight households receiving

---

32  Federal Reserve Report 2018, Figure 13, 22.

33  Federal Reserve Report 2018, 22.

34  10 percent is between the 7 percent rent/mortgage and utility bill average conflict rate and the 14 percent rate for African-Americans inferred from the Federal Reserve Report 2018, 22. This rate was chosen as an order of magnitude representation of the problem because of Baltimore's demographic and poverty rate characteristics.

35  HUD 2010, Exhibit 1, ES-4.

36  Boston Health Care for the Homeless 2013, S314. 71 percent of the study population were men, S313.

37  Mangano 2013, slide 18.



Figure 3: Percent of assistance to third-party overpayment

Source: BGE.com for account holders' history, OPC Electricity Retail Price Comparison by Service Area charts, and CARES.

federal heating assistance funds were still so cold that a member of the household became ill enough to have to go to the doctor or to the hospital; among households with at least one child under 18, that figure was 19 percent. In addition, 3 percent of the households also had someone who needed a doctor or hospital visit because the house was too hot.[38] These data indicate that the magnitude of the health problems associated with high energy burdens is considerably greater than the added health care costs associated with homelessness alone. Given the high percentages that face illness and medical bills, it is clear that the number of households involved number in the tens of thousands each year. Even if the added costs of emergency room visits and other assistance amount to $1,000 per year for such families, the social costs of economic stresses would run into tens of millions of dollars per year—quite apart from the costs to the families themselves.

---

38  NEADA 2011, Tables IV-25A and IV-25B, 43-44.

### Added economic distress due to higher third-party energy supply rates

The Baltimore data we collected from 40 energy-assistance recipients indicate that low-income households on third-party electricity supply pay 51 percent above the BGE Standard Offer Service rate for the month we checked. Third-party natural gas supply ranged between 8 percent and 210 percent more than the Standard Offer Service rate. The average increase for those on third-party supply was 78 percent more than the Standard Offer Service rate, implying an excess cost of $200 per year.

The nine cases we examined in detail showed average excess payments of more than $479 for electricity and gas. This amounts to about 3 percent of the average annual income of $14,000 of families getting electricity bill assistance in Maryland. We can infer from the Federal Reserve Report data that a significant fraction of low-income families that face such added costs would face conflicts with payment of other bills including rent or mortgage payments.

JA174

Another way of looking at the problem is that substantial fractions of energy assistance provided by taxpayers and ratepayers for the purpose of reducing energy burdens is actually captured by third-party suppliers in the form of higher rates for electricity and, in some cases, natural gas supply. Figure 3 (previous page) shows the percentage of assistance used for higher third-party supply costs for each of the nine cases we examined in detail.

## Data from Other States

Though publicly available data and media reporting is spotty across the 13 deregulated states for residential third-party results, our review and other data indicate the problem is widespread in deregulated markets. In other words, Maryland's experience of residential-sector third-party overpayments on average is not unique; rather, it appears to be typical. Consumers in several states paid third-party suppliers large sums in excess of the amounts they would have on their utility's electricity offers. The same suppliers use similar sales tactics and sell similar products with similar suboptimal results.

Other deregulated states have taken steps to reform their third-party energy marketplaces. Maine has tightened renewal and disclosure terms.[39] Connecticut publishes consumer pricing results and requires suppliers to publish historical variable rates on their websites.[40] Some deregulated states offer their residents unbiased and official online comparison tools to help households choose the best plan.[41]

In the summer of 2018, Illinois tried to reform energy choice, but the proposed law failed by a few votes. As reported, Exelon Corporation's pushback to the reform legislation was cited as a major reason for the bill's failure. Exelon stated that the reform legislation would have "substantially limited customer choice without

enacting additional consumer protection requirements." Similar to Maryland, Exelon also owns the Illinois distribution utility Commonwealth Edison as well as the supplier Constellation Energy Services and Constellation New Energy.[42] Since that time, Illinois' attorney general has called for an end to third-party residential retail supply.[43]

In November 2018, the attorney general's office filed a complaint against a supplier in Cook County Circuit Court, alleging fraudulent and deceitful marketing practices that targeted low-income, mainly African-American households.[44] The lawsuit, one of several complaints filed by the office, was settled on November 19, 2018, with a statement from the attorney general that "alternative retail electric supply industry is rife with fraud and deceit."[45] The provisions include refunds to customers and a ban on the company from the Illinois retail market for two years.

In March 2018, Massachusetts' attorney general published an extensive analysis of the state's energy choice markets and concluded that low-income customers enrolled with third-party suppliers at twice the rate of non-low-income households. Unfortunately, these low-income accounts paid even higher premiums ($252 per household) than non-low-income accounts ($217 per household).

It's also worth noting that only 10 percent of low-income households in Massachusetts were saving money compared to utility offers. Only 12 percent of non-low-income accounts beat their utility Standard Offer Service rates.[46] The Massachusetts legislature's Joint Committee on Telecommunications, Utilities, and Energy had a hearing on May 8, 2018. No legislation was pending as of October 2018.[47]

39  Fishell 2018.

40  Connecticut Consumer Council 2018.

41  http://www.papowerswitch.com/

42  Daniels 2018.

43  Daniels 2018a.

44  Madigan complaint 2018.

45  Illinois attorney general 2018.

46  Massachusetts attorney general 2018.

47  Jen Bosco, personal email communication 2018.

# Those who overpaid in 2017 (97 percent of the total who were on third-party supply) lost an average of about $154 compared to the Standard Offer Service rate.

Ohio, New York, and Pennsylvania have restricted electric choice for their low-income customers.[48] Some states have designed programs that are guaranteed to have rates lower than Standard Offer Service. Delaware offers state-sponsored low-income residential accounts to choose from on a pre-approved list of third-party supplier plans that not only guarantee savings but also mandate added consumer protections.[49] Ohio prohibits households receiving assistance from shopping for electricity individually; the state has designed a program that allows third-party supply by a utility-issued request for proposal if the rate is below the Standard Offer Service price.[50]

## Current Status at the Maryland PSC

As previously discussed, those who overpaid in 2017 (97 percent of the total who were on third-party supply) lost an average of about $154 compared to the Standard Offer Service rate. The PSC does not appear to have tracked overpayments by Maryland consumers to third-party electricity suppliers; however, this information is readily deducible from the Energy Information Administration's Form 861 spreadsheet "Sales to Ultimate Customers."

Adding to the puzzle is a stark 2014 case in which the PSC found a Maryland supplier in significant and multiple violations of state law in its marketing practices:

In this Order, the Maryland Public Service Commission (the "Commission") finds that Starion Energy PA, Inc. ("Starion") engaged in multiple practices that violate State law and Commission regulations. These violations include 122 "slamming" violations against Southern Maryland Electric Cooperative's ("SMECO") customers, thousands of violations of Maryland's Door-to-Door Sales Act, over 200 complaints by customers that Starion employed false and misleading tactics to acquire new accounts, and the failure to obtain a license to market electricity to SMECO customers or Potomac Electric Power Company's ("Pepco") commercial customers.[51]

The PSC found these actions to be intolerable and promised to be vigilant on such issues as part of the Order in Case 9324:

> To be clear, this Commission cannot and *will not tolerate* misleading or deceptive advertising or sales tactics in the retail marketplaces over which we hold jurisdiction. We have and *will continue to proactively monitor retail sales practices* and act firmly when we find that violations have occurred.[52]

---

48  Gabel 2017, iii.

49  Gabel 2017, 3.

50  Gabel 2017, 21-22.

51  Maryland PSC 2014, 1. The PSC defined "slamming" in this document as "a supplier enrolling a customer without the customer's permission or re-enrolling a customer after a customer has terminated service."

52  Maryland PSC 2014, 3 (italics added).

JA176

In the course of this work we collected testimonials from customers that included examples of door-to-door marketing in low-income areas of Baltimore and of customers who are not comfortable with the sales approaches. We have been able to do this with modest investment of time. To the extent that we can determine, the PSC does not appear to be exercising the proactive monitoring promised in 2014.

The publication in November 2018 of the Office of People's Counsel report on third-party supply has partly closed the information gap on costs of third-party supply in the residential sector. The report concluded that third-party supply of electricity and natural gas is resulting in substantial overpayments in the aggregate. The report also noted that data on how much energy bill assistance might be going to third-party suppliers in the form of higher bills is "critically needed."[53]

The Commission did consider the issue of whether data on third-party supply costs should be officially compiled at its August 14, 2018 hearing on the FY 2019 budget of the Office of Home Energy Programs (OHEP). As noted in the Office of People's Counsel report, the PSC "opened the door narrowly to obtaining more information" but did not order its acquisition. It acknowledged that the "topic merits further exploration and discussion."[54] The PSC did not say what might be done to stop the overpayments by low-income households while this "exploration and discussion" is going on, nor did it put a time limit on the exploration.

## Recommendations

In an effort to estimate the approximate overall cost to residential consumers of third-party supply, we found that the true extent of the harm can be easily determined through the billing data held by the electric and gas distribution companies. Further, there are ways to report these data that protect privacy as well as suppliers' concerns about proprietary data.

Individual contracts in the residential market are often detrimental and have been so in Maryland to the tune of some $255 million between 2014 and 2017. Our recommendations should be seen in the context of what has become—from the residential consumers' point of view—a dysfunctional residential market. They should also be seen in the context of widespread evidence that the same problems exist in other states and that low-income households suffer disproportionately adverse results.

The zip code analysis of third-party supplier activity in the Massachusetts attorney general's report shows that suppliers target low-income communities. Our limited analysis of Baltimore data indicates the same thing. A thorough analysis by zip code in Maryland therefore appears to be warranted.

Third-party supply can be beneficial and, in some circumstances, it is. This is indicated by the commercial customers who use large amounts of electricity and routinely save large amounts of money by using third-party supply. They have the resources to solicit bids, sort through them, and get a good price. It is notable that even in the commercial context, EIA 861 data indicate that small business consumers often wind up paying more.[55]

---

53  OPC 2018, 7.

54  PSC 2018, p. 6

55  We analyzed commercial third-party data in the same manner as residential data. The suppliers whose commercial customers averaged more than 100,000 kilowatt-hours of usage per year had average rates less than Standard Offer Service rates, while those supplying customers with less than 100,000 kilowatt-hours per year had higher rates.

## Individual contracts in the residential market are often detrimental and have been so in Maryland to the tune of some $255 million between 2014 and 2017.

### Residential third-party supply reforms

1. Residential customers who want third-party supply should only be served by some form of aggregated supply that would ensure lower costs. We are not recommending the end of third-party supply for the residential sector but are advocating for the end of marketing to and contracting with households for third-party supply on an individual basis (except on a restricted basis for 100 percent renewable plans as described below in no. 5). There are tested approaches to such aggregated contracts. For example, Ohio and Delaware have such programs that guarantee savings to low-income households. A program that uses the competitive supply market to ensure lower costs for all low-income households getting assistance should be put into place, with non-low-income households allowed to opt-in to such programs, if they choose. One approach would be for Maryland's Office of Home Energy Programs to competitively procure the third-party supply for all low-income households getting assistance, except those who opt out. Such a program could also be open to other low-income households, or possibly all other Maryland households, on an opt-in basis.

2. Variable rate contracts should not be permitted for residential customers.

3. Consumers should be allowed to terminate third-party energy supply contracts without early termination fees.

4. Utility bills should prominently and clearly state that the customer saved Y dollars or paid X dollars extra during that month by being on third-party supply, as the case may be. The bills should also have simple instructions on how to switch back to Standard Offer Service.

5. Individual third-party supply contracts would be permitted only if customers are (1) procuring 100 percent renewable supply; (2) the contract price is fixed for the duration of the contract; (3) the contract clearly states the premium above the prevailing SOS, if any, that the consumer would pay in percentage terms and per kilowatt-hour for green energy; (4) the contract clearly states whether the renewable energy procurement consists of only the electronic certificates representing renewable energy or whether both the energy and the certificates have been procured on behalf of the customer; (5) there are no termination fees; and (6) the contract price does not increase at the end of the contract term except if the cost of renewable energy procurement has verifiably increased and the documentation is provided to the customer in writing.

Abell Foundation    |    www.abell.org    |    @abellfoundation    |    P: 410-547-1300    |    December 2018

## Data collection and publication

1.  The Public Service Commission (PSC) should be required to annually collect and report actual bill-level data for consumers by zip code level. These data would reveal the scope of overpayments if they continue to exist—or estimate customer savings, if any—and would verify whether they disproportionately affect low-income households as our data and analyses from other states suggest.

2.  It is essential that the PSC require electric and natural gas utilities to provide the Office of Home Energy Programs with data of all residential customers who are on third-party supply and compensate the utilities for the effort that would entail. It is also essential for OHEP to have the resources to analyze that data, including calculating overall savings and costs for each third-party supplier relative to Standard Offer Service rates, and estimate the net total or excess costs (or savings) faced by all consumers.

3.  For customers who get government energy assistance, OHEP should be required to estimate the amount of energy assistance captured by third-party suppliers due to higher rates, if any. Of course, OHEP should also publish the estimate of overall net savings, should that be the case. The PSC should be required to collect and report yearly actual bill-level data for consumers by zip code. These data would reveal the scope of the problem of overpayments and confirm whether it disproportionately affects low-income households as our data and analyses from other states suggest.

## Public Service Commission action

1.  Some marketing practices affecting low-income households in Baltimore appear to be disturbingly similar to those condemned by the PSC in 2014. We strongly recommend that the PSC initiate a broad and thorough investigation into marketing practices affecting low-income households and enforce the regulations currently on the books.

## Conclusions

Despite the large number of third-party electricity suppliers, there is scant evidence of competition in the form of lower prices. In 2017, 97 percent of residential customers on third-party supply, about 387,000 households in all, had average rates higher than Standard Offer Service. The average overpayment was about $154. Only 3 percent—about 13,600 customers—saved money, roughly $58 per household. Between 2014 and 2017, the overall overpayments, taking into account all those who saved money and those who overpaid, totaled about $255 million.

Our brief examination of the commercial third-party supply indicates that large consumers, presumably with the ability to sort through bids and examine electricity bills, saved money on average. This indicates that aggregation of residential customers under an umbrella with a capacity to sort through bids and get lower prices could be beneficial.

We focused on low-income households in Baltimore, examining 127 of them in varying degrees of detail. This was not a random sample but rather a way of assessing the situation as it appears in one center set up to assist low-income households.

JA179

# A large fraction of the assistance that low-income households get to pay their electricity bills simply goes to third-party suppliers in the form of higher prices.

The data indicate that low-income households in Baltimore enroll at much higher rates than the Maryland average, and that they typically overpay by amounts that would adversely impact their financial and housing security. A large fraction of the assistance that low-income households get to pay their electricity bills simply goes to third-party suppliers in the form of higher prices. For the nine cases we reviewed, about 34 percent of assistance from up to four different sources went to third-party suppliers. As a result, the core purpose of ratepayer and taxpayer assistance to reduce the financial stresses of high utility bills on low-income households is partially defeated in such cases.

Despite these poor results, there has been a remarkable lack of vigilance on the part of the PSC, to the point that no official agency so much as estimates the overall impact on consumers. The inaction extends to low-income households, despite clear indications that much of the money intended to help low-income households lower their energy bills goes to third-party suppliers in the form of higher prices.

Given the financial stresses faced by hundreds of thousands of Maryland households, the lack of official action to compile and analyze the data needs to be urgently remedied. Options to save low-income households money by using market mechanisms are available and are in place in some states, like Delaware and Ohio. They are even discussed in a report prepared for Maryland's PSC.[56] But no action along those lines is pending in the state.

## About the Authors

Laurel Peltier is an independent journalist and publishes the environmental Greenlaurel column at Baltimore Fishbowl. Her work has been published in EcoWatch, *The Baltimore Sun* and CBS Baltimore. Her previous career as a consumer brand manager at PepsiCo and MCI were key in researching the consumer energy supplier marketplace for this report. She is a graduate of the University of Los Angeles and the Darden School of Business - University of Virginia.

Arjun Makhijani is president of the Institute for Energy and Environmental Research (IEER) (www.ieer.org). Since 2012 he and his colleagues have been working on renewable energy in Maryland, including a report on energy equity: Energy Justice in Maryland's Residential and Renewable Energy Sectors (2015). He earned his Ph.D. in 1972 from the Department of Electrical Engineering and Computer Sciences of the University of California at Berkeley. His work has appeared in scientific journals as well as in the mainstream media.

---

56  Gabel 2017

JA180

## Acknowledgements

We would first of all like to thank Lyn Griffith-Taylor for recognizing the importance of this topic when Laurel mentioned the data to her upon meeting Lyn. By bringing us together, Lyn made sure that this important topic was shared with the coalition of non-profits, Energy Advocates.

We are deeply grateful to all the people in Baltimore who shared their experiences and energy bills with us and to the GEDCO CARES staff and volunteers who made the collection of detailed data possible. In particular, Rachael V. Neill, Director of Community Services at GEDCO and Jason Jesner, a CARES volunteer who helped in data collection and compilation.

We are especially thankful for the cooperation of GEDCO CARES because our work with low-income Baltimoreans who get assistance with their bills would not have been possible without it. GEDCO CARES gets written permission from each client to enable collection of data and to share that data with third parties as appropriate. We have had access to data of 127 of those clients to help GEDCO CARES and ourselves analyze and understand the impact of third-party supply on the effectiveness of assistance.

Lynn Heller connected us with the Abell Foundation, whose funds have enabled us to do this report. We are grateful not only for the Abell's financial support but also for the comments and advice of Tracey Barbour-Gillett, Sarah Manekin, and Beth Harber of the foundation's staff, as well as Abell Foundation consultant Mary Warlow Bushel of The Hatcher Group.

We have received many useful comments in the course of this study from many sources, including from members of Energy Advocates and Cindy Riely (Office of People's Counsel). We benefited from information provided by the Office of People's Counsel and the Office of Home Energy Programs. We have benefited from formal reviews as well. Our reviewers included:

- Paula Carmody, People's Counsel Office of People's Counsel

- Bill Freeman, Director, Office of Home Energy Programs

- Mel Brennan, Former Executive Director, Fuel Fund of Maryland

- Olivia Wein, Attorney, National Consumer Law Center

- Rachael Neill, GEDCO CARES

We deeply appreciate their insights and comments and have benefited from them. Of course, as authors, we alone are responsible for the contents of this report, including its conclusions and recommendations and any errors or gaps that may remain.

A note about scope: this report is limited to an examination of the third-party supply of the residential market for electricity and natural gas in Maryland, mainly the former. Our recommendations are narrowly targeted to remedying the problems of high cost that have characterized the sector since 2014, especially as it concerns low-income households. Overall issues of energy assistance, affordability, efficiency, renewable energy, and many others are all critical, but are not addressed in this report.

Laurel Peltier, independent journalist

Arjun Makhijani, Ph.D., President, Institute for Energy and Environmental Research

JA181

## References

| | |
|---|---|
| **BGE 2009** | Comments of Baltimore Gas and Electric Company. Filed with the Maryland Public Service Commission in rule-making RM17. Baltimore, Maryland: January 20, 2009. Item 89 in the rulemaking document list at https://www.psc.state.md.us/search-results/?keyword=rm17&x.x=0&x.y=0&search=all&search=rulemaking |
| **Bosco 2018** | Jen Bosco, National Consumer Law Center, personal email to Arjun Makhijani, October 19, 2018; cited with permission. |
| **Boston Health Care for the Homeless 2013** | Monica Bharel, Wen-Chieh Lin, Jianying Zhang, Elizabeth O'Connell, Robert Taube, and Robin E. Clark. "Health Care Utilization Patterns of Homeless Individuals in Boston: Preparing for Medicaid Expansion Under the Affordable Care Act," American Journal of Public Health, v. 103(Suppl 2) (2013 December): S311–S317. www.ncbi.nlm.nih.gov/pmc/articles/PMC3969142/pdf/AJPH.2013.301421.pdf, from link at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3969142/ |
| **COMAR various articles** | State of Maryland Division of Documents. The various articles in the Maryland Code can be found by entering the code number at http://www.dsd.state.md.us/COMAR/searchall.aspx. |
| **Connecticut Consumer Council 2018** | OCC Fact Sheet: Electric Supplier Market, July 2018 through June 2018. Consumer Council of Connecticut, August 14, 2018. https://www.ct.gov/occ/lib/occ/fact_sheet_electric_supplier_market_june_2018.pdf |
| **Daniels 2018** | Steve Daniels. "Why Is It So Hard to Reform and Industry That Routinely Overcharges Its Customers?" Crain's Chicago Business, June 15, 2018. http://www.chicagobusiness.com/article/20180615/ISSUE01/180619895/illinois-retail-electricity-market-resists-reform |
| **Daniels 2018a** | Steve Daniels. "AG Madigan: Stop Retail Electricity Sales to Illinois Households," Crain's Chicago Business, October 15, 2018. https://www.chicagobusiness.com/utilities/ag-madigan-scrap-retail-electricity-sales-illinois-households |
| **Donovan 2018** | Doug Donovan. "Unity Crumbles over Plans to Reform Maryland Eviction Process," Baltimore Sun March 5, 2018. http://www.baltimoresun.com/news/maryland/politics/bs-md-rent-legislation-20180217-story.html (viewed on July 31, 2018) |
| **EIA 2016** | U.S. Department of Energy. Energy Information Administration. State Electricity Profiles: Maryland Electricity Profile 2016. Washington, DC: EIA 2016. Links to each table at http://www.eia.gov/electricity/state/maryland (updated annually) |
| **EIA Form 861** | U.S. Department of Energy. Energy Information Administration. Electric Power Sales, Revenue, and Energy Efficiency For EIA-861, Detailed Data Files. Washington, D.C. Links to annual tables at https://www.eia.gov/electricity/data/eia861/ |
| **Federal Reserve Report 2018** | Report on the Economic Well-Being of U.S. Households in 2017. Board of Governors of the Federal Reserve System. Washington, D.C.: May 2018. https://www.federalreserve.gov/publications/files/2017-report-economic-well-being-us-households-201805.pdf |
| **Fishell 2018** | Darren Fishell. "'Leading-edge' Restrictions on Electricity Sellers Become Maine Law," Bangor Daily News, Bangor Maine, February 16, 2018. http://bangordailynews.com/2017/05/23/politics/leading-edge-restrictions-on-electricity-sellers-become-maine-law/ |
| **Fisher, Sheehan, and Colton 2017** | Home Energy Affordability Gap. Historical Affordability Data for Maryland for 2017. Fisher, Sheen, and Colton. http://www.homeenergyaffordabilitygap.com/03a_affordabilityData.html |
| **Gabel 2017** | Gabel Associates. "A Report Evaluating the Advisability of Establishing an Opt-In Electric Affordability Program." Prepared for the Public Service Commission of Maryland, Public Conference 47. New Jersey: Highland Park, January 5, 2017. On the docket of Public Conference 47, Maryland Public Service Commission. Item #1 at https://www.psc.state.md.us/search-results/?keyword=pc47&x.x=23&x.y=4&search=all&search=rulemaking |

JA182

| | |
|---|---|
| **HUD 2010** | Brooke Spellman, Jill Khadduri, Brian Sokol, Josh Leopold (Abt Associates Inc.). "Costs Associated With First-Time Homelessness For Families and Individuals." Prepared for U.S. Department of Housing and Urban Development, Office of Policy Development and Research, Office of Special Needs Assistance Programs. [Washington, DC]: HUD, OPD&R, March 2010. www.huduser.org/portal//publications/pdf/Costs_Homeless.pdf, from link at http://www.huduser.org/portal/publications/povsoc/cost_homelessness.html |
| **Illinois Attorney General 2018** | "Madigan Sues Another Alternative Retail Electric Supplier & Reaches $3 Million Settlement for Defrauded Customers." Press Release from the Office of the Illinois Attorney General. Chicago, Illinois: November 19, 2018. |
| **Linton 2017** | Odogwu Obi Linton, Letter to Laurel Peltier, personal communication, February 9, 2017. Mr. Linton was on the staff of the Maryland Public Service Commission at the time of the letter. |
| **Madigan Complaint 2018** | Lisa Madigan v. IDT Energy, Inc. Complaint for Injunctive and other Relief in the Circuit Court of Cook County, Illinois. Case No. 2018CH14380. Office of the Attorney General of Illinois. Chicago, Illinois: November 19, 2018. |
| **Makhijani, Mills, and Makhijani 2015** | Arjun Makhijani, Christina Mills, and Annie Makhijani. "Energy Justice in Maryland's Residential and Renewable Energy Sectors: A Report of the Renewable Maryland Project." Takoma Park, MD: Institute for Energy and Environmental Research, October 2015. http://ieer.org/wp/wp-content/uploads/2015/10/RenMD-EnergyJustice-Report-Oct2015.pdf, from link at http://ieer.org/resource/energy-issues/energy-justice-marylands-residential/ |
| **Mangano 2013** | Philip F. Mangano. "Building the Business Case for Ending Homelessness." [Presentation to the] California Workforce Association, Meeting of the Minds, Monterey, California, September 4, 2013. Boston: American Round Table to Abolish Homelessness, 2013. http://www.calworkforce.org/images/plenary_phillip_mangano.pdf |
| **Maryland Electric Restructuring Act 1999** | Department of Legislative Services. Electric Utility Industry Restructuring: House Bill 703. Annapolis, Maryland. Maryland General Assembly 1999. The Department of Legislative Services summary at http://mlis.state.md.us/1999rs/billfile/hb0703.htm. Text of the bill is at http://mlis.state.md.us/1999rs/bills/hb/hb0703t.PDF |
| **Maryland PSC 2014** | Maryland Public Service Commission Case 9324, Order No. 86211, ML153109, Document 57, March 14, 2014. from the PSC's case proceedings. https://www.psc.state.md.us/search-results/?keyword=9324&x.x=15&x.y=20&search=all&search=case |
| **Massachusetts Attorney General 2018** | Susan M. Baldwin. "Analysis of the Individual Residential Electric Supply Market in Massachusetts: Are Consumers Benefiting from Competition?" A Report by the Massachusetts Attorney General's Office, March 2018. https://www.mass.gov/doc/comp-supply-report-final |
| **National Coalition for the Homeless 2009** | National Coalition for the Homeless. Health Care and Homelessness. Washington, DC: The Coalition, July 2009; last modified February 21, 2012. http://www.nationalhomeless.org/factsheets/health.html |
| **NEADA 2011** | APPRISE. "2011 National Energy Assistance Survey: Final Report." Prepared for National Energy Assistance Directors' Association. Washington, DC: NEADA, November 2011. http://www.appriseinc.org/reports/Final%20NEADA%202011%20Report.pdf, from link at http://neada.org/program-policy-reports/neada-and-public-health/  Summary at http://neada.org/wp-content/uploads/2013/05/FINAL_NEADA_2011_Summary_Report1.pdf  Brief at http://neada.org/wp-content/uploads/2013/05/NEA_Survey_Nov11.pdf |

JA183

| Office of People's Counsel 2018 | Susan M. Baldwin and Sarah M. Bosley. "Office of People's Counsel, Maryland's Electricity and Gas Markets: Where Do We Go from Here?" Maryland Office of People's Counsel. Baltimore Maryland: November 2018. http://opc.maryland.gov/Portals/0/Hot%20Topics/Maryland%20Electric%20and%20Gas%20Residential%20Supply%20Report%20November%202018.pdf |
|---|---|
| OPC Price Comparison | Consumer Corner – Retail Suppliers (of Electricity and Natural Gas). Maryland Office of People's Counsel. Baltimore, Maryland. Prices of electricity and natural gas by supplier and utility area can be found at http://www.opc.state.md.us/ConsumerCorner/RetailSuppliers.aspx |
| OHEP 2018 | Electric Universal Service Program (EUSP) Proposed Operations Plan for Fiscal Year 2019. Office of Home Energy Programs Maryland. Department of Human Resources. Family Investment Administration. Submitted to the Maryland Public Service Commission. Docket No, 8903. Number 503 on the webpage of the docket. https://www.psc.state.md.us/search-results/?keyword=8903&x.x=19&x.y=18&search=all&search=case |
| OHEP Budget 2018 | Office of Home Energy Programs: Operating Budget Data. Office of Home Energy Programs Maryland. Department of Human Resources. Baltimore, Maryland: January 2018. http://mgaleg.maryland.gov/pubs/budgetfiscal/2019fy-budget-docs-operating-n00i0006-dhs-office-of-home-energy-programs.pdf |
| PSC 2018 | Maryland Public Service Commission. In the Matter of the Electric Universal Service Program – Order No. 88850. Baltimore Maryland: September 26, 2018. Docket No, 8903. Number 516 on the webpage of the docket. https://www.psc.state.md.us/search-results/?keyword=8903&x.x=19&x.y=18&search=all&search=case |
| PSC Monthly Reports | Electric Choice Monthly Reports, Maryland Public Service Commission, various years. https://www.psc.state.md.us/electricity/electric-choice-monthly-enrollment-reports/ |
| PSC Compare | Public Service Commission Shop and Compare webpage. https://www.psc.state.md.us/electricchoice/shop-and-compare/ |
| Peltier 2018 | Interview conducted by Laurel Peltier with a client at Paul's Place. September 13, 2018. With permission. |
| Peltier 2017 | Laurel Peltier. Public Comments for Md. P.C. 47. Comments filed in the Maryland Public Service Commission Public Conference 47, January 20, 2017. Item #14 in the PC 47 docket https://www.psc.state.md.us/search-results/?keyword=pc47&x.x=0&x.y=0&search=all&search=rulemaking |
| RESA Comments 2018 | Motion to File Comments and Comments of the Retail Energy Supply Association. Item #513 in Docket 8903 of the Maryland Public Service Commission. August 9, 2018. https://www.psc.state.md.us/search-results/?keyword=8903&x.x=19&x.y=18&search=all&search=case |
| RESA Glossary | Retail Energy Supply Association. https://www.resausa.org/shop-energy/energy-glossary#p |
| SMECO 2018 | Sothern Maryland Electric Cooperative. Comments of Southern Maryland Electric Cooperative, Inc. In the Matter of Revisions to COMAR 20.32, 20.50, 20.53, 20.55, and 20.59 – Competitive Electricity and Gas Supply, Public Service Commission Administrative Docket RM62. April 19, 2018. https://webapp.psc.state.md.us/newIntranet/AdminDocket/CaseAction_new.cfm?CaseNumber=RM62 |
| Southwell et al. 2012 | Brian G. Southwell, Joseph J. Murphy, Jan E. DeWaters, and Patricia A. LeBaron. Americans' Perceived and Actual Understanding of Energy. RTI Research Report. Research Triangle Park, NC: RTI Press. August 2012. http://www.rti.org/rtipress |

JA184

A B E L L

F O U N D A T I O N

111 South Calvert Street, Suite 2300
Baltimore, Maryland 21202-6174

The

# Abell Report

Published by the Abell Foundation
Volume 31, Number 4

Maryland's Dysfunctional Residential Third-Party Energy Supply Market:
An Assessment of Costs and Policies

By Laurel Peltier and Arjun Makhijani, Ph.D.
December 2018

## About the Abell Foundation

The Abell Foundation is dedicated to the enhancement of the quality of life in Maryland, with a particular focus on Baltimore. The Foundation places a strong emphasis on opening the doors of opportunity to the disenfranchised, believing that no community can thrive if those who live on the margins of it are not included.

Inherent in the working philosophy of the Abell Foundation is the strong belief that a community faced with complicated, seemingly intractable challenges is well-served by thought-provoking, research-based information. To that end, the Foundation publishes background studies of selected issues on the public agenda for the benefit of government officials; leaders in business, industry and academia; and the general public.

For a complete collection of Abell publications, please visit our website at
www.abell.org/publications

JA185

# EXHIBIT 4

JA186



Groups that sign on to this testimony
Elders Climate Action
Public Employees for Environmental Protection
Maryland Legislative Coalition Climate Justice Wing
HoCoClimateAction
Maryland League of Conservation Voters

# TESTIMONY IN SUPPORT SB1 AS AMENDED BY SENATE EEE COMMITTEE

Electricity and Gas-Retail Supply – Regulation and Consumer Protection
Economic Matters Committee, Senator Augustine
March 26, 2024

Good afternoon, Chairman Wilson and members of the House Economic Matters Committee. The Maryland Energy Advocates Coalition (MEAC) is pleased to provide written testimony in support of SB1. Our collaboration of nonprofits, foundations, partners, and volunteers works to ensure that limited-income families can afford their utility bills through advocacy, education, and reporting.  MEAC is: AARP Maryland, National Consumer Law Center, Institute for Energy and Environmental Research, Climate Access Fund, GEDCO, Cancer Support Foundation, Chesapeake Physicians for Social Responsibility, and many partners. SB1 provides the urgently needed market and consumer reforms to level the residential retail energy consumer playing field. SB1 is tactical and practical and reforms many of the issues and injustices happening with today's current marketplace. SB1 does not eliminate choice, but rather it provides the guardrails needed for all Maryland residential consumers to access affordable energy.

The 1999 Electric Choice Act opened the door for competitive energy suppliers to service residential customers and offer electricity and gas supply. The deregulatory energy bill clearly stated the goal was "economic benefits for all classes." [1]

Yet the opposite has happened. Maryland's residential customers who chose a retail



**MARYLAND'S RESIDENTIAL RETAIL ENERGY OVERPAYMENTS VS. REGULATED UTILITY ELECTRICITY RATES**

| YEAR | Residential Electricity + | Residential Gas = | E & G Overpayment |
|---|---|---|---|
| 2014 | $77 M | $53 M | $130 M |
| 2015 | $69 M | $47 M | $116 M |
| 2016 | $50 M | $41 M | $91 M |
| 2017 | $59 M | $39 M | $98 M |
| 2018 | $73 M | $44 M | $117 M |
| 2019 | $88 M | $40 M | $128 M |
| 2020 | $106 M | $36 M | $142 M |
| 2021 | $117 M | $34M | $151 M |
| 2022 | $178 M | $49 M | $227 M |
| 2014 - 2022 Overpayment Total | $817 M | $381 M | $1.2 B |

*Electricity Data source is US D.O.E. EIA861. Gas is estimated at 25¢ markup for retail therms sold. EIA data reported every October.*

[1] https://mgaleg.maryland.gov/mgawebsite/Search/Legislation?target=/1999rs/billfile/hb0703.htm

1

JA187

supplier have paid **$1.2 billion more**[2] for home energy - an essential service.

Maryland's residential Retail Energy market negative outcomes have been highly reported and studied [3]. The data and facts are indisputable and clear that in its current form, Maryland's residential market did not meet its goals. From the Wall Street Journal's Page 1 investigative series[4] featuring Baltimore residents, to many restructured states' reports, articles, radio, and TV shows, retail energy has been a hot topic for many years.

In 2022, important research based on 3 years' worth BGE retail energy billing records was published by a PhD candidate at UC Berkeley, [5]  The researcher asked a serious economic question: Why are low-income households in the US paying more for retail energy compared to regulated utility offers?



**Maryland Residential Electricity 2019 - 2021 Rates per kWh BGE vs. Retail Energy By Income Level**

Median Prices Over Time by Income Group [14]

Source: https://haas.berkeley.edu/energy-institute/research/abstracts/wp-333/

Her research concluded that over time, the retail industry realized it is more cost effective to send commission-based direct salespeople door-to-door or embed them in big box stores in Maryland's lowest income ZIP codes[6].  Suppliers charged low-income accounts higher rates at the door than online. When variable rates kick in (the report found the average fixed rate contract was only 2 months), rates can creep up to any level. **Maryland's retail energy market has no pricing oversight.** As the UC Berkeley report detailed, Spanish-speaking accounts, African American accounts, and immigrant families pay the highest rates.

Of real concern is that the report proved that the driver in this market's pricing discrimination is based on demographics. Found on page 13, the report concluded that the presence of a majority African American ZIP code explained nearly half (45%) the pricing discrimination.

---

[2] https://www.energysupplierhelpdesk.org/. Data source DOE EIA861 file

[3] https://www.energysupplierhelpdesk.org/reports-pres

[4]  https://www.wsj.com/articles/electricity-deregulation-utility-retail-energy-bills-11615213623

[5] https://haas.berkeley.edu/energy-institute/research/abstracts/wp-333/

[6] PSC data reported in Baltimore Fishbowl https://datawrapper.dwcdn.net/x4zeA/1/

2

JA188

Since 2010 when purchase of receivables was integrated with utility consolidated billing [7], the Maryland residential market has seen significant overpayments compared to utility rates. And each year, per customer overpayments increased from $161 in 2014 to $483 per account in 2022 [8]. As the residential retail energy market has shrunk, industry has increased rates on their remaining customers.

In addition to the low-income targeting, **"Eco-buyers" are wooed into retail energy with promises of clean electricity.** Retail energy "green power" offers are based on voluntary renewable energy certificates. Maryland currently has no standards or regulations regarding "green offers" and Maryland has no visibility into what types of RECs suppliers purchase on behalf of their clients.  Research suggests most RECs are unbundled RECs from Texas wind farms. These RECs are very low cost (after broker fees, too) and offer no 'environmental benefits' for Maryland.

Eco-buyers assume they're paying more for actual wind and clean energy. [9] Maryland's eco-buyer retail energy segment is at least 25% of the retail energy base. In 2022, each "green offer" account paid on average $725 more for electricity compared to regulated rates. Retail Energy "green offer" premiums are significant. in 2022, the average retail "green offer" account paid for an additional 8 RECs (~8,000 kWh) above the 25% RPS requirement. At an average $725 premium, each retail supplier "green offer" RECs cost consumers an extra $90. Voluntary RECs sell between $2 to $10 each.

Lastly, the in-person direct sales shenanigans are many, including that most sales agents 'fudge the truth' about retail energy offers. It's a tough product to sell and the sales folks are, by and large, on commission per closed sale. Since 2010, per PSC data [10], about 2.8 million new residential contracts were sold. There are 2.3 million Maryland residential accounts.  And 2.5 million contracts have cancelled. It's a churn and burn marketplace relying heavily on direct sales.

**On average, Retail Energy costs more for the roughly 10 million US customers.** Yet even when the PSC "shot across the bow" from the bench and asked industry to "clean

### 2022 US Residential Retail Energy Results - Sorted by Overpay/Family

| DEREG STATE | # RESIDENTIAL ACCOUNTS | AVG. EXTRA EA. FAMILY PAID | % ABOVE REGULATED KWH RATES |
|---|---|---|---|
| New Jersey | 220,000 | +$500 | +56% |
| Maryland | 370,000 | +$485 | +50% |
| Pennsylvania | 1,150,000 | +$340 | +37% |
| Massachusetts | 325,000 | +$300 | +33% |
| Illinois - MISO | 218,000 | +$240 | +33% |
| Texas | 6,700,000 | +$220 | +12% |
| New York | 580,000 | +$210 | +30% |
| Illinois - PJM | 436,000 | +$185 | +24% |
| 2022 TOTAL | 10 million | $2.5 B | |

---

[7] Abell Foundation Report: Peltier & Makhijani https://abell.org/publication/marylands-dysfunctional-residential-third-party-energy-supply-market/

[8] https://www.energysupplierhelpdesk.org/1billion

[9] https://www.energysupplierhelpdesk.org/greenpower

[10] https://www.psc.state.md.us/electricity/electric-choice-monthly-enrollment-reports/

JA189

up your act," the retail industry chose to double-down on Maryland consumers (New Jersey, too) and charge Maryland families the highest 2022 premiums compared to other restructured states.

Our coalition, Maryland's Office of Home Energy Programs, the Fuel Fund of Maryland and Maryland residents are left picking up the pieces. The net is that Section 8 vouchers are lost and home utility accounts are terminated. Energy burdens are high in Maryland and this market needs to be reformed.

**SB1 solves many issues.**

1.  **RATE GUARDRAILS:** SB1 provides **first-ever rate oversight** that's tied to regulated rate levels. Another key regulation is **eliminating "purchase of receivables**." Combined with no rate oversight, POR as it's called, is a PSC-regulation that when combined with "free market" rates has driven pricing discrimination, with little risk to retail suppliers. Known as a "moral hazard," Maryland rate results support that retail suppliers fell into that trap. **Limiting contract lengths, fixing renewal terms at 1 year, and eliminating variable rates** is smart to ensure that consumers aren't hooked into never-ending monthly variable.

2.  **VULNERABLE POPULATION SAFEGUARDS:** With 20 years' retail energy customer outcomes, SB1's replacing compromised Choice Identification Numbers, "locking" a residential utility account on SOS, and eliminating retail choice for OHEP accounts are tactical and practical.

    a.  **Utility Choice ID Number Replacement:** When an account is compromised with an illegal sale, known as "slamming," a minority of account holders file PSC complaints. If they win their case, the sales reps still have their account information and can illegally re-enroll them without consent.  This requirement would allow the Choice ID to be changed by the utility system to reduce the likelihood of further slamming. (Also, very few residents seem to know about the PSC, let alone the Consumer Affairs Division online complaint process.)

    b.  **Account SOS / Gas Lock:** It appears that older adults are often targeted by door-to-door salespeople. A Baltimore City senior, Ms. Ida's experience (Figure 1 below) is an extreme example of this issue, yet illustrates the door-to-door sales issue with 23 switches over 30 months. SB1 would allow account holders and their caregivers to request that their distribution utility automatically keep their account on SOS. This one change will give seniors and their families peace-of-mind that their family's utility account is on SOS.

4

JA190

**Baltimore City (21218) OHEP Account:**   # Electric Switches: 23   # Gas Switches: 16

| Year | Month | ELECTRIC | | Yearly Use: 3,000 kWh | RED = SWITCH | GAS | | Yearly use: 450 therms |
|---|---|---|---|---|---|---|---|---|
| | April | Atlantic Energy | to | Spring Power | | Atlantic Energy | to | Spring Power |
| | May | Spring Power | | | | Spring Power | | |
| | June | Spring | to | Liberty Power | | Spring Power | | |
| | July | Liberty Power | to | Constellation | | Spring Power | | |
| | August | Constellation | | | | Spring Power | to | Constellation |
| | September | Constellation | to | Smart Energy | | Constellation | to | Spring Power |
| | October | Smart Energy | | | | Spring Power | | |
| | November | Smart Energy | to | Spark Energy. to | Spring Power | Spring Power | to | Spark Energy |
| | December | Spring Power | | | | Spark Energy | to | Spring Power |
| 2020 | January | Spring Power | to | Clearview | | Spring Power | to | Clearview |
| | February | Clearview | | | | Clearview | | |
| | March | Clearview | | | | Clearview | | |
| | April | Spark Energy | | | | Clearview | to | Spark Energy |
| | May | Spark Energy | | | | Spark Energy | | |
| | June | Spark Energy | to | Clearview | | Spark Energy | | |
| | July | Clearview | | | | Spark Energy | | |
| | August | Energy Harbor | to | Spring Power to | Clearview | Spark Energy | | |
| Case Mgr start -> | September | Spring Power | | | | Spark Energy | to | Spring Power |
| | October | Spring power | to | Park Power | | Spring Power | | |
| | November | Park power | to | Spring Power to | CleanChoice | Spring Power | to | Park Power |
| | December | CleanChoice | to | Spring Power | | Park Power | to | Spring power |
| 2021 | January | Spring power | to | MDGE-Vistra | | Spring Power | | |
| | February | MDGE | to | Spring Power | | Spring Power | to | MDGE-Vistra |
| | March | Spring power | to | | | MDGE-Vistra | to | Spring Power |
| | April | BGE | | | | Spring Power | | |
| | May | RPA Energy | | | | BGE | | |
| | June | RPA Energy | | | | RPA Energy | | |
| | July | RPA Energy | to | BGE | | RPA Energy | | |
| | August | BGE | | | | BGE | | |
| | September | Clearview | | | | Clearview | | |

*Figure 1: Ms. Ida (first name) lives in Baltimore City, a GEDCO community center client. L. Peltier and Ms. Ida's Healthcare for the Homeless Case manager began working in 9/20 to keep her on BGE supply. Unsuccessfully most of the time. The chart above lists the many suppliers that enrolled this elderly lady.*

3. **GREEN POWER OFFERS:** SB1 requires retail suppliers to purchase PJM and /or PJM delivered generation voluntary RECs above the RPS levels. SB1 requires suppliers to report REC types, location, and generator. Lastly, SB1 requires clear a consumer disclosure on all marketing. If passed these changes will ensure Maryland's eco-buyers can more readily know what they're buying. And, retail supplies will be required to present to the PSC the

5

JA191

RECs or forms of green power that support their "green power" offers in order to hav the rate approved by the PSC.



## MARYLAND RETAIL ENERGY "100% RENEWABLE" 2022 RESULTS

| Res. Supplier | # Customers | Xtra $ Paid per Family | Revenues Above SOS |
|---|---|---|---|
| #1 Shell Oil's Inspire | 35,000 | $470 | $ 16 million |
| #2 CleanChoice | 27,000 | $1,000 | $ 27 million |
| #3 Shell's SmartEnergy | 6,000 | $875 | $5 million |
| #4 CleanSky / Titan | 6,600 | $485 | $3 million |
| #5 Clearview | 4,000 | $885 | $3 million |
| #6 M Power | 5,000 | $560 | $3 million |
| #8 NRG - Stream | 5,200 | $519 | $4 million |
| #9 Indra / Palmco | 4,000 | $1,060 | $4 million |
| #10 Tomorrow/Sperian | 5,000 | $924 | $5 million |
| #11 NRG Green Mount | 3,400 | $775 | $2 million |
| #12 Greenlight | 3,500 | $775 | $3 million |
| #13 Vistra - Viridian | 2,000 | $820 | $2 million |
| #14 Spring Energy | 1,300 | $1,000 | $1 million |
| **All "Green" Suppliers** | **108,000** | **$725** | **$78,000,000** |

*Electricity Data source is US D.O.E. EIA861.*

*Figure 2: Nine "green power" residential retail brands that sell 100% renewable offers charged more than $750 on average more. DOE EIA861 files.*

4. **INCREASED PSC, OFFICE OF PEOPLE'S COUNSEL AND ATTORNEY GENERAL OVERSIGHT**: MEAC supports every SB1 change suggested. The residential retail energy market is roughly a $500,000,000 yearly market and has no dedicated staff. Recently, the PSC has spent considerably more labor

6

JA192

hours on major Supplier Complaint Cases and has beefed up the Consumer Affairs Department complaint group. Yet given that 50% of Maryland's electricity is sold via retail suppliers, it's astonishing how few labor hours are devoted to overseeing this market's results.  Stronger energy salesperson training and licensing, limiting retailer license timeframes, and expanding oversight are smart so that our regulatory agencies can regulate. Today's lax regulations seem to trigger an automatic court case by industry because of outdated and vague laws.

5.  **RESIDENTIAL RATE REPORTING**: A major reason SB1 has taken so long to come to fruition is our state's lack of official reporting. Without reporting, the public had little insight into retail energy results. When MEAC (originally under the Energy Supplier Reform Coalition) began reporting results in 2016 using federal U.S Department of Energy EIA861 data, many were rightly skeptical because the data wasn't "official."  For Maryland to effectively manage consumer utility bills in the years to come, we must know what retailers are charging, just as we do with regulated utilities.

The average rate charged in 2022 for 370,000 residential accounts was nearly $500 more, a 50% premium. Since 2013, retail suppliers have on average charged higher and higher rates. Often retail supplier rates didn't track with market wholesale trends, as regulated SOS rates do. This data is from the DOE EIA861 files.



Figure 3: Historical regulated SOS per kWh rates compared to average retail energy rates from 2013 to 2022. The value of overpayments between the two lines is $817 million more paid for retail energy electricity.

7

JA193

## MARYLAND RESIDENTIAL ELECTRICITY

| Market Share | Parent Company | Company Name | Customer Count | Avg Rate / kWh | % +/- SOS | Avg kWh usage / account | Extra Revenue Above SOS | Extra Each Family Paid Above SOS |
|---|---|---|---|---|---|---|---|---|
| | | Regulated MD SOS 2022 Rate | 1,970,755 | $0.0802 | | 11,432 | $0 | $0 |
| | | **RETAIL SUPPLIERS BELOW:** | | | | | | |
| 1 | | Constellation | 80,612 | $0.090 | 12% | 17,927 | $ 14,103,694 | $175 |
| 2 | NRG | Direct Energy Services | 23,382 | $0.118 | 47% | 11,154 | $ 9,798,372 | $419 |
| 2 | NRG | NRG / Reliant | 21,601 | $0.141 | 76% | 11,493 | $ 15,049,530 | $697 |
| 2 | NRG | XOOM | 9,573 | $0.145 | 81% | 10,900 | $ 6,794,760 | $710 |
| 2 | NRG | Stream Energy | 4,152 | $0.154 | 92% | 11,640 | $ 3,558,729 | $857 |
| 2 | NRG | Energy Plus Hold. | 2,022 | $0.147 | 83% | 11,038 | $ 1,487,245 | $736 |
| 2 | NRG | Green Mountain En. | 2,682 | $0.155 | 93% | 10,386 | $ 2,082,195 | $776 |
| | | NRG portfolio -->> | 63,412 | $0.135 | 68% | 11,227 | $ 38,770,831 | $611 |
| 3 | Shell Oil | Inspire Energy | 34,958 | $0.125 | 56% | 10,402 | $ 16,415,562 | $470 |
| 4 | Alta | WGL Energy | 33,842 | $0.100 | 24% | 10,121 | $ 6,628,368 | $196 |
| 5 | Private | CleanChoice Energy | 27,191 | $0.189 | 136% | 9,156 | $ 27,174,159 | $999 |
| 6 | Vistra | Ambit | 8,199 | $0.102 | 27% | 12,028 | $ 2,170,168 | $265 |
| 6 | Vistra | MDGE- Energy Services | 7,714 | $0.147 | 84% | 9,881 | $ 5,111,616 | $663 |
| 6 | Vistra | Public Power | 2,870 | $0.115 | 44% | 21,307 | $ 2,137,316 | $745 |
| 6 | Vistra | Viridian | 1,985 | $0.155 | 93% | 10,940 | $ 1,626,579 | $819 |
| | Now owns Energy Harbor 3/23 | Vistra portfolio -->> | 20,768 | $0.123 | 53% | 12,409 | $ 11,045,680 | $532 |
| 7 | Commerce | Just Energy | 15,517 | $0.118 | 47% | 10,497 | $ 6,160,892 | $397 |
| 8 | | SFE | 10,640 | $0.118 | 47% | 9,456 | $ 3,792,109 | $356 |
| 9 | Via Renewable | Spark Energy | 2,279 | $0.167 | 108% | 9,695 | $ 1,919,127 | $842 |
| 9 | Via | National Gas & E | 1,272 | $0.171 | 113% | 10,623 | $ 1,229,576 | $967 |
| 9 | Via | Major Energy | 3,252 | $0.146 | 82% | 10,818 | $ 2,321,844 | $714 |
| 9 | Via | Starion Energy | 24 | $0.064 | -20% | 583 | $ (223) | -$9 |
| | | VIA/ Spark portfolio -->> | 6,827 | $0.157 | 96% | 10,371 | $ 5,470,325 | $801 |
| 10 | | CleanSky/Titan | 6,575 | $0.120 | 49% | 12,334 | $ 3,209,712 | $488 |
| 11 | | SmartEnergy | 5,848 | $0.169 | 110% | 9,906 | $ 5,120,288 | $876 |
| 12 | | IDT Energy, Inc. | 5,364 | $0.174 | 118% | 8,392 | $ 4,244,358 | $791 |
| 13 | | MPower Energy NJ LLC | 5,029 | $0.171 | 114% | 6,212 | $ 2,852,112 | $567 |
| 14 | | Tomorow Energy Corp. | 4,907 | $0.168 | 109% | 10,533 | $ 4,533,612 | $924 |
| 15 | | Indra (was Palmco) | 3,932 | $0.239 | 198% | 6,688 | $ 4,173,170 | $1,061 |
| 16 | | Clearview Electric Inc. | 3,817 | $0.156 | 95% | 11,613 | $ 3,378,029 | $885 |
| 17 | | Statewise | 3,751 | $0.119 | 49% | 9,881 | $ 1,451,007 | $387 |
| 18 | | Greenlight Energy Inc. | 3,496 | $0.158 | 97% | 9,957 | $ 2,711,514 | $776 |
| 19 | | Star Energy Partners | 3,189 | $0.116 | 44% | 6,919 | $ 784,093 | $246 |
| 20 | | Energy Harbor Corp. | 2,321 | $0.083 | 4% | 13,710 | $ 97,562 | $42 |
| 21 | | Eligo Energy, LLC | 2,309 | $0.175 | 118% | 11,392 | $ 2,489,889 | $1,078 |
| 22 | | RPA Energy, Inc. | 2,261 | $0.197 | 146% | 6,768 | $ 1,794,936 | $794 |
| 23 | | Rushmore | 2,242 | $0.111 | 39% | 9,611 | $ 665,651 | $297 |
| 24 | | Park Power LLC | 2,046 | $0.141 | 76% | 7,610 | $ 953,846 | $466 |
| 25 | | AEP Energy | 1,855 | $0.090 | 13% | 14,682 | $ 279,952 | $151 |
| 26 | | North American Power | 1,725 | $0.151 | 89% | 12,643 | $ 1,550,061 | $899 |
| 27 | | IGS | 1,696 | $0.132 | 65% | 8,683 | $ 762,045 | $449 |
| 28 | | Alpha G&E | 1,587 | $0.130 | 62% | 8,103 | $ 641,140 | $404 |
| 29 | | Great American | 1,471 | $0.104 | 30% | 10,062 | $ 351,011 | $239 |
| 30 | | Spring Energy RRH | 1,352 | $0.185 | 130% | 9,552 | $ 1,348,430 | $997 |
| 31 | | Josco Energy | 1,309 | $0.165 | 105% | 7,065 | $ 781,205 | $597 |
| | | All Retail Suppliers | 368,589 | $0.120 | 50% | 12,005 | $ 178,148,071 | $483 |
| | | All suppliers Minus Constellation | $287,977 | $0.135 | 69% | 10,348 | $ 164,044,377 | $570 |

*Figure 4: Maryland's 2022 residential retail energy results by regulated utilities compared to each supplier. Only 1 supplier charged less than a 20% premium in 2022. Twenty-five supplier brands charged their customers more than $500 on average for electricity.*

8

JA194

# EXHIBIT 5

JA195

TESTIMONY **IN SUPPORT** OF SB 00001
Residential Retail Electricity – Regulation and Consumer Protection

Education, Energy, and the Environment Committee

My name is Anne Manuel and I've lived in Silver Spring, MD., for 39 years.

I am deeply concerned about the ever-more urgent threat climate change poses to our world. That's why my husband and I have been willing for several years to pay a premium to have our electricity come from renewable sources. That's why we chose WGL Energy's CleanSteps Wind Power for our home in Silver Spring and cabin in Myersville, MD. We were assured by the company's literature that, and I quote, *"CleanSteps® Wind Power covers 100% of your electricity usage, and **is composed of 100% wind energy**."*

We've been paying a premium of more than $1,000 each year to WGL for what we believed to be wind power. We learned last year that the company's claims – like claims by many other third-party electricity suppliers – are entirely misleading. Unlike community solar arrangements, WGL apparently is not selling us power generated by wind. The company is not buying wind power on our behalf. We are actually getting the same mix of the local power grid supply as our neighbors who have not opted for 100% clean energy and are not paying a premium. Instead, the company is selling us Renewable Energy Certificates (RECs). A REC, as I understand it, is a bookkeeping measure indicating that a megawatt of renewable energy *has been generated* (somewhere at some time). My premium does not, in fact, purchase wind power.

But potentially more serious than the fact that my family has been misled by "green power" marketing is the potential impact such misunderstandings can have on the climate. I'm sure we are not the only family or business in Maryland who has believed that we no longer needed to conserve energy since our usage was (we thought) actually encouraging renewable energy production. Families like ours are not only paying more, but using more. *Instead of easing the climate crisis, false green energy claims are making it worse.*

None of this can be gleaned from the third-party supplier marketing. This is an example where regulation is desperately needed to accomplish two goals: 1) ensure that consumers know what they are purchasing; and 2) press the companies to make available genuine clean energy choices for consumers such as ourselves.

The legislature missed an opportunity to address this problem last year. We don't have time to let another year go by. I believe that SB 00001 is a step in the right direction toward achieving these goals. Thank you for your consideration.

JA196

# EXHIBIT 6

JA197

**March 22, 2024**
**Chair Wilson**
**House Economic Matters Committee**
**Re: SB 1 <u>FAVORABLE *AS AMENDED* BY SENATE Education, Energy, and the Environment Committee</u>**
**Electricity and Gas Retail  Supply - Regulation and Consumer Protection, Senator Augustine - March 26, 2024**

**Good Afternoon Chair Wilson and Members of the House Economic Matters Committee:**

**<u>I am favorable for SB1 as amended by the Senate in EEE committee.</u> This is an infuriating case of 'No Good Deed Goes Unpunished'. To think it is legal in Maryland for an energy company to take over $10,000 from us, has me spitting nails.  We thought we were being responsible citizens - and now we discover we have been duped - - but *legally duped*. This must stop now.   Maryland must pass SB1 AS AMENDED BY THE SENATE IN EEE**

During COVID in 2020, my husband and I switched our Baltimore County BGE account to **CleanChoice Energy.**  Their marketing clearly claimed that if we switched to their "clean electricity" we were buying wind and solar energy.  Today, CleanChoice's web site marketing describes our environmental impact as: "*You'll be greatly reducing your carbon footprint by sourcing electricity that comes from clean, renewable sources. You'll also be helping to increase demand for clean energy, paving the way to become less reliant on polluting fossil fuels.*"

As fierce environmentalists, we are taking many steps in our life to live more sustainably, hoping to ensure a healthy planet for all future generations.  Climate change is real, it's getting worse and we feel a deep responsibility to take action, anyway we can.

Our Baltimore County home is large and over the past few years, we felt our BGE bill was very expensive. We chalked it up to the higher rates we heard about on the news. So imagine my shock when I'm at a meeting and my friend Laurel Peltier is in attendance. Another attendee mentioned that I should have Laurel "check my BGE bill" to see what's going on.  I knew something was very off when she immediately asked me to call CleanChoice to make sure that I had canceled our contract!

**Here's what we learned that day:**
  • Our contract switched to variable rates, or started on variable rates from day 1.
  • We never heard from, received any letters, or any materials, **ever**, from CleanChoice the 3 years we were their customer.
  • For many months, our account was charged between **$0.35 to $0.41 a kilowatt hour and BGE's was about $0.10 / kilowatt hour.**
  • Given our home uses about 30,000 kilowatt hours a year, anyone can do simple math and realize each year we paid thousands of dollars more, for….**RENEWABLE ENERGY CERTIFICATES!**
  • We weren't even getting wind energy from a wind farm feeding energy into the grid.
  • These certificates are beyond confusing, and we paid over $10,000 for some fictional, green idea, from someone selling a credit from their wind farm.  Another party bought the power. We were duped.   None of this was clear. None of this was explained to us  in then material we signed.

Mary Ellen Pease, 704 Stone Barn Ct, Towson MD 21286, 410-299-8211
Mpease@comcast.net

JA198

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

RETAIL ENERGY ADVANCEMENT          )
LEAGUE, et al.,                    )
                                   )
        Plaintiff,                 )
                                   )Civil No.
        vs.                        )24-cv-2820-JRR
                                   )
ANTHONY G. BROWN, in his           )
official capacity as Attorney      )Baltimore, Maryland
General of Maryland, et al.,       )
                                   )November 18, 2024
        Defendants.                )10:05 a.m.
_____)

**THE ABOVE-ENTITLED MATTER CAME ON FOR**
**<u>PRELIMINARY INJUNCTION HEARING</u>**
**BEFORE THE HONORABLE JULIE R. RUBIN**


<u>A P P E A R A N C E S</u>

On Behalf of the Plaintiffs Retail Energy
Advancement League and Green Mountain Energy Company:
     Thomas J. Johnson, Jr., Esquire
     Stephen J. Obermeier, Esquire
     Jeremy J. Broggi, Esquire

On Behalf of the Defendant Attorney General Brown:
     James D. Handley, Esquire
     Howard Feldman, Esquire

On Behalf of the Defendant Maryland Public
Service Commission:
     Colin Glynn, Esquire


     (Computer-aided transcription of stenotype notes)

                    <u>Reported by</u>:
               Ronda J. Thomas, RMR, CRR
               Federal Official Reporter
            101 W. Lombard Street, 4th Floor
               Baltimore, Maryland 21201

JA200

(10:05 a.m.)

THE COURT:  Good morning, everyone.  Please be seated. Let's call the case and get started.

THE CLERK:  The matter now pending before this Court is Civil No. JRR-24-2820, Retail Energy Advancement League, et al. v. Brown, et al.  This matter now comes before the Court for the purpose of a preliminary injunction hearing.

Counsel, please introduce yourself for the record, starting with the Plaintiff.

MR. JOHNSON:  Good morning, Your Honor.  Tom Johnson for Plaintiffs Retail Energy Advancement League and Green Mountain Energy Company.

MR. OBERMIER:  Steve Obermier, Your Honor, for the Plaintiffs.

MR. BROGGI:  Jeremy Broggi for the Plaintiffs.

THE COURT:  Good morning.

MR. HANDLEY:  Good morning, Your Honor.  James Handley on behalf of Attorney General Brown.

THE COURT:  Good morning.

MR. GLYNN:  Colin Glynn on behalf of the Maryland Public Service Commission.

THE COURT:  Good morning, Mr. Glynn.

MR. FELDMAN:  Good morning, Howard Feldman for the Attorney General.

THE COURT:  Nice to see you, Mr. Feldman.

All right.  I have read all of the papers, which I appreciate, and I am here with wide-open ears.

**MR. JOHNSON:**  Thank you, Your Honor.

Judge Rubin, may it please the Court.  The state of Maryland has enacted a law that bans speech on a critical matter of public debate, namely, what types of energy products are "clean, green, or renewable," prohibiting my clients from using these words and a laundry list of similar terms.

My clients truthfully and accurately use these terms to describe the environmental benefits of the renewable energy certificates, or RECs, that they sell to consumers.  And both the Federal Trade Commission and the Environmental Protection Agency have blessed RECs as the way that companies substantiate renewable energy claims.

Yet, Maryland Senate Bill 1 would prohibit my clients from making any green energy claims about their existing products, reserving those terms to Maryland's own preferred mix of RECs that content and viewpoint-based discrimination violates the First Amendment.

Now, Maryland does not dispute it is banning speech, rather, it claims it has a substantial state interest in preventing consumer deception.  But whether this Court ultimately applies strict scrutiny or heightened scrutiny, under the commercial speech test to this law, the law cannot be supported by a consumer deception rationale.

The state nowhere explains, Your Honor, why its parochial mix of RECs, limited to RECs sourced from the PJM region and neighboring states, why that is a uniquely, nondeceptive green or renewable product.  And nothing in the record, Your Honor, which I'll go through this morning, suggests that this specific mix is a solution for any consumer deception that they've presented to the Court.

To the contrary, the evidence in the State's brief, and in its accompanying exhibits to support this law, suggest some consumers believed they were receiving energy directly from a renewable source, like a wind farm, rather than by pairing the energy with the renewable energy credits.

But the speech restrictions in the Act, Your Honor, do nothing to alleviate that purported deception.  The Act allows suppliers to call retail energy products backed by RECs green or renewable so long as it's Maryland's preferred REC mix.  And both Maryland's preferred RECs and my client's RECs that fall outside the PJM, some of them, operate in the same way.  They both pair the energy that the consumer receives from the incumbent utility with the environmental benefits for each kilowatt-hour represented by the RECs.  There's no difference in the operation between the way in which Maryland's RECs operator and non-Maryland RECs operate.

So if consumers are confused by RECs, SB1 does nothing to cure their confusion.  To the contrary, what it would do is to

prevent my clients from continuing their public advocacy campaigns to truthfully educate consumers on their websites, on their Frequently Asked Questions, in their conversations with consumers about the environmental benefits of RECs.

Your Honor, that's critical to this business because ultimately what we're dealing with here, Your Honor, is an ideological product. It is a product that is offering to consumers for a premium the environmental benefits associated with RECs. So it is critical that my clients and participants in this market be permitted to speak to consumers about why it is that they ought to pay more for this energy because of the environmental benefits associated with it.

Now, second, Your Honor, there are parts of the Government's brief where they suggest that somehow consumers were deceived into purchasing RECs because they were not, quote, "sourced locally," that's page 22 of the Government's brief, or were, quote, "out of state," that's page 19.

Now, it's not clear whether this deception is something different from the deception about RECs. The idea that I wasn't getting my power directly from a wind farm, I was getting it from a rec. So this could simply collapse into the problem with REC that we were just talking about.

But, in any event, Your Honor, even if this is something different, again, the Government's proposed solution that only RECs derived from the PJM and neighboring states can be called

"green," that doesn't solve the problem.

The PJM comprises 13 states and neighboring areas that feed into those states. So, to give you one example, there are RECs in Chicago over 600 miles from this courthouse that are part of the PJM mix that will would be eligible to be called "green" under this framework, and there are RECs from New York less than 200 miles away from this courthouse that would not be eligible for the mix.

There's nothing in the record that suggest that consumers were somehow deceived into thinking that they weren't getting their RECs from New York, but they were getting their RECs from Chicago. There's nothing in the record that suggests that a PJM mix would alleviate consumer deception.

And, from a technical perspective, Your Honor, because it's not possible to ultimately track the electrons and the electricity to where they were generated to their ultimate destination, Maryland consumers have no more assurance under the State's framework that they're receiving their power from RECs sourced from Chicago than from anywhere else.

So this regional solution does not cure any confusion about the perceived deception around localism.

Third, Your Honor, it's at times unclear whether what the Government is arguing here is that there is deception concerning delivery of the electricity to the home, which is what we were just talking about, or whether it's a confusion

about the emissions profile of the electricity; its ability to reduce carbon footprint, right, which are two different things.

So I want to read this statement from the Government's brief, which I think is the closest they come to articulating what they believe the deception is. We've already looked at a piece of this. This is their Opposition Brief, page 22. They describe it as the, quote, "mistaken belief they are getting only renewable energy sourced locally and as a result helping to combat climate change."

So we've already talked about the problems with the sourced-locally limitation, in terms of the solution that SB1 proposes. But I also want to address this notion that locally-sourced RECs have some special value in combating climate change.

As the Government acknowledges elsewhere in its brief, page 6, climate change is a quote, "global," unquote, phenomenon. So whether you have a wind farm in Maryland, whether you have a wind farm in Texas, the fact that carbon emissions associated with that source would be lower than, you know, brown sources of electricity. The location of that doesn't matter in terms of its effect on climate change or at minimum the Government has not substantiated that there's something special about Maryland sources of energy with respect to alleviating climate change.

And that's why, Your Honor, federal law places no

limitation on companies to use RECs from wherever they are sourced in the country to substantiate their green energy claims because RECs, no matter where they're sourced, represent those environmental attributes of energy production, like the effect on the carbon footprint.

And relatedly, Your Honor, if you look at the bundle of RECs that Maryland says can permissibly be called "green," they don't clear up any deception with respect to the emissions profile of the sources.

So to give you one example, RECs derived from waste-to-energy or waste incineration is eligible for inclusion in the Maryland mix.

So if you think about the iconic Wheelabrator smoke stack that's off the highway, it says Baltimore on it -- I saw it on my way into the city yesterday -- there's a lot of controversy right now over whether to include that in the mandatory renewable portfolio standard in Maryland. But right now that's eligible for the mix. Whereas, much lower emission sources, like wind power, like wind farms that are outside of the PJM region are not eligible for the mix.

And to be clear, Your Honor, this is not a debate about energy policy. I'm not here arguing to you that the State has no legitimate way to prefer or subsidize the Wheelabrator if it might want to. It may have ways to do that. But what it cannot do is to cut off speech on this important matter of

JA207

public debate and to claim that there's something uniquely nondeceptive of calling the Wheelabrator clean, whereas, you can't call a Texas wind farm clean. They simply have not established that.

So this a case, Your Honor, in which there is a lack of fit between what they are claiming is their state interest, whether you look at that as a substantial state interest or a compelling state interest, and the solution that they have proposed in this statute.

So it's just like the *Sorrell* case. The Supreme Court said, the Government is telling us that what's important here is the confidentiality of patient information; but it's let everyone look at this information except for marketers. That doesn't make sense. There's a lack of fit there.

Well, it's the same thing here. The State is presenting you with evidence that suggests that what consumers are confused about is that retail energy providers are using RECs not sourcing that energy directly from a wind farm. But their solution is you can keep calling your products green if you use our RECs. It's the same thing. The solution, there is a lack of fit between the problem they're identifying and the solution.

So if you think, for example, about the case that they cite, *Recht v. Morrisey*, that was a case in which the Fourth Circuit upheld a commercial speech regulation because attorneys

JA208

were holding themselves out to be doctors, or attorneys were holding themselves out to be public health professionals. And the Court looked at that as a sort of factually deceptive thing that these commercial speech regulations could ameliorate. And that's understanding if someone is misrepresenting who they are.

But, it would be as if that statute was written to say, you can't use these terms like "recall" or "consumer health alert" unless you're one of this basket of law firms that the state prefers. That's what they've done here.

They've said, you can't use these terms unless you're using our portfolio mix that has the same problems with respect to the perceived consumer deception.

Now, Your Honor, we're certainly not saying that the state could not do anything to alleviate this consumer deception. There are more targeted public policies they could enact that do not have the same chilling effect on speech.

And indeed, as we pointed out in our brief, one problem with this statute is that it is not adequately tailored. Under current law, our clients, and all people that participate in this market, are required to disclose their use of RECs in connection with the State's mandatory renewable energy portfolio.

Now, the reason why we're not in here contesting or we haven't been in here contesting that existing regime is because

that does not then go further and prohibit us from making truthful and accurate claims about our own products.

But, what the State failed to consider here was whether any additional factual disclosures of that nature could be useful to ameliorate any consumer deception that remained in the market as to the voluntary mix. So above the mandatory mix, above the 38 percent, if consumers were still confused about what it is that RECs were then the proper remedy would be to extend those disclosures about the geographic source of RECs, about where the power source of the REC was, to the voluntary mix.

Instead, what the Government has done here is to prevent my clients from engaging in marketing activities that would continue to educate consumers about what it is that RECs were, what it is that they're purchasing. And we go through all of the different ways in which our clients currently do that in the declarations attached to our motion.

So I'd encourage the Court in this regard to look at the case *Kimberly-Clark*, it's a D.C. District Court case. And it goes through, as I'm sure Your Honor has already seen, a lot of the key precedents in this area. And it was a similar scheme because what it did was it prohibited the sort of qualitative words that said, if you produce wipes, you can't describe those wipes as flushable; and, on the other hand, it had disclosures about what the State believed a flushable wipe was.

And what the Court said in that case is that because disclosures, factual disclosures, were an option, that the State could not go further and say, well, you can't even talk about what you think flushable means. That even under a commercial speech standard that that restricts too much speech and must be stricken down.

And you see there are examples that the court provides in that case about, you know, could the State -- this comes from a D.C. Circuit case that is cited in that case -- could the State define what it means to be environmentally sustainable, and then force companies to say we're not environmentally sustainable based on that State definition.

And the court says, no, there might be targeted factual disclosures that a state could make. A state might be able to set up a certification regime and then you either say you meet that standard or you don't.

But what the state can't do is then go further and say, you can't make any of your own claims about what you believe to be the environmental benefits of your product. That goes beyond merely the nuts and bolts of a transaction. That goes to talking about the social value and the social utility of these products, which is a lively public policy debate, in which in *Sorrell* and *Riley* and similar cases courts have actually applied strict scrutiny when there has been this speech about a product that goes beyond merely proposing a

transaction.

So a word about the specific disclosures in the statute, Your Honor.

So I think if all we had here were purely factual disclosures, I don't think we would be in front of this Court. The problem is, as I said, this broad prohibition on green marketing, which is what I've spent the majority of my time this morning discussing, and then that is coupled with the State's preferred language.

So it's sort of like the *Greater Pregnancy Center* case that went up and down between this court and the Fourth Circuit where the State is sort of setting the terms of the debate at the outset. It says, you can't say anything of your own but you have to say what we want you to say; and part of that, Your Honor, is what are the environmental benefits of the products.

So the State is putting us in a position where we first need to offer their preferred energy mix if we want to call it "green," and then saying you need to describe what are the environmental benefits of that mix. And it's purely within the discretion of the Public Service Commission as to whether our marketing materials meet the statutory standard or not.

So it could put us in a position where we need to say this sort of Baroque mix of only PJM-eligible RECs, that's what is environmentally beneficial, but not the other RECs that would not qualify under the speech regime.

We also think there are factual problems with the disclosures, Your Honor. We think it doesn't accurately describe RECs. We have that in our papers. The fact that it says things like a REC is energy paired with renewable electricity, and that's not accurate because a REC actually is the environmental attributes of electricity so it can be unbundled; and once it is sold separately from the electricity, that electricity is no longer renewable. So, again, even as a factual matter we do not think that the disclosure is simply uncontroversial factual information.

And I want to do a note about timing because it's something that the Government brings up. So here we are in, you know, in November and the law is set to take effect January 1st. The State has put out for public comment kind of a draft proposal as to what this actual disclosure will look like, the PSC, and once it has comments on that it can actually notice that -- formally notice that proposal and then finalize it.

But we're in a situation in which with the law set to take effect January 1st, I think it's highly unlikely, if not impossible, that the State will actually finish that work by January 1st. So what the statute says is that you either have the statutory disclosure or a disclosure approved by the PSC. So given where we are, I think the statutory disclosure is what we will have to comply with on January 1st.

In any event, what the State has proposed in its proposed rules is the statutory disclosure and because the statute says there's something similar, you know, it's not even clear the extent to which the PSC has discretion to deviate from the statutory standard.

So, you know, the court was put in a similar position in the *Kimberly-Clark* case where the Government came up and said -- and I don't even take them to be making a ripeness argument -- but they came up and said, well, let's wait until we actually enforce this. We'll see how this plays out and see if this actually affects you. And the court said, no, because we see the statutory is about to take effect in a short period of time; we're not going to wait for further enforcement action, we're going to enjoin it now.

So the final thing that I wanted to touch on, Your Honor, was severability. And I think I want to sort of start with what I understand is not contested.

So the State lays out, I think very nicely in its statement of facts, and we do too, that what the Government was trying to do here is sort of establish two interconnected markets. A market that sort of mirrored the standard offered service market for the incumbent and a green-powered market, and they don't deny that those two markets are intertwined.

So the whole hook, the whole trigger in the statute currently on how you get from one market to the other is a

speech restriction. It says you cannot market "green power" unless you comply with these rules. If you market it, you're subject to civil penalties; and you cannot market it unless your price is approved by the commission.

So we think, at minimum, and I don't think it's disputed, that pre-approval process, that price-cap process, as well as the marketing restrictions and accompanying civil penalties, at minimum those provisions are not severable because all of them are pegged to that definition of "green power" in the statute. So it would put this Court in the position of essentially red-penciling the statute to determine what other trigger might there be for these various provisions.

So the only other argument that I read the State to be making on severability is that there are other provisions that they say do not relate specifically to this market. So they mention licensing of sales representatives and a couple of other things.

Your Honor, ultimately the test here is whether we think the legislature would have adopted this statute if all it was doing was adopting these sort of trailing provisions. And I don't think that this Court ought to be in a position to go through a sort of complex regulatory statute and determine what the state would have put in, what it wouldn't have put in.

I think that it befits everyone, citizens of Maryland, the Government, my clients, for this Court to send the entire

statute back to the legislature, preliminarily enjoin it so they can determine how best and how lawfully to create what I'll call a standard market and a green-powered market that is not keyed to speech and is not keyed on infringing on my client's constitutional rights.

Your Honor, I'm happy to answer any questions the Court might have, otherwise the balance of my arguments I'm happy to rest on the papers.

**THE COURT:** I appreciate that, Mr. Johnson. I do not have any questions. Thank you.

**MR. JOHNSON:** Thank you, Your Honor.

**THE COURT:** Mr. Handley, I take it you're arguing?

**MR. HANDLEY:** I am, Your Honor.

Good morning, Your Honor.

**THE COURT:** Good morning.

**MR. HANDLEY:** Plaintiffs are asking this Court for an extraordinary remedy to allow them to continue to mislead Maryland consumers about the energy products they sell. For years, retail energy suppliers have advertised products as 100 percent wind, 100 percent solar, otherwise providing green energy. In that time, Maryland consumers have spent significantly higher amounts monthly on their energy bills had they stayed with their local utility.

Despite paying this increased amount monthly, many Maryland consumers went on to later discover that the actual

energy they were receiving was no different than had they stayed with their utility. Instead, the only difference for consumers paying the significantly higher monthly payments are the renewable energy credits.

RECs are fungible creations to represent one megawatt of power generated from renewable sources, but not all RECs are equal nationwide, as not all states have the same definition for what constitutes renewable energy.

Over the last several decades, Maryland has been moving its energy supply towards renewable sources such as wind and solar. In order to make that dream a reality, Maryland has established, since 2004, renewable portfolio standards, or RPS.

Each year Maryland has increased the total share of renewable electricity supply that must be generated. As of this year that's 36.2 percent, and the stated goal for 2030 is over 50 percent.

But when you and I turn on the light here in the court or at home, we have no way of knowing that that energy is renewable. RECs are the vehicle by which -- to ensure those goals are met.

And, specifically, the RPS standards require that utilities and retail electricity suppliers purchase eligible RECs to equal the statutorily designated percentage.

Prior to the passage of SB1, there was a whole host of underhanded marketing and sales tactics that were all too

common in that third-party retailer supply market.  There were ballooning variable rates hidden in contracts, pushy salesman, and salespersons incentivized by --

THE COURT:  Commissions.

MR. HANDLEY:  Commission-based compensation, and suppliers that specifically targeted low-income neighborhoods, and even customers being signed up without their knowledge paying more month-over-month until discovery.

Specific to the First Amendment issues in the suit, retail energy suppliers have marketed their products as 100 percent green, 100 percent solar, despite the fact that the energy received from the consumers is the same as if they had stayed with BGE or PEPCO.

In response to these misleading tactics, SB1 was signed into law in May.  It's a broad-based consumer protection statute.  Chief sponsor explains that the overall theme was that these participants in the market were no longer going to gauge Maryland citizens.

Several significant reforms unrelated to the First Amendment issues before the Court:  Prohibition on variable rate contracts now, prohibition on compensation-based compensation, and further licensing requirements for energy salespersons and energy vendors.

Specifically to the First Amendment issues, SB1 created green power requirement and mandatory disclosures to ensure the

retail energy suppliers' claims of green energy are backed by a real standard of renewable energy. Customers can feel confident in understanding that their higher payments monthly are going towards green energy.

As Plaintiff is the movant here, it's their burden to make a clear showing that all four of the preliminary injunction elements have been met. They have not done so.

This is not a policy dispute about how to best tackle climate change. Instead, it's Maryland's attempt to protect its consumers from being deceived.

Significantly, Plaintiffs acknowledge that this is a facial challenge, which in the First Amendment context is high. In fact, the Supreme Court and the Fourth Circuit have held that First Amendment facial challenges are disfavored.

The green energy requirements and disclosures at issue in this case are commercial speech. The test being that speech is an advertisement, that the speech refers to a specific product, and that the speaker has an economic motivation. All three of those are met here. Despite that, Plaintiffs focus much of their argument on the fact that this is somehow some content-based speech restriction requiring utilization of strict scrutiny by this Court.

However, that's a misreading of the State of the commercial speech in the First Amendment. In fact, content-based restrictions on speech are permissible. The

*Sorrell* case quoted at length through the brief, it clearly states that this is the case.

Content-based restrictions on the free exercise of commercial speech has a subordinate position in First Amendment values and is therefore subject to the lower intermediate scrutiny of the *Central Hudson*. The *Central Hudson* factors weigh in favor of the State. While green power marketing -- while the green power marketing of its supply, its product, is lawful, it's misleading, and it's more likely to deceive the public than inform it. Legislators heard from customers who signed up for retail energy believing that they were getting 100 percent wind, 100 percent solar, only to find out the energy they were receiving was the exact same as BGE.

Customers were angry. They felt duped. They explained that none of this was explained to them, and that my power does not, in fact, come from wind energy.

Despite the claims that their marketing is truthful, Plaintiffs cannot escape this inconvenient fact. Plaintiffs and the third party -- excuse me -- according to Plaintiffs, this testimony is part of the bill file, is nothing more than cherrypicked anecdotes. But the Fourth Circuit has held the Government is not required to make an elaborate evidentiary showing in order to establish the misleading nature of regulated speech.

Likewise, Plaintiffs implied that these confused customers

should have known better or been more sophisticated.  This court noted in the *Federal Trade Commission v. Agora Financial, LLC*:  "The consumer protection laws are made to protect the trusting as well as the suspicious and the people have a right to make sure that fraudulent advertising traps are not laid to ensnare them."

The issue of whether or not the speech is misleading is dispositive in this case.  But if the Court were to conclude that the speech is protected, the remaining *Central Hudson* factors still weigh in favor of Maryland.  The State has a substantial interest in protecting its citizens from both misleading speech under its consumer protection police powers.  In this regard, the Supreme Court has observed that states possess a particularly strong interest in adapting, adopting, and enforcing rules of conduct designed to protect the public from harmful solicitation.

In addition to the State's general interest in protecting consumers related to commercial transactions, there are additional government interests here along with combating misleading advertisements and consumer confusion, and that's expanding renewable energy in Maryland and the PJM region.

Plaintiffs do not argue that the Commission, here for this motion, do not argue that the Commission lacks the power to set rates or impose the RPS standards overall.  Through the combination of SB1 and its increased yearly RPS standards,

Maryland is seeking to continue to grow its renewable energy base, obviously this can't happen overnight. This not only seeks to ameliorate climate change but also leads citizens to more healthy lives as we move away from fossil fuels.

The State seeks to incentivize the creation of further renewable energy in the PJM and Maryland through SB1 in permitting retail energy supplies who meet this green standard to increase both the share of renewables and to sell its product at a higher rate.

SB1 directly advances Maryland's interest in strong consumer protections. Plaintiffs seek to downplay the evidence before the General Assembly, but the Fourth Circuit has noted the Supreme Court permits governmental bodies to justify speech restrictions based on studies and anecdotal evidence. Before the legislators there were testimony that consumers were confused, and also there was the Abell report which explained many of the other issues related to this marketplace prior to the adoption of SB1.

Related to whether the speech restrictions are more extensive than necessary, Maryland has permitted significant leeway in the field of restricting commercial speech regulation and must find a reasonable fit to reach the desired objective. The REC case, which we cite in our brief, the Fourth Circuit upheld a West Virginia law regulating lawyers' advertisements which targets clients in litigation involving medication and

medical devices.  In so ruling, the State explained that the State's prohibition on advertising styled as consumer medical alerts plainly passed the test and noted that each prohibition targets a particularly misleading word or image.  And SB1 does the same in that it specifically prevents the use of misleading words that they are receiving 100 percent green energy, 100 percent renewable energy, 100 percent wind energy when, in fact, the customers are only receiving, prior to the enactment of this law, the same thing as if they had received BGE.

The Plaintiffs noted that the *Sorrell* case is helpful to the court here and demonstrate that whether or not strict scrutiny or the intermediate standard of *Central Hudson* is used, the outcome is the same.

However, *Sorrel* is not like this case as the government here, unlike either of the parties in the *Sorrell* case argues that the speech at issue is misleading.  In fact, both parties in that matter conceded that the speech was not misleading and continued on with the rest of the *Central Hudson* factors.

Relating to the mandatory disclosures.  Disclosures offered are purely factual and uncontroversial information.  In fact, the fact that RECs are one megawatt of power and can be sold separately on a market are nearly exactly the same as statements made in the materials provided that the Plaintiffs have on their website, Green Mountain specifically.

Whether or not this is controversial simply because the

overall matter is one of great public importance, a large political conversation, that does not automatically mean that the specific disclosure is controversial.  In fact, in the *Maryland Shall Issue* case, Anne Arundel County required store owners to provide a pamphlet related to suicide prevention and firearm use.

Obviously the court noted that firearm regulation and the gun debate in America is about as controversial as things can get.  Yet, they still affirmed -- they still found that that -- that that disclosure was not controversial because it focused on specific information, such as how to store a firearm and information about the warning signs of suicide.

Similarly, Plaintiffs already say that RECs are a social good.  Plaintiff's already say that RECs are a social good.  Here, the disclosure is the same.  Related to the case for the disclosure, the Plaintiffs asked the Court to emphasize *Kimberly-Clark*, the Government would actually say the same because it's not applicable here.  That's an applied challenge, this is a facial challenge, which has a much higher bar.  Specifically to the facts, this case related to flushable wipes and whether or not wipes are actually flushable.  It was an as-applied challenge because this plaintiff, in this case, specifically designed their wipes to be flushable, in their opinion, so there was a factual dispute.  And the court found that there wasn't -- it was a nonfactual -- the court found

JA224

that the information was not factual so the *Zauderer* test did not apply.

Finally, two other points, Your Honor, not mentioned by Plaintiffs were their contention that Article 40 is also a means by which they can find -- that this Court can find this law unconstitutional. However, under the Eleventh Amendment, state's immunity from suit limits this Court's jurisdiction in that regard.

Plaintiffs' case cited from the Court of Appeals from before the end of World War II does nothing to change that. In fact, the Fourth Circuit case that's much more recent, *Lee Thompson* that was cited, that's a matter in which the school board, the defendant in that matter, waived it's Eleventh Amendment immunity. Not something that's going on here, Your Honor.

Finally, on severability. This is a broad-based statute seeking to protect consumers through numerous ways. There's no connection here between the end of variable rate contracts, the end of commission-based sales, and the First Amendment issues directly before this Court.

Additionally, it's important, the focus should be on that under Maryland law there's a strong presumption that the portion -- there's a strong presumption of severability.

In fact, under Maryland law, except as otherwise provided by the statute, the provisions of all statutes enacted after

July 1, 1973, are severable. That statute, it's General Provision 1-201 -- sorry, 210. The finding by a court that a part of a statute is unconstitutional or void does not affect the validity of the remaining portion of the statute, unless the court finds that the remaining valid provisions alone are incomplete and incapable of being executed in accordance with the legislative intent.

Plaintiffs cannot argue that the ending of variable contracts and other portions have anything to do with the green power requirements, the disclosure requirements, or the two-tiered rate set up, Your Honor.

Finally, just in conclusion, this is a -- Plaintiffs are asking for extraordinary relief. Facial challenge makes this a high bar. Plaintiffs have not shown that the *Central Hudson* factors weigh in their favor and principally because they're not likely to succeed on their merits their motion should be denied.

I welcome any questions, Your Honor.

**THE COURT:** I do not have questions, Mr. Handley. Thank you.

Mr. Johnson, rebuttal.

**MR. GLYNN:** Your Honor.

**THE COURT:** Yes.

**MR. GLYNN:** Would you permit me to speak a few words before Plaintiffs go?

THE COURT: Is there any objection?

MR. JOHNSON: No, Your Honor.

MR. GLYNN: Thank you very much.

Colin Glynn on behalf of the Maryland Public Service Commission. Your Honor, there were a few points that were raised by Plaintiffs' counsel that I wanted to address quickly, questions that they asked.

The first question is why is Maryland's PJM only in adjacent states in certain circumstances renewable portfolio standard nondeceptively green? And the clear answer to that, which I think we've tried to explain as clearly as we could in our brief, is that if a customer gets RPS RECs effectively from within the PJM or a neighboring state where that power is transmitted into Maryland or the PJM region, they know that that energy purchase is related to the power they're actually getting. That these energy networks are somewhat connected a little bit at the margins between regions. But for the most part, the regions standalone.

If a PJM REC is attached to a power sale, that customer can say, yes, I don't know -- as we deal with in the disclosures -- I don't know exactly which electron is moving where, but I know that my money is going to support the general pool from which my power is coming. Whereas, a California or a Texas REC, that's someone else's power, that might relate to some other market where we don't really know necessarily what's

going on. But at least the customer knows.

And that cuts to the misleading issue at the center of SB1 as far as the First Amendment restrictions here. That that customer knows where the money is going. And if they're a sophisticated customer, they know that that money is going to incentivize the further development of cleaning up the power that they're going to be drawing on.

So as far as the customer is concerned, we're lining up their understanding with what they basically would expect is going to happen. That's what SB1 is trying to do.

And going to the question of fit that Plaintiffs raise. They relatedly ask, does the law SB1 protect consumers from confusion about where REC comes from?

Now, in this case we have two issues. We have the rules about the definition of "green power" and the marketing of green power, and we have separately have the disclosure requirements. That separate question the Plaintiff asked about confusion is for the most part addressed in the disclosure requirements so that customers understand this is what a REC is, this is what it means what you're buying. Because the Commission is now responsible for making sure the customers understand that, which previously they may not have been. This is new authority that is driving greater consumer understanding and limiting consumer confusion.

Now, there is also the question of is local energy better

for climate change, which is something that the Plaintiffs want to frame this issue as. The honest answer here is, beyond the renewable portfolio standard issues that I just raised, there's nothing that prevents Plaintiffs from selling their products, a product that -- in terms of what we talk about, it's a product that meets Maryland's renewable portfolio standard; but then instead of meeting necessarily potentially the higher green power standard, might mix in RECs from another state. They can sell that product, no problem, continuing under SB1. They can accurately describe that product and say, we are selling you RPS renewable power -- not RPS renewable power -- but RPS power that meets the RPS requirements; and we are also bundling with that these out-of-state RECs and you might find environmental benefits from those RECs. There's nothing in SB1 that prevents them from doing that.

What SB1 targets is a small, as it relates to the marketing question, a small handful of terms that the legislature determined were especially prone to confusion. Terms like "green" and "100 percent wind." Given that there's already concerns about what it means to be a REC, terms like this we might have some lay understanding, technical people have a technical understanding, customers have whatever understanding they have. The hope is to reduce the disconnect there but only as to a small handful of terms which are really marketing terms.

They are absolutely still permitted to accurately describe their products. Now, there gets into, which I'm not going to get into much, the fact that there are two parts to this statute that are being questioned: One being the speech, but then also the two-tiered stage of the marketplace.

We're here talking about the speech but it's hard to really disconnect the two in that sense of why the one is set up the way it is. But just for purposes of the speech, this cleans that up and that is the goal of the statute.

Now, when we talk about exactly who it's protecting, if we think about a regular power customer, a regular power customer says, I'm going to buy power on the open market and it's going to compete with standard-offered service power, utility power.

Now, if a supplier showed up and said, we're going to sell you renewable energy power but we're only going to meet the regular-power standards, then the statute says, well, that's deceptive, you're not doing any better for purposes of what this customer's really looking for than the regular standard-offered service power. So you can't use those buzzwords, but you can accurately describe what you're doing with more precision.

You just can't buzzword your way past this customer and then try and build additional market power through deception, which really is the concern of leading down this race to the bottom of all the suppliers are overmarketing products and

confusing customers. SB1 brings that in, but it still allows these products to sell themselves accurately.

Lastly I want to say, as it relates to the statutory disclosure compared to the regulations that the Commission is working on, those regulations are pending.

Now, Plaintiffs didn't previously, I guess, I'm not sure, address the issue of the timing on this, but they're asking for a full enjoiner of this statute. They haven't really addressed the question of whether a very temporary enjoiner would be appropriate if this Court concluded that there was a problem with the specific disclosure requirements. The Commission is in the process of developing new regulations but a permanent enjoiner of those regulations would seem to be massively more excessive than would be called for given that the Commission does have regulations, which Plaintiffs have not disputed, would address their concerns as to that specific point.

So with that being said, I will also close by saying the Maryland Public Service Commission has not had an opportunity to apply the disputed terms of SB1. We are in the process of figuring that out. This is, again, a facial challenge, as Mr. Handley pointed out. But we believe it can be done constitutionally. And I ask that you deny Plaintiff's motion for a preliminary injunction. I'm open to any questions the court might have.

**THE COURT:** I do not have questions, Mr. Glynn.

Mr. Johnson.

**MR. GLYNN:** Thank you very much.

**MR. JOHNSON:** Thank you very much, Your Honor. A few points in rebuttal.

First, you know, points of agreement with what the counsel for the Attorney General said, and I'm paraphrasing -- I tried to write down the words -- but we heard in the presentation as to what this -- how this process worked, what's it designed to do. Agreement that RECs are, quote, "The vehicle for how these goals, the environmental goals, are met."

What I didn't hear a lot of in that presentation was exactly how it was that this statute solves the problem of the fit between what problems are perceived and are presented here in the record and what the Government ultimately did in SB1.

So there was a lot of discussion about a hundred percent wind or a hundred percent clean energy claims. Well, again, Your Honor, you can make a hundred percent clean energy claim under this statute so long as you have a mix of RECs that includes at least 51 percent of those RECs that are eligible for the Maryland renewable portfolio standard.

You can even have a product mix, for example, Your Honor, 51 percent Maryland -- PJM-eligible RECs and 49 percent what I'll call national RECs. You could still then make all of the same green marketing claims, 100 percent wind, 100 percent renewable power. It does not change the fact that whether

under the national RECs or whether under SB1 you're ultimately relying upon RECs.

The other way my friend put it is that consumers thought, didn't realize they were receiving power from the same grid as my neighbor. I'm getting the same as BGE. Well, again, that's still true in terms of ultimate kind of last-mile power source that you're receiving, the energy that you're receiving. Whether you're receiving that from the Maryland portfolio standard or whether you're receiving that from ineligible RECs, it's just that that power is backed by a different basket of RECs.

So that is the key evidence the Government's putting in front of the court. And the solution that they have in PJ1 does not have a fit, does not fit the problems that they present in the record.

For the first time at argument this morning we heard a different rationale for the statute. This is not anywhere in their briefs, except it is noted in a footnote in their brief describe why it is we define RECs in this way.

What counsel said was quote -- again, I'm paraphrasing -- "Expanding renewable energy in the PJM region." Now, I think that's a welcome admission, Your Honor. I think that's right. I think there is an economic incentive behind that, that they are encouraging, they want to encourage certain local renewable resources.

Now, Your Honor, that is not in their brief.  They do not say in their brief that that's a substantial State interest. I'm not aware of any case law that would say a purely economic interest like that on behalf of the State is sufficient to justify suppression of speech.  I mean, that's why they framed this throughout their brief as a consumer deception matter. That's how they framed the case.

If you're talking about not consumer deception but kind of a purely economic interest, then there may be legitimate ways for them to prefer those REC sources, as I said; but banning speech is not one of them.

Also, it's not supported by the evidence in the record, Your Honor.

**THE COURT:**  What's the "it" to which you're referring?

**MR. JOHNSON:**  Oh, I'm sorry, Your Honor.  Justifying the marketing restrictions in this law with the economic interest that we heard earlier today, which is what they said, "expanding renewable energy in the PJM region."

So their evidence, Your Honor, supports that consumers may have been misled about the use of RECs in their products.

We also heard a lot today about price transparency and the fact that some consumers didn't understand the terms of the contracts that they were purchasing.  That has nothing to do with the marketing restriction that was adopted in SB1, Your Honor.  And certainly none of that evidence suggests that what

consumers wanted or what they thought -- what they thought was happening but wasn't happening was that Maryland wanted to expand or incentivize renewable energy resources in the PJM region. That's just not a substantial government interest.

Now, we heard some additional detail and color from counsel for the PSC members today. I don't think that they are here able to sort of supplement what the State is telling you is its own, the interests --

**THE COURT:** But he has spoken over no objection. So am I to disregard what Mr. Glynn said?

**MR. JOHNSON:** Oh, you don't have to disregard it, Your Honor. But in terms of the weight that it gives. The Attorney General is here telling you what the State legislature had in mind when it enacted the law.

And also, Your Honor, I think ordinary waiver principles apply. So we heard today for the first time a reason why consumers may not have been deceived by PJM-specific RECs. There is nothing in their briefs, or in the supporting evidence, that suggest what we thought we were getting was REC-sourced from this 13-state region, and that we think that in some attenuated sense as long as we're getting a REC from Chicago we think that somehow makes it more likely that that energy is being delivered directly into our home.

I think what those testimonials I think mean is that they thought a wind farm was connected to the house. They didn't

understand the concept of a REC.

I don't think it meant that we only want power from this larger grid. And, you know, as counsel admitted, it's not the case that the PJM is an island. The PJM is an organizational unit that is set up around the country so that people can manage energy within that geographical unit, make sure there's sufficient capacity, manage congestion and things like that. It is not an island onto itself. The entire eastern seaboard is connected and on some level the entire nation is connected. So it's not the case that Marylanders are only getting energy from the PJM region.

And, again, this is not something -- other than what counsel represented today, this is not something that is presented in either of their briefs or in the supporting evidence.

Now, I also thought it was interesting, I mean, what PSC counsel, PSC's members' counsel said about our clients being able to continue to advertise the environmental benefits of our products. That's not how I read the statute at all, Your Honor. And I don't think that is a colorable reading of the statute.

So just looking at what is prohibited. It's not just, you know, buzzwords, right. It is an entire panoply of terms: Clean, green, ecofriendly, environmentally friendly or responsible, carbon-free, renewable, 100 percent renewable, 100

percent wind, 100 percent hydro, 100 percent solar, 100 percent emission-free or similar claims.

So it's unclear what similar claims is, but the entire purpose of this is surely to prevent my clients from making environmental benefit claims related to their existing products.

I mean, we're hearing for the first time that maybe there's some way they could do that. It's prohibiting us from using the most natural words in our materials to describe our products.

Keep in mind, Your Honor, the product itself, the product itself is called the renewable energy certificate or renewable energy credit. The statute bans the term "renewable."

My client's names, it's Green Mountain, it's Green Choice. All of this is built into how our clients set ourselves out, represent ourselves. Our websites have these claims. Our Frequently Asked Questions have these claims.

We're completely at the mercy of the PSC to determine whether it is that we're in compliant with this marketing prohibition. There's no definition of marketing in the statute. Arguably, anything we do to hold ourselves out to the public, because ultimately we're a consumer-facing business, we want consumers to know about our products, to purchase our products in order to incentivize clean energy production. So it chills a substantial amount of speech. It's not clear

JA237

exactly where the lines are.

Also, there was an important concession when counsel for PSC said that the problem with consumer confusion is mostly addressed in the disclosure requirement. And we're aligned there, Your Honor. We agree that there are tailored disclosure requirements that could be constitutional that would help to ameliorate the consumer deception.

But just like in *Kimberly-Clark* and similar cases, you can't then go on and say that clients -- that my clients cannot make any other claims concerning clean or renewable energy. That restricts much more speech than is necessary in light of what the evidence shows is the concern.

Getting back to what I said about the record, Your Honor. I want to be clear, I mean, we're not here saying there might not be problems with this market. Most of what they have in the reports that they present talk about price transparency. They talk about, you know, potential and scrupulous practices of particular actors. Again, there might be ways to address that without limiting speech. But those price transparency concerns have no bearing on how my clients represent themselves, hold themselves out to the public in terms of green marketing.

In fact, if you look at the Abell report, if you look at the other nonprofit report that's in the record, what they suggest is that there needs to be more transparency around

telling consumers that clients -- that retail energy providers are relying on RECs and where the RECs are coming from. They don't come in and say there simply shouldn't be any green marketing or that RECs that are sourced outside of the PJM somehow don't have environmental benefits or environmental attributes.

On severability, Your Honor. A couple of quick points. First, I think, you know, look at what counsel said, completely agree, there's no dispute here in terms of the green marketing provisions being inextricably intertwined with I think what he called, quote, "the two-tiered rate set up." I think we're in agreement with that, Your Honor.

It seems like the only disagreement here is whether severability or inseverability would apply to a handful of other provisions, the two I heard both today and in the brief, the licensing requirements and the ban on variable rate contracts.

Again, Your Honor, I don't think it should be this Court that slices and dices the statute, but I do think it's important to note there's a lot of agreement here in terms of what, you know, § 707, which is the green marketing provisions and has this structure, I think everyone agrees that those provisions are inseverable.

There was some discussion of, you know, some discussion on the standard of a facial challenge. I think we're in

alignment. In their initial brief they said it was that there have to be no circumstances in which the statute is constitutional. We explained that it really just has to be a substantial number of circumstances in the First Amendment context. I understood that to be what the Government argued here.

And, Your Honor, there really isn't any daylight between how this statute applies to us with respect to green marketing and how it would apply to other people in the ecosystem. I don't think they're making any argument like that.

I think just with respect to our clients, we've established a substantial number of cases in which the statute would be unconstitutional but it applies the same to everyone.

It basically prohibits anyone who is relying on a REC sourced outside the PJM to not be able to make these claims. I don't see it. You know, if that's unconstitutional to us, I think it's unconstitutional as to all people within this ecosystem.

So, Your Honor, I mean, those are the points I wanted to make. We're asking for the statute to be preliminarily enjoined.

Just maybe a word on the timing, Your Honor. The reason why we asked for a decision by December 1st had to do with the fact that a lot of these contracts are on a 30-day renewable period for consumers. We're coming up on a time when we're

going to need to start notifying consumers as to whether their contracts are going to have to be canceled, moved to the incumbent utility. We're going to have to be changing our marketing materials and potentially pulling people out of the Maryland market for those members who are not going to be able to participate moving forward.

So we certainly appreciate the Court's time, but we wanted to alert the Court as to kind of the real, practical consequences that we are going to have to face to come into compliance by January 1st.

So if the Court has no further questions, those are the points.

THE COURT: I do not have questions. I'm going to take a few minutes of a recess. Why don't we just say 15 minutes and we'll come back. Thank you.

MR. JOHNSON: Thank you, Your Honor.

THE CLERK: All rise. This Honorable Court now stands in recess.

(A recess was taken from 11:07 a.m. to 11:36 a.m.)

THE COURT: I am prepared to issue an oral ruling that is going to take me some time to issue so I just give you that warning in advance. And with that, we'll get to it.

First of all, I also want to thank the parties for their very thorough papers which were helpful to me in understanding something that is esoteric and new to me so I appreciate that.

This Court has the benefit of the Supreme Court of Maryland's recent decision of the history of the electricity supply market in Maryland stating, and I'm quoting directly from *Matter of Smart Energy Holdings*:

"In 1999, the electricity supply market in Maryland underwent a sea change.  With the enactment of the Electric Customer Choice and Competition Act of 1999, called the Choice Act, the General Assembly deregulated the electric industry in Maryland.  Prior to the enactment of the Choice Act, electric energy supply and electric energy distribution were bundled together and were exclusively provided by one electric utility company to customers within the distribution territory for that company.  The legislative purposes of the Choice Act included establishing 'customer choice of electricity supply' and creating 'competitive retail electricity supply and electricity services markets.' In furtherance of these goals, the Choice Act requires that the component parts of the electric service be unbundled.  Although distribution would remain monopolized, the legislature intended that electricity supply rates would be largely established by the open market.

Since the enactment of the Choice Act, a Maryland consumer may shop on the open market for a third-party retail energy supplier.  For example, if a residential customer, or consumer rather, who resides in a Baltimore Gas and Electric Company distribution territory wishes to purchase electricity from a

third-party retailer energy supplier, the customer may do so. In such a case, the consumer will receive a monthly invoice from BGE, as the utility company responsible for distribution services in the territory, that includes the electricity rate charged by the retail electricity supplier.

Recognizing that not all Maryland consumers will shop for their electricity supplier, the Choice Act also requires electric utility companies to provide a 'backstop' or 'backstop electricity supply' known as the 'standard-offer service' or 'SOS' for consumers who do not shop for their electricity supply on the open market. In other words, although the consumer may select an electricity supplier that is different from the consumer's local utility company providing electricity distribution service, the consumer is not required to choose an electricity supplier and may pay the standard offer service to the distribution company.

As a condition to selling electricity in Maryland, the Choice Act requires that an electricity supplier hold a license that's issued by the Maryland Public Service Commission. The General Assembly has granted significant regulatory authority and oversight to the Commission to ensure that electricity suppliers who sell electricity in Maryland comply with the applicable laws designed to protect consumers, including the State's consumer protection laws."

That again is *Matter of Smart Energy Holdings, LLC*, at 486

JA243

Md. 502. The pincite is page 515 to 16.

Accordingly, the Choice Act allows customers to purchase electricity either from their local utility, meaning the Standard Offer Service, like BGE or PEPCO, or third-party retail electricity suppliers.

Because electricity cannot be differentiated once it enters the PJM grid, the federally designated interstate regional power grid, which includes Maryland and other states, Maryland requires electricity suppliers to pair electricity from renewable sources with matching Renewable Energy Certificates or Credits, or RECs.

As the Second Circuit has recognized, because RECs are "inventions of state property law," "different states define RECs or RECs differently, focusing on various attributes which they deem to be especially relevant."

Under Maryland law, a REC is defined as, quote, "credit equal to the generation attributes of one megawatt-hour of electricity that is derived from a Tier 1 renewable source or Tier 2 renewable source that is located:"

1) in the PJM region; 2) outside the PJM region but in a control area that is adjacent to the PJM region if the electricity is delivered into the PJM region; or 3) on the outer continental shelf of the Atlantic Ocean in an area that (i) the United States Department of the Interior designates for leasing after coordination and consultation with the state in

accordance with the Energy Policy Act of 2005, and (ii) is between 10 and 80 miles off the coast of the state.

Maryland law further provides that the Public Service Commission implements a renewable energy portfolio standard RPS, that applies to all retail electricity sales in Maryland. The RPS sets a minimum requirement for what share of an electricity supplier's retail electricity supply must come from eligible renewable sources. The 2025 rates are 35.5 percent from Tier 1 renewable sources, for example solar and wind; and 2.5 percent from Tier 2 renewable sources, for example, hydroelectric power other than pump storage generation.

As Defendants explain, Maryland law encourages the development of new RPS eligible renewable electricity generation within the PJM region by increasing, on an annual basis, the minimum percentage of electricity supply that must come from renewable generation.

Senate Bill 1, SB1, sponsors introduced it to address issues under then existing Maryland law. SB1 sponsor Senator Augustine described the bill as an effort to address concerns about Maryland consumers being, quote, "taken advantage of" for years, and stated that the "overlying principle" of the bill was to prevent gouging of Maryland citizens.

Similarly, Delegate Crosby, the sponsor of the cross-file House bill, further described the bill as "about consumer protection," and states that the bill, quote, "sets up

guardrails for the retail energy supply segment of our energy market," end quoting.

The Governor signed SB1 into on May 9, 2024, and it took effect on July 1, 2024. However, the challenged provisions at issue here apply prospectively starting January 1, 2025.

SB1 creates a new two-tiered marketplace for retail electricity supply separate from established utilities like BGE and PEPCO, wherein one tier is the standard market for electric energy that comparable to the Standard Offer Service, known as regular power, and the other tier is a market for energy generated as "Green Power." The two tiers are subject to different price restrictions for services with suppliers of regular power barred from exceeding the "12-month average of the electric company's Standard Offer Service rate in the electric company's service territory as of the date of agreement with the customer," and with suppliers of Green Power being permitted to exceed that, subject to certain procedures and approval by the Commission.

At issue here, SB1 imposes certain requirements on retail electricity suppliers marketing in the "Green Power" tier. Plaintiffs, including competitive energy providers in Maryland who market residential energy-backed RECs, argue that SB1 infringes on their First Amendment rights by adopting an "environmental speech code" that prevents them from "truthfully and accurately marketing their renewable energy product to

Maryland consumers" based on speech prohibitions and required disclosures set forth in SB1.

SB1 prohibits a retail electricity supplier from supplying electricity to residential retail electric customers and marketing such electricity as "green power," defined as "energy sources or renewable energy credits that are marketed as clean, green, ecofriendly, environmentally friendly or responsible, carbon-free, 100 percent renewable, 100 percent wind, 100 percent hydro, 100 percent solar, 100 percent emission-free, or similar claims" unless the following conditions are met:

1) the percentage of the electricity being offered or the equivalent number of renewable energy credits associated with the electricity being marketed as green power, that is eligible for inclusion in meeting the renewable energy portfolio standards equals or exceeds the greater of 51 percent; or 1 percent higher than the renewable energy portfolio standard for the year the electricity is provided to the customer.

2) the commission approves the price of the electricity being marketed as green power in accordance with the statute setting of price provisions.

And 3) the electricity supplier submits an application to the Commission that: Describes the electricity being marketed as green power, including the green power source and percentage of the electricity that is green power; describes how the green power complies with state law and regulations; and includes any

JA247

other information the commission considers necessary.

These restrictions do not apply to the Department of General Services when it sells energy under § 7 to 704.4 or 7-704.4 of that subtitle, a community choice aggregator under § 7-510.3 of that title, or an electricity supplier supplying electricity to commercial retail electric customers.

SB1 further requires that retail electricity suppliers marketing green power to residential retail electric customers include either the following disclosure "or a similar disclosure approved by the Commission."

Quote, "We deliver energy through the purchase of Renewable Energy Credits. A REC represents the social good that accompanies one-megawatt hour of renewable electricity generation. RECs may be sold separately from renewable electricity itself. Renewable electricity and RECs may be sold to different entities. The purchase of a REC does not indicate that a renewable electricity itself has been purchased by the entity that purchased the REC."

It similarly requires they include "plain language" disclosure explaining the following:

"1) what the customer will actually be paying for when the customer purchases green power from the electricity supplier; 2) how the electricity that the customer has purchased is generated; 3) how the green power will benefit the environment; 4) the percentage of electricity that would be provided by the

electricity supplier that is eligible for inclusion in meeting the RPS; and 5) the state in which the electricity was generated."

As we know, Plaintiffs seek a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff or plaintiffs here are entitled to such relief.

As such, it should be granted only sparingly and in limited circumstances. This principle reflects the reality that courts are more likely to make accurate decisions after the development of a complete factual record during the litigation.

Accordingly, to justify application of a preliminary injunction, "a plaintiff must establish that: 1) they are likely to succeed on the merits; 2) they are likely to suffer irreparable harm absent the preliminary relief; 3) that the balance of equities favors the requested injunctive relief; and 4) that relief is in the public interest."

These are sometimes called the *Winter* factors pursuant to the case that they come out of *Winter v. Natural Resources*. That's out of the U.S. Supreme Court, 555 U.S. 7 from 2008.

Plaintiffs bear the burden of establishing that each of these factors supports granting the injunction. The court, therefore, need not address all four factors if one or more

factors is not satisfied. Because preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigger of usual evidentiary standards, district courts may look to and indeed in appropriate circumstances rely on hearsay and other inadmissible evidence when deciding whether a preliminary injunction is warranted.

Plaintiffs contend they will likely succeed in showing that SB1 violates their First Amendment rights as well as their rights under Article 40 of the Maryland Declaration of Rights, which is of course Maryland's constitutional counterpart to the First Amendment.

Because Article 40 is generally read *in pari materia* with the First Amendment, the court need not consider them separately. As such, to the extent Defendants assert immunity arguments as to Plaintiffs' Article 40 claims only, they're not dispositive on the court's ruling on the PI motion. They're better addressed by way of a Rule 12 motion.

The First Amendment applicable to the states through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech. The First Amendment "has given rise to a complex array of legal protections for free expression, which the courts have flexibly applied in a variety of circumstances."

As the Fourth Circuit has explained in *Fusaro v. Cogan*, those precedents establish that the First Amendment protects

speech along a spectrum, so that laws that impinge upon speech receive different levels of judicial scrutiny depending on the type of regulation and the justifications and purposes underlying it.

At one end of the applicable spectrum, regulations that discriminate against speech based on its content are presumptively invalid and are usually subject to strict scrutiny. That is, such regulations must be necessary to serve a compelling state interest and narrowly drawn to achieve that end. Further down the spectrum, areas traditionally subject to government regulations, such as commercial speech and professional conduct, typically receive a lower level of review. Within that spectrum, the federal courts have employed various multifactor tests designed to achieve an intermediate level of review that can be sensibly applied in a range of contexts.

The First Amendment thus similarly protects commercial speech from unwarranted governmental regulation, however, the Constitution accords a lesser protection to commercial speech than to other constitutionally guaranteed expression, and the protection available for particular commercial expression turns on the nature both of the expression and of the Governmental interests served by its regulation.

Thus, when confronted with a restriction on commercial speech, the court conducts a four-part intermediate scrutiny

analysis distinct from the strict scrutiny analysis otherwise afforded to content-based restrictions.

This four-part analysis set forth in *Central Hudson* is as follows:

"For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next we ask whether the asserted governmental interest is substantial.  If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted and whether it is not more extensive than is necessary to serve that interest."

The Fourth Circuit's recent discussion of commercial speech in *Maryland Shall Issue* is instructive on commercial speech:

"By its plain meaning, commercial speech is speech specifically related to commercial transactions.  Thus, to be sure, speech that proposes a commercial transaction is commercial.  But speech is also commercial if it's related solely to the economic interests of the speaker and its audience.  And speech connected with the sale of a good or a service, promoting the product or service, explaining it, or giving warnings about it is commercial.  It serves either the interest of the seller or assists consumers and furthers the societal interest.  Thus, while commercial speech includes speech proposing a commercial transaction, it also includes the

advertising and promotion of products and services, assembly, or user instructions, information about the products or service, disclaimers, and warnings on health and safety. As Justice Stevens observed in *Rubin v. Coors Brewing Company*, commercial speech includes the Surgeon General's warning labels on cigarettes, labeling requirements for food products, labeling requirements for drugs products, and registration statements for securities."

Courts have further gleaned three factors to consider in deciding whether speech is commercial: 1) is the speech an advertisement; 2) does the speech refer to a specific product or service; and 3) does the speaker have an economic motivation for the speech.

The speech at issue here, that is speech promoting a product or service and explaining it, is plainly commercial pursuant to the First Amendment jurisprudence. All three factors set forth by the Fourth Circuit are satisfied. The speech concerns marketing of green power to consumers, specifically the products or services offered by the retail electricity suppliers that most certainly have an economic motivation for the speech.

Plaintiffs' emphasis on the U.S. Supreme Court's decision in *Sorrell* does not change this analysis. As the Fourth Circuit has aptly explained in *Recht v. Morrisy*: "Begin with *Sorrell*, which stated that 'in the ordinary case it is all but

dispositive to conclude that a law is content-based and, in practice, viewpoint discriminatory.' Yet this line must be placed within the larger context.  To start, the State in *Sorrell*, unlike West Virginia here, did not contend that the provision challenged would prevent false or misleading speech. But even more fundamentally*, Sorrell* itself applied the *Central Hudson* framework to a concededly content-based law.  Instead of examining whether the law was the least restrictive means to further a compelling government interest, which would have been classic strict scrutiny language, the Court required the State to show that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest.  It is difficult to imagine that the Supreme Court in consciously relying on *Central Hudson* was actually overruling it.  Thus, the Supreme Court in *Sorrell* applied intermediate scrutiny in finding the law at issue unconstitutional there."

Plaintiffs aver that the speech at issue is not merely commercial because, quote, "it does more than propose a commercial transaction," end quote, citing *U.S. v. United Foods*, meaning it prevents these companies from expressing their views.  This position is not compelling.  The speech at issue unequivocally relates to the promotion of products or services to Maryland consumers.  Moreover, if this argument carried the significance Plaintiffs contend, it would

effectively do away with the intermediate scrutiny as the framework for evaluation of commercial speech restrictions. It would be swallowed hole because any time a state-imposed commercial speech restriction were challenged in order to avail itself of the rigors of strict scrutiny, a challenger need only contend that the restricted speech also affects or impairs its ability to. Nothing in the law supports that proposition here. That Plaintiffs' ability to express their views related to the promotion of their products or services to Maryland consumers may be affected does not transform the speech at issue to noncommercial speech within the meaning of *Central Hudson* and its progeny. The court will therefore conform its analysis to the Plaintiffs' First Amendment claims to the *Central Hudson* standard applicable to claims arising from commercial speech.

Having established the applicable First Amendment protection afforded the speech at issue, I'm going to now first consider whether SB1 considers misleading commercial speech. Unquestionably, the state may impose appropriate restrictions on particular content or methods of advertising that are either inherently or in fact misleading. That again is the Fourth Circuit *Morrisey* decision. This analysis occurs by looking at evidence to support this proposition. However, the something has also cautioned against an absolute prohibition on certain types of potentially misleading information if the information may also or also may be presented in a way that is not

deceptive. The court does not find at this stage that the speech at issue is itself inherently or in fact misleading. Rather, as Defendants' acknowledge, quote, "the commercial speech at issue in SB1 is part of lawful activity, but it is the targeted commercial speech that is misleading."

The court is not persuaded that Plaintiffs' marketing is itself inherently or in fact misleading, but rather that such marketing communications may be misleading based on the context. Such a determination would be a factual and context-specific. The court is persuaded at this time that the speech at issue is entitled to the requisite protection under the First Amendment.

The court next considers whether the government interest served by SB1 is substantial. As explained before, the Supreme Court has observed that when experience has proved that the particular content or method of advertising is subject to abuse states may impose appropriate restrictions.

The Supreme Court has repeatedly identified a strong state interest in protecting consumers and regulating commercial transactions. This Court, too, has previously identified the Supreme Court's long history of recognizing a State's interest in protecting consumers and regulating commercial transactions.

In reply, Plaintiffs aver that the case law cited by Defendants does not use the word "substantial" to describe the State's interest in consumer protection. Plaintiffs'

contention does not change the court's assessment of the cited law, specifically because the Supreme Court described the State's interest in consumer protection as an important State interest in the context of analyzing a First Amendment commercial speech issue in *Ohio State Bar Association* and in *Edenfield v. Fane*. The court described the State's interest in ensuring the accuracy of commercial information in the marketplace as substantial.

Here, the sponsors' statements regarding SB1 and the cross-filed House Bill identified its purpose as protecting consumers from misleading information and price gouging by retail electricity suppliers. This is further supported by, and what the court will discuss in greater length later, the State's exhibits which detail testimony offered in support of SB1. These are ECF Nos. 14-4, 14-5, and 14-6. And the Abell Foundation report analyzing Maryland's third-party electricity supply market. That's at ECF-14-3. All of these provide support for Defendants' contention that the restrictions in SB1 serve Maryland's interest in protecting consumers from misleading information related to the marketing of green power.

The same is also true for the required, quote, "mix" of RECs that works to communicate to consumers an understanding of the source of the RECs at issue in the green power market.

In view of the case law and the legislative history of SB1, I'm persuaded that the State has a substantial

governmental interest in protecting consumers and regulating commercial transactions.

Next we'll consider whether SB1 directly advances the State's identified substantial interest. "A governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it cites are real and that its restriction will, in fact, alleviate them to a material degree." Again, that's the *Edenfield* case, 507 U.S. Supreme Court, 761.

The regulation may not be sustained if it provides only ineffective or remote support for the government's purpose.

Moreover, the direct advancement prong is not satisfied by mere speculation or conjecture. Instead, the State must demonstrate that the harms it recites are real, and that its restriction will in fact alleviate them to a material degree.

The State need not, however, provide empirical data accompanied by a surfeit of background information. Instead, it may rely upon reference to studies and anecdotes pertaining to different locales altogether or even based solely on history, consensus, and simply common sense.

Defendants attach a number of exhibits in support of their argument that the relevant provisions of SB1 directly advance the State's substantial interest in consumer protection. As I mentioned earlier, a report from the Abell Foundation entitled "Maryland Dysfunctional Residential Third-Party Energy Supply

Market:  An Assessment of Costs and Policies" examined whether retail competition has benefited residential consumers.

The report notes that between 2014 and 2017, quote, "Maryland households have been paying tens of millions of dollars more per year in aggregate to third-party electricity suppliers, about 225 million more in all than if they had stayed with their utility supply offer," end quote.  And it concluded that the third-party energy supplier market, quote, "has become dysfunctional," end quote, and was not benefiting all consumer classes.

Defendants also attached testimony offered in support of SB1, including the Maryland Energy Advocates Coalition, a coalition of nonprofits, foundations, partners, and volunteers, in which it testified that SB1, quote, "reforms many of the issues and injustices happening," end quote, in the retail electricity marketplace prior to SB1's enacting.

Specifically, that testimony read:  "In addition to the low-income targeting, eco-buyers are wooed into retail energy with promises of clean electricity.  Retail energy 'green power' offers are based on voluntary Renewable Energy Certificates.  Maryland currently has no standards or regulations regarding 'green offers' and Maryland has no visibility into what types of RECs suppliers purchase on behalf of their clients.  Research suggests that most RECs are unbundled RECs from Texas wind farms.  These RECs are very low

cost, after broker fees too, and offer no environmental benefits for Maryland.

Eco-buyers assume they're paying more for actual wind and clean energy.  Maryland's eco-buyer retail energy segment is at least 25 percent of the retail energy base.  In 2022, each 'green offer' account paid on average $725 more for electricity compared to regulated rated.  Retail energy 'green offer' premiums are significant.  In 2022, the average retail 'green offer' account paid for an additional eight RECs, that's about 8,000-kilowatt hours, above the 25 percent RPS requirement.  At an average of $725 premium, each retail supplier 'green offer' RECs cost consumers an extra $90.  Voluntary RECs sell between $2 and $10 each."

MEAC testified in support of SB1 contending that it would address many issues, many such issues, by setting rate guardrails, quote, "ensuring Maryland eco-buyers can more readily know what they're buying," end quote, and increasing oversight by the Commission.

Specifically, on Maryland's eco-buyers, MAEC offered as follows:  "SB1 requires retail suppliers to purchase PJM and/or PJM delivered generation voluntary RECs above the RPS levels. SB1 requires suppliers to support REC types, location, and generator.  Lastly, SB1 requires clear consumer disclosure on all marketing.  If passed, these changes will ensure Maryland's eco-buyers can more readily know what they're buying and retail

suppliers will be required to present to the Commission the RECs or forms of green power that support their 'green power' offers in order to have the rate approved by the Commission."

Finally, Defendants also include additional individual testimony offered in support of SB1 by Maryland customers who paid from electricity from a retail electricity supplier based on their personal commitments to "green power."  A Silver Spring, Maryland resident detailed how out of a concern for the threat of climate change she was willing to pay a premium for electricity from renewable sources.  However, she stated that she had been misled, those are her words, by "green power" marketing.

Quote, "I'm deeply concerned about the ever-more urgent threat climate change poses to our world.  That's why my husband and I have been willing for several years to pay a premium to have our electricity come from renewable sources. That's why we chose WGL Energy's CleanSteps Wind Power for our home in Silver Spring and cabin in Myersville, Maryland.  We were assured by the company's literature that, and I quote, 'CleanSteps Wind Power covers 100 percent of your electricity usage, and is composed of 100 percent wind energy,' end quote. We've been paying a premium of more than a thousand dollars each year to WGL for what we believed to be wind power.  We learned last year that the company's claims, like claims by many other third-party electricity suppliers, are entirely

JA261

misleading. Unlike community solar arrangements, WGL apparently is not selling us power generated by wind. The company is not buying wind power on our behalf. We are actually getting the same mix of the local power grid supply as our neighbors who have not opted for 100 percent clean energy and are not paying a premium. Instead, the company is selling us Renewable Energy Certificates. A REC, as I understand it, is a bookkeeping measure indicating that a megawatt of renewable energy has been generated somewhere at sometime. My premium does not, in fact, purchase wind power."

Similarly, a Towson resident provided as follows: "During COVID in 2020, my husband and I will switched our Baltimore County BGE account to CleanChoice Energy. Their marketing clearly claimed that if we switched to their clean electricity we were buying wind and solar energy. Today, CleanChoice's website marketing describes our environmental impact as, quote, 'You'll be greatly reducing your carbon footprint by sourcing electricity that comes from clean, renewable energy sources. You'll also be helping to increase demand for clean energy, paving the way to become less reliant on polluting fossil fuels,'" end quote.

"As fierce environmentalists, we're taking many steps in our life to live more sustainably, hoping to ensure a healthy planet for all future generations. Climate change is real. It's getting worse. And we feel a deep responsibility to take

JA262

action any way we can."

She also noted that upon calling CleanChoice regarding issues with her bill, she learned, among other things: "Given our home uses about 30,000-kilowatt hours a year, anyone can do simple math and realize each year we paid thousands of dollars more for Renewable Energy Certifies. We weren't even getting wind energy from a wind farm feeding energy into the grid. These certificates are beyond confusing, and we paid over $10,000 for some fictional green idea from someone selling a credit from their wind farm. Another party bought the power, we were duped. None of this was clear. None of this was explained to us in then material we signed."

Based on both the Abell Foundation report, the MEAC testimony and sources, and the anecdotal evidence presented in the individual testimony, there is certainly a direct link between the harm sought to be addressed by SB1, relevant here, misleading information, or information that could be misleading to consumers about "green power" and SB1's requirements that marketing conform with a uniform definition of "green power" that can be communicated to consumers. The link between the harm sought to be addressed and SB1's marketing requirements is direct and plain; in view of *Central Hudson* the connection between the two is neither ineffective nor remote.

Briefly, Plaintiffs' repeatedly emphasize that SB1's carveouts for similarly situation suppliers of electricity

further compound the problem, specifically that the requirements do not advance the State's substantial interest.

But Defendants address why such suppliers are not similarly situated, as the Maryland Department of General Services, and, for that matter, suppliers for commercial consumers, do not sell directly to residential consumers, and community choice aggregators are not themselves suppliers to individuals, though they are still subject to statutory oversight.

The court does not find that the excluded entities under SB1 demonstrate or lend to a conclusion that SB1 does not directly advance the State's interest, as none of the entities are, as the Court can tell, a third-party retail electricity supplier that supplies electricity to residential consumers. Indeed, this would appear to lend support to the proposition that the provisions in SB1 were narrowly tailored to its goal, specifically protection of residential consumers who have been and may be mislead.

Finally, the court considers whether the speech restriction is not more extensive than necessary to serve the interests that it supports. This inquiry complements the direct advancement inquiry.

On this prong, the U.S. Supreme Court explained in *Greater New Orleans Association*, the Government is not required to employ the least restrictive means conceivable, but it must

demonstrate narrow tailoring of the challenged regulation to the asserted interest, a fit that is not necessarily perfect, but reasonable, that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served.

Because it is difficult to establish with precision the point at which restrictions become more extensive than their objective requires, the standard gives the State needed leeway in a field, commercial speech, traditionally subject to governmental regulation. While the government must consider alternatives to regulating speeches to achieve its ends, the Fourth Circuit has explained that a State need not pursue such an alternative where it is doubtful that it would prove more effective. This is again the *Morrisey* court noting: "Plaintiffs next contend that West Virginia failed to consider alternatives to regulating speech to achieve its ends, suggesting that the State should undertake an educational campaign focused on the problems here instead of resorting to the Act's prohibitions. Yet it is difficult to visualize what this imagined campaign would look like. After all, the State is not regulating speech to convey a different message. Instead, it seeks to ensure that the information others communicate is truthful and not misleading. We thus doubt that a public awareness campaign might prove to be more effective than the Act's prohibition. It is much more likely that

misleading speech would wipe out the potential benefits of such a campaign."

In understanding the review of a tailored restriction, the Fourth Circuit's decision in *Educational Media Company* is helpful.  There, on the issue of restrictions on alcohol advertising, the Court explained:

"Here, § 5-20-40(B)(3) is narrowly tailored to serve the board's interest of establishing a comprehensive scheme attacking the problem of underage and dangerous drinking by college students.  The section is not a complete ban on alcohol advertising in college newspapers.  First, it only prohibits certain types of alcohol advertisements.  In fact, it allows restaurants to inform readers about the presence and type of alcohol they serve.  Second, the restriction only applies to college student publications, campus publications targeted at students under 21.  It does not, on its face, affect all possible student publications on campus.  Therefore, § 5-20-40(B)(3) is sufficiently narrow."

Plaintiff's position is that SB1 fails to satisfy this prong because it regulates far more speech than is necessary.

Specifically, Plaintiffs aver:  As explained, the Act contains a list of words that electricity suppliers cannot say unless they intend the same meaning shared by Maryland. Compounding that problem, the Act requires even those electricity suppliers that do agree with Maryland on the

JA266

meaning of words like "clean," "green," and "renewable" to obtain Maryland's permission before it says any of these words.

The court, however, disagrees. First, as explained in my opinion earlier, the restriction at issue has a reasonable fit with the Government's interest. Maryland implements this restriction to address misleading information, concerning "green power" provided to residential retail electric customers and SB1 creates restrictions for retail electricity suppliers marketing "green power" to these consumers. Moreover, contrary to Plaintiffs' assertion, the restriction is not without limitation. It is tailored to the interest at issue. It restricts marketing by retail electricity suppliers to residential consumers from using a limited category of words, including "clean," "green," "ecofriendly," "environmentally friendly or responsible," "carbon-free," "renewable," "100 percent renewable," "100 percent wind," "100 percent hydro," "100 percent solar," "100 percent emission-free," or other similar claims when seeking to participate in the "green power" market and thus be subject to the higher associated price caps.

The foregoing supports that the restrictions at issue are tailored and limited to address the specific interest at issue. They do not present unfettered restriction. The prohibition targets particular misleading words in order to protect consumers from misleading information.

Plaintiffs also contend that SB1 fails this prong because the State could have employed less restrictive options by either enforcing its existing laws against misleading advertising or using its own speech to promote its view in the form of an educational campaign.

Defendants persuasively address and advance why such alternatives would not have been effective. As an initial matter, the State need not reject every alternative method for advancing its interest, even methods that might be more effective. Instead, the standard is whether SB1 scope is in proportion to the interests served. That is the case here.

Moreover, the proposed alternatives appear to this court, and based on Defendants' opposition, to be far less effective means of addressing the goal at issue, which is to say protecting consumers from misleading marketing or marketing that could be misleading by retail electricity suppliers. The court is persuaded at this stage that Defendants have the better end of the stick here, which is to say that pre-SB1 Maryland law did not or does not address the issues within the existing structure, a structure that the Abell report called dysfunctional. Moreover, the court is doubtful that a public awareness campaign would be effective, let alone more effective, at addressing the goals of SB1. This is further supported by the often commission-based-in-person sales practices utilized by many retail electricity suppliers through

JA268

which misleading would be far more difficult to address.

Having considered the *Central Hudson* factors, Plaintiffs have not persuasively demonstrated a likelihood of success in their First Amendment challenge on the basis of legislative speech restrictions.

I turn now to Plaintiffs' challenges to SB1 for its disclosure requirement.

Courts apply "a lower level of scrutiny to laws that compel disclosures in certain contexts." This is from the *NIFLA* case.

As the Fourth Circuit has explained: "The Supreme Court has made clear that there are material differences between disclosure requirements and outright prohibitions on speech, after all, as the Court noted, the constitutionally protected interest is not providing any particular factual information in . . . advertising is minimal."

"So, while prohibitions on commercial speech must pass the test articulated in *Central Hudson*, *Zauderer* held that laws requiring advertisers to disclose purely factual and uncontroversial information are permissible as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."

In short, "compelled commercial speech is constitutional under the First Amendment so long as (1) it is 'purely factual and uncontroversial'; (2) it is 'reasonably related to the

State's interest in preventing deception of consumers'; and (3) it is not 'unjustified or unduly burdensome.'" That's the *Maryland Shall Issue* case that just came out recently.

Plaintiffs challenge the disclosure requirements and the obligation that they amend their marketing to comply with Maryland's definition of "green power" and contend that the required language is neither factual nor uncontroversial. Because Plaintiffs' arguments as to the burdens of the required disclosures are intertwined with their arguments about the disclosures being nonfactual and controversial, I'm going to analyze these factors together.

Specifically, Plaintiffs contend that a REC does not represent a social good but instead furthers various social goods and that SB1 would require plaintiffs to, quote, "falsely represent that RECs and the renewable energy on which they are based may be sold separately" when electricity cannot be renewable unless paired with RECs.

Plaintiffs also contend that the required speech is controversial because it's not factual. However, whether something is controversial is a separate inquiry from its factual accuracy and the court thus considers Plaintiffs' challenges to factual accuracy.

Without reaching the question to factual accuracy, Plaintiffs' argument is not compelling for the simple reason that SB1 does not require them to make the purportedly

JA270

nonfactual statements.

The relevant provision in SB1 requires the retail electricity suppliers in the "green power" tier to make the model disclosure, or to make a similar disclosure approved by the commission. Plaintiffs' arguments based on the framing of the model disclosure language is not compelling because they are simply not required to utter those phrases as written.

Further, Plaintiffs' arguments target the framing of the language, not the broader concepts. And they contend that they already make similar disclosures. So I'm not persuaded that Plaintiffs have demonstrated a likelihood of success as to their First Amendment challenge based on SB1's disclosure requirement.

But either considering the model disclosure set forth in SB1, Plaintiffs' factual challenges are not persuasive. First, the disclosure does not require Plaintiffs say that a REC is a social good. It instead places the phrase "social good" in a larger context, stating a REC represents the social good that accompanies one megawatt-hour of renewable energy electricity generation. Plaintiffs allow that it is factual and uncontroversial to say that RECs further a social good, and they cannot truthfully assert that a REC does not represent one megawatt-hour of electricity generated by a renewable energy generation source. Plaintiffs' challenge is thus solely to the specific language taken out of context that a REC, quote,

"represents the social good," end quote. At bottom, the distinction Plaintiffs ask the court to observe is not about factual accuracy; in my opinion it's about wordsmithing.

Plaintiffs also contend that the following statement contained in the model disclosure is nonfactual and controversial. Quote, "RECs may be sold separately from renewable electricity itself."

Plaintiffs' challenge appears to be based on the use of the word "renewable" in particular, arguing, based solely on a self-serving party representative attestation, that it is not a factual statement. But Plaintiffs do not appear to challenge that RECs can be sold separately from electricity or that RECs can be sold unbundled from the electricity produced from renewable energy facilities. Again, this dispute is less about factual accuracy and more about framing and rather semantical framing in my opinion.

This conclusion is further supported when considering the types of speech that have been held to be controversial and/or not factual. For instance, the challenged speech at issue in *NIFLA* case concerned a statute that required licensed clinics providing services to pregnant women to give notices including that the State provided free or low-cost services for abortion. The Supreme Court held that the notice was neither factual nor uncontroversial. Noting that the notice, quote, "in no way related to the services that the licensed clinics provide," and

they related to abortion which is "anything about an uncontroversial topic."

To be clear, the court does not opine that Plaintiffs' challenges must be as controversial or nonfactual as at issue in *NIFLA*. But the *NIFLA* decision instead provides an example of a notice requirement that was not factual. For example, in that case not related to the product or the service at all and was plainly controversial. Plaintiffs' challenge here, which again turns on the framing of certain phrases, bears no similarity to this example.

Regardless, as I've said, Plaintiffs' argument is not compelling because SB1 does not on its face require them to make any such statements that they contend are not factual.

As to the reasonable relation to the State's interest. For the same reasons I've already set forth, the disclosure requirement to avoid communication of misleading information about green energy to consumers as supported by Defendants' exhibits is certainly reasonably related to Maryland's interest and consumers protection.

For all such reasons, the court is not persuaded that Plaintiffs are likely to succeed on the merits of their First Amendment claims based on SB1 speech restrictions or its compelled disclosures at issue. For this reason, the preliminary injunction motion fails.

However, because I do find that I don't have to go on to

the other factors because I found that Plaintiffs will not meet their burden as to likelihood of success; however, even assuming without deciding that Plaintiffs have sufficiently demonstrated the risk of irreparable harm based on a loss of business opportunities, the court is not persuaded that Plaintiffs have established that the balance of equities and public interest favor injunctive relief.

As the parties agree, when the government is the party opposing a motion for preliminary injunction, the balance of equities and public interest factors merge. This court has previously explained as follows: As to the balance of the equities, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. When considering the public interest, the court should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.

Stated another way, the court must balance the harm to the plaintiff if the injunction is erroneously denied versus harm to the defendant if the injunction is erroneously granted.

Here, while Plaintiffs allege harm in the form or contend harm in the form of lost customers and potential customers and required changes to their marketing, they have not demonstrated that risk of such harms, individually or in the aggregate, weighs in favor in view of the balance of equities and the

public interest.

First, it bears more than a passing mention that Plaintiffs' timing of the motion, which is to say in my opinion a delay, undermines their irreparable harm argument. In analyzing the impact of such delay on consideration of a preliminary injunction motion, the court may consider the time-sensitive nature of the project involved and the fact that more expeditious action by the plaintiffs would have avoided major disruptions and increased costs. In this instance, had Plaintiffs moved earlier while the marketing changes and customer contract-related notices might have been the same, they surely could have been rolled out in a more gradual, less disruptive manner. Alternatively, Plaintiffs could have pursued their own disclosure language for PSC approval. They omit to mention whether they have pursued that, I'm assuming because, without finding, that the answer is no; and I'm assuming, without finding, that that is based on some assumption that the proposals would have been rejected or that the process would be lengthy.

Here, SB1 passed in the General Assembly on April 8, 2024. The Governor signed it into law the next month on May 9, 2024, and it went into effect July 1, 2024; and yet, Plaintiffs waited until October 1, 2024 to file. And although no motion for emergency injunction was filed, Plaintiffs' request, perhaps demand, that the court issue a ruling before December 1

because SB1's provisions call on Plaintiffs to invest in new or revised marketing materials to meet the January 1, 2025 start of the challenged requirements of SB1.

Plaintiffs' election not to file a motion for TRO, in my opinion, somewhat tacitly observes the incongruence between waiting so long to file and yet urging that the court must direct briefing of the motion, read and consume the papers, hold a hearing, and issue an opinion before December 1. Plaintiffs' claim of certain harm based on both the unknown timing of this Court's order, which is to say whether I would issue an opinion after January 1, and the changes they would have to make if the Court denied relief, are not particularly strong, and they have contributed to their alleged potential harm by sitting still.

Regardless, I do yield to Plaintiffs' request for a ruling by December 1 to ensure that they will have the time that they say is needed to produce new marketing materials and to issue those customer contract-related notices in time to abide the provisions of SB1.

Moreover, Plaintiffs' position ignores the public consequence of enjoining the law from taking effect. As discussed at length earlier, Defendants offer material evidence in support of their contention that customers or consumers of retail electricity suppliers have been financially harmed and misled under the existing law, specifically with regard to

claims of green power, enjoining SB1, which has in some measure already taken effect, would permit that harm to continue unabated. That continued risk of harm is not insignificant as Plaintiffs appear to suggest.

As acknowledged in *Maryland v. King*, any time a state is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.

Plaintiffs have not persuaded me that risk of irreparable harm to their businesses outweigh the consequence to the public attendant to enjoining the law from taking effect, especially where Plaintiffs have not demonstrated a likelihood of success in showing that any putative harm is the result of their constitutional claims.

Briefly, Plaintiffs rely on some *Legend Night Club v. Miller* is not compelling. There, the Fourth Circuit's analysis turned on a demonstrated likelihood of a First Amendment violation in addition to the loss of valuable business opportunities. The Fourth Circuit's conclusion was based on an assessment that the state was not harmed by issuance of an injunction to prevent an unconstitutional restriction.

Here, Plaintiffs have not demonstrated a likelihood of success on the merits of their First Amendment claims and so the issuance of an injunction is not likely to prevent an unconstitutional restriction.

Accordingly, having considered all of these factors, the *Winter* factors, the court does find that Plaintiffs have failed to show or failed to establish a clear showing that the extraordinarily remedy of a preliminary injunction is warranted here.  For all of these reasons, the motion at ECF-2 is denied.

That is all.  Thank you all.  And court is adjourned.

**THE CLERK:**  All rise.  This Honorable Court has adjourned.

(Court adjourned at 12:30 p.m.)

Ronda J. Thomas, RMR, CRR - Federal Official Reporter

JA278

CERTIFICATE OF OFFICIAL REPORTER

I, Ronda J. Thomas, Registered Merit Reporter, Certified Realtime Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 7th day of December 2024.

_____
Ronda J. Thomas, RMR, CRR
Federal Official Reporter

JA279

MR. BROGGI: [1]  2/15
MR. FELDMAN: [1]  2/23
MR. GLYNN: [5]  2/20 27/22 27/24
 28/3 33/2
MR. HANDLEY: [4]  2/17 17/13
 17/16 19/5
MR. JOHNSON: [8]  2/10 3/3 17/11
 28/2 33/3 35/15 36/11 42/16
MR. OBERMIER: [1]  2/13
THE CLERK: [3]  2/4 42/17 79/7
THE COURT: [17]  2/2 2/16 2/19
 2/22 2/25 17/9 17/12 17/15 19/4
 27/19 27/23 28/1 32/25 35/14 36/9
 42/13 42/20

**$**

$10 [1]  61/13
$10,000 [1]  64/9
$2 [1]  61/13
$725 [2]  61/6 61/11
$90 [1]  61/12

**'**

'backstop [1]  44/8
'backstop' [1]  44/8
'CleanSteps [1]  62/20
'competitive [1]  43/15
'customer [1]  43/14
'green [7]  60/19 60/22 61/6 61/7
 61/8 61/11 62/2
'in [1]  54/25
'purely [1]  70/24
'reasonably [1]  70/25
'SOS' [1]  44/10
'standard [1]  44/9
'standard-offer [1]  44/9
'unjustified [1]  71/2
'You'll [1]  63/17

**1**

1 percent [1]  48/16
1-201 [1]  27/2
10 [1]  46/2
100 [12]  17/20 21/12 21/12 37/25
 38/1 38/1 38/1 48/8 48/8 48/9
 48/9 63/5
100 percent [18]  17/20 19/10
 19/11 24/6 24/7 24/7 30/19 33/24
 33/24 37/25 48/8 62/20 62/21
 68/16 68/16 68/16 68/17 68/17
101 [1]  1/24
10:05 [2]  1/8 2/1
11:07 [1]  42/19
11:36 [1]  42/19
12 [1]  51/18
12-month [1]  47/13
12:30 [1]  79/9
13 [1]  6/2
13-state [1]  36/20
14-4 [1]  58/15
14-5 [1]  58/15
14-6 [1]  58/15
15 [1]  42/14
16 [1]  45/1
18 [1]  1/8
19 [1]  5/17
1973 [1]  27/1
1999 [2]  43/5 43/7
1st [6]  14/14 14/20 14/22 14/25
 41/23 42/10

**2**

2.5 [1]  46/10
200 miles [1]  6/7

2004 [1]  18/12
2005 [1]  46/1
2008 [1]  50/22
201 [1]  27/2
2014 [1]  60/3
2017 [1]  60/3
2020 [1]  63/12
2022 [2]  61/5 61/8
2024 [8]  1/8 47/3 47/4 76/20
 76/21 76/22 76/23 80/12
2025 [3]  46/8 47/5 77/2
2030 [1]  18/15
21 [1]  67/16
210 [1]  27/2
21201 [1]  1/25
22 [2]  5/16 7/6
225 million [1]  60/6
24-cv-2820-JRR [1]  1/5
25 percent [2]  61/5 61/10
28 [1]  80/6
2820 [1]  2/5

**3**

30,000-kilowatt [1]  64/4
30-day [1]  41/24
35.5 [1]  46/8
36.2 percent [1]  18/15
38 percent [1]  11/7

**4**

40 [6]  26/4 51/10 51/13 51/16
 67/7 67/18
486 [1]  44/25
49 percent [1]  33/22
4th [1]  1/24

**5**

5-20-40 [2]  67/7 67/18
50 percent [1]  18/16
502 [1]  45/1
507 [1]  59/8
51 percent [3]  33/19 33/22 48/15
510.3 [1]  49/5
515 [1]  45/1
555 [1]  50/22

**6**

600 miles [1]  6/4
65 [1]  50/5

**7**

7-510.3 [1]  49/5
7-704.4 [1]  49/4
704.4 [2]  49/3 49/4
707 [1]  40/21
753 [1]  80/7
761 [1]  59/9
7th [1]  80/12

**8**

8,000-kilowatt [1]  61/10
80 miles [1]  46/2

**A**

a.m [4]  1/8 2/1 42/19 42/19
Abell [6]  23/16 39/23 58/15 59/24
 64/13 69/20
abide [1]  77/18
ability [3]  7/1 56/7 56/8
able [5]  12/14 36/7 37/18 41/15
 42/5
abortion [2]  73/22 74/1
about [66]  3/16 5/4 5/10 5/19
 5/22 6/21 6/25 7/1 7/10 7/23 8/13
 8/21 9/17 9/23 11/2 11/8 11/9

11/10 11/14 11/25 12/4 12/8 12/18
 12/21 12/25 13/2 14/11 15/12
 17/18 20/8 25/8 25/12 29/13 29/15
 29/17 30/5 30/20 31/6 31/10 31/11
 33/15 35/8 35/20 35/21 37/17
 38/23 39/13 39/16 39/17 46/20
 46/24 53/22 54/2 60/6 61/9 62/13
 64/4 64/18 67/13 71/9 73/2 73/3
 73/14 73/15 74/1 74/17
above [6]  1/10 11/6 11/7 61/10
 61/21 80/9
above-entitled [2]  1/10 80/9
abridge [1]  51/20
absent [1]  50/17
absolute [1]  56/23
absolutely [1]  31/1
abuse [1]  57/16
accompanied [1]  59/17
accompanies [2]  49/13 72/19
accompanying [2]  4/9 16/7
accordance [3]  27/6 46/1 48/19
according [1]  21/19
Accordingly [3]  45/2 50/14 79/1
accords [1]  52/19
account [3]  61/6 61/9 63/13
accuracy [6]  58/7 71/21 71/22
 71/23 73/3 73/15
accurate [3]  11/2 14/5 50/11
accurately [7]  3/9 14/2 30/10
 31/1 31/20 32/2 47/25
achieve [5]  52/9 52/14 55/12
 66/11 66/16
acknowledge [2]  20/11 57/3
acknowledged [1]  78/5
acknowledges [1]  7/15
Act [14]  4/13 4/14 43/7 43/8 43/9
 43/13 43/17 43/21 44/7 44/18 45/2
 46/1 67/21 67/24
Act's [2]  66/19 66/25
action [3]  15/14 64/1 76/8
activities [1]  11/13
activity [2]  53/6 57/4
actors [1]  39/18
actual [3]  14/15 17/25 61/3
actually [12]  12/24 14/5 14/16
 14/21 15/10 15/11 25/17 25/21
 28/15 49/21 55/14 63/4
adapting [1]  22/14
addition [3]  22/17 60/17 78/18
additional [6]  11/4 22/19 31/23
 36/5 61/9 62/4
Additionally [1]  26/21
address [15]  7/12 28/6 32/7 32/16
 39/18 46/17 46/19 50/25 61/15
 65/3 68/6 68/22 69/6 69/19 70/1
addressed [6]  29/18 32/8 39/4
 51/18 64/16 64/21
addressing [2]  69/14 69/23
adequately [1]  10/19
adjacent [2]  28/9 45/21
adjourned [3]  79/6 79/8 79/9
admission [1]  34/22
admitted [1]  37/3
adopted [2]  16/19 35/24
adopting [3]  16/20 22/14 47/23
adoption [1]  23/18
advance [5]  42/22 59/22 65/2
 65/12 69/6
advancement [6]  1/3 1/14 2/5 2/11
 59/12 65/22
advances [4]  23/10 53/9 55/11
 59/3
advancing [1]  69/9
advantage [1]  46/20
advertise [1]  37/18

JA280

**A**

advertised [1]   17/19
advertisement [2]   20/17 54/11
advertisements [3]   22/20 23/24 67/12
advertisers [1]   70/19
advertising [9]   22/5 24/2 54/1 56/19 57/16 67/6 67/11 69/4 70/16
advocacy [1]   5/1
Advocates [1]   60/12
affect [2]   27/3 67/16
affected [1]   56/10
affects [2]   15/11 56/6
affirmed [1]   25/9
afforded [2]   53/2 56/16
after [7]   26/25 45/25 50/11 61/1 66/20 70/14 77/11
again [15]   5/24 14/8 32/20 33/16 34/5 34/20 37/12 39/18 40/18 44/25 56/20 59/8 66/14 73/14 74/9
against [3]   52/6 56/23 69/3
Agency [1]   3/13
aggregate [2]   60/5 75/24
aggregator [1]   49/4
aggregators [1]   65/7
Agora [1]   22/2
agree [4]   39/5 40/9 67/25 75/8
agreement [5]   33/5 33/9 40/12 40/20 47/16
agrees [1]   40/22
aided [1]   1/22
al [4]   1/3 1/7 2/6 2/6
alcohol [4]   67/5 67/10 67/12 67/14
alert [2]   10/9 42/8
alerts [1]   24/3
aligned [1]   39/4
alignment [1]   41/1
all [40]   3/1 3/1 10/20 11/15 13/4 16/8 16/19 18/6 18/7 18/25 20/6 20/18 26/25 31/25 33/23 37/19 38/15 41/17 42/17 42/23 44/6 46/5 50/25 54/16 54/25 58/17 60/6 60/10 61/24 63/24 66/20 67/16 70/14 74/7 74/20 79/1 79/5 79/6 79/6 79/7
allege [1]   75/21
alleged [1]   77/13
alleviate [5]   4/14 6/13 10/15 59/7 59/15
alleviating [1]   7/24
allow [2]   17/17 72/20
allows [4]   4/14 32/1 45/2 67/12
alone [2]   27/5 69/22
along [2]   22/19 52/1
already [9]   7/5 7/10 11/20 25/13 25/14 30/20 72/10 74/15 78/2
also [30]   7/12 14/1 23/3 23/16 26/4 29/25 30/12 31/5 32/17 35/12 35/21 36/15 37/16 39/2 42/23 44/7 53/18 53/25 56/6 56/23 56/25 56/25 58/21 60/11 62/4 63/19 64/2 69/1 71/18 73/4
alternative [2]   66/13 69/8
Alternatively [1]   76/13
alternatives [4]   66/11 66/16 69/7 69/12
although [3]   43/18 44/11 76/23
altogether [1]   59/19
am [4]   3/2 17/13 36/10 42/20
ameliorate [4]   10/4 11/5 23/3 39/7
amend [1]   71/5
Amendment [33]   3/19 19/9 19/20 19/24 20/12 20/14 20/24 21/4 26/6

26/14 26/19 29/3 41/4 47/23 51/9 51/12 51/14 51/19 51/20 51/21 51/25 52/17 54/16 56/13 56/15 57/12 58/4 70/4 70/24 72/12 74/22 78/17 78/23
America [1]   25/8
among [1]   64/3
amount [2]   17/24 38/25
amounts [1]   17/22
analysis [7]   53/1 53/1 53/3 54/23 56/12 56/21 78/16
analyze [1]   71/11
analyzing [3]   58/4 58/16 76/5
anecdotal [2]   23/14 64/14
anecdotes [2]   21/21 59/18
angry [1]   21/14
Anne [1]   25/4
annual [1]   46/14
another [3]   30/8 64/10 75/18
answer [4]   17/6 28/10 30/2 76/16
answers [1]   53/8
ANTHONY [1]   1/6
any [28]   3/16 4/6 5/23 6/20 8/8 11/4 11/5 12/18 15/1 17/6 17/10 27/18 28/1 31/17 32/23 35/3 39/10 40/3 41/7 41/10 48/25 56/3 64/1 68/2 70/15 74/13 78/5 78/13
anyone [2]   41/14 64/4
anything [5]   10/15 13/13 27/9 38/21 74/1
anywhere [2]   6/19 34/17
apparently [1]   63/2
Appeals [1]   26/9
appear [4]   65/15 69/12 73/11 78/4
appears [1]   73/8
applicable [6]   25/18 44/23 51/19 52/5 56/14 56/15
application [2]   48/21 50/14
applied [7]   12/24 25/18 25/22 51/23 52/15 55/6 55/15
applies [5]   3/23 41/8 41/13 46/5 67/14
apply [8]   26/2 32/19 36/16 40/14 41/9 47/5 49/2 70/8
appreciate [4]   3/2 17/9 42/7 42/25
appropriate [4]   32/10 51/5 56/18 57/17
approval [3]   16/6 47/18 76/14
approved [5]   14/23 16/4 49/10 62/3 72/4
approves [1]   48/18
April [1]   76/20
April 8 [1]   76/20
aptly [1]   54/24
are [127]
area [3]   11/21 45/21 45/23
areas [2]   6/2 52/10
Arguably [1]   38/21
argue [4]   22/22 22/23 27/8 47/22
argued [1]   41/5
argues [1]   24/15
arguing [4]   6/23 8/22 17/12 73/9
argument [10]   15/9 16/13 20/20 34/16 41/10 55/24 59/22 71/24 74/11 76/4
arguments [6]   17/7 51/16 71/8 71/9 72/5 72/8
arising [1]   56/14
around [3]   6/21 37/5 39/25
arrangements [1]   63/1
array [1]   51/22
Article [4]   26/4 51/10 51/13 51/16
articulated [1]   70/18

articulating [1]   7/4
Arundel [1]   25/4
as [131]
as-applied [1]   25/22
ask [4]   29/12 32/22 53/7 73/2
asked [6]   5/3 25/16 28/7 29/17 38/17 41/23
asking [4]   17/16 27/13 32/7 41/20
assembly [5]   23/12 43/8 44/20 54/1 76/20
assert [2]   51/15 72/22
asserted [3]   53/7 53/10 66/2
assertion [1]   68/10
assessment [3]   58/1 60/1 78/20
assists [1]   53/23
associated [5]   5/8 5/12 7/19 48/12 68/19
Association [2]   58/5 65/24
assume [1]   61/3
assuming [3]   75/3 76/15 76/17
assumption [1]   76/18
assurance [1]   6/17
assured [1]   62/19
Atlantic [1]   45/23
attach [1]   59/21
attached [3]   11/17 28/19 60/11
attacking [1]   67/9
attempt [1]   20/9
attendant [1]   78/11
attenuated [1]   36/21
attestation [1]   73/10
Attorney [6]   1/7 1/17 2/18 2/24 33/6 36/12
attorneys [2]   9/25 10/1
attributes [5]   8/4 14/6 40/6 45/14 45/17
audience [1]   53/20
Augustine [1]   46/19
authority [2]   29/23 44/20
automatically [1]   25/2
avail [1]   56/4
available [1]   52/21
aver [3]   55/18 57/23 67/21
average [4]   47/13 61/6 61/8 61/11
avoid [1]   74/16
avoided [1]   76/8
awarded [1]   50/6
aware [1]   35/3
awareness [2]   66/24 69/22
away [3]   6/7 23/4 56/1

**B**

back [3]   17/1 39/13 42/15
backed [4]   4/15 20/1 34/10 47/22
background [1]   59/17
balance [8]   17/7 50/18 75/6 75/9 75/11 75/12 75/18 75/25
ballooning [1]   19/2
Baltimore [5]   1/7 1/25 8/14 43/24 63/12
ban [2]   40/16 67/10
banning [2]   3/20 35/10
bans [2]   3/5 38/13
bar [3]   25/19 27/14 58/5
Baroque [1]   13/23
barred [1]   47/13
base [2]   23/2 61/5
based [33]   3/18 12/12 19/5 19/15 19/21 20/21 20/25 21/3 23/14 26/16 26/19 48/1 52/6 53/2 55/1 55/7 57/8 59/19 60/20 62/6 64/13 69/13 69/24 71/16 72/5 72/12 73/8 73/9 74/22 75/4 76/17 77/9 78/19
basically [2]   29/9 41/14
basis [2]   46/15 70/4

JA281

**B**

**basket [2]**  10/9 34/10
**be [101]**
**be making [1]**  15/8
**bear [1]**  50/23
**bearing [1]**  39/20
**bears [2]**  74/9 76/2
**because [39]**  5/5 5/11 5/15 6/14
 8/3 9/25 10/25 11/22 12/1 14/5
 14/11 15/2 15/11 16/8 24/25 25/10
 25/18 25/22 27/15 29/20 38/22
 45/6 45/12 51/1 51/13 55/19 56/3
 58/2 66/6 67/20 69/1 71/8 71/19
 72/6 74/12 74/25 75/1 76/16 77/1
**become [3]**  60/9 63/20 66/7
**been [22]**  10/25 12/24 18/9 20/7
 22/1 29/22 35/20 36/17 49/17 55/9
 60/4 62/11 62/15 62/22 63/9 65/17
 69/7 73/18 76/11 76/12 76/18
 77/24
**befits [1]**  16/24
**before [14]**  1/11 2/4 2/6 19/20
 23/12 23/14 26/10 26/20 27/25
 51/3 57/14 68/2 76/25 77/8
**Begin [1]**  54/24
**behalf [9]**  1/14 1/17 1/19 2/18
 2/20 28/4 35/4 60/23 63/3
**behind [1]**  34/23
**being [17]**  19/7 20/10 20/16 27/6
 31/4 31/4 32/17 36/23 37/17 40/10
 46/20 47/17 48/11 48/13 48/19
 48/22 71/10
**belief [1]**  7/7
**believe [3]**  7/5 12/18 32/21
**believed [3]**  4/10 11/25 62/23
**believing [1]**  21/11
**beneficial [1]**  13/24
**benefit [3]**  38/5 43/1 49/24
**benefited [1]**  60/2
**benefiting [1]**  60/9
**benefits [13]**  3/10 4/20 5/4 5/8
 5/12 12/19 13/15 13/19 30/14
 37/18 40/5 61/2 67/1
**best [3]**  17/2 20/8 66/3
**better [5]**  22/1 29/25 31/17 51/18
 69/18
**between [16]**  4/22 9/6 9/21 13/11
 26/18 28/17 33/13 41/7 46/2 60/3
 61/12 64/16 64/20 64/23 70/12
 77/5
**beyond [4]**  12/20 12/25 30/2 64/8
**BGE [8]**  19/13 21/13 24/9 34/5
 44/3 45/4 47/7 63/13
**bill [10]**  3/15 21/20 46/17 46/19
 46/21 46/24 46/24 46/25 58/10
 64/3
**bills [1]**  17/22
**bit [1]**  28/17
**blessed [1]**  3/13
**board [1]**  26/13
**board's [1]**  67/8
**bodies [1]**  23/13
**body [1]**  59/4
**bolts [1]**  12/20
**bookkeeping [1]**  63/8
**both [11]**  3/11 4/17 4/19 22/11
 23/8 24/16 40/15 52/22 53/8 64/13
 77/9
**bottom [2]**  31/25 73/1
**bought [1]**  64/10
**Brewing [1]**  54/4
**brief [16]**  4/8 5/14 5/17 7/4 7/6
 7/15 10/18 21/1 23/23 28/12 34/18
 35/1 35/2 35/6 40/15 41/1
**briefing [1]**  77/7

**Briefly [2]**  64/24 78/15
**briefs [3]**  34/18 36/18 37/14
**brings [2]**  14/12 32/1
**broad [3]**  13/6 19/15 26/16
**broad-based [2]**  19/15 26/16
**broader [1]**  72/9
**Broggi [2]**  1/16 2/15
**broker [1]**  61/1
**brown [5]**  1/6 1/17 2/6 2/18 7/20
**build [1]**  31/23
**built [1]**  38/15
**bundle [1]**  8/6
**bundled [1]**  43/10
**bundling [1]**  30/12
**burden [3]**  20/5 50/23 75/2
**burdens [1]**  71/8
**burdensome.' [1]**  71/2
**business [4]**  5/5 38/22 75/5 78/18
**businesses [1]**  78/10
**buy [1]**  31/12
**buyer [1]**  61/4
**buyers [5]**  60/18 61/3 61/16 61/19
 61/25
**buying [5]**  29/20 61/17 61/25 63/3
 63/15
**buzzword [1]**  31/22
**buzzwords [2]**  31/20 37/23

**C**

**cabin [1]**  62/18
**California [1]**  28/23
**call [7]**  2/3 4/15 9/3 13/17 17/3
 33/23 77/1
**called [9]**  5/25 6/5 8/7 32/14
 38/12 40/11 43/7 50/20 69/20
**calling [3]**  9/2 9/19 64/2
**came [4]**  1/10 15/7 15/9 71/3
**campaign [6]**  66/18 66/20 66/24
 67/2 69/5 69/22
**campaigns [1]**  5/2
**campus [2]**  67/15 67/17
**can [28]**  5/25 8/7 9/19 14/6 14/16
 17/2 20/2 24/21 25/8 26/5 26/5
 28/20 30/8 30/9 31/20 32/21 33/17
 33/21 37/5 52/15 61/16 61/25 64/1
 64/4 64/20 65/13 73/12 73/13
**can't [12]**  9/3 10/8 10/11 11/23
 12/3 12/17 12/18 13/13 23/2 31/19
 31/22 39/9
**canceled [1]**  42/2
**cannot [11]**  3/24 8/25 16/1 16/3
 21/18 27/8 39/9 45/6 67/22 71/16
 72/22
**cap [1]**  16/6
**capacity [2]**  1/7 37/7
**caps [1]**  68/20
**carbon [7]**  7/2 7/18 8/5 37/25
 48/8 63/17 68/15
**carbon-free [3]**  37/25 48/8 68/15
**carried [1]**  55/25
**carveouts [1]**  64/25
**case [43]**  2/3 9/5 9/10 9/23 9/24
 11/19 11/19 12/1 12/8 12/9 12/9
 13/10 15/7 20/16 21/1 21/2 22/8
 23/23 24/10 24/14 24/15 25/4
 25/15 25/20 25/22 26/9 26/11
 29/14 35/3 35/7 37/4 37/10 44/2
 50/21 54/25 57/23 58/24 59/8
 69/11 70/10 71/3 73/20 74/7
**cases [3]**  12/23 39/8 41/12
**category [1]**  68/13
**cautioned [1]**  56/23
**center [2]**  13/10 29/2
**Central [14]**  21/6 21/6 22/9 24/12
 24/18 27/14 53/3 55/6 55/14 56/11

 56/13 64/22 70/2 70/18
**Central Hudson [5]**  21/6 22/9
 24/18 27/14 70/2
**certain [9]**  28/9 34/24 47/17
 47/19 56/23 67/12 70/9 74/9 77/9
**certainly [6]**  10/14 35/25 42/7
 54/20 64/15 74/18
**certificate [2]**  38/12 79/11
**certificates [5]**  3/11 45/11 60/21
 63/7 64/8
**certification [1]**  12/15
**Certified [1]**  80/4
**Certifies [1]**  64/6
**certify [1]**  80/6
**challenge [14]**  20/12 25/18 25/19
 25/22 27/13 32/20 40/25 70/4 71/4
 72/12 72/24 73/8 73/11 74/8
**challenged [6]**  47/4 55/5 56/4
 66/1 73/19 77/3
**challenger [1]**  56/5
**challenges [5]**  20/14 70/6 71/22
 72/15 74/4
**change [16]**  7/9 7/14 7/16 7/21
 7/24 20/9 23/3 26/10 30/1 33/25
 43/6 54/23 58/1 62/9 62/14 63/24
**changes [4]**  61/24 75/23 76/10
 77/11
**changing [1]**  42/3
**charged [1]**  44/5
**cherrypicked [1]**  21/21
**Chicago [4]**  6/4 6/12 6/19 36/22
**Chief [1]**  19/16
**chilling [1]**  10/17
**chills [1]**  38/25
**choice [13]**  38/14 43/7 43/7 43/9
 43/13 43/14 43/16 43/21 44/7
 44/18 45/2 49/4 65/7
**choose [1]**  44/14
**chose [1]**  62/17
**cigarettes [1]**  54/6
**Circuit [15]**  9/25 12/9 13/11
 20/13 21/21 23/12 23/23 26/11
 45/12 51/24 54/17 54/24 56/21
 66/12 70/11
**Circuit's [4]**  53/12 67/4 78/16
 78/19
**circumstances [6]**  28/9 41/2 41/4
 50/10 51/5 51/23
**cite [2]**  9/24 23/23
**cited [5]**  12/9 26/9 26/12 57/23
 58/1
**cites [1]**  59/6
**citing [1]**  55/20
**citizens [5]**  16/24 19/18 22/11
 23/3 46/22
**city [1]**  8/15
**civil [5]**  1/5 2/5 16/3 16/7 50/5
**claim [3]**  9/1 33/17 77/9
**claimed [1]**  63/14
**claiming [1]**  9/6
**claims [29]**  3/14 3/16 3/21 8/3
 11/2 12/18 20/1 21/17 33/16 33/24
 38/2 38/3 38/5 38/16 38/17 39/10
 41/15 48/10 51/16 56/13 56/14
 62/24 62/24 68/18 74/22 75/12
 78/1 78/14 78/23
**Clark [4]**  11/19 15/7 25/17 39/8
**classes [1]**  60/10
**classic [1]**  55/10
**clean [17]**  3/7 9/2 9/3 33/16
 33/17 37/24 38/24 39/10 48/6
 60/19 61/4 63/5 63/14 63/18 63/19
 68/1 68/14
**CleanChoice [2]**  63/13 64/2
**CleanChoice's [1]**  63/15

JA282

**C**

cleaning [1] 29/6
cleans [1] 31/9
CleanSteps [1] 62/17
clear [14] 5/18 8/8 8/21 15/3
 20/6 28/10 38/25 39/14 50/7 61/23
 64/11 70/12 74/3 79/3
clearly [3] 21/1 28/11 63/14
client's [3] 4/17 17/5 38/14
clients [19] 3/7 3/9 3/15 5/1 5/9
 10/20 11/13 11/16 16/25 23/25
 37/17 38/4 38/15 39/9 39/9 39/20
 40/1 41/11 60/24
climate [11] 7/9 7/14 7/16 7/21
 7/24 20/9 23/3 30/1 62/9 62/14
 63/24
clinics [2] 73/20 73/25
close [1] 32/17
closest [1] 7/4
Club [1] 78/15
coalition [2] 60/12 60/13
coast [1] 46/2
code [1] 47/24
Cogan [1] 51/24
Colin [3] 1/20 2/20 28/4
collapse [1] 5/21
college [3] 67/10 67/11 67/15
color [1] 36/5
colorable [1] 37/20
combat [1] 7/9
combating [2] 7/13 22/19
combination [1] 22/25
come [10] 7/4 21/16 40/3 42/9
 42/15 46/7 46/16 50/21 53/5 62/16
comes [4] 2/6 12/8 29/13 63/18
coming [3] 28/23 40/2 41/25
comment [1] 14/14
comments [1] 14/16
commercial [47] 3/24 9/25 10/4
 12/5 20/16 20/24 21/4 22/18 23/21
 49/6 52/11 52/17 52/19 52/21
 52/24 53/5 53/12 53/13 53/15
 53/16 53/17 53/18 53/18 53/22
 53/24 53/25 54/5 54/10 54/15
 55/19 55/20 56/2 56/4 56/14 56/17
 57/3 57/5 57/19 57/22 58/5 58/7
 59/2 59/5 65/5 66/9 70/17 70/23
commission [29] 1/19 2/21 3/12
 13/20 16/4 19/5 22/2 22/22 22/23
 26/19 28/5 29/21 32/4 32/11 32/14
 32/18 44/19 44/21 46/4 47/18
 48/18 48/22 49/1 49/10 61/18 62/1
 62/3 69/24 72/5
commission-based [2] 19/5 26/19
Commissions [1] 19/4
commitments [1] 62/7
common [2] 19/1 59/20
communicate [2] 58/22 66/23
communicated [1] 64/20
communication [1] 74/16
communications [1] 57/8
community [3] 49/4 63/1 65/7
companies [5] 3/13 8/1 12/11 44/8
 55/21
company [12] 1/14 2/12 43/12
 43/13 43/24 44/3 44/13 44/16 54/4
 63/3 63/6 67/4
company's [4] 47/14 47/15 62/19
 62/24
comparable [1] 47/9
compared [2] 32/4 61/7
compel [1] 70/9
compelled [2] 70/23 74/23
compelling [8] 9/8 52/9 55/9
 55/22 71/24 72/6 74/12 78/16

compensation [3] 19/5 19/21 19/22
compensation-based [1] 19/21
compete [1] 31/13
competing [1] 75/12
competition [2] 43/7 60/2
competitive [1] 47/21
complements [1] 65/21
complete [2] 50/12 67/10
completely [2] 38/18 40/8
complex [2] 16/22 51/21
compliance [1] 42/10
compliant [1] 38/19
complies [1] 48/25
comply [4] 14/25 16/2 44/22 71/5
component [1] 43/17
composed [1] 62/21
compound [1] 65/1
Compounding [1] 67/24
comprehensive [1] 67/8
comprises [1] 6/2
Computer [1] 1/22
Computer-aided [1] 1/22
conceded [1] 24/17
concededly [1] 55/7
conceivable [1] 65/25
concept [1] 37/1
concepts [1] 72/9
concern [4] 31/24 39/12 53/6 62/8
concerned [3] 29/8 62/13 73/20
concerning [3] 6/24 39/10 68/6
concerns [5] 30/20 32/16 39/20
 46/19 54/18
concession [1] 39/2
conclude [2] 22/8 55/1
concluded [2] 32/10 60/8
conclusion [4] 27/12 65/11 73/17
 78/19
condition [1] 44/17
conditions [1] 48/10
conduct [2] 22/15 52/12
conducts [1] 52/25
Conference [1] 80/10
confident [1] 20/3
confidentiality [1] 9/12
conform [2] 56/12 64/19
conformance [1] 80/10
confronted [1] 52/24
confused [5] 4/24 9/17 11/7 21/25
 23/16
confusing [2] 32/1 64/8
confusion [9] 4/25 6/20 6/25
 22/20 29/13 29/18 29/24 30/18
 39/3
congestion [1] 37/7
conjecture [1] 59/13
connected [5] 28/16 36/25 37/9
 37/9 53/20
connection [3] 10/22 26/18 64/22
consciously [1] 55/14
consensus [1] 59/20
consequence [2] 77/21 78/10
consequences [2] 42/9 75/16
consider [9] 11/3 51/14 54/9
 56/17 59/3 66/10 66/15 75/13 76/6
consideration [1] 76/5
considered [2] 70/2 79/1
considering [3] 72/14 73/17 75/14
considers [5] 49/1 56/17 57/13
 65/19 71/21
constitutes [1] 18/8
Constitution [1] 52/19
constitutional [6] 17/5 39/6 41/3
 51/11 70/23 78/14
constitutionally [3] 32/22 52/20
 70/14

consultation [1] 45/25
consume [1] 77/7
consumer [34] 3/22 3/25 4/6 4/19
 6/13 10/8 10/13 10/15 11/5 19/15
 22/3 22/12 22/20 23/11 24/2 29/23
 29/24 35/6 35/8 38/22 39/3 39/7
 43/21 43/23 44/2 44/12 44/14
 44/24 46/24 57/25 58/3 59/23
 60/10 61/23
consumer's [1] 44/13
consumer-facing [1] 38/22
consumers [63] 3/11 4/10 4/24 5/2
 5/4 5/8 5/10 5/14 6/9 6/17 9/16
 11/7 11/14 17/18 17/21 17/25 18/3
 19/12 20/10 22/18 23/15 26/17
 29/12 34/3 35/19 35/22 36/1 36/17
 38/23 40/1 41/25 42/1 44/6 44/10
 44/23 46/20 48/1 53/23 54/18
 55/24 56/9 57/19 57/22 58/11
 58/19 58/22 59/1 60/2 61/12 64/18
 64/20 65/6 65/6 65/14 65/17 68/9
 68/13 68/25 69/15 70/22 74/17
 74/19 77/23
consumers' [1] 71/1
contained [1] 73/5
contains [1] 67/22
contend [13] 51/8 55/4 55/25 56/6
 66/15 69/1 71/6 71/12 71/18 72/9
 73/4 74/13 75/21
contending [1] 61/14
content [10] 3/18 20/21 20/25
 21/3 52/6 53/2 55/1 55/7 56/19
 57/16
content-based [6] 20/21 20/25
 21/3 53/2 55/1 55/7
contention [4] 26/4 58/1 58/18
 77/23
contested [1] 15/17
contesting [2] 10/24 10/25
context [8] 20/12 41/5 55/3 57/9
 57/10 58/4 72/18 72/25
context-specific [1] 57/10
contexts [2] 52/16 70/9
continental [1] 45/23
continue [5] 11/14 17/17 23/1
 37/18 78/2
continued [2] 24/18 78/3
continuing [2] 5/1 30/9
contract [2] 76/11 77/18
contract-related [2] 76/11 77/18
contracts [8] 19/2 19/21 26/18
 27/9 35/23 40/17 41/24 42/2
contrary [3] 4/8 4/25 68/9
contributed [1] 77/13
control [1] 45/21
controversial [11] 24/25 25/3
 25/8 25/10 71/10 71/19 71/20 73/6
 73/18 74/4 74/8
controversy [1] 8/15
conversation [1] 25/2
conversations [1] 5/3
convey [1] 66/21
coordination [1] 45/25
Coors [1] 54/4
correct [1] 80/7
cost [3] 61/1 61/12 73/22
costs [2] 60/1 76/9
could [19] 5/21 10/4 10/15 10/16
 11/4 12/3 12/8 12/9 12/14 13/22
 28/11 33/23 38/8 39/6 64/17 69/2
 69/16 76/12 76/13
counsel [11] 2/8 28/6 33/5 34/20
 36/6 37/3 37/13 37/17 37/17 39/2
 40/8
counterpart [1] 51/11

JA283

**C**

country [2] 8/2 37/5
County [2] 25/4 63/13
couple [2] 16/16 40/7
coupled [1] 13/8
course [1] 51/11
court [99]
court's [7] 26/7 42/7 51/17 54/22
 57/21 58/1 77/10
courthouse [2] 6/4 6/7
courts [8] 12/23 50/11 51/4 51/23
 52/13 54/9 70/8 75/12
covers [1] 62/20
COVID [1] 63/12
create [1] 17/2
created [1] 19/24
creates [2] 47/6 68/8
creating [1] 43/15
creation [1] 23/5
creations [1] 18/5
credit [3] 38/13 45/16 64/10
credits [6] 4/12 18/4 45/11 48/6
 48/12 49/12
critical [3] 3/5 5/5 5/9
Crosby [1] 46/23
cross [2] 46/23 58/10
cross-file [1] 46/23
cross-filed [1] 58/10
CRR [2] 1/23 80/16
cure [2] 4/25 6/20
current [1] 10/20
currently [3] 11/16 15/25 60/21
customer [19] 28/12 28/19 29/1
 29/4 29/5 29/8 31/11 31/11 31/22
 43/7 43/23 44/1 47/16 48/17 49/21
 49/22 49/23 76/11 77/18
customer's [1] 31/18
customers [20] 19/7 20/2 21/10
 21/14 21/25 24/8 29/19 29/21
 30/22 32/1 43/12 45/2 48/4 49/6
 49/8 62/5 68/7 75/22 75/22 77/23
cut [1] 8/25
cuts [1] 29/2
cv [1] 1/5

**D**

D.C [2] 11/19 12/9
dangerous [1] 67/9
data [1] 59/16
date [1] 47/15
Dated [1] 80/12
day [2] 41/24 80/12
daylight [1] 41/7
deal [1] 28/20
dealing [1] 5/6
debate [6] 3/6 8/21 9/1 12/22
 13/12 25/8
decades [1] 18/9
deceive [1] 21/9
deceived [4] 5/15 6/10 20/10
 36/17
December [5] 41/23 76/25 77/8
 77/16 80/12
December 1 [3] 76/25 77/8 77/16
December 1st [1] 41/23
deception [20] 3/22 3/25 4/6 4/14
 5/18 5/19 6/13 6/21 6/23 7/5 8/8
 10/13 10/15 11/5 31/23 35/6 35/8
 39/7 70/22 71/1
deceptive [3] 10/3 31/17 57/1
deciding [3] 51/6 54/10 75/3
decision [6] 41/23 43/2 54/22
 56/21 67/4 74/5
decisions [1] 50/11
Declaration [1] 51/10

declarations [1] 11/17
deem [1] 45/15
deep [1] 63/25
deeply [1] 62/13
defendant [4] 1/17 1/19 26/13
 75/20
Defendants [11] 1/8 46/12 51/15
 57/24 59/21 60/11 62/4 65/3 69/6
 69/17 77/22
Defendants' [4] 57/3 58/18 69/13
 74/17
define [3] 12/10 34/19 45/13
defined [2] 45/16 48/5
definition [7] 12/12 16/9 18/7
 29/15 38/20 64/19 71/6
degree [2] 59/8 59/15
delay [2] 76/4 76/5
Delegate [1] 46/23
deliver [1] 49/11
delivered [3] 36/23 45/22 61/21
delivery [1] 6/24
demand [2] 63/19 76/25
demonstrate [5] 24/11 59/6 59/14
 65/11 66/1
demonstrated [7] 70/3 72/11 75/4
 75/23 78/12 78/17 78/22
denied [4] 27/17 75/19 77/12 79/5
deny [2] 15/23 32/22
Department [3] 45/24 49/2 65/4
depending [1] 52/2
deregulated [1] 43/8
derived [3] 5/25 8/10 45/18
describe [11] 3/10 7/7 11/23
 13/18 14/3 30/10 31/1 31/20 34/19
 38/9 57/24
described [4] 46/19 46/24 58/2
 58/6
describes [3] 48/22 48/24 63/16
designated [2] 18/23 45/7
designates [1] 45/24
designed [6] 22/15 25/23 33/8
 44/23 51/2 52/14
desired [1] 23/22
despite [4] 17/24 19/11 20/19
 21/17
destination [1] 6/17
detail [2] 36/5 58/14
detailed [1] 62/8
determination [1] 57/9
determine [5] 16/11 16/22 17/2
 38/18 53/9
determined [1] 30/18
developing [1] 32/12
development [3] 29/6 46/13 50/12
deviate [1] 15/4
devices [1] 24/1
dices [1] 40/19
did [5] 11/22 26/1 33/14 55/4
 69/19
didn't [5] 32/6 33/11 34/4 35/22
 36/25
difference [2] 4/21 18/2
differences [1] 70/12
different [14] 5/19 5/24 7/2
 11/16 18/1 34/10 34/17 44/12
 45/13 47/12 49/16 52/2 59/19
 66/21
differentiated [1] 45/6
differently [1] 45/14
difficult [4] 55/13 66/6 66/19
 70/1
direct [5] 59/12 64/15 64/22
 65/22 77/7
directly [13] 4/10 5/20 9/18
 23/10 26/20 36/23 43/3 53/9 55/11

59/3 59/22 65/6 65/12
disagreement [1] 40/13
disagrees [1] 68/3
disclaimers [1] 54/3
disclose [2] 10/21 70/19
disclosure [34] 14/9 14/15 14/23
 14/23 14/24 15/2 25/3 25/10 25/15
 25/16 27/10 29/16 29/18 32/4
 32/11 39/4 39/5 49/9 49/10 49/20
 61/23 70/7 70/13 70/21 71/4 72/4
 72/4 72/6 72/12 72/14 72/16 73/5
 74/15 76/14
disclosures [20] 11/4 11/9 11/24
 12/2 12/2 12/14 13/2 13/5 14/2
 19/25 20/15 24/19 24/19 28/21
 48/2 70/9 71/9 71/10 72/10 74/23
disconnect [2] 30/23 31/7
discover [1] 17/25
discovery [1] 19/8
discretion [2] 13/20 15/4
discriminate [1] 52/6
discrimination [1] 3/18
discriminatory.' [1] 55/2
discuss [1] 58/13
discussed [1] 77/22
discussing [1] 13/8
discussion [4] 33/15 40/24 40/24
 53/12
disfavored [1] 20/14
disposition [1] 66/4
dispositive [3] 22/8 51/17 55/1
dispute [5] 3/20 20/8 25/24 40/9
 73/14
disputed [3] 16/5 32/15 32/19
disregard [2] 36/10 36/11
disruptions [1] 76/9
disruptive [1] 76/13
distinct [1] 53/1
distinction [1] 73/2
distribution [7] 43/10 43/12
 43/18 43/25 44/3 44/14 44/16
district [6] 1/1 1/1 11/19 51/4
 80/5 80/6
DIVISION [1] 1/2
do [41] 4/13 4/25 8/24 8/25 10/15
 10/17 11/16 12/17 14/9 14/11
 15/19 15/20 16/15 17/9 22/22
 22/23 27/9 27/19 29/10 32/25 33/9
 35/1 35/23 38/8 38/21 40/19 41/23
 42/13 44/1 44/10 49/2 56/1 64/4
 65/2 65/6 67/25 68/23 73/11 74/25
 77/15 80/6
doctors [1] 10/1
does [35] 3/20 4/24 6/20 11/1
 21/15 24/4 25/2 26/10 27/3 29/12
 32/15 33/25 34/14 34/14 49/16
 54/11 54/12 54/23 55/19 56/10
 57/1 57/24 58/1 63/10 65/10 65/11
 67/16 69/19 71/12 71/25 72/16
 72/22 74/3 74/12 79/2
doesn't [4] 6/1 7/21 9/14 14/2
doing [4] 16/20 30/15 31/17 31/20
dollars [3] 60/5 62/22 64/5
don't [21] 8/8 12/16 13/5 15/8
 15/23 16/5 16/21 28/20 28/21
 28/25 36/6 36/11 37/2 37/20 40/3
 40/5 40/18 41/10 41/16 42/14
 74/25
done [4] 10/10 11/12 20/7 32/21
doubt [1] 66/23
doubtful [2] 66/13 69/21
down [5] 12/6 13/11 31/24 33/7
 52/10
downplay [1] 23/11
draft [1] 14/15

JA284

**D**

**drawing [1]** 29/7
**drawn [2]** 52/9 55/12
**dream [1]** 18/11
**drinking [1]** 67/9
**driving [1]** 29/23
**drugs [1]** 54/7
**duped [2]** 21/14 64/11
**during [2]** 50/12 63/11
**dysfunctional [3]** 59/25 60/9
  69/21

**E**

**each [10]** 4/20 18/13 24/3 50/23
  61/5 61/11 61/13 62/23 64/5 75/13
**earlier [5]** 35/17 59/24 68/4
  76/10 77/22
**ears [1]** 3/2
**eastern [1]** 37/8
**ECF [3]** 58/15 58/17 79/5
**ECF-14-3 [1]** 58/17
**ECF-2 [1]** 79/5
**eco [6]** 60/18 61/3 61/4 61/16
  61/19 61/25
**eco-buyer [1]** 61/4
**eco-buyers [5]** 60/18 61/3 61/16
  61/19 61/25
**ecofriendly [3]** 37/24 48/7 68/14
**economic [8]** 20/18 34/23 35/3
  35/9 35/16 53/19 54/12 54/20
**ecosystem [2]** 41/9 41/18
**Edenfield [2]** 58/6 59/8
**educate [2]** 5/2 11/14
**educational [3]** 66/17 67/4 69/5
**effect [12]** 7/21 8/5 10/17 14/13
  14/20 15/12 47/4 75/13 76/22
  77/21 78/2 78/11
**effective [7]** 66/14 66/24 69/7
  69/10 69/13 69/22 69/23
**effectively [2]** 28/12 56/1
**effectuating [1]** 78/6
**effort [1]** 46/19
**eight [1]** 61/9
**either [10]** 12/15 14/22 24/15
  37/14 45/3 49/9 53/22 56/19 69/3
  72/14
**elaborate [1]** 21/22
**election [1]** 77/4
**electric [15]** 43/6 43/8 43/9
  43/10 43/11 43/17 43/24 44/8 47/8
  47/14 47/15 48/4 49/6 49/8 68/7
**electricity [97]**
**electron [1]** 28/21
**electrons [1]** 6/15
**elements [1]** 20/7
**Eleventh [2]** 26/6 26/14
**eligible [13]** 6/5 6/8 8/11 8/18
  8/20 13/23 18/22 33/19 33/22 46/8
  46/13 48/13 50/1
**else [1]** 6/19
**else's [1]** 28/24
**elsewhere [1]** 7/15
**emergency [1]** 76/24
**emission [4]** 8/18 38/2 48/9 68/17
**emission-free [3]** 38/2 48/9 68/17
**emissions [3]** 7/1 7/19 8/8
**emphasis [1]** 54/22
**emphasize [2]** 25/16 64/24
**empirical [1]** 59/16
**employ [1]** 65/25
**employed [2]** 52/13 69/2
**employing [1]** 75/16
**enact [1]** 10/16
**enacted [4]** 3/5 26/25 36/14 78/6
**enacting [1]** 60/16

**enactment [4]** 24/8 43/6 43/9
  43/21
**encourage [2]** 11/18 34/24
**encourages [1]** 46/12
**encouraging [1]** 34/24
**end [15]** 26/10 26/18 26/19 47/2
  52/5 52/10 55/20 60/7 60/9 60/15
  61/17 62/21 63/21 69/18 73/1
**ending [1]** 27/8
**ends [2]** 66/11 66/16
**energy [122]**
**Energy's [1]** 62/17
**energy,' [1]** 62/21
**energy-backed [1]** 47/22
**enforce [1]** 15/10
**enforcement [1]** 15/13
**enforcing [2]** 22/15 69/3
**engaging [1]** 11/13
**enjoin [2]** 15/14 17/1
**enjoined [2]** 41/21 78/6
**enjoiner [3]** 32/8 32/9 32/13
**enjoining [3]** 77/21 78/1 78/11
**ensnare [1]** 22/6
**ensure [7]** 18/19 19/25 44/21
  61/24 63/23 66/22 77/16
**ensuring [2]** 58/7 61/16
**enters [1]** 45/7
**entire [5]** 16/25 37/8 37/9 37/23
  38/3
**entirely [1]** 62/25
**entities [3]** 49/16 65/10 65/12
**entitled [5]** 1/10 50/8 57/11
  59/24 80/9
**entity [1]** 49/18
**environment [1]** 49/24
**environmental [20]** 3/10 3/12 4/20
  5/4 5/8 5/12 8/4 12/19 13/15
  13/19 14/6 30/13 33/10 37/18 38/5
  40/5 40/5 47/24 61/1 63/16
**environmentalists [1]** 63/22
**environmentally [6]** 12/10 12/11
  13/24 37/24 48/7 68/14
**equal [3]** 18/7 18/23 45/17
**equals [1]** 48/15
**equities [5]** 50/18 75/6 75/10
  75/12 75/25
**equivalent [1]** 48/12
**erroneously [2]** 75/19 75/20
**escape [1]** 21/18
**esoteric [1]** 42/25
**especially [3]** 30/18 45/15 78/11
**Esquire [6]** 1/15 1/15 1/16 1/17
  1/18 1/20
**essentially [1]** 16/10
**establish [6]** 15/20 21/23 50/15
  51/25 66/6 79/3
**established [7]** 9/4 18/12 41/12
  43/20 47/7 56/15 75/6
**establishing [3]** 43/14 50/23 67/8
**et [4]** 1/3 1/7 2/5 2/6
**evaluation [1]** 56/2
**even [14]** 5/23 12/3 12/4 14/8
  15/3 15/8 19/7 33/21 55/6 59/19
  64/6 67/24 69/9 75/2
**event [2]** 5/23 15/1
**ever [1]** 62/13
**ever-more [1]** 62/13
**every [1]** 69/8
**everyone [5]** 2/2 9/13 16/24 40/22
  41/13
**evidence [15]** 4/8 9/16 23/11
  23/14 34/12 35/12 35/19 35/25
  36/19 37/15 39/12 51/6 56/22
  64/14 77/22
**evidentiary [2]** 21/22 51/4

**exact [1]** 21/13
**exactly [5]** 24/22 28/21 31/10
  33/12 39/1
**examined [1]** 60/1
**examining [1]** 55/8
**example [10]** 6/3 8/10 9/23 33/21
  43/23 46/9 46/10 74/5 74/6 74/10
**examples [1]** 12/7
**exceed [1]** 47/17
**exceeding [1]** 47/13
**exceeds [1]** 48/15
**except [3]** 9/13 26/24 34/18
**excessive [1]** 32/14
**excluded [1]** 65/10
**exclusively [1]** 43/11
**excuse [1]** 21/19
**executed [1]** 27/6
**exercise [1]** 21/3
**exhibits [4]** 4/9 58/14 59/21
  74/18
**existing [7]** 3/16 10/25 38/5
  46/18 69/3 69/20 77/25
**expand [1]** 36/3
**expanding [3]** 22/21 34/21 35/18
**expect [1]** 29/9
**expeditious [1]** 76/8
**experience [1]** 57/15
**explain [2]** 28/11 46/12
**explained [16]** 21/14 21/15 23/16
  24/1 41/3 51/24 54/24 57/14 64/12
  65/23 66/12 67/6 67/21 68/3 70/11
  75/11
**explaining [3]** 49/20 53/21 54/15
**explains [2]** 4/1 19/16
**express [1]** 56/8
**expressing [1]** 55/21
**expression [4]** 51/22 52/20 52/21
  52/22
**extend [1]** 11/9
**extensive [4]** 23/20 53/11 65/20
  66/7
**extent [2]** 15/4 51/15
**extra [1]** 61/12
**extraordinarily [1]** 79/4
**extraordinary [4]** 17/17 27/13
  50/6 75/16

**F**

**face [3]** 42/9 67/16 74/12
**facial [6]** 20/12 20/14 25/19
  27/13 32/20 40/25
**facilities [1]** 73/14
**facing [1]** 38/22
**fact [28]** 7/18 14/3 19/11 20/13
  20/20 20/24 21/16 21/18 24/8
  24/16 24/21 24/21 25/3 26/11
  26/24 31/3 33/25 35/22 39/23
  41/24 56/20 57/2 57/7 59/7 59/15
  63/10 67/12 76/7
**factors [16]** 21/6 22/10 24/18
  27/15 50/20 50/24 50/25 51/1 54/9
  54/17 70/2 71/11 75/1 75/10 79/1
  79/2
**facts [2]** 15/19 25/20
**factual [29]** 11/4 12/2 12/13 13/4
  14/1 14/9 14/10 24/20 25/24 26/1
  50/12 57/9 70/15 70/19 70/24 71/7
  71/19 71/21 71/22 71/23 72/15
  72/20 73/3 73/11 73/15 73/19
  73/23 74/6 74/13
**factually [1]** 10/3
**failed [4]** 11/3 66/15 79/2 79/3
**fails [3]** 67/19 69/1 74/24
**fall [1]** 4/17
**false [1]** 55/5

**F**

falsely [1] 71/14
Fane [1] 58/6
far [5] 29/3 29/8 67/20 69/13 70/1
farm [9] 4/11 5/20 7/17 7/18 9/3 9/18 36/25 64/7 64/10
farms [2] 8/19 60/25
favor [5] 21/7 22/10 27/15 75/7 75/25
favors [1] 50/18
federal [7] 1/24 3/12 7/25 22/2 50/5 52/13 80/16
federally [1] 45/7
feed [1] 6/3
feeding [1] 64/7
feel [2] 20/2 63/25
fees [1] 61/1
Feldman [3] 1/18 2/23 2/25
felt [1] 21/14
few [4] 27/24 28/5 33/3 42/14
fictional [1] 64/9
field [2] 23/21 66/9
fierce [1] 63/22
figuring [1] 32/20
file [5] 21/20 46/23 76/23 77/4 77/6
filed [2] 58/10 76/24
final [1] 15/15
finalize [1] 14/17
Finally [5] 26/3 26/16 27/12 62/4 65/19
Financial [1] 22/2
financially [1] 77/24
find [9] 21/12 23/22 26/5 26/5 30/13 57/1 65/10 74/25 79/2
finding [4] 27/2 55/16 76/16 76/17
finds [1] 27/5
finish [1] 14/21
firearm [3] 25/6 25/7 25/11
firms [1] 10/9
first [43] 3/19 13/16 19/9 19/19 19/24 20/12 20/14 20/24 21/4 26/19 28/8 29/3 33/5 34/16 36/16 38/7 40/8 41/4 42/23 47/23 51/9 51/12 51/14 51/19 51/21 51/25 52/17 54/16 56/13 56/15 56/16 57/12 58/4 67/11 68/3 70/4 70/24 72/12 72/15 74/21 76/2 78/17 78/23
fit [10] 9/6 9/14 9/21 23/22 29/11 33/13 34/14 34/14 66/2 68/4
flexibly [1] 51/23
Floor [1] 1/24
flushable [6] 11/24 11/25 12/4 25/20 25/21 25/23
focus [2] 20/19 26/21
focused [2] 25/10 66/18
focusing [1] 45/14
following [4] 48/10 49/9 49/20 73/4
follows [4] 53/4 61/20 63/11 75/11
food [1] 54/6
Foods [1] 55/21
footnote [1] 34/18
footprint [3] 7/2 8/5 63/17
force [1] 12/11
foregoing [2] 68/21 80/7
form [4] 69/5 75/21 75/22 78/7
formally [1] 14/17
format [1] 80/9
forms [1] 62/2
forth [5] 48/2 53/3 54/17 72/14

74/15
forward [1] 42/6
fossil [2] 23/4 63/20
found [4] 25/9 25/24 25/25 75/1
Foundation [3] 58/16 59/24 64/13
foundations [1] 60/13
four [4] 20/6 50/25 52/25 53/3
four-part [2] 52/25 53/3
Fourteenth [1] 51/20
Fourth [17] 9/24 13/11 20/13 21/21 23/12 23/23 26/11 51/24 53/12 54/17 54/23 56/20 66/12 67/4 70/11 78/16 78/19
frame [1] 30/2
framed [2] 35/5 35/7
framework [4] 6/6 6/18 55/7 56/2
framing [5] 72/5 72/8 73/15 73/16 74/9
fraudulent [1] 22/5
free [9] 21/3 37/25 38/2 48/8 48/9 51/22 68/15 68/17 73/22
freedom [1] 51/20
Frequently [2] 5/3 38/17
friend [1] 34/3
friendly [3] 37/24 48/7 68/15
front [2] 13/5 34/13
fuels [1] 23/4
fuels,' [1] 63/21
full [2] 32/8 51/3
fundamentally [1] 55/6
fungible [1] 18/5
further [20] 11/1 12/3 12/17 15/13 19/22 23/5 29/6 42/11 46/3 46/24 49/7 52/10 54/9 55/9 58/12 65/1 69/23 72/8 72/21 73/17
furtherance [1] 43/16
furthers [2] 53/23 71/13
Fusaro [1] 51/24
future [1] 63/24

**G**

Gas [1] 43/24
gauge [1] 19/18
general [15] 1/7 1/17 2/18 2/24 22/17 23/12 27/1 28/22 33/6 36/13 43/8 44/20 49/3 65/4 76/20
General's [1] 54/5
generally [1] 51/13
generated [9] 6/16 18/6 18/14 47/11 49/24 50/3 63/2 63/9 72/23
generation [8] 45/17 46/11 46/14 46/16 49/14 61/21 72/20 72/24
generations [1] 63/24
generator [1] 61/23
geographic [1] 11/9
geographical [1] 37/6
get [5] 2/3 15/25 25/9 31/3 42/22
gets [2] 28/12 31/2
getting [15] 5/20 5/21 6/10 6/11 7/7 21/11 28/16 34/5 36/19 36/21 37/10 39/13 63/4 63/25 64/6
give [4] 6/3 8/10 42/21 73/21
given [5] 14/24 30/19 32/14 51/21 64/3
gives [2] 36/12 66/8
giving [1] 53/22
gleaned [1] 54/9
global [1] 7/16
Glynn [6] 1/20 2/20 2/22 28/4 32/25 36/10
go [9] 4/5 11/1 11/15 12/3 12/17 16/21 27/25 39/9 74/25
goal [4] 18/15 31/9 65/16 69/14
goals [5] 18/20 33/10 33/10 43/16 69/23

goes [4] 11/20 12/19 12/20 12/25
going [26] 15/13 15/14 19/17 20/4 26/14 28/22 29/1 29/4 29/5 29/7 29/10 29/11 31/2 31/12 31/12 31/14 31/15 42/1 42/2 42/3 42/5 42/9 42/13 42/21 56/16 71/10
good [19] 2/2 2/10 2/16 2/17 2/19 2/22 2/23 17/14 17/15 25/14 25/14 49/12 53/20 71/13 72/17 72/17 72/18 72/21 73/1
goods [1] 71/14
gouging [2] 46/22 58/11
governed [1] 51/3
government [22] 6/23 7/15 7/22 9/11 11/12 14/12 15/7 15/19 16/25 21/22 22/19 24/14 25/17 33/14 36/4 41/5 52/11 55/9 57/13 65/24 66/10 75/8
government's [7] 5/14 5/16 5/24 7/3 34/12 59/11 68/5
governmental [9] 23/13 52/18 52/22 53/7 53/10 55/12 59/1 59/4 66/10
Governor [2] 47/3 76/21
gradual [1] 76/12
granted [3] 44/20 50/9 75/20
granting [2] 50/24 75/13
great [1] 25/1
greater [5] 13/10 29/23 48/15 58/13 65/23
greatly [1] 63/17
green [75] 1/14 2/11 3/7 3/16 4/3 4/15 6/1 6/6 8/2 8/7 9/19 13/6 13/18 15/22 16/1 16/9 17/3 17/20 19/11 19/25 20/1 20/4 20/15 21/7 21/8 23/7 24/6 24/24 27/9 28/10 29/15 29/16 30/7 30/19 33/24 37/24 38/14 38/14 39/21 40/3 40/9 40/21 41/8 47/11 47/16 47/20 48/5 48/7 48/13 48/19 48/23 48/23 48/24 48/24 49/8 49/22 49/24 54/18 58/20 58/23 62/2 62/7 62/11 64/9 64/18 64/19 68/1 68/7 68/9 68/14 68/18 71/6 72/3 74/17 78/1
green-powered [2] 15/22 17/3
grid [6] 34/4 37/3 45/7 45/8 63/4 64/7
grow [1] 23/1
guaranteed [1] 52/20
guardrails [2] 47/1 61/16
guess [1] 32/6
gun [1] 25/8

**H**

had [12] 11/24 13/4 17/22 18/1 19/12 24/9 32/18 36/13 41/23 60/6 62/11 76/9
hand [1] 11/24
handful [3] 30/17 30/24 40/14
Handley [5] 1/17 2/17 17/12 27/19 32/21
happen [2] 23/2 29/10
happening [3] 36/2 36/2 60/15
happy [2] 17/6 17/7
hard [1] 31/6
harm [16] 50/17 51/3 64/16 64/21 75/4 75/18 75/19 75/21 75/22 76/4 77/9 77/14 78/2 78/3 78/10 78/13
harmed [2] 77/24 78/20
harmful [1] 22/16
harms [3] 59/6 59/14 75/24
has [55] 3/5 3/21 7/22 8/22 10/12 11/12 11/20 12/24 14/14 14/16 15/1 15/4 18/9 18/11 18/13 20/18 21/4 21/21 22/10 22/13 23/12

JA286

## H

has... [34]   23/20 25/19 32/18 35/23 36/9 40/22 41/3 42/11 43/1 44/20 45/12 49/17 49/23 51/21 51/24 54/24 56/23 57/15 57/15 57/18 57/20 58/25 60/2 60/9 60/21 60/22 63/9 66/12 68/4 70/11 70/12 75/10 78/1 79/7
have [100]
haven't [2]   10/25 32/8
having [3]   56/15 70/2 79/1
he [2]   36/9 40/10
health [3]   10/2 10/8 54/3
healthy [2]   23/4 63/23
hear [1]   33/11
heard [8]   21/10 33/7 34/16 35/17 35/21 36/5 36/16 40/15
hearing [4]   1/11 2/7 38/7 77/8
hearsay [1]   51/5
heightened [1]   3/23
held [6]   20/13 21/21 70/18 73/18 73/23 80/8
help [1]   39/6
helpful [3]   24/10 42/24 67/5
helping [2]   7/8 63/19
her [2]   62/11 64/3
here [54]   3/2 5/6 6/23 8/22 9/11 9/15 10/10 10/24 10/25 11/3 11/12 13/4 14/12 15/20 16/18 18/17 20/5 20/19 22/19 22/22 24/11 24/15 25/15 25/18 26/15 26/18 29/3 30/2 31/6 33/13 36/7 36/13 39/14 40/9 40/13 40/20 41/6 47/5 47/19 50/7 54/14 55/4 56/7 58/9 64/16 66/18 67/7 69/11 69/18 74/8 75/21 76/20 78/22 79/5
hereby [1]   80/6
hidden [1]   19/2
high [2]   20/12 27/14
higher [8]   17/22 18/3 20/3 23/9 25/19 30/7 48/16 68/19
highly [1]   14/20
highway [1]   8/14
his [1]   1/6
history [4]   43/2 57/21 58/24 59/20
hold [4]   38/21 39/21 44/18 77/8
holding [2]   10/1 10/2
Holdings [2]   43/4 44/25
hole [1]   56/3
home [5]   6/24 18/18 36/23 62/18 64/4
honest [1]   30/2
Honor [57]   2/10 2/13 2/17 3/3 4/1 4/4 4/13 5/5 5/6 5/13 5/23 6/14 6/22 7/25 8/6 8/21 9/5 10/14 11/20 13/3 13/15 14/2 15/15 16/18 17/6 17/11 17/13 17/14 26/3 26/15 27/11 27/18 27/22 28/2 28/5 33/3 33/17 33/21 34/22 35/1 35/13 35/15 35/19 35/25 36/12 36/15 37/20 38/11 39/5 39/13 40/7 40/12 40/18 41/7 41/19 41/22 42/16
HONORABLE [3]   1/11 42/17 79/7
hook [1]   15/24
hope [1]   30/23
hoping [1]   63/23
host [1]   18/24
hour [5]   4/21 45/17 49/13 72/19 72/23
hours [2]   61/10 64/4
house [3]   36/25 46/24 58/10
households [1]   60/4
how [19]   15/10 15/25 17/2 17/2 20/8 25/11 33/8 33/9 33/12 35/7 37/19 38/15 39/20 41/8 41/9 48/24 49/23 49/24 62/8
Howard [2]   1/18 2/23
however [12]   20/23 24/14 26/6 47/4 52/18 56/22 59/16 62/10 68/3 71/19 74/25 75/2
Hudson [14]   21/6 21/6 22/9 24/12 24/18 27/14 53/3 55/7 55/14 56/11 56/13 64/22 70/2 70/18
hundred [3]   33/15 33/16 33/17
hundred percent [2]   33/15 33/16
husband [2]   62/15 63/12
hydro [3]   38/1 48/9 68/17
hydroelectric [1]   46/11

## I

I'd [1]   11/18
I'll [3]   4/5 17/3 33/23
I'm [22]   8/22 11/20 17/6 17/7 31/2 31/12 32/6 32/23 33/6 34/5 34/20 35/3 35/15 42/13 43/3 56/16 58/25 62/13 71/10 72/10 76/15 76/16
I've [3]   13/7 74/11 74/15
iconic [1]   8/13
idea [2]   5/19 64/9
identified [4]   57/18 57/20 58/10 59/4
identifying [1]   9/21
ideological [1]   5/7
ignores [1]   77/20
ii [2]   26/10 46/1
image [1]   24/4
imagine [1]   55/13
imagined [1]   66/20
immunity [3]   26/7 26/14 51/15
impact [2]   63/16 76/5
impairs [1]   56/6
impinge [1]   52/1
implements [2]   46/4 68/5
implied [1]   21/25
importance [1]   25/1
important [6]   8/25 9/11 26/21 39/2 40/20 58/3
impose [3]   22/24 56/18 57/17
imposed [1]   56/3
imposes [1]   47/19
impossible [1]   14/21
inadmissible [1]   51/6
incapable [1]   27/6
incentive [1]   34/23
incentivize [4]   23/5 29/6 36/3 38/24
incentivized [1]   19/3
incineration [1]   8/11
include [4]   8/16 49/9 49/19 62/4
included [1]   43/13
includes [7]   33/19 44/4 45/8 48/25 53/24 53/25 54/5
including [6]   44/23 47/21 48/23 60/12 68/14 73/21
inclusion [3]   8/11 48/14 50/1
income [2]   19/6 60/18
incomplete [1]   27/6
incongruence [1]   77/5
inconvenient [1]   21/18
increase [2]   23/8 63/19
increased [4]   17/24 18/13 22/25 76/9
increasing [2]   46/14 61/17
incumbent [3]   4/20 15/22 42/3
indeed [3]   10/18 51/4 65/15
indicate [1]   49/16
indicating [1]   63/8
individual [2]   62/4 64/15
individually [1]   75/24
individuals [1]   65/8
industry [1]   43/8
ineffective [2]   59/11 64/23
ineligible [1]   34/9
inextricably [1]   40/10
inform [2]   21/10 67/13
informal [1]   51/2
information [23]   9/12 9/13 14/10 24/20 25/11 25/12 26/1 49/1 54/2 56/24 56/24 58/7 58/11 58/20 59/17 64/17 64/17 66/22 68/6 68/25 70/15 70/20 74/16
infringes [1]   47/23
infringing [1]   17/4
inherently [3]   56/20 57/2 57/7
initial [2]   41/1 69/7
injunction [20]   1/11 2/7 20/6 32/23 50/4 50/6 50/15 50/24 51/1 51/7 74/24 75/9 75/17 75/19 75/20 76/6 76/24 78/21 78/24 79/4
injunctive [2]   50/18 75/7
injury [2]   75/12 78/8
injustices [1]   60/15
inquiries [1]   53/8
inquiry [3]   65/21 65/22 71/20
inseverability [1]   40/14
inseverable [1]   40/23
insignificant [1]   78/3
instance [2]   73/19 76/9
instead [14]   11/12 18/2 20/9 30/7 55/7 59/13 59/17 63/6 66/18 66/22 69/10 71/13 72/17 74/5
instructions [1]   54/2
instructive [1]   53/13
intend [1]   67/23
intended [1]   43/19
intent [1]   27/7
interconnected [1]   15/20
interest [52]   3/21 9/6 9/7 9/8 22/11 22/14 22/17 23/10 35/2 35/4 35/9 35/17 36/4 50/19 52/9 53/7 53/10 53/11 53/23 53/24 55/9 55/12 55/13 57/13 57/19 57/21 57/25 58/3 58/4 58/6 58/19 59/1 59/4 59/23 65/2 65/12 66/2 66/5 67/8 68/5 68/11 68/22 69/9 70/15 70/22 71/1 74/14 74/18 75/7 75/10 75/15 76/1
interesting [1]   37/16
interests [6]   22/19 36/8 52/23 53/19 65/21 69/11
Interior [1]   45/24
intermediate [6]   21/5 24/12 52/14 52/25 55/16 56/1
interstate [1]   45/7
intertwined [3]   15/23 40/10 71/9
introduce [1]   2/8
introduced [1]   46/17
invalid [1]   52/7
inventions [1]   45/13
invest [1]   77/1
invoice [1]   44/2
involved [1]   76/7
involving [1]   23/25
irreparable [6]   50/17 51/2 75/4 76/4 78/7 78/9
is [322]
island [2]   37/4 37/8
isn't [1]   41/7
issuance [2]   78/20 78/24
issue [37]   20/15 22/7 24/16 25/4 29/2 30/2 32/7 42/20 42/21 47/5 47/19 53/13 54/14 55/16 55/18 55/23 56/10 56/16 57/2 57/4 57/11

JA287

## I

issue... [16]  58/5 58/23 67/5 68/4 68/11 68/21 68/22 69/14 71/3 73/19 74/4 74/23 76/25 77/8 77/11 77/17
issued [1]  44/19
issues [13]  19/9 19/20 19/24 23/17 26/19 29/14 30/3 46/18 60/15 61/15 61/15 64/3 69/19
it [142]
it's [45]  4/16 5/18 6/15 6/22 6/25 9/10 9/12 9/15 9/20 11/19 13/10 13/19 14/11 14/20 15/3 16/5 19/15 20/5 20/9 21/9 21/9 25/18 26/13 26/21 27/1 30/5 31/6 31/10 31/12 34/10 35/12 37/3 37/10 37/22 38/3 38/8 38/14 38/14 38/25 40/19 41/17 53/18 63/25 71/19 73/3
its [40]  4/1 4/9 7/1 7/15 7/21 15/1 15/18 18/10 20/10 21/8 21/8 22/11 22/12 22/25 23/1 23/8 36/8 52/6 52/23 53/15 53/19 56/6 56/12 56/12 58/10 59/6 59/14 65/16 66/11 66/16 67/16 69/3 69/4 69/4 69/9 70/6 71/20 74/12 74/22 78/7
itself [10]  37/8 38/11 38/12 49/15 49/17 55/6 56/5 57/2 57/7 73/7

## J

James [2]  1/17 2/17
January [8]  14/14 14/20 14/22 14/25 42/10 47/5 77/2 77/11
January 1 [3]  47/5 77/2 77/11
January 1st [5]  14/14 14/20 14/22 14/25 42/10
Jeremy [2]  1/16 2/15
Johnson [5]  1/15 2/10 17/9 27/21 33/1
Jr [1]  1/15
JRR [2]  1/5 2/5
JRR-24-2820 [1]  2/5
Judge [1]  3/4
judicial [2]  52/2 80/10
JULIE [1]  1/11
July [3]  27/1 47/4 76/22
July 1 [2]  47/4 76/22
jurisdiction [1]  26/7
jurisprudence [1]  54/16
just [18]  5/22 6/25 9/10 27/12 30/3 31/8 31/22 34/10 36/4 37/22 37/22 39/8 41/3 41/11 41/22 42/14 42/21 71/3
Justice [1]  54/4
justifications [1]  52/3
justify [3]  23/13 35/5 50/14
Justifying [1]  35/15

## K

keep [2]  9/19 38/11
key [2]  11/21 34/12
keyed [2]  17/4 17/4
kilowatt [3]  4/21 61/10 64/4
kilowatt-hour [1]  4/21
Kimberly [4]  11/19 15/7 25/17 39/8
Kimberly-Clark [4]  11/19 15/7 25/17 39/8
kind [4]  14/14 34/6 35/8 42/8
King [1]  78/5
know [23]  7/20 12/8 14/13 15/3 15/6 28/14 28/20 28/21 28/22 28/25 29/5 33/5 37/3 37/23 38/23 39/17 40/8 40/21 40/24 41/16 50/4 61/17 61/25
knowing [1]  18/18
knowledge [1]  19/7
known [3]  22/1 44/9 47/9
knows [2]  29/1 29/4

## L

labeling [2]  54/6 54/7
labels [1]  54/5
lack [3]  9/5 9/14 9/20
lacks [1]  22/23
laid [1]  22/5
language [8]  13/9 49/19 55/10 71/7 72/6 72/9 72/25 76/14
large [1]  25/1
largely [1]  43/20
larger [3]  37/3 55/3 72/18
last [3]  18/9 34/6 62/24
last-mile [1]  34/6
Lastly [2]  32/3 61/23
later [3]  17/25 51/3 58/13
laundry [1]  3/8
law [38]  3/5 3/24 3/24 4/9 7/25 10/9 10/20 14/13 14/19 19/15 23/24 24/9 26/6 26/22 26/24 29/12 35/3 35/16 36/14 45/13 45/16 46/3 46/12 46/18 48/25 55/1 55/7 55/8 55/16 56/7 57/23 58/2 58/24 69/19 76/21 77/21 77/25 78/11
lawful [3]  21/9 53/6 57/4
lawfully [1]  17/2
laws [8]  22/3 44/23 44/24 51/20 52/1 69/3 70/8 70/18
lawyers' [1]  23/24
lay [1]  30/21
lays [1]  15/18
leading [1]  31/24
leads [1]  23/3
LEAGUE [4]  1/3 1/14 2/5 2/11
learned [2]  62/24 64/3
leasing [1]  45/25
least [6]  29/1 33/19 53/6 55/8 61/5 65/25
Lee [1]  26/12
Lee Thompson [1]  26/12
leeway [2]  23/21 66/8
legal [1]  51/22
Legend [1]  78/15
legislative [4]  27/7 43/13 58/24 70/4
legislators [2]  21/10 23/15
legislature [5]  16/19 17/1 30/18 36/13 43/19
legitimate [2]  8/23 35/9
lend [2]  65/11 65/15
length [3]  21/1 58/13 77/22
lengthy [1]  76/19
less [6]  6/7 63/20 69/2 69/13 73/14 76/12
lesser [1]  52/19
let [2]  9/12 69/22
let's [2]  2/3 15/9
level [4]  37/9 52/12 52/15 70/8
levels [2]  52/2 61/21
license [1]  44/18
licensed [2]  73/20 73/25
licensing [3]  16/16 19/22 40/16
life [1]  63/23
light [2]  18/17 39/11
like [22]  4/11 8/4 8/19 8/19 9/10 10/8 13/10 14/4 14/16 24/14 30/10 30/20 35/4 37/7 39/8 40/13 41/10 45/4 47/7 62/24 66/20 68/1
likelihood [6]  70/3 72/11 75/2 78/12 78/17 78/22

## L (continued)

likely [10]  21/9 27/16 36/22 50/11 50/16 50/16 51/8 66/25 74/21 78/24
Likewise [1]  21/25
limitation [3]  7/11 8/1 68/11
limited [4]  4/2 50/10 68/13 68/22
limiting [2]  29/24 39/19
limits [1]  26/7
line [1]  55/2
lines [1]  39/1
lining [1]  29/8
link [2]  64/15 64/20
list [2]  3/8 67/22
literature [1]  62/19
litigation [2]  23/25 50/13
little [1]  28/17
live [1]  63/23
lively [1]  12/22
lives [1]  23/4
LLC [2]  22/3 44/25
local [6]  17/23 29/25 34/24 44/13 45/3 63/4
locales [1]  59/19
localism [1]  6/21
locally [4]  5/16 7/8 7/11 7/13
locally-sourced [1]  7/13
located [1]  45/19
location [2]  7/20 61/22
Lombard [1]  1/24
long [7]  4/16 33/18 36/21 57/21 70/20 70/24 77/6
longer [2]  14/8 19/17
look [10]  8/6 9/7 9/13 11/18 14/15 39/23 39/23 40/8 51/4 66/20
looked [2]  7/5 10/3
looking [3]  31/18 37/22 56/21
loss [2]  75/4 78/18
lost [1]  75/22
lot [7]  8/15 11/20 33/11 33/15 35/21 40/20 41/24
low [4]  19/6 60/18 60/25 73/22
low-cost [1]  73/22
low-income [2]  19/6 60/18
lower [5]  7/19 8/18 21/5 52/12 70/8

## M

made [3]  22/3 24/23 70/12
MAEC [1]  61/19
major [1]  76/9
majority [1]  13/7
make [20]  9/14 12/14 12/18 18/11 20/5 21/22 22/5 33/17 33/23 37/6 39/10 41/15 41/20 50/11 71/25 72/3 72/4 72/10 74/13 77/12
makes [2]  27/13 36/22
making [7]  3/16 11/1 15/8 16/14 29/21 38/4 41/10
manage [2]  37/6 37/7
mandatory [5]  8/16 10/22 11/6 19/25 24/19
manner [1]  76/13
many [8]  17/24 23/17 60/14 61/15 61/15 62/25 63/22 69/25
margins [1]  28/17
market [35]  5/10 10/21 11/6 15/21 15/22 15/22 15/25 16/1 16/2 16/3 16/15 17/3 17/3 19/1 19/17 24/22 28/25 31/12 31/23 39/15 42/5 43/3 43/5 43/20 43/22 44/11 47/2 47/8 47/10 47/22 58/17 58/23 60/1 60/8 68/19
marketed [5]  19/10 48/6 48/13 48/19 48/22
marketers [1]  9/13

JA288

**M**

**marketing [45]**   11/13 13/7 13/21 16/7 18/25 21/7 21/8 21/17 29/15 30/17 30/25 33/24 35/16 35/24 38/19 38/20 39/22 40/4 40/9 40/21 41/8 42/4 47/20 47/25 48/5 49/8 54/18 57/6 57/8 58/20 61/24 62/12 63/13 63/16 64/19 64/21 68/9 68/12 69/15 69/15 71/5 75/23 76/10 77/2 77/17
**marketplace [5]**   23/17 31/5 47/6 58/8 60/16
**markets [2]**   15/21 15/23
**markets.' [1]**   43/16
**MARYLAND [81]**
**Maryland's [18]**   3/17 4/16 4/17 4/22 20/9 23/10 28/8 30/6 43/2 51/11 58/16 58/19 61/4 61/19 61/24 68/2 71/6 74/18
**Marylanders [1]**   37/10
**massively [1]**   32/13
**matching [1]**   45/10
**materia [1]**   51/13
**material [5]**   59/7 59/15 64/12 70/12 77/22
**materials [6]**   13/21 24/23 38/9 42/4 77/2 77/17
**math [1]**   64/5
**matter [18]**   1/10 2/4 2/6 3/6 7/21 8/3 8/25 14/9 24/17 25/1 26/12 26/13 35/6 43/4 44/25 65/5 69/8 80/9
**may [29]**   3/4 8/24 19/15 29/22 35/9 35/19 36/17 43/22 44/1 44/12 44/15 47/3 49/14 49/15 50/6 51/4 56/10 56/18 56/25 56/25 57/8 57/17 59/10 59/18 65/18 71/16 73/6 76/6 76/21
**May 9 [2]**   47/3 76/21
**maybe [2]**   38/7 41/22
**Md [1]**   45/1
**me [6]**   21/19 27/24 42/21 42/24 42/25 78/9
**MEAC [2]**   61/14 64/13
**mean [7]**   25/2 35/5 36/24 37/16 38/7 39/14 41/19
**meaning [6]**   45/3 53/15 55/21 56/11 67/23 68/1
**means [8]**   12/4 12/10 26/5 29/20 30/20 55/8 65/25 69/14
**meant [1]**   37/2
**measure [3]**   55/12 63/8 78/1
**Media [1]**   67/4
**medical [2]**   24/1 24/2
**medication [1]**   23/25
**meet [6]**   12/15 13/21 23/7 31/15 75/1 77/2
**meeting [3]**   30/7 48/14 50/1
**meets [2]**   30/6 30/12
**megawatt [7]**   18/5 24/21 45/17 49/13 63/8 72/19 72/23
**megawatt-hour [3]**   45/17 72/19 72/23
**members [2]**   36/6 42/5
**members' [1]**   37/17
**mention [3]**   16/16 76/2 76/15
**mentioned [2]**   26/3 59/24
**mercy [1]**   38/18
**mere [1]**   59/13
**merely [3]**   12/20 12/25 55/18
**merge [1]**   75/10
**Merit [1]**   80/4
**merits [4]**   27/16 50/16 74/21 78/23
**message [1]**   66/21

**met [5]**   18/20 20/7 20/19 33/10 48/10
**method [2]**   57/16 69/8
**methods [2]**   56/19 69/9
**might [15]**   8/24 12/13 12/14 16/11 17/7 28/24 30/8 30/13 30/21 32/24 39/14 39/18 66/24 69/9 76/11
**mile [1]**   34/6
**miles [3]**   6/4 6/7 46/2
**Miller [1]**   78/16
**million [1]**   60/6
**millions [1]**   60/4
**mind [2]**   36/14 38/11
**minimal [1]**   70/16
**minimum [5]**   7/22 16/5 16/8 46/6 46/15
**minutes [2]**   42/14 42/15
**mirrored [1]**   15/21
**mislead [2]**   17/17 65/18
**misleading [35]**   19/14 21/9 21/23 22/7 22/12 22/20 24/4 24/5 24/16 24/17 29/2 53/6 55/5 56/17 56/20 56/24 57/2 57/5 57/7 57/8 58/11 58/20 63/1 64/17 64/17 66/23 67/1 68/6 68/24 68/25 69/3 69/15 69/16 70/1 74/16
**misled [3]**   35/20 62/11 77/25
**misreading [1]**   20/23
**misrepresenting [1]**   10/5
**mistaken [1]**   7/7
**mix [22]**   3/17 4/2 4/6 4/16 6/5 6/8 6/13 8/12 8/18 8/20 10/12 11/6 11/7 11/11 13/17 13/19 13/23 30/8 33/18 33/21 58/21 63/4
**model [4]**   72/4 72/6 72/14 73/5
**money [3]**   28/22 29/4 29/5
**monopolized [1]**   43/18
**month [4]**   19/8 19/8 47/13 76/21
**month-over-month [1]**   19/8
**monthly [5]**   17/22 17/24 18/3 20/3 44/2
**more [43]**   5/11 6/17 10/16 19/8 21/9 21/20 22/1 23/4 23/19 26/11 31/21 32/13 36/22 39/11 39/25 50/11 50/25 53/10 55/6 55/19 60/5 60/6 61/3 61/6 61/16 61/25 62/13 62/22 63/23 64/6 65/20 66/7 66/13 66/24 66/25 67/20 69/9 69/22 70/1 73/15 76/2 76/8 76/12
**Moreover [6]**   55/24 59/12 68/9 69/12 69/21 77/20
**morning [12]**   2/2 2/10 2/16 2/17 2/19 2/22 2/23 4/5 13/8 17/14 17/15 34/16
**Morrisey [3]**   9/24 56/21 66/14
**Morrisy [1]**   54/24
**most [6]**   28/17 29/18 38/9 39/15 54/20 60/24
**mostly [1]**   39/3
**motion [14]**   11/17 22/23 27/16 32/22 51/17 51/18 74/24 75/9 76/3 76/6 76/23 77/4 77/7 79/5
**motivation [3]**   20/18 54/12 54/21
**Mountain [4]**   1/14 2/12 24/24 38/14
**movant [1]**   20/5
**move [1]**   23/4
**moved [2]**   42/2 76/10
**moving [3]**   18/9 28/21 42/6
**Mr [2]**   2/22 17/9
**Mr. [8]**   2/25 17/12 27/19 27/21 32/21 32/25 33/1 36/10
**Mr. Feldman [1]**   2/25
**Mr. Glynn [2]**   32/25 36/10
**Mr. Handley [3]**   17/12 27/19 32/21

**Mr. Johnson [2]**   27/21 33/1
**much [11]**   8/18 12/5 20/19 25/19 26/11 28/3 31/3 33/2 33/3 39/11 66/25
**multifactor [1]**   52/14
**must [20]**   12/6 18/14 23/22 46/7 46/15 50/15 52/8 53/6 53/8 55/2 59/5 59/13 65/25 66/10 70/17 74/4 75/12 75/13 75/18 77/6
**my [30]**   3/7 3/9 3/15 4/17 5/1 5/9 5/20 8/15 11/13 13/7 16/25 17/4 17/7 21/15 28/22 28/23 34/3 34/5 38/4 38/14 39/9 39/20 62/14 63/9 63/12 68/3 73/3 73/16 76/3 77/4
**Myersville [1]**   62/18

**N**

**namely [1]**   3/6
**names [1]**   38/14
**narrow [2]**   66/1 67/18
**narrowly [3]**   52/9 65/16 67/7
**nation [1]**   37/9
**national [2]**   33/23 34/1
**nationwide [1]**   18/7
**natural [2]**   38/9 50/21
**nature [4]**   11/4 21/23 52/22 76/7
**nearly [1]**   24/22
**necessarily [4]**   28/25 30/7 66/2 66/3
**necessary [7]**   23/20 39/11 49/1 52/8 53/11 65/20 67/20
**need [10]**   13/17 13/18 13/22 42/1 50/25 51/14 56/5 59/16 66/12 69/8
**needed [2]**   66/8 77/17
**needs [1]**   39/25
**neighbor [1]**   34/5
**neighborhoods [1]**   19/6
**neighboring [4]**   4/3 5/25 6/2 28/13
**neighbors [1]**   63/5
**neither [3]**   64/23 71/7 73/23
**networks [1]**   28/16
**new [10]**   6/6 6/11 29/23 32/12 42/25 46/13 47/6 65/24 77/1 77/17
**newspapers [1]**   67/11
**next [5]**   53/7 57/13 59/3 66/15 76/21
**Nice [1]**   2/25
**nicely [1]**   15/18
**NIFLA [4]**   70/10 73/20 74/5 74/5
**Night [1]**   78/15
**no [29]**   1/5 2/5 4/21 6/17 7/25 8/3 8/23 12/13 14/8 15/11 18/1 18/18 19/17 26/17 28/2 30/9 36/9 38/20 39/20 40/9 41/2 42/11 60/21 60/22 61/1 73/24 74/9 76/16 76/23
**non [1]**   4/23
**non-Maryland [1]**   4/23
**noncommercial [1]**   56/11
**nondeceptive [2]**   4/3 9/2
**nondeceptively [1]**   28/10
**none [5]**   21/15 35/25 64/11 64/11 65/12
**nonfactual [5]**   25/25 71/10 72/1 73/5 74/4
**nonprofit [1]**   39/24
**nonprofits [1]**   60/13
**NORTHERN [1]**   1/2
**Nos [1]**   58/15
**not [182]**
**note [2]**   14/11 40/20
**noted [8]**   22/2 23/12 24/3 24/10 25/7 34/18 64/2 70/14
**notes [2]**   1/22 60/3
**nothing [12]**   4/4 4/14 4/24 6/9

**N**

**nothing... [8]**  6/12 21/20 26/10
30/4 30/14 35/23 36/18 56/7
**notice [5]**  14/17 14/17 73/23
73/24 74/6
**notices [3]**  73/21 76/11 77/18
**notifying [1]**  42/1
**noting [2]**  66/14 73/24
**notion [1]**  7/12
**November [2]**  1/8 14/13
**now [25]**  2/4 2/6 3/20 5/13 5/18
8/16 8/17 10/14 10/24 15/14 19/21
29/14 29/21 29/25 31/2 31/10
31/14 32/6 34/21 35/1 36/5 37/16
42/17 56/16 70/6
**nowhere [1]**  4/1
**number [4]**  41/4 41/12 48/12 59/21
**numerous [1]**  26/17
**nuts [1]**  12/20

**O**

**Obermeier [1]**  1/15
**Obermier [1]**  2/13
**objection [2]**  28/1 36/9
**objective [2]**  23/22 66/8
**obligation [1]**  71/5
**observe [1]**  73/2
**observed [3]**  22/13 54/4 57/15
**observes [1]**  77/5
**obtain [1]**  68/2
**obviously [2]**  23/2 25/7
**occurs [1]**  56/21
**Ocean [1]**  45/23
**October [1]**  76/23
**October 1 [1]**  76/23
**off [3]**  8/14 8/25 46/2
**offer [9]**  13/17 44/9 44/15 45/4
47/9 47/14 60/7 61/1 77/22
**offer' [4]**  61/6 61/7 61/9 61/11
**offered [10]**  15/21 24/20 31/13
31/19 48/11 54/19 58/14 60/11
61/19 62/5
**offering [1]**  5/7
**offers [2]**  60/20 62/3
**offers' [1]**  60/22
**official [4]**  1/7 1/24 80/1 80/16
**often [1]**  69/24
**Oh [2]**  35/15 36/11
**Ohio [1]**  58/5
**omit [1]**  76/15
**once [3]**  14/7 14/16 45/6
**one [20]**  6/3 8/10 10/9 10/18
15/25 18/5 24/21 25/1 31/4 31/7
35/11 43/11 45/17 47/8 49/13
50/25 52/5 66/4 72/19 72/22
**one-megawatt [1]**  49/13
**ones [1]**  51/2
**only [21]**  5/24 7/8 13/23 16/13
18/2 21/12 23/2 24/8 28/8 30/24
31/15 37/2 37/10 40/13 50/6 50/9
51/16 56/5 59/10 67/11 67/14
**open [6]**  3/2 31/12 32/23 43/20
43/22 44/11
**operate [2]**  4/18 4/23
**operation [1]**  4/22
**operator [1]**  4/23
**opine [1]**  74/3
**opinion [8]**  25/24 68/4 73/3 73/16
76/3 77/5 77/8 77/11
**opportunities [2]**  75/5 78/19
**opportunity [1]**  32/18
**opposing [1]**  75/9
**opposition [2]**  7/6 69/13
**opted [1]**  63/5
**option [1]**  12/2

**options [1]**  69/2
**oral [1]**  42/20
**order [7]**  18/11 21/23 38/24 56/4
62/3 68/24 77/10
**ordinary [2]**  36/15 54/25
**organizational [1]**  37/4
**Orleans [1]**  65/24
**other [28]**  11/24 13/24 15/25
16/11 16/13 16/14 16/17 23/17
26/3 27/9 28/25 34/3 37/12 39/10
39/24 40/15 41/9 44/11 45/8 46/11
47/10 49/1 51/5 52/20 62/25 64/3
68/18 75/1
**others [1]**  66/22
**otherwise [4]**  17/7 17/20 26/24
53/1
**ought [2]**  5/11 16/21
**our [33]**  9/20 10/12 10/18 10/20
11/2 11/16 11/17 13/20 14/3 23/23
28/12 36/23 37/17 37/18 38/9 38/9
38/15 38/16 38/16 38/23 38/23
41/11 42/3 47/1 62/14 62/16 62/17
63/3 63/5 63/12 63/16 63/23 64/4
**ourselves [3]**  38/15 38/16 38/21
**out [22]**  5/17 10/1 10/2 10/18
14/14 15/10 15/18 21/12 30/13
32/20 32/21 38/15 38/21 39/21
42/4 50/21 50/22 62/8 67/1 71/3
72/25 76/12
**outcome [1]**  24/13
**outer [1]**  45/23
**outright [1]**  70/13
**outset [1]**  13/13
**outside [5]**  4/18 8/19 40/4 41/15
45/20
**outweigh [1]**  78/10
**over [7]**  6/4 8/16 18/9 18/16 19/8
36/9 64/8
**overall [3]**  19/16 22/24 25/1
**overlying [1]**  46/21
**overmarketing [1]**  31/25
**overnight [1]**  23/2
**overruling [1]**  55/15
**oversight [3]**  44/21 61/18 65/9
**own [7]**  3/17 11/2 12/18 13/13
36/8 69/4 76/14
**owners [1]**  25/5

**P**

**p.m [1]**  79/9
**page [6]**  5/16 5/17 7/6 7/16 45/1
80/9
**paid [5]**  61/6 61/9 62/6 64/5 64/8
**pair [2]**  4/19 45/9
**paired [2]**  14/4 71/17
**pairing [1]**  4/11
**pamphlet [1]**  25/5
**panoply [1]**  37/23
**papers [5]**  3/1 14/3 17/8 42/24
77/7
**paraphrasing [2]**  33/6 34/20
**pari [1]**  51/13
**parochial [1]**  4/1
**part [9]**  6/5 13/14 21/20 27/3
28/18 29/18 52/25 53/3 57/4
**participants [2]**  5/9 19/17
**participate [3]**  10/20 42/6 68/18
**particular [8]**  39/18 52/21 56/19
57/16 68/24 70/15 73/9 75/15
**particularly [3]**  22/14 24/4 77/12
**parties [4]**  24/15 24/16 42/23
75/8
**partners [1]**  60/13
**parts [3]**  5/13 31/3 43/17
**party [15]**  19/1 21/19 43/22 44/1

45/4 58/16 59/25 60/5 60/8 62/25
64/10 65/13 73/10 75/8 75/13
**pass [1]**  70/17
**passage [1]**  18/24
**passed [3]**  24/3 61/24 76/20
**passing [1]**  76/2
**past [1]**  31/22
**patient [1]**  9/12
**paving [1]**  63/20
**pay [5]**  5/11 44/15 62/9 62/15
75/15
**paying [8]**  17/24 18/3 19/8 49/21
60/4 61/3 62/22 63/6
**payments [2]**  18/3 20/3
**pegged [1]**  16/9
**penalties [2]**  16/3 16/7
**penciling [1]**  16/11
**pending [2]**  2/4 32/5
**people [8]**  10/20 22/4 30/21 37/5
41/9 41/17 42/4 78/7
**PEPCO [3]**  19/13 45/4 47/8
**per [1]**  60/5
**perceived [3]**  6/21 10/13 33/13
**percent [45]**  11/7 17/20 17/20
18/15 18/16 19/10 19/11 21/12
21/12 24/6 24/7 24/7 30/19 33/15
33/16 33/17 33/19 33/22 33/22
33/24 33/24 37/25 38/1 38/1 38/1
38/1 46/8 46/10 48/8 48/8 48/9
48/9 48/9 48/15 48/16 61/5 61/10
62/20 62/21 63/5 68/16 68/16
68/16 68/17 68/17
**percentage [5]**  18/23 46/15 48/11
48/23 49/25
**perfect [1]**  66/2
**perhaps [1]**  76/25
**period [2]**  15/12 41/25
**permanent [1]**  32/12
**permissible [2]**  20/25 70/20
**permissibly [1]**  8/7
**permission [1]**  68/2
**permit [2]**  27/24 78/2
**permits [1]**  23/13
**permitted [4]**  5/10 23/20 31/1
47/17
**permitting [1]**  23/7
**person [1]**  69/24
**personal [1]**  62/7
**perspective [1]**  6/14
**persuaded [8]**  57/6 57/10 58/25
69/17 72/10 74/20 75/5 78/9
**persuasive [1]**  72/15
**persuasively [2]**  69/6 70/3
**pertaining [1]**  59/18
**phenomenon [1]**  7/17
**phrase [1]**  72/17
**phrases [2]**  72/7 74/9
**PI [1]**  51/17
**piece [1]**  7/6
**pincite [1]**  45/1
**PJ1 [1]**  34/13
**PJM [32]**  4/2 4/18 5/25 6/2 6/5
6/13 8/19 13/23 22/21 23/6 28/8
28/13 28/14 28/19 33/22 34/21
35/18 36/3 36/17 37/4 37/4 37/11
40/4 41/15 45/7 45/20 45/20 45/21
45/22 46/14 61/20 61/21
**PJM-eligible [2]**  13/23 33/22
**PJM-specific [1]**  36/17
**placed [1]**  55/3
**places [2]**  7/25 72/17
**plain [3]**  49/19 53/15 64/22
**plainly [3]**  24/3 54/15 74/8
**plaintiff [8]**  1/4 2/9 20/5 25/22
29/17 50/7 50/15 75/19

JA290

**P**

**Plaintiff's [3]**   25/14 32/22 67/19
**plaintiffs [65]**   1/14 2/11 2/14 2/15 17/16 20/11 20/19 21/18 21/18 21/19 21/25 22/22 23/11 24/10 24/23 25/13 25/16 26/4 27/8 27/12 27/14 27/25 29/11 30/1 30/4 32/6 32/15 47/21 50/4 50/7 50/23 51/8 55/18 55/25 57/23 66/15 67/21 69/1 70/2 71/4 71/12 71/14 71/18 72/11 72/16 72/20 73/2 73/4 73/11 74/21 75/1 75/3 75/6 75/21 76/8 76/10 76/13 76/22 77/1 78/4 78/9 78/12 78/15 78/22 79/2
**Plaintiffs' [28]**   26/9 28/6 51/16 54/22 56/8 56/13 57/6 57/25 64/24 68/10 70/6 71/8 71/21 71/24 72/5 72/8 72/15 72/24 73/8 74/3 74/8 74/11 76/3 76/24 77/4 77/9 77/15 77/20
**planet [1]**   63/24
**plays [1]**   15/10
**please [3]**   2/2 2/8 3/4
**point [2]**   32/16 66/7
**pointed [2]**   10/18 32/21
**points [7]**   26/3 28/5 33/4 33/5 40/7 41/19 42/12
**police [1]**   22/12
**policies [2]**   10/16 60/1
**policy [4]**   8/22 12/22 20/8 46/1
**political [1]**   25/2
**polluting [1]**   63/20
**pool [1]**   28/23
**portfolio [12]**   8/17 10/12 10/23 18/12 28/9 30/3 30/6 33/20 34/8 46/4 48/14 48/16
**portion [2]**   26/23 27/4
**portions [1]**   27/9
**poses [1]**   62/14
**position [9]**   13/16 13/22 15/6 16/10 16/21 21/4 55/22 67/19 77/20
**positive [1]**   53/8
**possess [1]**   22/14
**possible [2]**   6/15 67/17
**potential [4]**   39/17 67/1 75/22 77/13
**potentially [3]**   30/7 42/4 56/24
**power [79]**   5/20 6/18 8/19 11/10 16/1 16/9 18/6 19/25 21/7 21/8 21/15 22/23 24/21 27/10 28/13 28/15 28/19 28/23 28/24 29/6 29/15 29/16 30/8 30/11 30/11 30/11 31/11 31/11 31/12 31/13 31/13 31/16 31/19 31/23 33/25 34/4 34/6 34/10 37/2 45/8 46/11 47/10 47/11 47/13 47/16 47/20 48/5 48/13 48/19 48/23 48/23 48/24 48/25 49/8 49/22 49/24 54/18 58/20 58/23 62/2 62/7 62/11 62/17 62/20 62/23 63/2 63/3 63/4 63/10 64/10 64/18 64/19 68/7 68/9 68/19 71/6 72/3 78/1
**power' [2]**   60/20 62/2
**powered [2]**   15/22 17/3
**powers [1]**   22/12
**practical [1]**   42/8
**practice [1]**   55/2
**practices [2]**   39/17 69/25
**pre [2]**   16/6 69/18
**pre-approval [1]**   16/6
**pre-SB1 [1]**   69/18
**precedents [2]**   11/21 51/25
**precision [2]**   31/21 66/6
**prefer [2]**   8/23 35/10

**preferred [5]**   3/17 4/16 4/17 13/9 13/17
**prefers [1]**   10/10
**Pregnancy [1]**   13/10
**pregnant [1]**   73/21
**preliminarily [2]**   17/1 41/20
**preliminary [14]**   1/11 2/7 20/6 32/23 50/4 50/5 50/14 50/17 51/1 51/6 74/24 75/9 76/6 79/4
**premium [7]**   5/8 61/11 62/9 62/16 62/22 63/6 63/10
**premiums [1]**   61/8
**prepared [1]**   42/20
**presence [1]**   67/13
**present [4]**   34/15 39/16 62/1 68/23
**presentation [2]**   33/7 33/11
**presented [5]**   4/7 33/13 37/14 56/25 64/14
**presenting [1]**   9/15
**presumption [2]**   26/22 26/23
**presumptively [1]**   52/7
**prevent [8]**   5/1 11/12 38/4 46/22 51/2 55/5 78/21 78/24
**preventing [3]**   3/22 70/22 71/1
**prevention [1]**   25/5
**prevents [5]**   24/5 30/4 30/14 47/24 55/21
**previously [4]**   29/22 32/6 57/20 75/11
**price [10]**   16/4 16/6 35/21 39/16 39/19 47/12 48/18 48/20 58/11 68/20
**price-cap [1]**   16/6
**principally [1]**   27/15
**principle [2]**   46/21 50/10
**principles [1]**   36/15
**prior [5]**   18/24 23/17 24/8 43/9 60/16
**problem [12]**   5/22 6/1 9/21 10/18 13/6 30/9 32/10 33/12 39/3 65/1 67/9 67/24
**problems [7]**   7/10 10/12 14/1 33/13 34/14 39/15 66/18
**Procedure [1]**   50/5
**procedures [1]**   47/17
**proceedings [2]**   51/2 80/8
**process [6]**   16/6 16/6 32/12 32/19 33/8 76/19
**produce [2]**   11/23 77/17
**produced [1]**   73/13
**product [20]**   4/4 5/7 5/7 12/19 12/25 20/17 21/8 23/9 30/5 30/5 30/9 30/10 33/21 38/11 38/11 47/25 53/21 54/11 54/15 74/7
**production [2]**   8/4 38/24
**products [27]**   3/6 3/16 4/15 9/19 11/2 12/22 13/15 17/18 17/19 19/10 30/4 31/2 31/25 32/2 35/20 37/19 38/6 38/10 38/23 38/24 54/1 54/2 54/6 54/7 54/19 55/23 56/9
**professional [1]**   52/12
**professionals [1]**   10/2
**profile [2]**   7/1 8/9
**progeny [1]**   56/12
**prohibit [2]**   3/15 11/1
**prohibited [2]**   11/22 37/22
**prohibiting [2]**   3/7 38/8
**prohibition [9]**   13/6 19/20 19/21 24/2 24/3 38/20 56/23 66/25 68/23
**prohibitions [4]**   48/1 66/19 70/13 70/17
**prohibits [4]**   41/14 48/3 51/20 67/11
**project [1]**   76/7

**promises [1]**   60/19
**promote [1]**   69/4
**promoting [2]**   53/21 54/14
**promotion [3]**   54/1 55/23 56/9
**prone [1]**   30/18
**prong [4]**   59/12 65/23 67/20 69/1
**proper [1]**   11/8
**property [1]**   45/13
**proportion [2]**   66/4 69/11
**proposal [2]**   14/15 14/17
**proposals [1]**   76/18
**propose [1]**   55/19
**proposed [5]**   5/24 9/9 15/1 15/1 69/12
**proposes [2]**   7/12 53/17
**proposing [2]**   12/25 53/25
**proposition [3]**   56/7 56/22 65/15
**prospectively [1]**   47/5
**protect [7]**   20/9 22/3 22/15 26/17 29/12 44/23 68/24
**protected [2]**   22/9 70/14
**protecting [9]**   22/11 22/17 31/10 57/19 57/22 58/10 58/19 59/1 69/15
**protection [15]**   3/12 19/15 22/3 22/12 44/24 46/25 52/19 52/21 56/16 57/11 57/25 58/3 59/23 65/17 74/19
**protections [2]**   23/11 51/22
**protects [2]**   51/25 52/17
**prove [2]**   66/13 66/24
**proved [1]**   57/15
**provide [5]**   25/5 44/8 58/17 59/16 73/25
**provided [8]**   24/23 26/24 43/11 48/17 49/25 63/11 68/7 73/22
**providers [3]**   9/17 40/1 47/21
**provides [4]**   12/7 46/3 59/10 74/5
**providing [4]**   17/20 44/13 70/15 73/21
**provision [4]**   27/2 53/5 55/5 72/2
**provisions [16]**   16/8 16/12 16/14 16/20 26/25 27/5 40/10 40/15 40/21 40/23 47/4 48/20 59/22 65/16 77/1 77/19
**PSC [8]**   14/16 14/23 15/4 36/6 37/16 38/18 39/3 76/14
**PSC's [1]**   37/17
**public [29]**   1/19 2/21 3/6 5/1 9/1 10/2 10/16 12/22 13/20 14/14 21/10 22/15 25/1 28/4 32/18 38/22 39/21 44/19 46/3 50/19 66/24 69/21 75/7 75/10 75/15 75/16 76/1 77/20 78/10
**publications [3]**   67/15 67/15 67/17
**pulling [1]**   42/4
**pump [1]**   46/11
**purchase [10]**   18/22 28/15 38/23 43/25 45/2 49/11 49/16 60/23 61/20 63/10
**purchased [3]**   49/17 49/18 49/23
**purchases [1]**   49/22
**purchasing [3]**   5/15 11/15 35/23
**purely [6]**   13/4 13/19 24/20 35/3 35/9 70/19
**purported [1]**   4/14
**purportedly [1]**   71/25
**purpose [4]**   2/7 38/4 58/10 59/11
**purposes [4]**   31/8 31/17 43/13 52/3
**pursuant [4]**   50/5 50/20 54/16 80/6
**pursue [1]**   66/12
**pursued [2]**   76/14 76/15

JA291

**P**

**pushy [1]** 19/2
**put [7]** 13/22 14/14 15/6 16/10 16/23 16/23 34/3
**putative [1]** 78/13
**putting [2]** 13/16 34/12

**Q**

**qualify [1]** 13/25
**qualitative [1]** 11/22
**question [7]** 28/8 29/11 29/17 29/25 30/17 32/9 71/23
**questioned [1]** 31/4
**questions [11]** 5/3 17/6 17/10 27/18 27/19 28/7 32/23 32/25 38/17 42/11 42/13
**quick [1]** 40/7
**quickly [1]** 28/6
**quote [33]** 5/16 5/17 7/7 7/16 33/9 34/20 40/11 45/16 46/20 46/25 49/11 55/19 55/20 57/3 58/21 60/3 60/7 60/8 60/9 60/14 60/15 61/16 61/17 62/13 62/19 62/21 63/16 63/21 71/14 72/25 73/1 73/6 73/24
**quoted [1]** 21/1
**quoting [2]** 43/3 47/2

**R**

**race [1]** 31/24
**raise [1]** 29/11
**raised [2]** 28/6 30/3
**range [1]** 52/15
**rate [10]** 19/21 23/9 26/18 27/11 40/11 40/16 44/4 47/14 61/15 62/3
**rated [1]** 61/7
**rates [4]** 19/2 22/24 43/19 46/8
**rather [6]** 3/21 4/11 43/24 57/3 57/7 73/15
**rationale [2]** 3/25 34/17
**reach [1]** 23/22
**reaching [1]** 71/23
**read [7]** 3/1 7/3 16/13 37/19 51/13 60/17 77/7
**readers [1]** 67/13
**readily [2]** 61/17 61/25
**reading [1]** 37/20
**real [5]** 20/2 42/8 59/6 59/14 63/24
**reality [2]** 18/11 50/10
**realize [2]** 34/4 64/5
**really [8]** 28/25 30/24 31/7 31/18 31/24 32/8 41/3 41/7
**Realtime [1]** 80/5
**reason [5]** 10/24 36/16 41/22 71/24 74/23
**reasonable [4]** 23/22 66/3 68/4 74/14
**reasonably [2]** 70/21 74/18
**reasons [3]** 74/15 74/20 79/5
**rebuttal [2]** 27/21 33/4
**rec [28]** 4/16 5/21 5/22 11/10 14/4 14/5 23/23 28/19 28/24 29/13 29/19 30/20 35/10 36/20 36/21 37/1 41/14 45/16 49/12 49/16 49/18 61/22 63/7 71/12 72/16 72/18 72/22 72/25
**REC-sourced [1]** 36/20
**recall [1]** 10/8
**receive [3]** 44/2 52/2 52/12
**received [2]** 19/12 24/9
**receives [1]** 4/19
**receiving [11]** 4/10 6/18 18/1 21/13 24/6 24/8 34/4 34/7 34/7 34/8 34/9

**recent [3]** 26/11 43/2 53/12
**recently [1]** 71/3
**recess [3]** 42/14 42/18 42/19
**Recht [2]** 9/24 54/24
**recites [1]** 59/14
**recognized [1]** 45/12
**recognizing [2]** 44/6 57/21
**record [10]** 2/8 4/4 6/9 6/12 33/14 34/15 35/12 39/13 39/24 50/12
**RECs [86]**
**red [1]** 16/11
**red-penciling [1]** 16/11
**reduce [2]** 7/2 30/23
**reducing [1]** 63/17
**refer [1]** 54/11
**reference [1]** 59/18
**referring [1]** 35/14
**refers [1]** 20/17
**reflects [1]** 50/10
**reforms [2]** 19/19 60/14
**regard [5]** 11/18 22/13 26/8 75/15 77/25
**regarding [3]** 58/9 60/22 64/2
**Regardless [2]** 74/11 77/15
**regime [3]** 10/25 12/15 13/25
**region [14]** 4/2 8/20 22/21 28/14 34/21 35/18 36/4 36/20 37/11 45/20 45/20 45/21 45/22 46/14
**regional [2]** 6/20 45/8
**regions [2]** 28/17 28/18
**Registered [1]** 80/4
**registration [1]** 54/7
**regular [6]** 31/11 31/11 31/16 31/18 47/10 47/13
**regular-power [1]** 31/16
**regulated [2]** 21/24 61/7
**regulates [1]** 67/20
**regulating [7]** 23/24 57/19 57/22 59/1 66/11 66/16 66/21
**regulation [10]** 9/25 23/21 25/7 52/3 52/18 52/23 53/9 59/10 66/1 66/10
**regulations [12]** 10/4 32/4 32/5 32/12 32/13 32/15 48/25 52/5 52/8 52/11 60/22 80/10
**regulatory [2]** 16/22 44/20
**reject [1]** 69/8
**rejected [1]** 76/18
**relate [2]** 16/15 28/24
**related [20]** 22/18 23/17 23/19 25/5 25/15 25/20 28/15 38/5 53/16 53/18 56/8 58/20 70/21 70/25 73/25 74/1 74/7 74/18 76/11 77/18
**relatedly [2]** 8/6 29/12
**relates [3]** 30/16 32/3 55/23
**Relating [1]** 24/19
**relation [1]** 74/14
**relevant [4]** 45/15 59/22 64/16 72/2
**reliant [1]** 63/20
**relief [8]** 27/13 50/8 50/17 50/18 50/19 75/7 75/14 77/12
**rely [3]** 51/5 59/18 78/15
**relying [4]** 34/2 40/2 41/14 55/14
**remain [1]** 43/18
**remained [1]** 11/5
**remaining [3]** 22/9 27/4 27/5
**remedy [5]** 11/8 17/17 50/6 75/16 79/4
**remote [2]** 59/11 64/23
**renewable [81]**
**renewables [1]** 23/8
**repeatedly [2]** 57/18 64/24
**reply [1]** 57/23

**report [8]** 23/16 39/23 39/24 58/16 59/24 60/3 64/13 69/20
**reported [2]** 1/23 80/8
**Reporter [5]** 1/24 80/1 80/4 80/5 80/16
**reports [1]** 39/16
**represent [7]** 8/3 18/5 38/16 39/20 71/13 71/15 72/22
**representative [1]** 73/10
**representatives [2]** 16/16 78/7
**represented [2]** 4/21 37/13
**represents [4]** 49/12 66/3 72/18 73/1
**request [2]** 76/24 77/15
**requested [2]** 50/18 75/14
**require [5]** 18/21 71/14 71/25 72/16 74/12
**required [15]** 10/21 21/22 25/4 44/14 48/1 55/10 58/21 62/1 65/24 71/7 71/8 71/18 72/7 73/20 75/23
**requirement [8]** 19/25 39/4 46/6 61/10 70/7 72/13 74/6 74/16
**requirements [20]** 19/22 20/15 27/10 27/10 29/17 29/19 30/12 32/11 39/6 40/16 47/19 54/6 54/7 64/18 64/21 65/2 70/13 70/21 71/4 77/3
**requires [12]** 43/17 44/7 44/18 45/9 49/7 49/19 61/20 61/22 61/23 66/8 67/24 72/2
**requiring [2]** 20/21 70/19
**requisite [1]** 57/11
**Research [1]** 60/24
**reserving [1]** 3/17
**resident [2]** 62/8 63/11
**residential [11]** 43/23 47/22 48/4 49/8 59/25 60/2 65/6 65/14 65/17 68/7 68/13
**resides [1]** 43/24
**resorting [1]** 66/18
**resources [3]** 34/25 36/3 50/21
**respect [5]** 7/23 8/8 10/12 41/8 41/11
**response [1]** 19/14
**responsibility [1]** 63/25
**responsible [5]** 29/21 37/25 44/3 48/7 68/15
**rest [2]** 17/8 24/18
**restaurants [1]** 67/13
**restricted [1]** 56/6
**restricting [1]** 23/21
**restriction [17]** 16/1 20/21 35/24 52/24 56/4 59/5 59/7 59/15 65/20 67/3 67/14 68/4 68/6 68/10 68/23 78/21 78/25
**restrictions [21]** 4/13 16/7 20/25 21/3 23/14 23/19 29/3 35/16 47/12 49/2 53/2 56/2 56/18 57/17 58/18 66/7 67/5 68/8 68/21 70/5 74/22
**restrictive [3]** 55/8 65/25 69/2
**restricts [3]** 12/5 39/11 68/12
**result [2]** 7/8 78/13
**retail [49]** 1/3 1/14 2/5 2/11 4/15 9/17 17/19 18/22 19/9 20/1 21/11 23/7 40/1 43/15 43/22 44/5 45/5 46/5 46/7 47/1 47/6 47/19 48/3 48/4 49/6 49/7 49/8 54/19 58/12 60/2 60/15 60/18 60/19 61/4 61/5 61/7 61/8 61/11 61/20 61/25 62/6 65/13 68/7 68/8 68/12 69/16 69/25 72/2 77/24
**retailer [2]** 19/1 44/1
**review [3]** 52/13 52/15 67/3
**revised [1]** 77/2
**rigger [1]** 51/3

JA292

**R**

**right [7]** 3/1 7/2 8/16 8/17 22/4 34/22 37/23
**rights [5]** 17/5 47/23 51/9 51/10 51/10
**rigors [1]** 56/5
**Riley [1]** 12/23
**ripeness [1]** 15/8
**rise [3]** 42/17 51/21 79/7
**risk [4]** 75/4 75/24 78/3 78/9
**RMR [2]** 1/23 80/16
**rolled [1]** 76/12
**Ronda [3]** 1/23 80/4 80/16
**RPS [15]** 18/12 18/21 22/24 22/25 28/12 30/11 30/11 30/11 30/12 46/5 46/6 46/13 50/2 61/10 61/21
**RUBIN [3]** 1/11 3/4 54/4
**Rule [2]** 50/5 51/18
**rules [4]** 15/2 16/2 22/15 29/14
**ruling [5]** 24/1 42/20 51/17 76/25 77/15

**S**

**safety [1]** 54/3
**said [21]** 9/11 10/11 11/23 12/1 13/6 15/8 15/9 15/11 31/14 32/17 33/6 34/20 35/10 35/17 36/10 37/17 39/3 39/13 40/8 41/1 74/11
**sale [2]** 28/19 53/20
**sales [5]** 16/16 18/25 26/19 46/5 69/24
**salesman [1]** 19/2
**salespersons [2]** 19/3 19/23
**same [23]** 4/18 9/15 9/20 10/12 10/17 18/7 19/12 21/13 24/5 24/9 24/13 24/22 25/15 25/17 33/24 34/4 34/5 41/13 58/21 63/4 67/23 74/15 76/11
**satisfied [3]** 51/1 54/17 59/12
**satisfy [1]** 67/19
**saw [1]** 8/14
**say [29]** 10/7 12/3 12/11 12/15 12/17 13/13 13/14 13/14 13/22 16/15 25/13 25/14 25/17 28/20 30/10 32/3 35/2 35/3 39/9 40/3 42/14 67/22 69/14 69/18 72/16 72/21 76/3 77/10 77/17
**saying [4]** 10/14 13/18 32/17 39/14
**says [11]** 8/7 8/14 12/13 13/13 14/4 14/22 15/2 16/1 31/12 31/16 68/2
**SB1 [68]** 4/24 7/11 18/24 19/14 19/24 22/25 23/6 23/10 23/18 24/4 29/2 29/10 29/12 30/9 30/14 30/16 32/1 32/19 33/14 34/1 35/24 46/17 46/18 47/3 47/6 47/19 47/22 48/2 48/3 49/7 51/9 56/17 57/4 57/14 58/9 58/15 58/18 58/25 59/3 59/22 60/12 60/14 61/14 61/20 61/22 61/23 62/5 64/16 65/11 65/11 65/16 67/19 68/8 69/1 69/10 69/18 69/23 70/6 71/14 71/25 72/2 72/15 74/12 74/22 76/20 77/3 77/19 78/1
**SB1's [6]** 60/16 64/18 64/21 64/24 72/14 77/1
**scheme [2]** 11/21 67/8
**school [1]** 26/13
**scope [2]** 66/4 69/10
**scrupulous [1]** 39/17
**scrutiny [15]** 3/23 3/23 12/24 20/22 21/6 24/12 52/2 52/8 52/25 53/1 55/10 55/16 56/1 56/5 70/8
**sea [1]** 43/6
**seaboard [1]** 37/8

**seated [1]** 2/2
**second [3]** 5/13 45/12 67/14
**section [1]** 67/10
**securities [1]** 54/8
**see [6]** 2/25 12/7 15/10 15/10 15/12 41/16
**seek [2]** 23/11 50/4
**seeking [4]** 23/1 26/17 59/5 68/18
**seeks [3]** 23/3 23/5 66/22
**seem [1]** 32/13
**seems [1]** 40/13
**seen [1]** 11/20
**segment [2]** 47/1 61/4
**select [1]** 44/12
**self [1]** 73/10
**self-serving [1]** 73/10
**sell [9]** 3/11 17/18 23/8 30/9 31/14 32/2 44/22 61/12 65/6
**seller [1]** 53/23
**selling [6]** 30/4 30/10 44/17 63/2 63/6 64/9
**sells [1]** 49/3
**semantical [1]** 73/15
**Senate [2]** 3/15 46/17
**Senator [1]** 46/18
**send [1]** 16/25
**sense [4]** 9/14 31/7 36/21 59/20
**sensibly [1]** 52/15
**sensitive [1]** 76/7
**separate [3]** 29/17 47/7 71/20
**separately [8]** 14/7 24/22 29/16 49/14 51/15 71/16 73/6 73/12
**serve [6]** 52/8 53/11 58/19 65/20 67/7 67/14
**served [4]** 52/23 57/14 66/5 69/11
**serves [1]** 53/22
**service [23]** 1/19 2/21 13/20 15/22 28/4 31/13 31/19 32/18 43/17 44/14 44/15 44/19 45/4 46/3 47/9 47/14 47/15 53/21 53/21 54/3 54/12 54/15 74/7
**service' [1]** 44/9
**services [12]** 43/16 44/4 47/12 49/3 54/1 54/19 55/24 56/9 65/5 73/21 73/22 73/25
**serving [1]** 73/10
**set [14]** 12/15 14/13 14/19 22/23 27/11 31/7 37/5 38/15 40/11 48/2 53/3 54/17 72/14 74/15
**sets [2]** 46/6 46/25
**setting [3]** 13/12 48/20 61/15
**severability [6]** 15/16 16/14 26/16 26/23 40/7 40/14
**severable [2]** 16/8 27/1
**several [3]** 18/9 19/19 62/15
**Shall [3]** 25/4 53/13 71/3
**share [3]** 18/13 23/8 46/6
**shared [1]** 67/23
**she [5]** 62/9 62/10 62/11 64/2 64/3
**shelf [1]** 45/23
**shop [3]** 43/22 44/6 44/10
**short [2]** 15/12 70/23
**should [7]** 22/1 26/21 27/16 40/18 50/9 66/17 75/15
**shouldn't [1]** 40/3
**show [2]** 55/11 79/3
**showed [1]** 31/14
**showing [6]** 20/6 21/23 50/7 51/8 78/13 79/3
**shown [1]** 27/14
**shows [1]** 39/12
**signed [6]** 19/7 19/14 21/11 47/3 64/12 76/21
**significance [1]** 55/25

**significant [4]** 19/19 23/20 44/20 61/8
**significantly [3]** 17/22 18/3 20/11
**signs [1]** 25/12
**Silver [2]** 62/7 62/18
**similar [13]** 3/8 11/21 12/23 15/3 15/6 38/2 38/3 39/8 48/10 49/9 68/18 72/4 72/10
**similarity [1]** 74/10
**similarly [7]** 25/13 46/23 49/19 52/17 63/11 64/25 65/4
**simple [2]** 64/5 71/24
**simply [7]** 5/21 9/3 14/9 24/25 40/3 59/20 72/7
**since [2]** 18/12 43/21
**single [1]** 66/3
**sitting [1]** 77/14
**situated [1]** 65/4
**situation [2]** 14/19 64/25
**slices [1]** 40/19
**small [3]** 30/16 30/17 30/24
**Smart [2]** 43/4 44/25
**smoke [1]** 8/13
**so [66]** 4/16 4/24 5/9 5/21 6/3 6/20 7/3 7/10 7/17 8/10 8/13 9/5 9/10 9/23 11/6 11/18 13/2 13/4 13/10 13/16 13/22 14/6 14/8 14/12 14/22 14/24 15/6 15/15 15/18 15/24 16/5 16/10 16/13 16/15 17/1 20/7 24/1 25/24 26/1 29/8 29/19 31/19 32/17 33/15 33/18 34/12 35/19 36/9 36/16 37/5 37/10 37/22 38/3 38/24 41/19 42/7 42/11 42/21 42/25 44/1 52/1 70/17 70/24 72/10 77/6 78/23
**social [12]** 12/21 12/21 25/13 25/14 49/12 71/13 71/13 72/17 72/17 72/18 72/21 73/1
**societal [1]** 53/24
**solar [10]** 17/20 18/11 19/11 21/12 38/1 46/9 48/9 63/1 63/15 68/17
**sold [8]** 14/7 24/22 49/14 49/15 71/16 73/6 73/12 73/13
**solely [4]** 53/19 59/19 72/24 73/9
**solicitation [1]** 22/16
**solution [9]** 4/6 5/24 6/20 7/11 9/8 9/19 9/20 9/22 34/13
**solve [1]** 6/1
**solves [1]** 33/12
**some [18]** 4/9 4/18 7/13 20/20 28/25 30/21 35/22 36/5 36/21 37/9 38/8 40/24 40/24 42/21 64/9 76/17 78/1 78/15
**somehow [5]** 5/14 6/10 20/20 36/22 40/5
**someone [3]** 10/5 28/24 64/9
**something [13]** 5/18 5/23 7/23 9/1 14/12 15/3 26/14 30/1 37/12 37/13 42/25 56/22 71/20
**sometime [1]** 63/9
**sometimes [1]** 50/20
**somewhat [2]** 28/16 77/5
**somewhere [1]** 63/9
**sophisticated [2]** 22/1 29/5
**Sorrel [1]** 24/14
**Sorrell [10]** 9/10 12/23 21/1 24/10 24/15 54/23 54/25 55/4 55/6 55/15
**sorry [2]** 27/2 35/15
**sort [11]** 10/3 11/22 13/10 13/12 13/23 15/16 15/20 15/21 16/20 16/22 36/7
**sought [2]** 64/16 64/21

JA293

**S**

**source [10]**  4/11 7/19 11/9 11/10 34/6 45/18 45/19 48/23 58/23 72/24
**sourced [11]**  4/2 5/16 6/19 7/8 7/11 7/13 8/2 8/3 36/20 40/4 41/15
**sourced-locally [1]**  7/11
**sources [16]**  7/20 7/23 8/9 8/18 18/6 18/10 35/10 45/10 46/8 46/9 46/10 48/6 62/10 62/16 63/18 64/14
**sourcing [2]**  9/18 63/17
**sparingly [1]**  50/9
**speak [2]**  5/10 27/24
**speaker [3]**  20/18 53/19 54/12
**special [2]**  7/13 7/23
**specific [13]**  4/5 13/2 19/9 20/17 25/3 25/11 32/11 32/16 36/17 54/11 57/10 68/22 72/25
**specifically [18]**  16/15 18/21 19/6 19/24 24/5 24/24 25/20 25/23 53/16 54/19 58/2 60/17 61/19 65/1 65/17 67/21 71/12 77/25
**spectrum [4]**  52/1 52/5 52/10 52/13
**speculation [1]**  59/13
**speech [99]**
**speeches [1]**  66/11
**spent [2]**  13/7 17/21
**spoken [1]**  36/9
**sponsor [3]**  19/16 46/18 46/23
**sponsors [1]**  46/17
**sponsors' [1]**  58/9
**Spring [2]**  62/8 62/18
**stack [1]**  8/13
**stage [3]**  31/5 57/1 69/17
**standalone [1]**  28/18
**standard [29]**  8/17 12/5 12/16 13/21 15/5 15/21 17/3 20/2 23/7 24/12 28/10 30/3 30/6 30/8 31/13 31/19 33/20 34/9 40/25 44/15 45/4 46/4 47/8 47/9 47/14 48/16 56/14 66/8 69/10
**standard-offered [2]**  31/13 31/19
**standards [8]**  18/12 18/21 22/24 22/25 31/16 48/15 51/4 60/21
**stands [1]**  42/17
**start [4]**  15/16 42/1 55/3 77/2
**started [1]**  2/3
**starting [2]**  2/9 47/5
**state [66]**  3/4 3/21 4/1 5/17 8/22 9/6 9/7 9/8 9/15 10/10 10/14 11/3 11/25 12/3 12/8 12/9 12/12 12/14 12/14 12/17 13/12 13/16 14/14 14/21 15/1 15/18 16/13 16/23 20/23 21/7 22/10 23/5 24/1 28/13 30/8 30/13 35/2 35/4 36/7 36/13 36/20 45/13 45/25 46/2 48/25 50/2 52/9 55/3 55/10 56/3 56/18 57/18 58/3 58/5 58/25 59/13 59/11 66/8 66/12 66/17 66/20 69/2 69/8 73/22 78/5 78/20
**state's [20]**  4/8 6/18 10/22 13/9 22/17 24/2 26/7 44/24 57/21 57/25 58/3 58/6 58/14 59/4 59/23 65/2 65/12 70/21 71/1 74/14
**state-imposed [1]**  56/3
**stated [5]**  18/15 46/21 54/25 62/10 75/18
**statement [4]**  7/3 15/19 73/4 73/11
**statements [5]**  24/23 54/8 58/9 72/1 74/13
**states [17]**  1/1 4/3 5/25 6/2 6/3

18/7 21/2 22/13 28/9 45/8 45/13 45/24 46/25 51/19 57/17 80/5 80/11
**stating [2]**  43/3 72/18
**statute [37]**  9/9 10/7 10/19 13/2 14/22 15/2 15/24 16/9 16/11 16/19 16/22 17/1 19/16 26/16 26/25 27/1 27/3 27/4 31/4 31/9 31/16 32/8 33/12 33/18 34/17 37/19 37/21 38/13 38/21 40/19 41/2 41/8 41/12 41/20 48/19 55/11 73/20
**statutes [2]**  26/25 78/6
**statutorily [1]**  18/23
**statutory [8]**  13/21 14/23 14/24 15/2 15/5 15/12 32/3 65/8
**stayed [4]**  17/23 18/2 19/12 60/7
**stenographically [1]**  80/8
**stenographically-reported [1]** 80/8
**stenotype [1]**  1/22
**Stephen [1]**  1/15
**steps [1]**  63/22
**Steve [1]**  2/13
**Stevens [1]**  54/4
**stick [1]**  69/18
**still [10]**  11/7 22/10 25/9 25/9 31/1 32/1 33/23 34/6 65/8 77/14
**storage [1]**  46/11
**store [2]**  25/4 25/11
**Street [1]**  1/24
**stricken [1]**  12/6
**strict [8]**  3/23 12/24 20/22 24/11 52/7 53/1 55/10 56/5
**strong [6]**  22/14 23/10 26/22 26/23 57/18 77/13
**structure [3]**  40/22 69/20 69/20
**student [2]**  67/15 67/17
**students [2]**  67/10 67/16
**studies [2]**  23/14 59/18
**styled [1]**  24/2
**subject [10]**  16/3 21/5 47/11 47/17 52/7 52/10 57/16 65/8 66/9 68/19
**submits [1]**  48/21
**subordinate [1]**  21/4
**subsidize [1]**  8/23
**substantial [17]**  3/21 9/7 22/11 35/2 36/4 38/25 41/4 41/12 53/8 55/11 57/14 57/24 58/8 58/25 59/4 59/23 65/2
**substantiate [2]**  3/13 8/2
**substantiated [1]**  7/22
**subtitle [1]**  49/4
**succeed [4]**  27/16 50/16 51/8 74/21
**success [5]**  70/3 72/11 75/2 78/12 78/23
**such [20]**  18/10 25/11 44/2 48/5 50/8 50/9 51/15 52/8 52/11 57/7 57/9 61/15 65/3 66/12 67/1 69/6 74/13 74/20 75/24 76/5
**suffer [1]**  50/16
**suffers [1]**  78/7
**sufficient [2]**  35/4 37/7
**sufficiently [2]**  67/18 75/3
**suggest [6]**  4/9 5/14 6/9 36/19 39/25 78/4
**suggesting [1]**  66/17
**suggests [5]**  4/5 6/12 9/16 35/25 60/24
**suicide [2]**  25/5 25/12
**suit [2]**  19/9 26/7
**supplement [1]**  36/7
**supplier [17]**  31/14 43/23 44/1 44/5 44/7 44/12 44/15 44/18 48/3

48/21 49/5 49/22 50/1 60/8 61/11 62/6 65/14
**supplier's [1]**  46/7
**suppliers [33]**  4/15 17/19 18/22 19/6 19/10 31/25 44/22 45/5 45/9 47/12 47/16 47/20 49/7 54/20 58/12 60/6 60/23 61/6 61/22 62/1 62/25 64/25 65/5 65/5 65/7 67/22 67/25 68/8 68/12 69/16 69/25 72/3 77/24
**suppliers' [1]**  20/1
**supplies [2]**  23/7 65/14
**supply [18]**  18/10 18/14 19/1 21/8 43/3 43/5 43/10 43/15 43/19 44/11 46/7 46/15 47/1 47/7 58/17 59/25 60/7 63/4
**supply' [2]**  43/14 44/9
**supplying [2]**  48/3 49/5
**support [14]**  4/9 28/22 56/22 58/14 58/18 59/11 59/21 60/11 61/14 61/22 62/2 62/5 65/15 77/23
**supported [6]**  3/25 35/12 58/12 69/24 73/17 74/17
**supporting [2]**  36/18 37/14
**supports [5]**  35/19 50/24 56/7 65/21 68/21
**suppression [1]**  35/5
**Supreme [17]**  9/10 20/13 22/13 23/13 43/1 50/22 54/22 55/13 55/15 57/14 57/18 57/21 58/2 59/8 65/23 70/11 73/23
**sure [6]**  11/20 22/5 29/21 32/6 37/6 53/17
**surely [2]**  38/4 76/12
**surfeit [1]**  59/17
**Surgeon [1]**  54/5
**suspicious [1]**  22/4
**sustain [1]**  59/5
**sustainable [2]**  12/10 12/12
**sustainably [1]**  63/23
**sustained [1]**  59/10
**swallowed [1]**  56/3
**switched [2]**  63/12 63/14

**T**

**tacitly [1]**  77/5
**tackle [1]**  20/8
**tactics [2]**  18/25 19/14
**tailored [7]**  10/19 39/5 65/16 67/3 67/7 68/11 68/22
**tailoring [1]**  66/1
**take [8]**  14/13 14/19 15/8 15/12 17/12 42/14 42/21 63/25
**taken [4]**  42/19 46/20 72/25 78/2
**taking [3]**  63/22 77/21 78/11
**talk [5]**  12/3 30/5 31/10 39/16 39/17
**talked [1]**  7/10
**talking [5]**  5/22 6/25 12/21 31/6 35/8
**target [1]**  72/8
**targeted [5]**  10/16 12/13 19/6 57/5 67/15
**targeting [1]**  60/18
**targets [4]**  23/25 24/4 30/16 68/24
**technical [3]**  6/14 30/21 30/22
**tell [1]**  65/13
**telling [4]**  9/11 36/7 36/13 40/1
**temporary [1]**  32/9
**tens [1]**  60/4
**term [1]**  38/13
**terms [22]**  3/8 3/9 3/17 7/11 7/21 10/8 10/11 13/12 30/5 30/17 30/19 30/20 30/24 30/25 32/19 34/6

**T**

**terms... [6]** 35/22 36/12 37/23 39/21 40/9 40/20
**territory [4]** 43/12 43/25 44/4 47/15
**test [6]** 3/24 16/18 20/16 24/3 26/1 70/18
**testified [2]** 60/14 61/14
**testimonials [1]** 36/24
**testimony [8]** 21/20 23/15 58/14 60/11 60/17 62/5 64/14 64/15
**tests [1]** 52/14
**Texas [4]** 7/18 9/3 28/24 60/25
**than [24]** 4/11 6/7 6/19 7/19 18/1 21/10 21/20 23/20 31/18 32/14 37/12 39/11 46/11 48/16 52/20 53/11 55/19 60/6 62/22 65/20 66/7 66/25 67/20 76/2
**thank [11]** 3/3 17/10 17/11 27/20 28/3 33/2 33/3 42/15 42/16 42/23 79/6
**that [512]**
**that's [38]** 5/5 5/16 5/17 7/25 8/14 8/17 10/5 10/10 13/23 14/5 18/15 20/23 22/20 25/18 26/11 26/12 26/14 28/24 29/10 31/16 34/5 34/22 34/22 35/2 35/5 35/7 36/4 37/19 39/24 41/16 44/19 50/22 58/17 59/8 61/9 62/14 62/17 71/2
**their [82]**
**them [15]** 4/18 15/8 16/8 17/17 21/15 22/6 30/15 35/10 35/11 47/24 51/14 59/7 59/15 71/25 74/12
**theme [1]** 19/16
**themselves [6]** 10/1 10/2 32/2 39/21 39/21 65/7
**then [17]** 11/1 11/8 12/11 12/15 12/17 13/8 13/18 14/17 30/6 31/5 31/16 31/23 33/23 35/9 39/9 46/18 64/12
**there [47]** 5/13 6/3 6/6 6/23 9/5 9/14 9/20 10/16 12/7 12/13 12/24 14/1 16/12 16/14 18/24 19/1 22/18 23/15 23/16 25/24 25/25 28/1 28/5 29/25 30/24 31/2 31/3 32/10 33/15 34/23 35/9 36/18 39/2 39/5 39/5 39/14 39/18 39/25 40/3 40/24 41/1 41/7 55/17 64/15 67/5 70/12 78/16
**there's [19]** 4/21 6/9 6/12 7/22 8/15 9/1 9/14 15/3 26/17 26/22 26/23 30/3 30/14 30/19 37/6 38/8 38/20 40/9 40/20
**therefore [4]** 21/5 50/25 56/12 67/17
**these [35]** 3/8 3/9 10/4 10/8 10/11 12/22 16/2 16/12 16/20 19/14 19/17 21/25 28/16 30/13 32/2 33/9 38/16 38/17 41/15 41/24 43/16 49/2 50/20 50/24 55/21 58/15 58/17 60/25 61/24 64/8 68/2 68/9 71/11 79/1 79/5
**they [101]**
**they're [15]** 6/18 8/3 9/21 11/15 27/15 28/15 29/4 29/7 32/7 41/10 51/16 51/17 61/3 61/17 61/25
**they've [3]** 4/6 10/10 10/11
**thing [5]** 9/15 9/20 10/3 15/15 24/9
**things [6]** 7/2 14/4 16/17 25/8 37/7 64/3
**think [41]** 7/4 8/13 9/23 12/4 13/4 13/5 14/1 14/2 14/9 14/20 14/24 15/16 15/18 16/5 16/5 16/18

16/21 16/24 28/11 31/11 34/21 34/22 34/23 36/6 36/15 36/20 36/22 36/24 36/24 37/2 37/20 40/8 40/10 40/11 40/18 40/19 40/22 40/25 41/10 41/11 41/17
**thinking [1]** 6/10
**third [12]** 6/22 19/1 21/19 43/22 44/1 45/4 58/16 59/25 60/5 60/8 62/25 65/13
**third-party [10]** 19/1 43/22 44/1 45/4 58/16 59/25 60/5 60/8 62/25 65/13
**this [155]**
**Thomas [4]** 1/15 1/23 80/4 80/16
**Thompson [1]** 26/12
**thorough [1]** 42/24
**those [26]** 3/17 6/3 8/4 11/9 11/23 15/23 16/8 18/19 20/19 30/14 31/19 32/5 32/13 33/19 35/10 36/24 39/19 40/22 41/19 42/5 42/11 51/25 62/11 67/24 72/7 77/18
**though [1]** 65/8
**thought [6]** 34/3 36/1 36/1 36/19 36/25 37/16
**thousand [1]** 62/22
**thousands [1]** 64/5
**threat [2]** 62/9 62/14
**three [3]** 20/18 54/9 54/16
**through [12]** 4/5 11/15 11/20 16/22 21/1 22/24 23/6 26/17 31/23 49/11 51/19 69/25
**throughout [1]** 35/6
**thus [9]** 52/17 52/24 53/16 53/24 55/15 66/23 68/19 71/21 72/24
**tier [8]** 45/18 45/19 46/9 46/10 47/8 47/10 47/20 72/3
**tiered [4]** 27/11 31/5 40/11 47/6
**tiers [1]** 47/11
**time [15]** 13/7 15/13 17/21 34/16 36/16 38/7 41/25 42/7 42/21 56/3 57/10 76/7 77/16 77/18 78/5
**time-sensitive [1]** 76/7
**times [1]** 6/22
**timing [5]** 14/11 32/7 41/22 76/3 77/10
**title [1]** 49/5
**today [7]** 35/17 35/21 36/6 36/16 37/13 40/15 63/15
**together [2]** 43/11 71/11
**Tom [1]** 2/10
**too [5]** 12/5 15/19 18/25 57/20 61/1
**took [1]** 47/3
**topic [1]** 74/2
**total [1]** 18/13
**touch [1]** 15/15
**towards [2]** 18/10 20/4
**Towson [1]** 63/11
**track [1]** 6/15
**Trade [2]** 3/12 22/2
**traditionally [2]** 52/10 66/9
**trailing [1]** 16/20
**transaction [5]** 12/20 13/1 53/17 53/25 55/20
**transactions [5]** 22/18 53/16 57/20 57/22 59/2
**transcript [2]** 80/8 80/9
**transcription [1]** 1/22
**transform [1]** 56/10
**transmitted [1]** 28/14
**transparency [4]** 35/21 39/16 39/19 39/25
**traps [1]** 22/5
**trial [1]** 51/3

**tried [2]** 28/11 33/6
**trigger [2]** 15/24 16/11
**TRO [1]** 77/4
**true [3]** 34/6 58/21 80/7
**trusting [1]** 22/4
**truthful [3]** 11/2 21/17 66/23
**truthfully [4]** 3/9 5/2 47/24 72/22
**try [1]** 31/23
**trying [2]** 15/20 29/10
**turn [2]** 18/17 70/6
**turned [1]** 78/17
**turns [2]** 52/21 74/9
**two [14]** 7/2 15/20 15/23 26/3 27/11 29/14 31/3 31/5 31/7 40/11 40/15 47/6 47/11 64/23
**two-tiered [4]** 27/11 31/5 40/11 47/6
**type [2]** 52/3 67/13
**types [6]** 3/6 56/24 60/23 61/22 67/12 73/18
**typically [1]** 52/12

**U**

**U.S [6]** 50/22 50/22 54/22 55/20 59/8 65/23
**U.S.C [1]** 80/7
**ultimate [2]** 6/16 34/6
**ultimately [7]** 3/23 5/6 6/15 16/18 33/14 34/1 38/22
**unabated [1]** 78/3
**unbundled [4]** 14/7 43/18 60/25 73/13
**unclear [2]** 6/22 38/3
**unconstitutional [8]** 26/6 27/3 41/13 41/16 41/17 55/17 78/21 78/25
**uncontroversial [7]** 14/10 24/20 70/20 71/7 72/21 73/24 74/2
**uncontroversial' [1]** 70/25
**under [24]** 3/24 6/6 6/17 10/19 12/4 13/25 22/12 26/6 26/22 26/24 30/9 33/18 34/1 34/1 45/16 46/18 49/3 49/4 51/10 57/11 65/10 67/16 70/24 77/25
**underage [1]** 67/9
**underhanded [1]** 18/25
**underlying [1]** 52/4
**undermines [1]** 76/4
**understand [6]** 15/17 29/19 29/22 35/22 37/1 63/7
**understanding [10]** 10/5 20/3 29/9 29/23 30/21 30/22 30/23 42/24 58/22 67/3
**understood [1]** 41/5
**undertake [1]** 66/17
**underwent [1]** 43/6
**unduly [1]** 71/2
**unequivocally [1]** 55/23
**unfettered [1]** 68/23
**uniform [1]** 64/19
**uniquely [2]** 4/3 9/1
**unit [2]** 37/5 37/6
**UNITED [5]** 1/1 45/24 55/20 80/5 80/11
**unknown [1]** 77/9
**unless [8]** 10/9 10/11 16/2 16/3 27/4 48/10 67/23 71/17
**unlike [3]** 24/15 55/4 63/1
**unlikely [1]** 14/20
**Unquestionably [1]** 56/18
**unquote [1]** 7/16
**unrelated [1]** 19/19
**until [3]** 15/9 19/8 76/23
**unwarranted [1]** 52/18

**U**

**up [18]** 8/8 12/15 13/11 14/12 15/7 15/9 19/7 21/11 27/11 29/6 29/8 31/8 31/9 31/14 37/5 40/11 41/25 46/25
**upheld [2]** 9/25 23/24
**upon [5]** 34/2 50/7 52/1 59/18 64/2
**urgent [1]** 62/13
**urging [1]** 77/6
**us [10]** 9/11 11/1 13/16 13/22 38/8 41/8 41/16 63/2 63/7 64/12
**usage [1]** 62/21
**use [12]** 3/9 8/1 9/19 10/8 10/11 10/21 24/5 25/6 31/19 35/20 57/24 73/8
**used [1]** 24/13
**useful [1]** 11/5
**user [1]** 54/2
**uses [1]** 64/4
**using [6]** 3/8 9/17 10/12 38/9 68/13 69/4
**usual [1]** 51/3
**usually [1]** 52/7
**utilities [2]** 18/22 47/7
**utility [12]** 4/20 12/21 17/23 18/2 31/13 42/3 43/11 44/3 44/8 44/13 45/3 60/7
**utilization [1]** 20/21
**utilized [1]** 69/25
**utter [1]** 72/7

**V**

**valid [1]** 27/5
**validity [1]** 27/4
**valuable [1]** 78/18
**value [2]** 7/13 12/21
**values [1]** 21/5
**variable [5]** 19/2 19/20 26/18 27/8 40/16
**variety [1]** 51/23
**various [4]** 16/12 45/14 52/14 71/13
**vehicle [2]** 18/19 33/9
**vendors [1]** 19/23
**versus [1]** 75/19
**very [7]** 15/18 28/3 32/9 33/2 33/3 42/24 60/25
**view [4]** 58/24 64/22 69/4 75/25
**viewpoint [2]** 3/18 55/2
**viewpoint-based [1]** 3/18
**views [2]** 55/22 56/8
**violates [2]** 3/18 51/9
**violation [1]** 78/18
**Virginia [3]** 23/24 55/4 66/15
**visibility [1]** 60/23
**visualize [1]** 66/19
**void [1]** 27/3
**voluntary [5]** 11/6 11/11 60/20 61/12 61/21
**volunteers [1]** 60/13
**vs [1]** 1/5

**W**

**wait [2]** 15/9 15/13
**waited [1]** 76/23
**waiting [1]** 77/6
**waived [1]** 26/13
**waiver [1]** 36/15
**want [14]** 7/3 7/12 8/24 13/14 13/17 14/11 15/16 30/1 32/3 34/24 37/2 38/23 39/14 42/23
**wanted [6]** 15/15 28/6 36/1 36/2 41/19 42/7
**War [1]** 26/10

**warning [3]** 25/12 42/22 54/5
**warnings [2]** 53/22 54/3
**warranted [2]** 51/7 79/4
**was [56]** 5/20 9/24 10/7 11/3 11/10 11/21 11/22 11/25 15/6 15/16 15/19 16/19 16/20 18/1 18/24 19/14 19/16 21/13 21/15 23/16 24/17 25/10 25/21 25/24 25/25 26/1 26/12 32/10 33/11 33/12 33/15 34/20 35/24 36/1 36/2 36/19 36/25 37/16 39/2 40/24 41/1 42/19 46/22 50/2 55/8 55/14 60/9 62/9 64/11 64/11 73/23 74/6 74/8 76/24 78/19 78/20
**wasn't [3]** 5/20 25/25 36/2
**waste [2]** 8/11 8/11
**way [17]** 3/13 4/18 4/22 8/15 8/23 18/18 31/8 31/22 34/3 34/19 38/8 51/18 56/25 63/20 64/1 73/24 75/18
**ways [5]** 8/24 11/16 26/17 35/9 39/18
**we [80]** 5/22 6/25 10/18 10/24 11/15 13/4 13/5 13/14 13/16 13/17 13/22 14/1 14/2 14/3 14/9 14/12 14/24 14/25 15/10 15/12 15/19 16/5 16/18 18/18 23/4 23/23 28/11 28/20 28/25 29/14 29/14 29/16 30/5 30/10 30/12 30/21 31/10 31/10 32/19 32/21 33/7 34/16 34/19 35/17 35/21 36/5 36/16 36/19 36/20 36/22 37/2 38/21 38/22 39/5 41/3 41/23 42/7 42/7 42/9 42/14 49/11 50/4 53/7 53/8 62/17 62/18 62/23 62/23 63/3 63/14 63/15 63/25 64/1 64/5 64/6 64/8 64/11 64/12 66/23
**we'll [4]** 15/10 42/15 42/22 59/3
**we're [25]** 5/6 10/14 10/24 12/11 14/19 15/13 15/14 29/8 31/6 31/14 31/15 36/21 38/7 38/18 38/19 38/22 39/4 39/14 40/11 40/25 41/20 41/25 41/25 42/3 63/22
**we've [5]** 7/5 7/10 28/11 41/11 62/22
**website [2]** 24/24 63/16
**websites [2]** 5/2 38/16
**weigh [3]** 21/7 22/10 27/15
**weighs [1]** 75/25
**weight [1]** 36/12
**welcome [2]** 27/18 34/22
**well [9]** 9/15 12/3 15/9 16/6 22/4 31/16 33/16 34/5 51/9
**went [3]** 13/11 17/25 76/22
**were [41]** 4/10 5/15 5/15 5/17 5/22 6/10 6/11 6/16 6/25 10/1 10/1 11/7 11/8 11/14 12/2 13/4 18/1 18/25 19/1 19/17 21/11 21/13 21/14 22/8 23/15 23/15 26/4 28/5 28/5 30/18 34/4 35/23 36/19 42/24 43/10 43/11 56/4 62/19 63/15 64/11 65/16
**weren't [2]** 6/10 64/6
**West [3]** 23/24 55/4 66/15
**WGL [3]** 62/17 62/23 63/1
**what [84]**
**what's [4]** 9/11 28/25 33/8 35/14
**whatever [1]** 30/22
**Wheelabrator [3]** 8/13 8/23 9/2
**when [17]** 12/24 18/17 24/7 31/10 36/14 39/2 41/25 49/3 49/21 51/6 52/24 57/15 68/18 71/16 73/17 75/8 75/14
**where [18]** 5/14 6/16 8/3 11/10 13/12 13/16 13/22 14/24 15/7

28/13 28/22 28/25 29/4 29/13 39/1 40/2 66/13 78/12
**whereas [3]** 8/18 9/2 28/23
**wherein [1]** 47/8
**wherever [1]** 8/1
**whether [39]** 3/22 5/18 6/22 6/25 7/17 7/18 8/16 9/7 11/3 13/20 16/18 22/7 23/19 24/11 24/25 25/21 32/9 33/25 34/1 34/8 34/9 38/19 40/13 42/1 51/6 53/7 53/9 53/10 54/10 55/8 56/17 57/13 59/3 60/1 65/19 69/10 71/19 76/15 77/10
**which [56]** 3/1 4/5 4/22 6/24 7/2 7/4 9/5 9/24 11/16 12/22 12/23 13/7 14/19 15/4 18/19 20/12 23/16 23/23 23/25 25/19 26/5 26/12 28/11 28/21 28/23 29/22 30/1 30/24 31/2 31/24 32/15 35/14 35/17 40/21 41/2 41/12 42/24 45/8 45/14 50/2 51/11 51/23 54/25 55/9 58/14 60/14 66/7 69/14 69/18 70/1 71/15 74/1 74/8 76/3 77/10 78/1
**while [7]** 21/7 21/8 53/24 66/10 70/17 75/21 76/10
**who [13]** 10/5 21/10 23/7 31/10 41/14 42/5 43/24 44/10 44/22 47/22 62/5 63/5 65/17
**whole [3]** 15/24 15/24 18/24
**whose [1]** 66/4
**why [16]** 4/1 4/3 5/10 7/25 10/24 28/8 31/7 34/19 35/5 36/16 41/23 42/14 62/14 62/17 65/3 69/6
**wide [1]** 3/2
**wide-open [1]** 3/2
**will [19]** 6/5 14/15 14/21 14/25 32/17 44/2 44/6 49/21 49/24 51/8 56/12 58/13 59/7 59/15 61/24 62/1 63/12 75/1 77/16
**willing [2]** 62/9 62/15
**wind [34]** 4/11 5/20 7/17 7/18 8/19 8/19 9/3 9/18 17/20 18/10 21/12 21/16 24/7 30/19 33/16 33/24 36/25 38/1 46/9 48/8 60/25 61/3 62/17 62/20 62/21 62/23 63/2 63/3 63/10 63/15 64/7 64/7 64/10 68/16
**Winter [3]** 50/20 50/21 79/2
**wipe [2]** 11/25 67/1
**wipes [5]** 11/23 11/24 25/20 25/21 25/23
**wishes [1]** 43/25
**withholding [1]** 75/14
**within [11]** 13/19 28/13 37/6 41/17 43/12 46/14 52/13 53/5 55/3 56/11 69/19
**without [7]** 19/7 39/19 68/10 71/23 75/3 76/16 76/17
**women [1]** 73/21
**wooed [1]** 60/18
**word [5]** 13/2 24/4 41/22 57/24 73/9
**words [13]** 3/8 11/23 24/6 27/24 33/7 38/9 44/11 62/11 67/22 68/1 68/2 68/13 68/24
**wordsmithing [1]** 73/3
**work [1]** 14/21
**worked [1]** 33/8
**working [1]** 32/5
**works [1]** 58/22
**world [2]** 26/10 62/14
**worse [1]** 63/25
**would [49]** 3/15 4/25 6/5 6/7 6/13 7/19 10/7 11/8 11/13 13/5 13/24 16/10 16/19 16/23 25/17 27/24

JA296

**W**

**would... [33]**  29/9 32/9 32/13
 32/14 32/16 35/3 39/6 40/14 41/9
 41/13 43/18 43/19 49/25 55/5 55/9
 55/25 56/3 57/9 61/14 65/15 66/13
 66/20 67/1 69/7 69/22 70/1 71/14
 76/8 76/18 76/19 77/10 77/11 78/2
**wouldn't [1]**  16/23
**write [1]**  33/7
**written [2]**  10/7 72/7

**Y**

**year [8]**  18/13 18/15 48/17 60/5
 62/23 62/24 64/4 64/5
**yearly [1]**  22/25
**years [3]**  17/19 46/21 62/15
**yes [2]**  27/23 28/20
**yesterday [1]**  8/15
**yet [6]**  3/15 25/9 55/2 66/19
 76/22 77/6
**yield [2]**  53/8 77/15
**York [2]**  6/6 6/11
**you [80]**  2/25 3/3 6/3 7/17 7/18
 7/19 8/6 8/10 8/13 8/22 9/2 9/7
 9/16 9/19 9/19 9/23 10/8 10/11
 11/23 11/23 12/3 12/4 12/7 12/8
 12/15 12/15 12/16 12/18 12/18
 13/13 13/14 13/14 13/18 14/13
 14/22 15/3 15/6 15/11 15/25 16/1
 16/2 16/2 16/3 17/10 17/11 18/17
 27/20 27/24 28/3 30/10 30/13
 31/15 31/19 31/20 31/22 32/22
 33/2 33/3 33/5 33/17 33/18 33/21
 33/23 36/7 36/11 36/13 37/3 37/22
 39/8 39/17 39/23 39/23 40/8 40/21
 40/24 41/16 42/15 42/16 42/21
 79/6
**You'll [1]**  63/19
**you're [14]**  10/9 10/11 16/2 17/12
 29/20 31/17 31/20 34/1 34/7 34/7
 34/8 34/9 35/8 35/14
**your [65]**  2/10 2/13 2/17 3/3 4/1
 4/4 4/13 5/5 5/6 5/13 5/23 6/14
 6/22 7/25 8/6 8/21 9/5 9/19 10/14
 11/20 12/18 12/19 13/3 13/13
 13/14 14/2 15/15 16/4 16/18 17/6
 17/11 17/13 17/14 26/3 26/15
 27/11 27/18 27/22 28/2 28/5 31/22
 33/3 33/17 33/21 34/22 35/1 35/13
 35/15 35/19 35/24 36/11 36/15
 37/19 38/11 39/5 39/13 40/7 40/12
 40/18 41/7 41/19 41/22 42/16
 62/20 63/17
**yourself [1]**  2/8

**Z**

**Zauderer [2]**  26/1 70/18

JA297

| From: | MDD_CM-ECF_Filing@mdd.uscourts.gov |
|---|---|
| To: | MDDdb_ECF@mdd.uscourts.gov |
| Subject: | Activity in Case 1:24-cv-02820-JRR Retail Energy Advancement League et al v. Brown et al Order on Motion for Preliminary Injunction |
| Date: | Friday, December 13, 2024 3:18:37 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## District of Maryland

## Notice of Electronic Filing

The following transaction was entered on 12/13/2024 at 3:17 PM EST and filed on 12/13/2024

**Case Name:** Retail Energy Advancement League et al v. Brown et al

**Case Number:** 1:24-cv-02820-JRR

**Filer:**

**Document Number:** 25(No document attached)

**Docket Text:**
**PAPERLESS ORDER: The court held a hearing on the Motion for Preliminary Injunction at ECF No. 2 on November 18, 2024. As set forth on the record, the court ordered that the Motion for Preliminary Injunction at ECF No. 2 was that day DENIED. Signed by Judge Julie Rebecca Rubin on 12/13/2024. (kk5s, Deputy Clerk)**

**1:24-cv-02820-JRR Notice has been electronically mailed to:**

Howard Ross Feldman     hfeldman@oag.state.md.us, hwoods@oag.state.md.us, mscanlan@oag.state.md.us

Miles H Mitchell     miles.mitchell@maryland.gov

Colin Patrick Glynn     colin.glynn@maryland.gov

Jeremy Joseph Broggi     jbroggi@wiley.law

James David Handley     jhandley@oag.state.md.us

Krystal Brunner Swendsboe     kswendsboe@wiley.law, WMolster@wiley.law, sobermeier@wiley.law, wlane@wiley.law

JA298

Joel S. Nolette    jnolette@wiley.law

Thomas M. Johnson, Jr    tmjohnson@wiley.law

**1:24-cv-02820-JRR Notice will not be electronically delivered to:**

JA299

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| RETAIL ENERGY ADVANCEMENT LEAGUE, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>ANTHONY G. BROWN, in his official capacity as Attorney General of Maryland, *et al.*,<br><br>    Defendants. | Civil Action No. 1:24-cv-2820 |

## NOTICE OF APPEAL

Plaintiffs Retail Energy Advancement League and Green Mountain Energy Company hereby appeal the Court's order given at the hearing on November 18, 2024, denying Plaintiffs' Motion for Preliminary Injunction, *see* ECF No. 24 at 79; ECF No. 25, to the United States Court of Appeals for the Fourth Circuit.

Dated: December 13, 2024

Respectfully submitted,

/s/ Joel S. Nolette
Thomas M. Johnson, Jr. (*pro hac vice*)
Stephen J. Obermeier (DMD Bar No. 31382)
Jeremy J. Broggi (DMD Bar No. 14968)
William K. Lane III
    *Application for Admission Pending*
Krystal B. Swendsboe (DMD Bar No. 30839)
Joel S. Nolette (DMD Bar No. 30920)
WILEY REIN LLP
2050 M Street NW
Washington, D.C. 20036
T: (202) 719-7000
F: (202) 719-7049
tmjohnson@wiley.law
sobermeier@wiley.law

1

JA300

jbroggi@wiley.law
wlane@wiley.law
kswendsboe@wiley.law
jnolette@wiley.law

*Attorneys for Plaintiffs*

2

JA301

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 13th day of December, 2024, the foregoing Notice of

Appeal was filed with the Court's CM/ECF system and served on all counsel of record.


Date: December 13, 2024                    */s/ Joel S. Nolette*
                                           Joel S. Nolette